CA NO. 22-50048

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

          Plaintiff-Appellee,

v.

STEVEN DUARTE,

          Defendant-Appellant.

DC NO. 2:20-cr-00387-AB-1

---

**APPELLANT'S OPENING BRIEF**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE ANDRE BIROTTE, JR.
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
SONAM HENDERSON
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081
Email: Sonam_Henderson@fd.org

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND QUESTIONS PRESENTED ...................................1

II.    STATEMENT OF ADDENDUM ...................................................................2

III.    STATEMENT OF THE CASE ........................................................................2

    A.    Jurisdiction ............................................................................................2

    B.    Custody Status .......................................................................................2

    C.    Background ..............................................................................................2

IV.    SUMMARY OF ARGUMENT ......................................................................3

V.    STANDARDS OF REVIEW .........................................................................5

VI.    ARGUMENT ..................................................................................................6

    A.    18 U.S.C. § 922(g) is unconstitutional as applied to Duarte, who has never been convicted of a violent crime. .........................................6

        1.    Under *Bruen*, in order for a regulation on guns to be constitutional it must either address conduct not covered by the plain text of the Second Amendment or be consistent with this Nation's historical tradition of gun regulation.............6

        2.    Barring nonviolent felons like Duarte from possessing firearms violates the Second Amendment. ................................9

            a.    The plain text of the Second Amendment covers Duarte and his conduct in possessing a firearm for self-defense. .....................................................................9

            b.    Permanently barring nonviolent felons from possessing firearms is not consistent with the Nation's historical tradition of firearm regulation. ........13

                (1)    There is no historical evidence of Founding-era laws dispossessing non-violent felons of the right to bear arms.................................................13

# TABLE OF CONTENTS

**Page**

(2) Failed proposals made at Founding-era ratifying conventions do not support general felon dispossession, but at most dispossession of violent felons....................................................15

(3) The claim that Founding-era felons were routinely put to death and so the loss of other rights can be assumed is historically inaccurate...............................................................19

(4) The argument that individual gun rights are limited to virtuous citizens relies on a misplaced analogy to civic rights like voting and sitting on juries. .............................................21

c. All of Duarte's previous felony convictions were nonviolent. .......................................................23

d. This Court's pre-*Bruen* precedent upholding felon in possession laws as applied to nonviolent felons is clearly irreconcilable with *Bruen*. ..................................25

(1) *Bruen* is clearly irreconcilable with holdings premised on there being no individual right to bear arms or that the right is subject to means-ends scrutiny.......................................................26

(2) *Bruen* is clearly irreconcilable with the theory that the regulations on *Heller*'s list of "presumptively lawful regulatory measures" are beyond constitutional challenge. ....................27

B. Duarte has good cause for not having moved for dismissal below.....31

VII. CONCLUSION................................................................33

CERTIFICATE OF RELATED CASES ...............................................34

CERTIFICATE OF COMPLIANCE...................................................35

## TABLE OF CONTENTS

**Page**

ADDENDUM .......................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Davis v. United States*,
   411 U.S. 233 (1973)...........................................................................33

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)....................................................................*passim*

*Folajtar v. Att'y Gen. of the United States*,
   980 F.3d 897 (3d Cir. 2020) ..............................................................11

*Hamilton v. Pallozzi*,
   848 F.3d 614 (4th Cir. 2017) .............................................................11

*In re Skywalkers, Inc.*,
   49 F.3d 546 (9th Cir.1995) ................................................................32

*Kanter v. Barr*,
   919 F.3d 437 (7th Cir. 2019) .......................................................*passim*

*McDonald v. City of Chicago, Ill.*,
   561 U.S. 742 (2010)....................................................................6, 22

*Medina v. Whitaker*,
   913 F.3d 152 (D.C. Cir. 2019)......................................................11, 21

*Miller v. Gammie*,
   335 F.3d 889 (9th Cir. 2003) (en banc) .......................................25, 27

*Moncrieffe v. Holder*,
   569 U.S. 1678 (2013)........................................................................32

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022)................................................................*passim*

*Pena v. Lindley*,
   898 F.3d 969 (9th Cir. 2018) .............................................................29

*Range v. Attorney General*,
   53 F.4th 462 (3d Cir. 2022) ...............................................................10

*Silveira v. Lockyer*,
   312 F.3d 1052 (9th Cir. 2002) ...........................................................26

iv

# TABLE OF AUTHORITIES

**Page(s)**

*Stinson v. United States*,
    508 U.S. 36 (1993) .............................................................................24

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) (en banc) ...........................................29

*United States v. Aguilera-Rios*,
    769 F.3d 626 (9th Cir. 2014) .....................................5, 31, 32, 33

*United States v. Anderson*,
    472 F.3d 662 (9th Cir. 2006) .................................................................5

*United States v. Boren*,
    278 F.3d 911 (9th Cir. 2002) .................................................................5

*United States v. Canon*,
    993 F.2d 1439 (9th Cir. 1993) ............................................................24

*United States v. Chovan*,
    735 F.3d 1127 (9th Cir. 2013) ...................................................14, 29

*United States v. Everist*,
    368 F.3d 517 (5th Cir. 2004) ...............................................................26

*United States v. Guerrero*,
    921 F.3d 895 (9th Cir. 2019) .......................................................5, 31

*United States v. Jimenez-Shilon*,
    34 F.4th 1042 (11th Cir. 2022) ..........................................................12

*United States v. Meza-Rodriguez*,
    798 F.3d 664 (7th Cir. 2015) ...............................................................12

*United States v. Nature*,
    898 F.3d 1022 (9th Cir. 2018) .............................................................5

*United States v. Torres*,
    789 F. App'x 655 (9th Cir. 2020) .....................................................29

*United States v. Twine*,
    344 F.3d 987 (9th Cir. 2003) ...............................................................24

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Vongxay*,
   594 F.3d 1111 (9th Cir. 2010) ...............................................*passim*

*United States v. Younger*,
   398 F.3d 1179 (9th Cir. 2005) ...............................................26

*Young v. Hawaii*,
   992 F.3d 765 (9th Cir. 2021) (en banc) ..................................7, 8, 28

**Federal Constitution**

U.S. Const. amend. I ..............................................................10

U.S. Const. amend. II ............................................................*passim*

U.S. Const. amend. IV ...........................................................10, 11

**Federal Statutes**

8 U.S.C. § 1326......................................................................31

18 U.S.C. § 922......................................................................*passim*

18 U.S.C. §3231......................................................................2

28 U.S.C. §1291......................................................................2

**Federal Rules**

Fed. R. Crim. P. 12 ...............................................................5, 31

**State Cases**

*People v. Howard*,
   34 Cal. 4th 1129 (Cal. 2005)................................................24

*People v. Pinkston*,
   5 Cal. Rptr. 3d 274 (Cal. App. 2003)....................................24

**State Statutes**

Cal. Health & Safety Code § 11351.5 ........................................3, 24, 25

Cal. Penal Code § 594.............................................................2, 23

# TABLE OF AUTHORITIES

**Page(s)**

Cal. Penal Code § 29800 ................................................................3, 24

Cal. Penal Code § 29900 ..............................................................24

Cal. Veh. Code § 2800.2 ............................................................3, 24

**Other Authorities**

Gabriel J. Chin, *The New Civil Death: Rethinking Punishment in the Era of Mass Incarceration*, 160 U. Pa. L. Rev. 1789 (2012) .............................20

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007) ....................................18

Saul Cornell, *A New Paradigm for the Second Amendment*, 22 Law & Hist. Rev. 161 (2004) ....................................................................21

Saul Cornell, *"Don't Know Much About History"*: *The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002) .................21

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004).................19

Nathan Dane*, Digest of American Law* (1823) ........................................20

Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d ed. 1891)...........................................15

Lawrence M. Friedman, *Crime and Punishment in American History* (1993) ..................................................................................20

Samuel Johnson, *Dictionary of The English Language* (5th ed. 1773)...................18

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983) ......................................16

Alexander Keyssar, *The Right to Vote* (2009) ........................................22

Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009) .............................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

Joyce Lee Malcolm, *To Keep and Bear Arms* (1994) ...............................18

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32
    Harv. J.L. & Pub. Pol'y 695 (2009)..............................................14, 18

Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662) ...........................17

*New Universal Etymological English Dictionary* (4th ed. 1756)...........17

Antonin Scalia, *The Rule of Law as a Law of Rules,* 56 U. Chi. L.
    Rev. 1175 (1989) ...............................................................................25

*Sir John Knight's Case*,
    87 Eng. Rep. 75, 76 (K.B. 1686) .......................................................18

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*,
    11 Tex. Rev. L. & Pol. 191 (2006) .........................................17, 19, 23

Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551 (2009).................14, 18

## I.  INTRODUCTION AND QUESTIONS PRESENTED

Appellant Steven Duarte has prior felony convictions, but no convictions for anything violent.  After his conviction in this case for possessing a firearm in violation of 18 U.S.C. § 922(g), the Supreme Court held in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), that a firearms regulation is permissible under the Second Amendment only if it is consistent with this Nation's historical tradition of firearms regulation at the time of the Founding.  Although this Court has previously held that 18 U.S.C. § 922(g) is constitutional as applied to nonviolent offenders like Duarte, it has never concluded that there is a Founding-era historical tradition of dispossessing nonviolent felons of firearms.  Nor could it—no such tradition exists.  In light of *Bruen*, Duarte's conviction cannot stand.

Duarte accordingly presents the following two questions for review:

**A.** Whether 18 U.S.C. § 922(g) is unconstitutional as applied to nonviolent offenders like Duarte, where this Nation has no historical tradition of barring such nonviolent offenders from possessing firearms, and instead such regulations are relatively recent 20th century inventions.

**B.** Whether this Court's prior precedent upholding 18 U.S.C. § 922(g) as constitutional even as applied to nonviolent offenders like Duarte, which was still good law at the time of Duarte's trial court proceedings, constitutes good cause for Duarte not having raised the issue in a pretrial motion.

## II.  STATEMENT OF ADDENDUM

Pertinent authority is set forth in the addendum to this brief.

## III.  STATEMENT OF THE CASE

### A.    Jurisdiction

This appeal is from a judgment rendered on February 28, 2022, by the Honorable Andre Birotte, United States District Judge, sentencing Duarte to a 51-month term of imprisonment.  (1-ER-3-4.)  The district court entered judgment after a jury found Duarte guilty of one count of possessing a gun as a prohibited person in violation of 18 U.S.C. § 922(g).  (1-ER-3.)  Duarte filed a timely notice of appeal on March 9, 2022.  (1-ER-23.)  The district court had jurisdiction under 18 U.S.C. §3231; this Court has jurisdiction under 28 U.S.C. §1291.

### B.    Custody Status

Duarte is in federal custody serving the sentence imposed in this case. According to the Bureau of Prisons, his expected release date is July 4, 2024.

### C.    Background

In September 2020, a grand jury returned an indictment against Duarte for one count of violating 18 U.S.C. § 922(g)(1) by possessing a .380 pistol and six rounds of ammunition on March 20, 2020, while knowing he had previously been convicted of at least one felony offense.  (1-ER-19.)  The government alleged five prior felonies, all non-violent:  from 2013, vandalism, in violation of California Penal Code § 594(a); from 2016, felon in possession of a firearm, in violation of

2

California Penal Code § 29800(a)(1), felony evading a police officer in violation of California Vehicle Code § 2800.2, and possession of a controlled substance for sale, in violation of California Health & Safety Code § 11351.5; and from 2019, a second violation of California Vehicle Code § 2800.2. (1-ER-20; *see also* 1-ER-15 (government conceding that "none of defendant's prior convictions are violent or involve fraud").)

Prior to trial, Duarte's defense counsel moved for suppression of evidence on various grounds. (*See* 1-ER-34.) Counsel, however, did not move to dismiss for failure to state a cognizable offense.

Duarte proceeded to trial and was convicted. At sentencing, he received a sentence of 51 months imprisonment. (1-ER-3.)

## IV. SUMMARY OF ARGUMENT

Duarte has only nonviolent prior convictions. Under the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the blanket federal felon dispossession law at 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him.

First, the plain text of the Second Amendment covers Duarte and his conduct. *Bruen* explained that the Second Amendment protects his conduct of possessing a firearm for self-defense outside the home. And as an American, he is part of "the people" whom the Amendment protects.

3

Second, permanently barring nonviolent felons from possessing firearms is not consistent with the Nation's historical tradition of firearm regulation. There is no historical evidence of Founding-era laws dispossessing non-violent felons of the right to bear arms, as this Court has previously observed and as now-Justice Barrett explained in detail in a pre-*Bruen* dissent while she was still a judge on the Seventh Circuit. Instead, blanket felon dispossession statutes are a 20th-century invention. Because such statutes are not consistent with this Nation's historical tradition of gun regulation, they run afoul of the Second Amendment.

Moreover, this Court's pre-*Bruen* precedent upholding felon in possession laws as applied to nonviolent felons is clearly irreconcilable with *Bruen*, and so no longer good law. That precedent is premised on there being no individual right to bear arms and on the right being subject to means-ends scrutiny, notions that the Supreme Court emphatically dismissed in *Bruen*. That precedent also mistakenly treated as beyond constitutional challenge a list of regulations that dicta in *District of Columbia v. Heller*, 554 U.S. 570 (2008), described as "presumptively lawful regulatory measures." But that reasoning is wholly inconsistent with *Bruen*, in which the Supreme Court held the government to its burden of showing consistency with this Nation's historical tradition and then struck down a concealed-carry licensing scheme, despite concealed-carry laws being included on the *Heller* list.

Finally, Duarte has good cause satisfying Federal Rule of Criminal Procedure 12(c)(3) for not having moved for dismissal on these grounds below. At the time of his trial proceedings, precedent foreclosed the argument that he makes here. That argument opened up during the course of his appeal proceedings with the issuance of *Bruen*. A previously foreclosed argument becoming available during the pendency of appeal constitutes good cause under this Court's precedent.

## V. STANDARDS OF REVIEW

This Court reviews de novo a motion to dismiss an indictment under Rule 12(b)(3)(B)(v), failure to state an offense. *United States v. Nature*, 898 F.3d 1022, 1023 (9th Cir. 2018). In ruling on such a motion, a court is bound by the four corners of the indictment: it analyzes whether a cognizable offense has been charged, accepting as true the allegations in the indictment. *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).

Where, as here, a defendant does not timely move to dismiss prior to trial, this Court may address the issue and grant relief upon a showing of good cause for failure to raise the issue earlier. *See* Fed. R. Crim. P. 12(c)(3); *United States v. Guerrero*, 921 F.3d 895, 897 (9th Cir. 2019); *United States v. Aguilera-Rios*, 769 F.3d 626, 630 (9th Cir. 2014); *United States v. Anderson*, 472 F.3d 662, 669 (9th Cir. 2006)

# VI.  ARGUMENT

**A.**     **18 U.S.C. § 922(g) is unconstitutional as applied to Duarte, who has never been convicted of a violent crime.**

**1.**     **Under *Bruen*, in order for a regulation on guns to be constitutional it must either address conduct not covered by the plain text of the Second Amendment or be consistent with this Nation's historical tradition of gun regulation.**

The Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), clarified not just the substance of the Second Amendment, but also rejected an improperly rights-limiting mode of analyzing the Second Amendment that had been embraced by the Courts of Appeals, including this one.

**a.** *Bruen* built upon the holding in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which held that there is an individual, constitutional right to keep and bear arms, including to possess a handgun in the home, *id.* at 595, 628-630.  *See also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010) ("individual self-defense is 'the central component' of the Second Amendment right" (quoting *Heller*, 554 U.S. at 599)).  *Bruen* took up the question whether that right to possess a handgun for protection *inside* the home also extends *outside* the home.  *Bruen*, 142 S. Ct. at 2116.  To carry a gun outside the home for self-defense, New York required a person to prove that "proper cause"—consisting of a "special need for self-protection distinguishable from that of the general community"—existed to issue that person an unrestricted license to carry a concealed firearm.  *Id.* at 2122-

6

23 (citation and internal quotation marks omitted). The Supreme Court held that New York's "special need" concealed carry regime violated the Constitution. *Id.* at 2122. The "plain text" of the Second Amendment protects the right to carry a handgun in public for self-defense. *Id.* at 2134-35. The petitioners were part of "the people" whose rights to bear arms are described in the Second Amendment. *Id.* at 2134; *see also Heller*, 554 U.S. at 580 ("the people" is a term of art describing "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community" (citation omitted)). And to "bear arms" mean wearing and carrying weapons "for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person," a definition that "naturally encompasses" carrying arms in public. *Bruen*, 142 S. Ct. at 2134 (cleaned up).

**b.** Separate from its substantive holding, the Supreme Court also held that the Second Amendment analytical framework around which the Courts of Appeals had coalesced since *Heller* was incorrect. *Id.* at 2125. That framework was a two-step process combining history with means-ends scrutiny. *Id.* at 2125. This Court's version of that two-step inquiry involved, at the first step, determining "whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood." *See id.* at 2124; *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (en banc),

*cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *abrogated by Bruen*. This Court also included at that first step looking at whether the regulation was one of the "presumptively lawful regulatory measures" noted in *Heller*; if it did, then, according to this Court, the law could be upheld as not impinging on the Second Amendment without engaging in any historical analysis. *See Young*, 992 F.3d at 784; *see also Heller*, 554 U.S. at 626-27 & n.26. If there was an impingement, at the second step, this Court would "determine the appropriate level of scrutiny" for analyzing whether the regulation could stand despite that impingement. *Young*, 992 F.3d at 784; *see also Bruen*, 142 S. Ct. at 2126-27 (describing the second step as used by Courts of Appeals generally).

The Supreme Court emphatically rejected that two-step framework. *Bruen*, 142 S. Ct. at 2129-30. Instead, it set out a streamlined inquiry that centers the right as written into the Constitution as opposed to policy questions about whether a regulation serves important interests. First, a court must consider whether "the Second Amendment's plain text covers an individual's conduct"; if so "the Constitution presumptively protects that conduct." *Id.* To justify a regulation despite that presumptive protection, the government "may not simply posit that the regulation promotes an important interest." *Id.* at 2130. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* "*Only* if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct

falls outside the Second Amendment's unqualified command." *Id.* (citation and internal quotation marks omitted) (emphasis added).

Importantly, the "historical tradition" in question is that with sufficient proximity to the Founding-era to reveal the understanding of the Second Amendment held by its ratifiers. That is because the Amendment's "meaning is fixed according to the understandings of those who ratified it." *Id.* at 2132. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131; *see also id* at 2154 & n.28 (declining to rely on evidence of late-19th century and 20th century practice unless it is consistent with regulations closer to the Founding).

**2. Barring nonviolent felons like Duarte from possessing firearms violates the Second Amendment. [1]**

**a. The plain text of the Second Amendment covers Duarte and his conduct in possessing a firearm for self-defense.**

The first part of the analysis required by *Bruen* is whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. The plain text of the Amendment covers both Duarte and his conduct.

---

[1] The constitutionality of the federal blanket felon dispossession law post-*Bruen* appears to be an issue of first impression across the circuits. As far as Appellant is aware, the circuit that has come closest to deciding the issue is the Third Circuit. A panel of that court initially upheld the ban, but the full court then

**i.** In terms of conduct, Duarte was accused of carrying a handgun. The Supreme Court has already determined that carrying a handgun, whether inside or outside the home, is protected by the Second Amendment. "As [the Supreme Court] explained in *Heller*, the 'textual elements' of the Second Amendment's operative clause— 'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Id.* at 2134 (quoting *Heller*, 554 U.S. at 592). That "plain text" encompasses protection in the home but also public carry, since "[m]any Americans hazard greater danger outside the home than in it." *Id.* at 2135.

**ii.** Duarte himself is also covered by the amendment, notwithstanding his prior convictions. The text of the Second Amendment "codifies a 'right of the people.'" *Heller*, 554 U.S. at 579 (quoting U.S. Const., am II). In *Heller*, the Supreme Court explained that the Bill of Rights uses the phrase "right of the people" three times—in the First, Second, and Fourth Amendments. *Id.* The Court concluded that in all three instances, the term "the people" "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. Thus, *Heller* concluded, "the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

---

vacated that panel opinion and set the case for en banc argument on February 15, 2023. *See Range v. Attorney General*, 53 F.4th 462 (3d Cir. 2022), *rehearing en banc granted*, *opinion vacated by* 56 F.4th 992 (3d Cir. 2023).

Thus, the plain text of the Second Amendment applies to Duarte, just as it applies to "all Americans." *Id.* Just as there is no serious argument that a prior felony conviction renders a person outside of the community possessing First and Fourth Amendment rights, a person with prior felony convictions is also among "the people" covered by the text of the Second Amendment.

After *Heller*, but before the Supreme Court decided *Bruen*, some courts grappled with challenges to felon dispossession laws by asserting that individuals with prior felonies "fall entirely outside the Second Amendment's scope." *See Kanter v. Barr*, 919 F.3d 437, 451-52 (7th Cir. 2019) (Barrett, J., dissenting), *maj. op. abrogated by Bruen*; *see also Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017); *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 905 (3d Cir. 2020); *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).[2] This is in contrast to an understanding "that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting).

---

[2] Other courts, like the Seventh Circuit, recognized that the historical case for felons being excluded from the right was "'inconclusive at best." *Kanter*, 919 F.3d at 445 (maj. op.). This Court's approach was somewhat contradictory: it wrote that "felons are categorically different from the individuals who have a fundamental right to bear arms," but in the same opinion, went on to say that "the historical question has not been definitively resolved." *United States v. Vongxay*, 594 F.3d 1111, 1115, 1118 (9th Cir. 2010).

As then-Judge, now-Justice Barrett wrote in her Seventh Circuit dissent in *Kanter*, the notion that felons as a class fall outside of "the people" is both "analytically awkward" and at odds with *Heller*. *Id.* at 453. She recalled that *Heller* "interpreted the word 'people' as referring to 'all Americans,'" and concluded that "[n]either felons nor the mentally ill are categorically excluded from our national community." *Id.* (quoting *Heller*, 554 U.S. at 580-81). Other circuit courts reached the same view as Justice Barrett. *See, e.g.*, *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044-45 (11th Cir. 2022) (discussing "*Heller*'s 'national community'-focused definition of 'the people'" and remarking that it "finds support in Founding-era dictionaries"); *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015) ("the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and therefore extends to all "persons who are part of a national community").

In *Bruen*, the Supreme Court vindicated Justice Barrett's view. *Bruen* explicitly abrogated the majority opinion from which then-Judge Barrett had dissented in *Kanter*. *Bruen*, 142 S. Ct. at 2126-27. The Court cited the same discussion from *Heller* about "the people" being all members of the national community, and then held: "The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at 2134, 2156. As an American, Duarte is one of "the people," protected by the Second Amendment.

12

### b. Permanently barring nonviolent felons from possessing firearms is not consistent with the Nation's historical tradition of firearm regulation.

That Duarte is one of "the people" and his conduct in carrying a firearm is protected by the Second Amendment does not, of course, mean that § 922(g) is automatically unconstitutional as applied to him. Rather, it means that for § 922(g) to be constitutional as applied to a nonviolent offender like Duarte, it must be "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. In conducting this historical analysis, the government bears the burden to show that, in the Founding era, there was a "distinctly similar historical regulation" to § 922(g). *Id.* at 2131.[3] If the government fails to produce such evidence, then "the challenged regulation is inconsistent with the Second Amendment." *Id.* As then-Judge Barrett demonstrated in her *Kanter* dissent, no such historical analogue exists. Section 922(g) is therefore unconstitutional as applied to people, like Duarte, who have previously been convicted of non-violent felonies.

### (1) There is no historical evidence of Founding-era laws dispossessing non-violent felons of the right to bear arms.

There is no evidence of Founding-era laws dispossessing non-violent felons of the right to bear arms. "[A]t least thus far, scholars have not been able to

---

[3] Firearm violence is a general societal problem that has persisted since the time of the Founding. *See Bruen*, 142 S. Ct. at 2131.

identify any such laws." *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting).  Indeed, this Court has previously observed, relying on a comprehensive historical review, that "'one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I.'" *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013) (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009)).  Rather, the blanket prohibition on those with convictions punishable by a year or more possessing firearms in 18 U.S.C. § 922(g)(1) dates to the 1960s.  *See* Marshall, *Why Can't Martha Stewart*, *supra*, at 698.  A prior law—dating to 1938 but with state antecedents dating into the 1920s—dispossessed those convicted of "crimes of violence," including murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking, and some aggravated assaults.  *Id.* at 699-700, 702-705.

Other relatively recent studies concur about felon dispossession being a late invention.  *See* Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374 (2009) ("so far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms"); Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("[t]he Founding generation had no . . . laws denying the right to people convicted of crimes").

With no actual felon dispossession laws from anytime close to the Founding to point to, those arguing that there is a historical tradition for dispossessing all

14

felons focus on three other arguments. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting). First, proponents point to proposals raised (but not adopted) by three state ratifying conventions. Second, they argue that felonies in the colonial era were punished by death, and that accordingly a penalty short of death, like dispossession, would naturally have been encompassed. Third, they argue that gun rights would have been understood at the Founding to be civic rights, like voting and jury service, limited to virtuous members of the citizenry. As now-Justice Barrett showed, however, none of those arguments withstands scrutiny.

> **(2)** **Failed proposals made at Founding-era ratifying conventions do not support general felon dispossession, but at most dispossession of violent felons.**

In terms of evidence of the state ratifying convention proposals, those proposals are of limited use, reflecting language and ideas that did not make it into the Second Amendment. One proposal was from the majority of the New Hampshire convention stating, "'Congress shall never disarm any citizen, *unless such as are or have been in actual rebellion*.'" *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (quoting 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891)) (emphasis added in *Kanter*). One proposal made by Samuel Adams at the Massachusetts convention, but not adopted by the majority, stated: "And that the said Constitution be never construed to authorize Congress to . . . prevent the

15

people of the United States, *who are peaceable citizens*, from keeping their own arms." *See id.* at 454-55 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971)) (emphasis added in *Kanter*). And the final proposal, from the Pennsylvania minority, stated: "'That the people have a right to bear arms for the defense of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals* . . . .'" *Id.* at 455 (quoting 2 Schwartz, *The Bill of Rights*, *supra*, at 662, 665) (emphasis added in *Kanter*).

As now-Justice Barrett pointed out, "none of the relevant limiting language made its way into the Second Amendment." *Id.* Moreover, "only New Hampshire's proposal—the least restrictive of the three—even carried a majority of its convention." *Id.* Proposals from other states advocating a constitutional right to arms did not carry such limiting language, and none of the four parallel state constitutional provisions enacted before the ratification of the Second Amendment (including Pennsylvania and Massachusetts, as well as North Carolina and Vermont) had such language. *Id.* (citing Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev.

204, 222 (1983); and Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006)).[4]

Even on their own terms, the common concern of these never-adopted proposals was not about felons or criminals, but about "threatened violence and the risk of public injury." *Id.* at 456. The New Hampshire proposal would have restricted only the gun rights of those who had been in "rebellion," meaning the "'traiterous taking up arms, or a tumultuous opposing the authority of the king, etc. or supreme power in a nation.'" *Id.* at 455 (quoting "Rebellion," 2 *New Universal Etymological English Dictionary* (4th ed. 1756)). Samuel Adams's Massachusetts

---

[4] The 1790 Pennsylvania constitution stated without qualification that, "The right of the citizens to bear arms in defence of themselves and the State shall not be questioned." Volokh, *State Constitutional Rights*, *supra*, at 208. The 1780 Massachusetts constitution focused on the collective right, stating, "The people have a right to keep and to bear arms for the common defence." *Id.* The 1776 North Carolina constitution similarly stated, "That the people have a right to bear arms, for the defence of the State. . ." *Id.* And the 1777 Vermont constitution stated, "That the people have a right to bear arms for the defence of themselves and the State . . ." *Id.* Additionally, the 1792 Kentucky constitution from just after the Second Amendment's ratification echoed Pennsylvania, stating "The right of the citizens to bear arms in defence of themselves and the State shall not be questioned." *Id.* Similarly unqualified language about the right of "every citizen" (or "person," in the case of Michigan) to bear arms in self -defense appears in early 19th century constitutions for Mississippi, Connecticut, Alabama, Maine, and Michigan, while other constitutions affirmed that right for "the people" or "the free white men" of a state. *Id.* at 208-09. It appears that the first state constitution to mention a limitation on the right in order "to prevent crime" was Tennessee in 1870, followed by Texas in 1876. *Id.* at 208-214. Idaho's 1978 constitution appears to be the only state constitution to make specific allowance for limiting possession of firearms by a convicted felon. *Id.* at 215.

proposal would have limited the right to "peaceable citizens," with "peaceable" meaning "'[f]ree from war; free from tumult'"; "'[q]uiet; undisturbed'"; "'[n]ot violent; not bloody'"; "'[n]ot quarrelsome; not turbulent.'" *Id.* at 455 (quoting 1 Samuel Johnson, *A Dictionary of The English Language* (5th ed. 1773)). And while the Pennsylvania minority proposal mentions "crimes committed," that phrasing is most consistently and coherently read as referring to a subset of crimes that pose a "real danger of public injury." *Id.* at 456.

A concern with threatened violence also animated the restrictions on arms possession that were imposed in England and in pre-revolution America. English law punished those who went "'armed to terrify the King's subjects,'" and allowed for the disarmament of those "'dangerous to the Peace of the Kingdom,'" including Catholics, who were, because of the politics of the day, considered to be a danger to revolt and commit massacres. *Id.* at 456-57 (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686); and Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662); additionally citing, *inter alia*, Joyce Lee Malcolm, *To Keep and Bear Arms* 18-19, 122 (1994); Adam Winkler, *Gunfight* 115 (2011); and Marshall, *Why Can't Martha Stewart*, *supra*, at 723). The American colonies similarly restricted access to arms for groups suspected of possible rebellion, such as slaves, Native Americans, Catholics, and those who refused to swear allegiance to the United States as a whole or to particular states. *Id.* at 457-58 (citing, *inter alia*, Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early*

18

*America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004); Volokh, *State Constitutional Rights*, *supra*, at 208-09; Winkler, *Gunfight*, *supra*, at 115-16).

Thus, while Founding-era legislatures may have disarmed groups whom they judged to be violent threats to public order, "neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons." *Id.* at 458.

> **(3)** **The claim that Founding-era felons were routinely put to death and so the loss of other rights can be assumed is historically inaccurate.**

The claim that Founding-era felons were routinely executed or stripped of all rights, such that no one would have thought them within the scope of those entitled to possess arms, rests on "shaky" ground. *Kanter*, 919 F.3d at 458 (Barrett, J. dissenting). Instead, the historical evidence is that the consequences of a felony conviction at the time of the Founding were not as categorically severe as the argument assumes. *Id.* at 461.

At English common law, felonies were intertwined with punishments of actual death and civil death, which was a stripping of property and civil rights for the period between the imposition of a capital sentence and its execution. *Id.* at 458-59. But in the colonies during the period leading up to the Founding, "the connection between felonies and capital punishment started to fray." *Id.* at 459. In

19

the seventeenth- and eighteenth-century colonies, capital punishment was used

sparingly, and property crimes "'were, on the whole, not capital.'" *Id.* (quoting

Lawrence M. Friedman, *Crime and Punishment in American History* 42

(1993)). By the period of and just after the Constitution's ratification, prominent

legal authorities Nathan Dane and James Wilson observed that the term "felony"

was no longer associated with capital punishment or civil death: as Dane put it,

"'[W]e have many felonies, not one punished with forfeiture of estate, and but a

very few with death.'" *Id.* at 459-60 (quoting 6 Nathan Dane, *Digest of American

Law* 715 (1823)). "'In England, civil death was a common law punishment, but in

the United States, it existed only if authorized by statute. It was far from universal

. . .'" *Id.* at 460 (quoting Gabriel J. Chin, *The New Civil Death: Rethinking

Punishment in the Era of Mass Incarceration*, 160 U. Pa. L. Rev. 1789, 1796

(2012)). And for felonies with term of year—as opposed to life—sentences, there

is no indication that the concept of civil death ever applied, beyond a suspension of

rights while incarcerated. *Id.* at 461.

As then-Judge Barrett summed up, "a felony conviction and the loss of all

rights did not necessarily go hand-in-hand," in the Founding-era, and thus, "the

argument that the severity of punishment at the Founding implicitly sanctions the

blanket stripping of rights from all felons, including those serving a term of years,

is misguided." *Id.* Moreover, even if the historical record was supportive of a

notion that felons faced death, courts do not otherwise interpret rights in this way:

"for example, we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding." *Id.* at 461-62. "The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society." *Id.*

> **(4) The argument that individual gun rights are limited to virtuous citizens relies on a misplaced analogy to civic rights like voting and sitting on juries.**

Some also contend that gun rights are limited to "virtuous citizens." *See Medina*, 913 F.3d at 159 (collecting cases and references). This Court has previously noted such arguments, while recognizing that the historical case for them is contested. *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010).

As then-Judge Barrett explained, because there are no Founding-era laws depriving those with felony convictions of their gun rights, these virtue arguments rely on an analogy to the right to vote and the right to serve on juries. *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). But the analogy fails, because the right to vote and the right to sit on juries are civic rights—rights held by individuals for collective purposes. *See id.* (citing, *inter alia*, Saul Cornell, *A New Paradigm for the Second Amendment*, 22 Law & Hist. Rev. 161, 165 (2004); Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002)).

In contrast, *Heller* expressly rejected the argument that the right to bear arms is such a purely civic right, holding that "the Second Amendment confer[s] *an individual right* to keep and bear arms," and emphasizing that the Second Amendment is rooted in the individual's right to defend him- or herself, rather than the right to serve in a well-regulated militia. *See id.* (quoting *Heller*, 554 U.S. at 595 (emphasis in *Kanter*)). The Supreme Court further emphasized the individual nature of the right to bear arms in *Bruen*, stating: "'individual self-defense is "the *central component*" of the Second Amendment right.'" *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767, emphasis in *Bruen*); *see also id.* at 2127 (right as written in Second Amendment "does not depend on service in the militia").

The virtuous citizen argument thus rests on a rejected notion of gun ownership as a civic right serving the greater good. There appears, moreover, to be no historical case for virtue exclusions to individual rights, like gun possession, rather than civic rights, like voting and jury service. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting). Virtue exclusions from the exercise of civic rights were explicit, with numerous state constitutions expressly excluding or authorizing the exclusion of those who had committed certain crimes from voting and serving on juries. *Id.* (citing*, inter alia*, Alexander Keyssar, *The Right to Vote* 62–63 & tbl. A.7 (2009)). By contrast, state constitutions protecting the right to bear arms made no exclusion for certain criminals, even as many of those same constitutions

22

provided for the exclusion of criminals from the right to vote. *Id.* (citing Volokh, Volokh, *State Constitutional Rights*, *supra*, at 208-10 & Keyssar, *Right to Vote*, *supra* tbl. A.7).

\* \* \*

In sum, "this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, does not include blanket and permanent dispossession of all those with felony convictions. Such prohibitions are modern inventions without "distinctly similar" historical antecedents. *See id.* at 2131. Rather, the historical evidence at most suggests support for dispossessing those who "threatened violence" and posed "a risk of public injury" through rebellion. *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting).

### c. All of Duarte's previous felony convictions were nonviolent.

None of Duarte's prior convictions was a crime of violence nor involved rebellion against the rule of the sovereign. Indeed, the government conceded as much below. (1-ER-15 ("none of defendant's prior convictions are violent or involve fraud").)

Duarte's first felony conviction was for vandalism in violation of California Penal Code § 594(a), which criminalizes defacing property with graffiti or otherwise damaging or destroying the property of others. Cal. Penal Code § 594(a). (1-ER-20.) His second offense, for felon in possession of a firearm, in

violation of California Penal Code § 29800(a)(1), (1-ER-20), required only that he possessed a firearm after the first, nonviolent conviction, and again has no element of violent harm to others or the polity.[5]  *Cf. United States v. Canon*, 993 F.2d 1439, 1441 (9th Cir. 1993) ("possession of a firearm by a felon is not a 'crime of violence' under § 924(c)"); *United States v. Twine*, 344 F.3d 987, 988 (9th Cir. 2003) (18 U.S.C. § 922(g) not a "crime of violence" under Bail Reform Act); *Stinson v. United States*, 508 U.S. 36, 47 (1993) (felon in possession offenses not crimes of violence for purposes of USSG § 4B1.1-1.2).  His two offenses of evading a police officer in violation of California Vehicle Code § 2800.2, (1-ER-20-), were similarly not violent.  *See*, *e.g.*, *People v. Howard*, 34 Cal. 4th 1129, 1138, 104 P.3d 107, 113 (Cal. 2005) (§ 2800.2 includes "conduct that ordinarily would not be considered particularly dangerous"); *People v. Pinkston*, 5 Cal. Rptr. 3d 274, 278 (Cal. App. 2003) (although statute uses "phrase 'willful or wanton disregard for safety or property of others,' the statute defines this element so that it may be satisfied by proof of property damage or by proof that the defendant committed three Vehicle Code violations").  Finally, his conviction of possession of a controlled substance for sale, in violation of California Health & Safety Code

---

[5] Notably, California has a separate offense for possessing a firearm after being convicted of a violent felony.  California Penal Code § 29900(a)(1).

§ 11351.5, (1-ER-20), also does not have an element of violent harm to others or the sovereignty of the government.  *See* Cal. H. & S. § 11351.5.

> **d.     This Court's pre-*Bruen* precedent upholding felon in possession laws as applied to nonviolent felons is clearly irreconcilable with *Bruen*.**

After *Heller* and before *Bruen*, this Court held that § 922(g) was constitutional as applied to nonviolent offenders.  *See Vongxay*, 594 F.3d at 1114-15. As explained below, that holding is clearly irreconcilable with *Bruen*, such that this Court must reject it and instead follow *Bruen*.

"[W]here intervening Supreme Court authority is clearly irreconcilable" with prior Ninth Circuit authority, "courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled."  *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).  In considering irreconcilability, this Court looks not only at the holding of the intervening authority, but also to its "'mode of analysis.'" *Id.* (quoting Antonin Scalia, *The Rule of Law as a Law of Rules,* 56 U. Chi. L. Rev. 1175, 1177 (1989)).  Such higher court holdings "need not be identical in order to be controlling" so long as they "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable."  *Id*.

In *Vongxay*, a defendant with three nonviolent felony convictions (two convictions for car burglaries and one for drug possession) challenged the constitutionality of § 922(g)(1) as applied to him after *Heller*.  *Vongxay*, 594 F.3d

at 1114.  This Court rejected those arguments, holding § 922(g)(1) was constitutional even as applied to that nonviolent defendant.  *Id.*  at 1118.  That holding, however, was based on two primary reasons, both of which are "clearly irreconcilable" with *Bruen*.  Because *Bruen* undercuts the theory and reasoning employed by this Court in *Vongxay*, this Court is not bound by *Vongxay* but by *Bruen*.

> **(1)**     ***Bruen* is clearly irreconcilable with holdings premised on there being no individual right to bear arms or that the right is subject to means-ends scrutiny.**

In reaching its conclusions, *Vongxay* relied heavily on a line of cases upholding felon-in-possession laws either on the basis that there is no individual right to bear arms, or on the basis that means-end scrutiny makes those laws constitutional.  594 F.3d at 1116-18.  Thus, it cited as binding precedent on the issue of felon dispossession *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), which held that there is no individual right to possess arms, *id.* at 1087; *United States v. Everist*, 368 F.3d 517 (5th Cir. 2004), which held that § 922(g)(1) is constitutional because it "represents a limited and narrowly tailored exception to the freedom to possess firearms, reasonable in its purposes," *id.* at 519; and *United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), which held that § 922(g) was constitutional because of combination of *Silveira* and *Everist*, *id.* at 1192.

26

But *Bruen* rejected both those premises. It reiterated *Heller*'s holding that the right to bear arms is an individual right, and also made crystal clear that means-ends scrutiny has no place in the Second Amendment context. *Bruen*, 142 S. Ct. at 2125-27, 2129. Instead, the "[o]nly" way for a firearm regulation to pass constitutional muster is if it is "consistent with this Nation's historical tradition." *Id.* at 2130. These intervening Supreme Court holdings about what the right is and the mode of analysis that must be employed to vindicate it are clearly irreconcilable with *Vongxay* and other pre-*Bruen* precedent of this Court embracing means-end testing and the notion that the right to bear arms is collective and not individual. Accordingly, those cases are no longer good law. *See Miller*, 335 F.3d at 900.

> **(2)** **_Bruen_ is clearly irreconcilable with the theory that the regulations on _Heller_'s list of "presumptively lawful regulatory measures" are beyond constitutional challenge.**

The other aspect of *Vongxay*'s reasoning fatally undercut by *Bruen* is *Vongxay*'s erroneous overreliance of the mention in dicta in *Heller* of a list of "presumptively lawful regulatory measures"—i.e., ones that the Supreme Court assumed had the required historical pedigree but which it had not yet actually subjected to a full historical analysis. *Heller*, 554 U.S. at 627 n.26; *see also id.* at 626 ("we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment"); *id*. at 635 (promising there would be "time enough to

27

expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us"). That list included, *inter alia*, laws restricting possession by felons and the mentally ill, laws barring the carrying of firearms in "sensitive places," and "prohibitions on carrying concealed weapons." *Id*. at 626.

In *Vongxay* (and other cases since), this Court transmogrified the Supreme Court's dicta statement about presuming that list of unanalyzed regulations were constitutional into an irrebuttable certainty. *Vongxay* held that the list was not dicta, but rather a limitation on the scope of *Heller*'s holding that was integral to that holding. *See* 594 F.3d at 1115. It reasoned, without any historical analysis, that because the Supreme Court included felon in possession laws on that list, "felons are categorically different from the individuals who have a fundamental right to bear arms." *Id.* Echoing that same line of reasoning, this Court later announced that it "may uphold a law without further analysis if it falls within the 'presumptively lawful regulatory measures' that *Heller* identified." *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *abrogated by Bruen*.

Even before *Bruen*, various judges on this Court expressed concerns about this approach, noting that there were "good reasons to be skeptical" that any "longstanding prohibition" prevented felons from having guns, and expressing doubt that *Heller*'s language categorically barred challenges to felon-in-possession

28

laws and other regulations listed as presumptively legal.[6]  *Bruen* vindicated these

reservations and made clear that the list of did not constitute any essential or

integral portion of the holding in *Heller*.  It did so by presenting a clear example of

the Supreme Court taking one of the "presumptively lawful regulations" that it had

noted in *Heller* and requiring the government to meet the same burden of

consistency with historical tradition that it would for any other gun regulation.

Thus, in *Heller*, the Supreme Court included concealed carry laws as an example

of a presumptively lawful regulation.  *Heller*, 554 U.S. at 626.  However, when

faced in *Bruen* with a challenge to a New York regulation requiring people to show

a "special need" to get a license to publicly carry a concealed weapon for self-

defense, *Bruen*, 142 S. Ct. at 2122-23, the Supreme Court did not stand on *Heller's*

dicta statement that concealed-carry laws were presumptively lawful.  Rather, the

Court conducted a full historical review, reached a more nuanced understanding of

the history surrounding such laws, and held the New York licensing scheme

violated the Constitution.  *See id.* at 2146-47, 2156.

Importantly, *Bruen* did not overrule *Heller* as to concealed-carry laws, nor

did it have to.  Rather, it did what *Heller* promised: conducted an "exhaustive

---

[6] *Phillips*, 827 F.3d at 1174 & n.2; *Chovan*, 735 F.3d at 1137; *United States v. Torres*, 789 F. App'x 655, 657 (9th Cir. 2020) (Lee, J., concurring); *Pena v. Lindley*, 898 F.3d 969, 1006 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 692 (9th Cir. 2017) (en banc) (Tallman, J., concurring in part and dissenting in part).

historical analysis" on one of the presumed exceptions that had now "come before it." *Heller*, 554 U.S. at 635. *Bruen*'s mode of analysis—requiring the government to carry the burden of showing that the regulation was consistent with this Nation's historical tradition of firearm analysis, *see* 142 S. Ct. at 2135—fatally undermines this Court's pre-*Bruen* precedent (including *Vongxay*) that treated the inclusion of a law among *Heller*'s list of "presumptively lawful regulations" as a final and unchallengeable presumption that the listed regulations were lawful. Rather, the Supreme Court in *Bruen* meant what it said when it wrote, "*Only* if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2130 (citation and internal quotation marks omitted, emphasis added). As with concealed carry, *Heller*'s preliminary take did not decide the constitutionality of regulations dispossessing felons, including non-violent felons. Rather, those regulations must pass through *Bruen*'s refined and restated "historical tradition" test.

\* \* \*

This Court's pre-*Bruen* precedent holding § 922(g) constitutional as applied to a nonviolent offender are based on theories and reasoning clearly irreconcilable with *Bruen*, and so cannot stand. Instead, because this nation has no relevant "historical tradition of firearm regulation" banning nonviolent felons from

30

possessing firearms, § 922(g) is unconstitutional as applied to nonviolent offenders like Duarte.

**B.    Duarte has good cause for not having moved for dismissal below.**

Duarte's trial court case resolved with the issuance of the judgment and commitment order on February 23, 2022, four months before *Bruen* was decided. Duarte's trial counsel did not move under Rule 12 to dismiss the indictment on the grounds he is now pursuing on appeal.  (*See* 1-ER-31-42.)  The issuance of *Bruen* between trial and appeal, however, constitutes good cause for the failure to move at the trial level, and permits this Court to review this issue.

Under Rule 12, a defense that the government's charging document has failed to state a legally cognizable offense is supposed to be raised pretrial, on the motions schedule set by the district court.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v), (c)(1), & (c)(3).  But a court, including this Court, may consider an untimely articulation of such a defense if the defendant shows "good cause."  Fed. R. Crim. P. 12(c)(3); *see also United States v. Guerrero*, 921 F.3d 895, 897 (9th Cir. 2019).

That this Court's controlling precedent at the time of the motions deadline foreclosed a defense constitutes good cause for not raising the defense.  In *United States v. Aguilera-Rios*, 769 F.3d 626 (9th Cir. 2014), the defendant in a 8 U.S.C. § 1326 prosecution argued for the first time on appeal that his prior California firearms conviction was not a categorical match for a federal firearms conviction, and so his prior removal was invalid and not a legal predicate for prosecution, *id.* at

31

629. That argument was made possible by the Supreme Court's decision in *Moncrieffe v. Holder*, 569 U.S. 1678 (2013), which issued during the pendency of the *Aguilera-Rios* appeal. *See Aguilera-Rios*, 769 F.3d at 629. The fact that *Moncrieffe* opened up an argument that was previously foreclosed by precedent constituted good cause under Rule 12 for raising the argument for the first time on appeal: "Prior to *Moncrieffe*, Aguilera would have had no reason to challenge whether he was properly removed for a 'firearms offense,'" because "this Court's caselaw prior to *Moncrieffe* foreclosed the argument he now makes." *Id.* at 630-31. This Court may entertain an issue raised for the first time on appeal when there is "'a change in the intervening law that brought the issue into focus.'" *Id.* at 631 (quoting *In re Skywalkers, Inc.*, 49 F.3d 546, 548 n. 4 (9th Cir.1995)). That is all the more true when the issue is "purely legal" and the government has the full opportunity to respond in written briefing and at oral argument. *Id.*

So too here. Prior to *Bruen*, this Court held that § 922(g)(1) was constitutional even as applied to nonviolent offenders. *See Vongxay*, 594 F.3d at 1115. Accordingly, *Vongxay* "foreclosed" Duarte's trial counsel from making the argument now made on appeal. *See Aguilera-Rios*, 769 F.3d at 631. As detailed above, however, *Bruen* rejected the modes of analysis on which *Vongxay* was based. *See* Section A(2)(d), *supra*. That intervening change of law opened up the issue. Moreover, as in *Aguilera-Rios*, the issue is purely legal, Duarte has raised it at the first opportunity post-*Bruen*, and the government will have a full opportunity

32

to respond.  *Aguilera-Rios*, 769 F.3d at 631.  Accordingly, Duarte has good cause

for not having raised the issue in the trial court, and this Court should consider it

now on appeal.[7]

## VII. CONCLUSION

For the reasons above, this Court should vacate Steven Duarte's conviction

and dismiss the indictment against him.


Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender


DATED:  January 27, 2023          By  */s/ SONAM HENDERSON*
                                      Sonam_Henderson@fd.org
                                      Deputy Federal Public Defender
                                      Attorney for Defendant-Appellant


---

[7] To the extent there is also a requirement that Duarte show prejudice, *see Davis v. United States*, 411 U.S. 233, 245 (1973), that requirement is easily and obviously met here.  If § 922(g)(1) is unconstitutional as applied to him, his conviction and sentence must be reversed, and his freedom restored.  The inability to bring a complete defense to a charge is self-evidently prejudicial.

## CERTIFICATE OF RELATED CASES

Counsel for appellant certifies that he is aware of the following pending

cases that present an issue or issues related to those raised in this brief:

*United States v. Brandon Yates*, CA No. 22-30051

*United States v. Miguel Alaniz*, CA No. 22-30141


DATED:  January 27, 2023          */s/ SONAM HENDERSON*
                                  SONAM HENDERSON

34

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this opening brief is proportionally spaced, has a typeface of 14 points or more, and contains approximately 8153 words.


DATED:  January 27, 2023                    */s/ SONAM HENDERSON*
                                            SONAM HENDERSON

## ADDENDUM

## U.S. Constitution amendment II

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed

## 18 U.S.C. § 922 (g)(1)

(g)It shall be unlawful for any person—

(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; . . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

## Federal Rules of Criminal Procedure, Rule 12 (b)-(c)

(b) Pretrial Motions.

(1) In General. A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits. Rule 47 applies to a pretrial motion.

(2) Motions That May Be Made at Any Time. A motion that the court lacks jurisdiction may be made at any time while the case is pending.

(3) Motions That Must Be Made Before Trial. The following defenses, objections, and requests must be raised by pretrial motion if the basis for the

motion is then reasonably available and the motion can be determined without a trial on the merits:

    (A) a motion alleging a defect in instituting the prosecution, including:

        (i) improper venue;

        (ii) preindictment delay;

        (iii) a violation of the constitutional right to a speedy trial;

        (iv) selective or vindictive prosecution; and

        (v) an error in the grand-jury proceeding or preliminary hearing;

    (B) a defect in the indictment or information; including;

        (i) joining two or more offenses in the same count (duplicity);

        (ii) charging the same offense in more than one count (multiplicity);

        (iii) lack of specificity;

        (iv) improper joinder; and

        (v) failure to state an offense;

    (C) suppression of evidence;

    (D) severance of charges or defendants under Rule 14; and

    (E) discovery under Rule 16.

(4) Notice of the Government's Intent to Use Evidence.

37

      (A) At the Government's Discretion. At the arraignment or as soon afterward as practicable, the government may notify the defendant of its intent to use specified evidence at trial in order to afford the defendant an opportunity to object before trial under Rule 12(b)(3)(C).

      (B) At the Defendant's Request. At the arraignment or as soon afterward as practicable, the defendant may, in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16.

(c) Deadline for a Pretrial Motion; Consequences of Not Making a Timely Motion.

    (1) Setting the Deadline. The court may, at the arraignment or as soon afterward as practicable, set a deadline for the parties to make pretrial motions and may also schedule a motion hearing. If the court does not set one, the deadline is the start of the trial.

    (2) Extending or Resetting the Deadline. At any time before trial, the court may extend or reset the deadline for pretrial motions.

    (3) Consequences of Not Making a Timely Motion Under Rule 12(b)(3). If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause.