CA NO. 22-50048

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

STEVEN DUARTE,

        Defendant-Appellant.

DC NO. 2:20-cr-00387-AB-1

---

**APPELLANT'S REPLY BRIEF**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE ANDRE BIROTTE, JR.
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
SONAM HENDERSON
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2584
Facsimile: (213) 894-0081
Email: Sonam_Henderson@fd.org

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................1

II. ARGUMENT.....................................................................3

A.  The claim that Duarte must show good cause *and* plain error is baseless. ...................................................................3

B.  This Court's pre-*Bruen* caselaw upholding § 922(g)(1) even as applied to nonviolent offenders is clearly irreconcilable with *Bruen*. ...................................................................5

1.  *Vongxay* held itself to be controlled by precedent plainly invalidated by *Bruen*. ...............................................5

2.  *Vongxay* impermissibly relied on *Heller* dicta about "presumptively lawful" regulations instead of actual historical proof. .....................................................7

C.  The Second Amendment does not protect solely law-abiding, responsible citizens; it protects "the people" of the United States, including Duarte. ..........................................................8

D.  The government cannot show that dispossessing nonviolent offenders like Duarte is consistent with our Founding-era tradition of firearm regulation...........................................................15

1.  The government applies the wrong standard, and waives any argument that there is a Founding-era analogue "distinctly similar" to § 922(g)(1). ..................................15

2.  The government's attempts to show a historical antecedent for § 922(g)(1) fail even under the incorrect standard it assigns itself. ..........................................................16

a.  The government's argument that the English Bill of Rights allowed the legislature to choose who to disarm would just reinstate the legislative balancing *Bruen* disavowed. ..........................................16

## TABLE OF CONTENTS

Page

  b. The three failed ratification-era proposals do not show that § 922(g)(1) is constitutional as applied to Duarte. .........................................................................17

  c. That some 18th century felonies were punishable by death does not show that § 922(g)(1) is constitutional as applied to Duarte. ....................................................19

  d. Founding-era laws dispossessing Catholics, slaves, Native Americans, and those disloyal during wartime do not show that § 922(g)(1) is constitutional as applied to Duarte...........................................................21

  e. The government's attempt to equate the "how and why" of its historical examples with § 922(g)(1) falls flat. ...............................................................................24

 E. The government's claim that no court has held § 922(g)(1) unconstitutional under *Bruen* is no longer correct. ...........................25

 F. All of Duarte's previous convictions were nonviolent, making § 922(g)(1) even more clearly unconstitutional as applied to him. ....28

III. CONCLUSION.................................................................32

CERTIFICATE OF COMPLIANCE...................................................34

INDEX OF ADDENDUM..............................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Am. Vantage Companies, Inc. v. Table Mountain Rancheria*,
    292 F.3d 1091 (9th Cir. 2002) ...........................................................................14

*Atkinson v. Garland*,
    70 F.4th 1018 (7th Cir. 2023) ...................................................................2, 8, 26

*Descamps v. United States*,
    570 U.S. 254 (2013)................................................................................31, 32

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).................................................................................*passim*

*Hatfield v. Barr*,
    925 F.3d 950 (7th Cir. 2019) ............................................................................29

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ............................................................18, 19, 20

*Miller v. Gammie*,
    335 F.3d 899 (9th Cir. 2003) (en banc) ...........................................................5, 6

*Moncrieffe v. Holder*,
    569 U.S. 184 (2013)..........................................................................................32

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S.Ct. 2111 (2022)..................................................................................*passim*

*Pell v. Procunier*,
    417 U.S. 817 (1974)...........................................................................................9

*Range v. Att'y Gen.*,
    69 F.4th 96 (3d Cir. 2023) (en banc) .........................................................*passim*

*Range v. Att'y Gen.*,
    53 F.4th 262 (3d Cir. 2022) ..............................................................................22

*Teter v. Lopez*,
    ---F.4th--- (9th Cir. Aug. 7, 2023) ....................................................................8

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Alaniz*,
  69 F.4th 1124 (9th Cir. 2023) ................................................................15

*United States v. Ankeny*,
  502 F.3d 829 (9th Cir. 2007) ...................................................................4

*United States v. Barber*,
  2023 WL 1073667 (E.D. Tex. Jan. 27, 2023) ......................................11

*United States v. Bullock*,
  ---F.Supp.3d---- (S.D. Miss. June 28, 2023)........................10, 12, 27

*United States v. Christensen*,
  828 F.3d 763 (9th Cir. 2015) ...................................................................4

*United States v. Daniels*,
  ---F.4th.---- (5th Cir. 2023)...................................................................18

*United States v. Evans*,
  883 F.3d 1154 (9th Cir. 2018) ...............................................................12

*United States v. Everist*,
  368 F.3d 517 (5th Cir. 2004) ...............................................................5, 6

*United States v. Forbis*,
  No. 4:23-cr-00133-GKF, Dkt 37 (N.D. Okla. Aug. 17, 2023).........27

*United States v. Gonzalez Aguilar*,
  718 F.3d 1185 (9th Cir. 2013) ..........................................................28, 29

*United States v. Grey*,
  959 F.3d 1166 (9th Cir. 2020) .................................................................9

*United States v. Guerrero*,
  921 F.3d 895 (9th Cir. 2019) ..............................................................3, 4

*United States v. Harrison*,
  ---F.Supp.3d---- (W.D. Okla. Feb. 3, 2023) ........................................2

*United States v. Hickcox*,
  2023 WL 3075054 (5th Cir. 2023) .......................................................26

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Jackson*,
   69 F.4th 495 (8th Cir. 2023) ........................................................27, 28

*United States v. Lowry*,
   2023 WL 3587309 (D.S.D. May 5, 2023) ........................................11

*United States v. Martin*,
   2023 WL 1767161 (D. Vt. Feb. 3, 2023).........................................11

*United States v. Phillips*,
   827 F.3d 1171 (9th Cir. 2016) ...........................................................6

*United States v. Quailes*,
   ---F.Supp.3d---- (M.D. Pa. Aug. 22, 2023).....................................27

*United States v. Rahimi*,
   61 F.4th 443 (5th Cir.) .....................................................................23

*United States v. Ramirez*,
   976 F.3d 946 (9th Cir. 2020) ...........................................................16

*United States v. Roy*,
   2023 WL 3073266 (5th Cir. 2023) ...................................................27

*United States v. Torres*,
   911 F.3d 1253 (9th Cir. 2019) .........................................................10

*United States v. Vongxay*,
   594 F.3d 1111 (9th Cir. 2010) ...................................................*passim*

*United States v. Ware*,
   2023 WL 3568606 (S.D. Ill. May 19, 2023) ....................................10

*United States v. Williams*,
   5 F.4th 973 (9th Cir. 2021) ................................................................4

*United States v. Younger*,
   398 F.3d 1179 (9th Cir. 2005) ...................................................5, 6, 7

*United Union of Roofers, Waterproofers & Allied Workers v. Meese*,
   823 F.2d 652 (1st Cir. 1987)............................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**State Cases**

*People v. Escobar*,
  1 Cal. Rptr. 2d 579 (Cal. App. 1991)................................................31

*People v. Howard*,
  104 P.3d 107 (Cal. 2005)........................................................30

*People v. Pinkston*,
  5 Cal. Rptr. 3d 274 (Cal. App. 2003)...........................................30

**Federal Statutes**

Act of May 8, 1792, § 1, 1 Stat. 271 ............................................21

18 U.S.C. § 351 .........................................................................12

18 U.S.C. § 922 ...................................................................*passim*

18 U.S.C. § 1464 .......................................................................12

18 U.S.C. § 3581 .......................................................................19

**Federal Rules**

Fed. R. Crim. P. 12....................................................................1, 3, 4

Fed. R. Crim. P. 52....................................................................3, 4

Fed. R. Evid. 609 .......................................................................29

**State Statutes**

Cal. Health & Safety Code § 11350..............................................26

Cal. Health & Safety Code § 11377..............................................26

Cal. Penal Code § 594................................................................26

Cal. Penal Code § 1170..............................................................26

Cal. Penal Code § 29800............................................................26

# TABLE OF AUTHORITIES

**Page(s)**

Cal. Veh. Code § 2800.2 ...................................................................26, 30

Cal. Veh. Code § 20002 .........................................................................31

## Other Authorities

*Black's Law Dictionary* (7th ed.1999) ....................................................14

Carys Brown, *Catholic Politics and Creating Trust in Eighteenth Century England,* 33 British Cath. History 622 (2017). ...................................22

Saul Cornell & Nathan DeDino, *A Well Regulated Right*, 73 Fordham L. Rev. 487 (2004) ...............................................................................23

Joyce Lee Malcolm, *To Keep and Bear Arms* 136 (1994) ......................................17

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009)....................................................21

En Banc Oral Argument, *Range v. Att'y Gen.*, CA No. 21-2835 (3rd Cir. 2023) .......................................................................................21

Jim Wedeking, *Quaker State*, 2 NYU J.L. & Liberty 28 (2006)...........................23

## I.  INTRODUCTION

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), held that a firearm regulation is constitutionally permissible **only** if the government can prove it is consistent with Founding-era traditions.  Section 922(g)(1) fails that test—and certainly fails as applied to Duarte, a nonviolent offender.  Although criminal firearm violence is a problem that existed at the Founding, there is no record of the Founders addressing it by permanently dispossessing ordinary offenders, let alone those with nonviolent convictions.

The government doesn't claim there were Founding-era laws "distinctly similar" to § 922(g)(1).  Rather, it proceeds on a series of false premises.  First, it claims Duarte must demonstrate plain error, even though good cause "displaces" plain error for unpreserved Rule 12 motions.  Second, it claims *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), remains good law, even though *Vongxay*'s reasoning doesn't include the historical analysis *Bruen* requires.  Third, it claims the Second Amendment protects only the "law-abiding and responsible," despite *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), holding that it protects *all* Americans, and despite the government's hopelessly vague qualifiers impermissibly subjecting the Second Amendment right to legislative interest-balancing.  Fourth, it cites purportedly analogous Founding-era antecedents, but holds itself to the wrong analogical standard and ultimately fails to

1

identify Founding-era regulations meaningfully like § 922(g)(1). Finally, it disavows its previous concession that Duarte's priors were nonviolent, despite conceding the priors have no violent elements, and irrelevantly smears Duarte as a gang member while speculating that maybe he committed some violence not reflected in the record.

These arguments fail. For one, the government has elsewhere admitted that its position is—absurdly—that legislatures can label as felonious any conduct they choose—including "lawn-mowing" and "jaywalking"—and then permanently strip lawn-mowers and jaywalkers of Second Amendment rights. *United States v. Harrison*, ---F.Supp.3d----, 2023 WL 1771138, at *23 (W.D. Okla. Feb. 3, 2023); En Banc Oral Argument, at 47:20-49:05, *Range v. Att'y Gen.*, CA No. 21-2835 (3rd Cir. 2023).[1] The en banc Third Circuit recently rejected these arguments, reversed one of the government's primary authorities, and held § 922(g)(1) unconstitutional as applied to a nonviolent defendant. *See Range v. Att'y Gen.*, 69 F.4th 96, 99, 106 (3d Cir. 2023) (en banc); *see also Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) (refusing to treat felon-in-possession laws as "presumptively lawful" and remanding for in-depth historical analysis). This

---

[1] *Available at* https://www2.ca3.uscourts.gov/oralargument/audio/21-2835_Rangev.AttyGenUSA_EnBanc.mp3.

Court should reject the government's arguments and find § 922(g)(1)

unconstitutional, at least as applied to Duarte.

## II. ARGUMENT

### A. The claim that Duarte must show good cause *and* plain error is baseless.

Normally Duarte would have challenged § 922(g)(1)'s constitutionality via a

pretrial Rule 12(b)(3) motion to dismiss. (AOB-31.) But because he didn't, he

must show "good cause" to raise his claim on appeal. (AOB-31.) That *Bruen*

issued after his conviction constitutes "good cause," because pre-*Bruen* precedent

had foreclosed his arguments about § 922(g)(1)'s unconstitutionality. (AOB-31-

33.)

The government concedes that "good cause" might exist if *Bruen* "abrogated

this Court's precedent," and that determining "good cause" requires reaching the

merits of Duarte's claim. (GAB-12 n.2.) But it incorrectly asserts that on top of

"good cause," Duarte *also* must show Rule 52(b) plain error. (GAB-11-12 & n.2,

GAB-26, GAB-52.)

That assertion ignores and contradicts *United States v. Guerrero*, 921 F.3d

895 (9th Cir. 2019). (AOB-31-33.) *Guerrero* rejected a claim "that untimely Rule

12(b)(3) defenses, objections, and requests raised for the first time on appeal

should be reviewed for plain error." 921 F.3d at 897-98. Instead, this Court

continued to "construe[] Rule 12's good-cause standard as ***displacing*** the plain-

error standard" for such issues. *Id.* at 897 (emphasis added). Because Rule 12 "displaces" plain error in favor of good cause, the claim that Duarte must show both is meritless.[2]

Additionally, even if plain error applied, Duarte satisfies it. *See United States v. Williams*, 5 F.4th 973, 978 (9th Cir. 2021) (plain error standard). As explained below and in the opening brief, *Bruen* plainly abrogates this Court's prior § 922(g)(1) precedent, and there is also clearly no Founding-era analogue to permanent dispossession of any individual convicted of a crime punishable by more than a year's imprisonment. Moreover, the record shows Duarte falls outside any arguably constitutional application of § 922(g)(1) to violent felons. Finally, conviction for an unconstitutional offense obviously affects substantial rights and seriously affects the integrity, fairness, and public reputation of the courts. *See United States v. Ankeny*, 502 F.3d 829, 839 (9th Cir. 2007).

---

[2] *United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015), (GAB-12), says nothing to the contrary. It involved jury instructions subject to Rule 52(b), not Rule 12 defenses. *Id.* at 787-97. Thus, *Christensen* holds only that where Rule 52(b) applies, an intervening law does not relieve litigants from meeting plain error. *Id.* at 779. It casts no doubt on *Guerrero*'s clear holding that for Rule 12 defenses, good cause "displaces" plain error.

**B.    This Court's pre-*Bruen* caselaw upholding § 922(g)(1) even as applied to nonviolent offenders is clearly irreconcilable with *Bruen*.**

The opening brief demonstrated two ways that this Court's key pre-*Bruen* § 922(g)(1) case, *Vongxay*, is clearly irreconcilable with *Bruen*, and so overruled. (AOB-26-30.)  *See also Miller v. Gammie*, 335 F.3d 899, 900 (9th Cir. 2003) (en banc).  The government fails to counter either demonstration.

**1.    *Vongxay* held itself to be controlled by precedent plainly invalidated by *Bruen*.**

*Vongxay* treated *United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), as "control[ling]."  *Vongxay*, 594 F.3d at 1116.  And *Younger*, in turn, upheld § 922(g)(1) based on two reasons, both untenable post-*Bruen*: (1) the "Second Amendment does not confer an individual right to possess arms," and (2) "§ 922(g)(1) 'represents a limited and narrowly tailored exception to the freedom to possess firearms, reasonable in its purposes.'"  *Id.* at 1192 (quoting *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004)).  That reasoning is clearly irreconcilable with *Bruen*'s holdings that the right is individual and that means-end scrutiny plays no role in Second Amendment analysis.  142 S.Ct. at 2125-27, 2129-30.

The government doesn't deny *Vongxay* relied on *Younger* or that *Younger* held the Second Amendment right is both collective and subject to interest-balancing.  Instead, it asserts *Vongxay* "correctly explained why *Heller* did not

5

disturb" *Younger*.  (GAB-22-23.)  But whether *Vongxay* was correct, pre-*Bruen*, about *Younger* is irrelevant.[3]  What matters is whether *Younger* (and *Vongxay*) survive *Bruen*.  *Younger* and *Vongxay* performed nothing like *Bruen*'s required historical analysis—indeed, *Vongxay* recognized "that the historical question ha[d] not been definitively resolved."  594 F.3d at 1118.  But *Bruen* requires definitive resolution: a firearm regulation is constitutional "[o]nly" if the government "affirmatively prove[s]" its historical case.  142 S.Ct. at 2126-27.  *Younger* and *Vongxay* are thus overruled under *Miller* and *Bruen*.

The government also argues that *Vongxay* didn't engage in means-end scrutiny.  (GAB-15, GAB-23-24.)  But this ignores *Vongxay* identifying *Younger* as "control[ling]," and *Younger* explicitly relying on the Fifth Circuit's means-end analysis in *Everist*, 368 F.3d at 519.  *Younger*, 398 F.3d at 1192; *Vongxay*, 594 F.3d at 1116.  Being controlled by another case's impermissible reasoning is no more constitutional than engaging in such reasoning anew.  *Bruen*'s rejection of

---

[3] *Vongxay* was, however, incorrect.  As *Vongxay* acknowledged, *Heller* "invalidated" *Younger*'s underlying no-individual-right "reasoning."  594 F.3d at 1116.  Under *Miller*, such fundamental "undercut[ting]" of prior precedent's "reasoning" renders that precedent "effectively overruled."  335 F.3d at 900.  Moreover, *United States v. Phillips*, 827 F.3d 1171, 1174 n.1 (9th Cir. 2016), (GAB-23), said only that litigants who believed *Vongxay* wrongly decided needed intervening authority (like *Bruen*) or en banc review.  *Id.* at 1174 n.1.

means-end analysis overruled *Younger*, and so *Vongxay*, controlled by *Younger*, falls too.

### 2. *Vongxay* impermissibly relied on *Heller* dicta about "presumptively lawful" regulations instead of actual historical proof.

As noted above, *Vongxay* didn't make the government affirmatively prove consistency with historic traditions. Instead, it settled for no "definitive[] resol[ution]" on history, and instead relied on *Heller* dicta listing felon-in-possession laws as among a set of "presumptively lawful regulatory measures" that had yet to receive "exhaustive historical analysis." *Vongxay*, 594 F.3d at 1115, 1118; *Heller*, 554 U.S. at 626-627 & n.26. That reasoning too is irreconcilable with *Bruen*: whatever *Heller* assumed about regulations not before it, *Bruen* held that the "[o]nly" route to constitutionality is proven consistency with historic traditions. (AOB-30.)

The government doesn't respond to Duarte's demonstration that *Bruen*'s holding requiring historical proof means there is no legal effect to *Heller*'s list of regulations for which the Court assumed it would later find such proof. (*See* GAB-24-25 (not responding).)

Instead, the government attacks only Duarte's subsidiary demonstration that despite concealed-carry laws being among the "presumptively lawful" regulations identified by *Heller*, *Bruen* still subjected New York's concealed-carry licensing

regime to full historical analysis.  (AOB-29; GAB-25.)  It claims *Heller* only discussed concealed-carry laws in the sentence before the one listing presumptively lawful regulations.  (GAB-24.)  But that argument fails in context: the whole paragraph is about Second Amendment limits, and the concealed-carry sentence gave an example of a limiting regulation the Court assumed would survive analysis, while the subsequent sentence offered further examples, including felon-in-possession laws.  *See Heller*, 554 U.S. at 626-27 & n.26.  When *Bruen* later subjected a concealed-carry regulation to historical analysis, *see* 142 S.Ct. at 2122, 2146-50, it affirmed there is no shortcut to constitutionality.

Indeed, post-*Bruen* both the Seventh Circuit and the en banc Third Circuit have rejected the government's "presumptively lawful" argument: "Nothing allows us to sidestep *Bruen* in the way the government invites." *Atkinson*, 70 F.4th at 1022; *see also Range*, 69 F.4th at 103-04.  Thus again, because *Vongxay* didn't undertake the historical scrutiny *Bruen* requires, it is overruled.  *See Teter v. Lopez*, ---F.4th---, 2023 WL 5008203, at *7 (9th Cir. Aug. 7, 2023) (*Bruen* abrogated prior precedent that used other analyses).

**C.    The Second Amendment does not protect solely law-abiding, responsible citizens; it protects "the people" of the United States, including Duarte.**

The government repeatedly, but meritlessly, asserts that Duarte has no Second Amendment rights—and so *Vongxay* is redeemable and § 922(g)(1)

constitutional—because *Heller*, *Bruen*, and the text and history of the Second exclude those with felony convictions from "the people," in favor of virtuous, law-abiding, responsible citizens. (GAB-2, GAB-9, GAB-13, GAB-20, GAB-28-33, GAB-50.)[4]

But *Heller* and *Bruen* don't exclude Americans with felony convictions from "the people." (AOB-7, AOB-10-12.) *Heller* held that "the people" includes all those "who are part of [our] national community." 554 U.S. at 580 (citation omitted). And *Bruen* affirmed that the Second Amendment right applies to "'all Americans.'" 142 S.Ct. at 2156 (quoting *Heller*, 554 U.S. at 581). Moreover, *Heller* recognized that "the people" has the same meaning in the Second Amendment as it has in the First and Fourth Amendments. 554 U.S. at 580. Those Amendments plainly cover Americans with felony convictions. *See, e.g.*, *Pell v. Procunier*, 417 U.S. 817, 820 n.1, 822 (1974) (penitentiary inmates retain First Amendment rights); *United States v. Grey*, 959 F.3d 1166, 1169, 1172 (9th Cir. 2020) (search violated Fourth Amendment despite searchee's prior felonies).

---

[4] The government also counts statements in dissents and concurrences across different cases to assert that most Supreme Court Justices approve of felon-in-possession statutes. (*See* GAB-9, GAB-21-22 & n.5.) But such predictive punditry isn't legal analysis. The government cannot substitute tea-reading about how various Justices might feel if presented with the issue for the actual historical proof *Bruen* requires. 142 S.Ct. at 2130.

**1.** The government asserts that "the people" doesn't "need" to have the same meaning across the Amendments, and claims *Heller*'s definition of "the people" can be ignored because *Heller* propounded it while concluding the Second Amendment right is individual. (GAB-30-31.) But the government cannot explain why the context in which *Heller* defined "the people" should cheapen its holding. Nor does its quotation from *United States v. Torres*, 911 F.3d 1253, 1259 (9th Cir. 2019), about *Heller* not fully resolving who has the Second Amendment right, suggest Duarte is outside "the people." (*See* GAB-31.) The question in *Torres* was whether unlawful aliens counted among "the people." *Id.* While *Heller*'s definition may not have resolved that question, that doesn't mean it resolved *no* questions. *Torres* recognized that *Heller* defined "the people" as including, at least, "all Americans." *See id.* at 1259, 1261 (quoting *Heller*, 554 U.S. at 581). That definition is sufficient here: Duarte, a citizen, (PSR-2), is plainly covered.

**2.** The government also argues that *Heller* and *Bruen*'s descriptions of their litigants as "law-abiding, responsible citizens" set the boundaries of "the people." (GAB-20, GAB-31 (accusing Duarte of failing to "confront" "law-abiding" language).) That argument has been rightly rejected by many courts, including the en banc Third Circuit. *See Range*, 69 F.4th at 101.[5]

---

[5] *See also*, *e.g.*, *United States v. Bullock*, ---F.Supp.3d----, 2023 WL 4232309, at *20 (S.D. Miss. June 28, 2023); *United States v. Ware*, 2023 WL

*Heller* did not define "the people" using "law-abiding, responsible citizens." Rather, it used the term only after it had already defined "the people," and had shifted to explaining why it could conclude a total ban on in-home firearms was unconstitutional without fully articulating Second Amendment scrutiny: "[W]hatever else" the Second Amendment "leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 634-35. Nothing in that statement suggests *Heller* meant to amend, *sub silentio*, its holding that "the people" includes all members of the national community. *Id.* at 580. Indeed, if the statement about law-abiding people defending their homes limited the Second Amendment's reach, then the right would stop at "defense of hearth and home," but *Bruen* made clear the Second Amendment contains no "home/ public distinction." 142 S.Ct. at 2134.

Nor did *Bruen*'s repetition of "law-abiding" limit "the people." *Bruen* had no reason to revisit the definition of "the people," because the "two ordinary, law-abiding, adult citizen[]" litigants were undisputedly among "the people." *Id.* That "the people" easily covered those litigants says nothing about whom it doesn't

---

3568606, at *5 (S.D. Ill. May 19, 2023); *United States v. Lowry*, 2023 WL 3587309, at *3 (D.S.D. May 5, 2023); *United States v. Martin*, 2023 WL 1767161, at *2 (D. Vt. Feb. 3, 2023); *United States v. Barber*, 2023 WL 1073667, at *6 (E.D. Tex. Jan. 27, 2023).

cover. Thus, the en banc Third Circuit concluded it would be "overread[ing]" *Heller* and *Bruen* to limit "the people" based on the "law-abiding" language. *Range*, 69 F.4th at 101-02.

Lastly, the government's proposed "law-abiding, responsible citizens" limit is hopelessly vague and unworkable. *Range*, 69 F.4th at 102. Are all convicts forever non-"law-abiding," or can post-conviction life restore one's law-abidingness? *See Bullock*, 2023 WL 4232309, at *30. Does "law-abiding" exclude those incurring civil penalties, traffic violations, and petty misdemeanors? *Range*, 69 F.4th at 102. And what about minor felonies versus serious misdemeanors? *Id.* Does cursing on the radio—a federal felony—render one less "law-abiding" than "assault by beating, striking, or wounding"—a federal misdemeanor? *See id.* at 102; *see also* 18 U.S.C. §§ 351(a)(4) & 1464. The term "responsible" only adds further vagueness, since Americans have "widely divergent views" about what constitutes "responsible" behavior. *Id.* at 102; *see also United States v. Evans*, 883 F.3d 1154, 1162-63 (9th Cir. 2018) (phrase "other family responsibilities" impermissibly vague). Ultimately, as the en banc Third Circuit explained, the government's argument "devolves" into claiming that legislators can "decide whom to exclude from 'the people,'" since a motivated legislature could frame laws to render most people non-"law-abiding" or

irresponsible. *Range*, 69 F.4th at 102-03. That is just another route to the deference to legislative interest-balancing that *Bruen* rejected. *Id.* at 103.

**3.** Finally, the government invokes the "virtuous citizen" arguments anticipated in Duarte's opening brief. It supports them by, *inter alia*, misreading *Heller*'s statement that "the people" refers to "all members of the political community," 554 U.S. at 580, claiming those with felony convictions are outside the "political community" because they can be excluded from voting, holding office, and jury-service. (GAB-29-31.)

The opening brief explains the problems with the "virtuous citizen" argument. Briefly, voting, holding office, and jury-service are all civic rights held for the collective benefit. (AOB-21.) As *Heller* and *Bruen* explained, the Second Amendment right is not such a collective right, but a right held for individuals' own protection. (AOB-22.) There appears to be no historic case for virtue exclusions to individual rights like gun possession—or, for instance, Fourth Amendment rights. (AOB-23; *see also* Section II.C*, supra*.)

The government presents no such historical case. Instead, it simply invokes pre-*Bruen* courts and commentators mistakenly equating collective and individual rights. (GAB-29-30.)

Nor is its "political community" argument compelling. *Heller*'s "political community" reference wasn't to those participating in civic-political processes like

voting. Rather, *Heller* used "political community" interchangeably with "national community"; indeed, its "political community" discussion concluded with the "strong presumption that the Second Amendment right … belongs to all Americans." 554 U.S. at 580-81. This is a standard usage of "political community": this Court has said a "citizen" is "'a member of a political community … .'" *Am. Vantage Companies, Inc. v. Table Mountain Rancheria*, 292 F.3d 1091, 1096 (9th Cir. 2002) (quoting Black's Law Dictionary (7th ed.1999)). Thus, *Heller*'s statement that "the people" includes "all members of the political community, not an unspecified subset," 554 U.S. at 580, actually demonstrates that even citizens with felony convictions are included.

\* \* \*

The government cannot escape *Bruen*'s clear affirmation that the Second Amendment applies to "all Americans," including Duarte. 142 S.Ct. at 2156. If the government is to dispossess him, it must "affirmatively prove" that doing so is consistent with our traditions, *id.* at 2127—something it cannot do.

**D. The government cannot show that dispossessing nonviolent offenders like Duarte is consistent with our Founding-era tradition of firearm regulation.**

**1. The government applies the wrong standard, and waives any argument that there is a Founding-era analogue "distinctly similar" to § 922(g)(1).**

*Bruen* outlined two separate historical-analogical standards for determining if the government has "affirmatively prove[d]" a regulation is consistent with our traditions. 142 S.Ct. at 2127. A regulation addressing "a general societal problem that has persisted since the 18th century" must be "distinctly similar" to historical analogues. *Id.* at 2131. If the Founders faced the same problem, they could have adopted closely-analogous regulations to confront it, and so the absence of such regulations points towards the challenged regulation being inconsistent with the Second Amendment. *Id.* When, however, regulations confront "unprecedented societal concerns" that were "unimaginable at the founding," then such regulations need only be "relevantly similar" to Founding-era laws, as determined by evaluating "how and why" the regulations burden the Second Amendment right. *Id.* at 2132-33. *See United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) ("relevantly similar" applies to "largely modern crime[s]").

Criminal firearm violence such as § 922(g)(1) addresses is a general societal problem that existed in the 18th century, and so the government must identify "distinctly similar" Founding-era regulations. (AOB-13 (citing *Bruen*, 142 S.Ct. at

15

2131).)  The government doesn't acknowledge that burden, let alone try to meet it.  Accordingly, it has waived any such arguments.  *United States v. Ramirez*, 976 F.3d 946, 955 n.3 (9th Cir. 2020).

## 2. The government's attempts to show a historical antecedent for § 922(g)(1) fail even under the incorrect standard it assigns itself.

The government instead—and without explanation—tries only to show that there were "relevantly similar" regulations analogous to § 922(g)(1), (GAB-49, GAB-51), thus proceeding as if criminal firearm violence was a problem "unimaginable at the founding."  But it cannot clear even that incorrectly lowered bar.

The opening brief showed that "bans on convicts possessing firearms were unknown before World War I"—long after the Founding.  (AOB-14.)  The government neither disputes this nor identifies any earlier bans addressing analogous problems via analogous means.  Instead, it points to historical laws and proposals with no meaningful similarity to § 922(g)(1).

### a. The government's argument that the English Bill of Rights allowed the legislature to choose who to disarm would just reinstate the legislative balancing *Bruen* disavowed.

The government first tries to avoid identifying specific regulations purportedly similar to § 922(g)(1) by showing the English Bill of Rights, a Second Amendment predecessor, only guaranteed arms to Protestants, as "suitable to their

Conditions, and as allowed by Law." (GAB-32.) This, the government argues, shows legislatures may determine who is insufficiently "law-abiding" to bear arms. (GAB-32-33.)

That argument proves far too much, as nothing in the English Bill of Rights language limits legislatures to dispossessing felons, as opposed to anyone else. In other words, the government asks this Court to reinstate the "judicial deference to legislative interest balancing" that *Bruen* explicitly rejected. *See* 142 S.Ct. at 2129. Nor does the fact that the English Bill of Rights deferred to the legislature mean that the Second Amendment does too. That 1689 document granted only a "limited right … restricted to Protestants and held only against the Crown, but not Parliament." *Id.* at 2142. The right "matured" and expanded by the Founding, with Americans "swe[eping] aside" the English "as allowed by law" limitation. *See id.*; Joyce Lee Malcolm, *To Keep and Bear Arms* 136-37, 162 (1994).

> **b.    The three failed ratification-era proposals do not show that § 922(g)(1) is constitutional as applied to Duarte.**

The government similarly points to unadopted proposals from the New Hampshire, Massachusetts, and Pennsylvania ratification conventions, claiming that these proposals limited the right to citizens who were both peaceable and law-abiding. (GAB-33, GAB-46-49.) The government's arguments fail, for reasons mostly already addressed in the opening brief, including now-Justice Barrett's convincing explanation for why the proposals shouldn't be understood as

17

addressed to all criminal conduct, (AOB-17-19 (citing *Kanter v. Barr*, 919 F.3d 437, 455-56 (7th Cir. 2019) (Barrett, J., dissenting)), and the obvious observation that none of these proposals made it into the Second Amendment, nor even into contemporaneous state constitutions.  (AOB-16-17.)

In response, the government illogically insists that the proposals' ultimate failure doesn't undermine their significance, and that the Second Amendment silently intended what the proposals stated explicitly.  (GAB-48.)  But the usual assumption when a lawmaking body doesn't adopt draft language is that the stricken language was purposefully omitted.  *See, e.g.*, *United States v. Daniels*, ---F.4th.----, 2023 WL 5091317, at *12 (5th Cir. 2023).  *Heller*'s mention of the proposals, (GAB-48), doesn't change that.  *Heller* uses them to show a common focus on individual rights across Founding-era proposals and state constitutions, not to suggest that rejected language *limits* the Second Amendment.  554 U.S. at 604.  Indeed, *Heller* explicitly warned: "It is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." *Id.* at 590.

Moreover, *Heller* also recognized the proposals are a "dubious" source for Second Amendment interpretation because the Amendment codified an existing right, rather than fashioning a new one.  *Id.* at 603.  If these proposals reflected existing practice, the government should be able to identify Founding-era laws

imposing similar firearms restrictions—evidence that exists for other rights, like voting.  *See, e.g.*, *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting) (identifying early-19th-century state constitutions that excluded certain convicted persons from the franchise).  Yet the government provides no such evidence here.

### c. That some 18th century felonies were punishable by death does not show that § 922(g)(1) is constitutional as applied to Duarte.

Turning to purportedly analogous Founding-era regulations, the government argues that because, according to Blackstone, a "felony" was defined in 18th century England as an offense resulting in total forfeiture of property and capital punishment, today's "felonies" can permissibly be punished with the lesser penalty of dispossession of the right to bear arms.  (GAB-34-40.)  This point is meritless.

First, the government's argument is circular and self-defeating, as it relies on a "felony" being defined as a capital crime.  But that is not the definition of "felony" used today.  For most purposes of federal law, including § 922(g), a "felony" is a crime punishable by imprisonment exceeding a year.  *See* 18 U.S.C. § 3581(b); 18 U.S.C. § 922(g).  And under the government's reasoning, "felonies" for which death is not authorized also don't justify the lesser penalty of permanent dispossession.

Second, in the Founding-era colonies, the definition of "felony" had already shifted from Blackstone's punishable-by-death-and-forfeiture to something less

severe, where very few felonies were punishable by death. (AOB-19-20.) Citing the now-reversed panel opinion in *Range*, the government argues that it doesn't matter if death was rarely imposed, because—it claims—felonies still carried the risk of execution, and so equally exposed people to permanent dispossession. (GAB-39.) But the historical sources don't just say the death penalty was rarely used, but also that felonies were no longer all death-eligible. *See Kanter*, 919 F.3d at 459-60 (Barrett, J., dissenting).

Third, the government's argument fails even on its own terms. As the en banc Third Circuit explained in *Range*, "[t]he greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." 69 F.4th at 105. (*See also* AOB-20-21.) Indeed, this Court and the Supreme Court have implicitly recognized that principle already: as noted in Section II.C, *supra*, while losing one's First or Fourth Amendment rights would be, like the dispossession of firearms, lesser penalties than death, a conviction doesn't remove those rights.

The principle is also borne out by history. A Founding-era felon sentenced who was not executed "could 'repurchase arms' after successfully completing his

sentence and reintegrating into society." *Range*, 69 F.4th at 105.[6]  One key Founding-era statute even *required* prior felons to keep arms: the Militia Act of 1792, enacted just after the Second Amendment, required "each and every" free, able-bodied white male citizen between 18 and 45 to arm himself "with a good musket or firelock"—with no exceptions for prior felons.  Act of May 8, 1792, § 1, 1 Stat. 271.

> **d.  Founding-era laws dispossessing Catholics, slaves, Native Americans, and those disloyal during wartime do not show that § 922(g)(1) is constitutional as applied to Duarte.**

The government also cites laws it claims show a tradition of disarming "untrustworthy individuals and those outside the political community."  (GAB-40.) These include: a 1689 English law requiring Catholics to take an oath to avoid being dispossessed of weapons (but excluding "necessary weapons … for the defense of his House or person"); colonial laws banning gun ownership by slaves and Native Americans; colonial laws imposed disarming Catholics who refused to swear loyalty during the French and Indian War; and Revolutionary War laws

---

[6] Similarly, the governments' repeated references to forfeiture fail.  (GAB-34-35.)  Forfeiting one's estate didn't mean that one could not later acquire new possessions, including arms.  C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 715, 724 (2009)

disarming those perceived as disloyal.  (GAB-40-46.)  Both the justifications and the burden of these laws differed dramatically from § 922(g)(1).

**i.**  In terms of justification, such laws did not dispossess those who were "untrustworthy" because of criminal convictions; rather they focused on those seen as at risk of rebelling, aiding national enemies, or otherwise undermining the state's continued existence.  (*See* AOB-18-19.)

While apparently granting that slaves and Native Americans were considered at danger of rebelling, the government quibbles with Catholics being considered potentially rebellious, and similarly makes much of laws disarming people who refused to swear loyalty oaths during the Revolutionary War, noting that these laws swept in nonviolent people, including Quakers.  (GAB-44-46.) These arguments fundamentally ignore the history of the period.

The claim that English and colonial legislatures perceived Catholics merely as scofflaws disregards episodes like the Gunpowder Plot of 1605—thereafter commemorated annually with parades and pope-burnings—and the Jacobite Rising of 1745.  *See* Carys Brown, *Catholic Politics and Creating Trust in Eighteenth Century England*, 33 British Cath. History 622, 622-23 (2017).  Moreover, the three American colonies that disarmed Catholics did so only when England and its colonies warred with Catholic France.  *See Range v. Att'y Gen.*, 53 F.4th 262, 276-77 (3d Cir. 2022), *rev'd en banc*, 69 F.4th 96 (3d Cir. 2023).

22

Similarly, the Revolutionary War-era loyalty laws came as the Founders were bringing forth a new nation with no guarantee of success: removing arms from those apparently loyal to England was an "obvious precaution." Saul Cornell & Nathan DeDino, *A Well Regulated Right*, 73 Fordham L. Rev. 487, 506 (2004). Pennsylvania's loyalty oath statute dispossessed Quakers because their religion forbade oath-swearing, but Quakers were also "suspected Tory sympathizers" who refused to recognize Pennsylvania's revolutionary government and whose leaders largely ended up exiled to Virginia. *See* Jim Wedeking, *Quaker State*, 2 NYU J.L. & Liberty 28, 50-52 (2006). Some states, like Massachusetts, found a cut-out to avoid dispossessing Quakers as disloyal, Cornell & DeDino, *supra*, at 507; Pennsylvania failing to do so is an unrevealing "outlier" position that cannot constitute the "well-established" tradition *Bruen* requires. 142 S.Ct. at 2133.

Fundamentally, as the en banc Third Circuit recently explained, Founding-era governments disarming groups perceived as disloyal and potentially existential threats to the state, "does nothing to prove that [someone like Duarte] is part of a similar group today." *Range*, 69 F.4th at 105. "[A]ny such analogy would be 'far too broad.'" *Id.* (quoting *Bruen*, 142 S.Ct. at 2134). For one, as the Fifth Circuit has explained, those groups may have been "written out of 'the people'": excluded from the nascent national community for their perceived desire to see it fail. *See United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir.), *cert. granted*, 143 S.Ct. 2688

23

(2023); Malcolm, *supra*, at 141 (Native Americans and slaves not given citizens' rights). And even if those groups were among "the people," compelling allegiance and preventing insurrection during wars and revolution is not meaningfully similar to policing ordinary crime.

**ii.** In terms of burden, the "how" of these laws differed dramatically from § 922(g)(1), which *permanently* dispossesses those it covers. The disloyalty laws "read more like forfeiture laws than disabilities" and so "did not technically prohibit recusants from acquiring new arms." Marshall, *supra*, at 724. Moreover, as the government concedes, many of these measures allowed individuals to reacquire firearms simply by taking an oath. (GAB-42-43, GAB-45-46.) Contrastingly, § 922(g)(1) removes the right to bear arms—not simply weapons momentarily possessed—and affords no opportunity to restore the right at will.

> **e.** **The government's attempt to equate the "how and why" of its historical examples with § 922(g)(1) falls flat.**

In claiming the how and why of its examples are similar to § 922(g)(1), the government asserts that § 922(g)(1) imposes no burden on the "'right to armed self-defense,'" because those with felony convictions have no such right, and that § 922(g)(1) is "'comparably justified'" because "historic laws sought to punish felons and deter re-offending as well as protect society from the untrustworthy." (GAB-50 (quoting *Bruen*, 142 S.Ct. at 2133).)

24

Most of this is dealt with above.  *See, e.g.*, Section II.C (right not limited to the law-abiding); Section II.D.2.d (disarmed groups either "outside the people" or disarmed only temporarily, with guns re-obtainable via oath).  The government's claims fail on that basis alone.  *See Bruen*, 142 S.Ct. at 2133 (laws must present comparable burdens *and* be comparably justified).  But its claim that § 922(g)(1) and the historic examples it cites are comparably justified because they collectively punish felons and protect society from the untrustworthy is also far too general. *All* criminal statutes seek to punish lawbreakers and protect society.  The government's argument thus boils down to an untenable claim that the criminal law as a whole provides a comparable justification for § 922(g)(1).  *Cf. Bruen*, 142 S.Ct. at 2133-34 (rejecting as "far too broad[]" claim that "sensitive place" justification covers everywhere people typically congregate).

### E.    The government's claim that no court has held § 922(g)(1) unconstitutional under *Bruen* is no longer correct.

The government also tries to deluge the Court with citations to cases upholding the constitutionality of § 922(g)(1), and asserts that there was no clear error because no Court has found § 922(g)(1) unconstitutional.  (GAB-52-62.)[7]

---

[7] As discussed in Section II.A, *supra*, while the government asserts that Duarte must meet the plain error standard by showing clear error, Duarte actually must show only good cause, which has no clear error requirement.

But subsequent events have unraveled its arguments. To start, the post-*Bruen* Third Circuit case the government cites, *Range*, has since been reversed en banc. That Circuit now holds that § 922(g)(1) is unconstitutional at least as applied to some nonviolent offenders. *Range*, 69 F.4th at 106.[8]

Similarly, rather than relying on its pre-*Bruen* precedent, the Seventh Circuit recently remanded a § 922(g)(1) case for the in-depth historical analysis required by *Bruen*. *Atkinson*, 70 F.4th at 1022.

By contrast, the government's unreported Fifth Circuit decisions held only that the defendants couldn't prove their plain error facial challenges to the constitutionality of § 922(g)(1), because of a lack of precedent so holding. *United*

---

[8] The government's Rule 28(j) letter characterizes *Range* as a "'narrow' decision" addressing only a state misdemeanant, not a felon. (Dkt 38 at 2.) But that is misleading semantics. "[T]he classification of crimes as "felonies" or "misdemeanors" varies considerably from state to state." *United Union of Roofers, Waterproofers & Allied Workers v. Meese*, 823 F.2d 652, 657-58 (1st Cir. 1987). That is presumably why § 922(g)(1) doesn't mention "felonies" but rather "crime[s] punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). Notwithstanding the "misdemeanor" label in *Range*, that defendant's conviction exposed him to *more* prison time than any prior "felony" committed by Duarte. The *Range* defendant's "misdemeanor" conviction was "punishable by up to five years' imprisonment." *Range*, 69 F.4th at 98. By contrast, none of Duarte's priors was punishable by more than four years. (*See* PSR-6-8.) *See also* Cal. H & S Code § 11350(a); Cal. H & S Code § 11377 (a); Cal. Penal Code § 594(a); Cal. Penal Code § 1170(h); Cal. Penal Code § 29800(a)(1); Cal. Veh. Code § 2800.2. Thus, the *Range* defendant's prior being denominated a misdemeanor is irrelevant: by the sentencing exposure used to apply § 922(g)(1), it was just as serious as Duarte's priors.

*States v. Hickcox*, 2023 WL 3075054, at *1 (5th Cir. 2023); *United States v. Roy*, 2023 WL 3073266, at *1 (5th Cir. 2023).

The "over 100 district court decisions" post-*Bruen*, (GAB-53), similarly show little, because, as the en banc Third Circuit pointed out, "the district courts are bound to follow their circuits' [pre-*Bruen*] precedent." *Range*, 69 F.4th at 106. And several district courts have since ruled that § 922(g)(1) is unconstitutional as applied. *Bullock*, 2023 WL 4232309, at *2 & n.2; *United States v. Quailes*, ---F.Supp.3d----, 2023 WL 5401733, at *1 (M.D. Pa. Aug. 22, 2023); *United States v. Forbis*, No. 4:23-cr-00133-GKF, Dkt 37 (N.D. Okla. Aug. 17, 2023).

The only still-operative circuit decision cited by the government that actually upholds § 922(g)(1) is *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023). (*See* Dkt 38.) Relying on the now-vacated *Range* panel opinion and historical sources similar to the government's citations here, *Jackson* concluded legislatures may disarm any group they deem "dangerous"—no matter how undangerous some of its members may be—as well as those who have "demonstrated disrespect for legal norms of society." *Id*. at 503-04. But *Jackson*'s reasoning fails, for the reasons discussed above. *See, e.g*., Section II.D, *supra* (historical regulations not analogues, let alone "distinctly similar" to § 922(g)(1)). Perhaps most damningly, *Jackson*'s conclusion that legislatures can freely dispossess anyone in a group the legislatures deem dangerous or with "disrespect

27

for legal norms" just reinstates the same "judicial deference to legislative interest balancing" that *Bruen* rejected. 142 S.Ct. at 2129. Under *Jackson*, history wouldn't constrain Congress's power to disarm anyone.

The en banc Third Circuit therefore correctly rejected the government's attempt to justify § 922(g)(1)'s permanent, blanket felon-in-possession ban. *Range*, 69 F.4th at 104-05. This Court should do the same.

## F. All of Duarte's previous convictions were nonviolent, making § 922(g)(1) even more clearly unconstitutional as applied to him.

The opening brief examined Duarte's record and demonstrated that, as the government conceded pretrial, "none of [his] prior convictions are violent." (AOB-23-25; 1-ER-15.) The government's response minimizes its pretrial concession; asserts Duarte's arguments require the categorical (elements-based) approach and that Duarte must also prove his convictions involved no underlying violence; and smears Duarte with past gang-membership and with misleading descriptions of his priors that nonetheless don't show violence. (GAB-63-68.) These points fail. At bottom, the government hasn't proven a tradition of permanent dispossession for conduct like Duarte's.

**1.** The government asserts Duarte must prove not just that his convictions involved no violent elements, but that violence was completely absent even from the underlying circumstances. (GAB-3, GAB-63, GAB-65.) Its authorities, however, impose no burden to prove a negative about years-old events. *United*

28

*States v. Gonzalez Aguilar*, 718 F.3d 1185 (9th Cir. 2013), says only that plain

error requires a "reasonable probability" an error affected the outcome, *id.* at 1189.

And *Hatfield v. Barr*, 925 F.3d 950 (7th Cir. 2019), said a defendant making an as-

applied challenge against a "presumptively lawful" regulation must distinguish his

felonies from other felonies, *id.* at 953.

These authorities are inapplicable here: plain error does not apply, *see*

Section II.A, *supra*, and *Hatfield* conflicts with *Bruen*'s holding that the

government "must affirmatively prove" consistency with tradition. 142 S.Ct. at

2127; *Range*, 69 F.4th at 101 (government carries historical burden even with as

applied challenge). But even applying them, any burden is met. Probation issued

the pre-sentence report after an investigation including database inquiries and a

search for arrest and court records. (PSR-6.) Yet that report includes no violent

convictions, nor any suggestion that violent acts underlay those convictions. (PSR-

6-8.) Hence the government's prior concession that Duarte's priors were

nonviolent. (1-ER-15.)

**2.** The government's attempts to minimize that concession and smear

Duarte as undesirable and possibly violent, (GAB-63-65), only show how weak its

claims are. It says its concession came while discussing Rule of Evidence 609,

which doesn't allow a conviction's underlying details, and so it meant only that his

convictions aren't "categorically violent." (GAB-64-65.) But that both admits

29

Duarte's convictions aren't categorically violent and fails to demonstrate any violence attending them.

Similarly, the government's examination of Duarte's prior record produces only speculation that maybe he did something violent that is not in the record. (GAB-63-65.) It repeatedly asserts he admitted gang membership, (GAB-63-64),[9] but doesn't explain why that would permit permanently dispossessing him. Similarly, it asserts that his convictions for Vehicle Code § 2800.2 required "willful or wanton disregard for the safety of person or property," and there was also an attendant misdemeanor hit-and-run. (GAB-63.) But as previously noted— and ignored by the government—although § 2800.2 uses the "willful or wanton disregard" phrasing, the statute defines that phrase as satisfied merely by three traffic violations or accidental property damage. (AOB-24); Cal. Veh. Code § 2800.2(b); *People v. Pinkston*, 5 Cal. Rptr. 3d 274, 278 (Cal. App. 2003). Thus the offense is not inherently violent or even particularly dangerous. *People v. Howard*, 104 P.3d 107, 113 (Cal. 2005). The same goes for hit-and-run, which requires only improperly leaving the scene of an accident, not that the defendant caused or

---

[9] The government claims the PSR showed Duarte admitting gang membership at the time of this offense. (GAB-64.) The PSR, however, mentions only an undated police record claiming Duarte admitted gang membership, and a gang enhancement imposed eight years before this offense. (PSR ¶¶ 31, 62.)

intended any injury: the crime "is not the 'hitting' but the 'running.'" *People v. Escobar*, 1 Cal. Rptr. 2d 579, 582 (Cal. App. 1991).[10]

**3.**  Regarding the government's attacks on the categorical approach, this Court need not determine whether the categorical approach applies, because even after Probation's pre-sentence investigation and the government's smears there is nothing to suggest violence attending Duarte's convictions.

But to the extent the categorical approach is necessary, the government offers no reason it shouldn't apply.  Its points to concurrences and dissents lodging dissatisfaction with the categorical approach, (GAB-66), but it doesn't propose any better generalized system for determining whether a defendant has a violent criminal history.  To the contrary, it concedes that "case-by-case analysis" of prior convictions would be incredibly unwieldy, and that a prior system of restoring gun rights via case-by-case analysis perished under its own weight.  (GAB-67.)  A non-elements-based system would face "daunting difficulties" like locating and interpreting aged documents, and the fact that when pleading guilty in an earlier proceeding, a defendant may have had no opportunity to challenge non-element allegations.  *See Descamps v. United States*, 570 U.S. 254, 270-71 (2013).

---

[10] Moreover, Duarte's actual hit-and-run charge was for leaving an accident "resulting only in damage to any property," as opposed to injury. (PSR-8); Cal. Veh. Code § 20002.

31

Moreover, jurors in felon-in-possession cases might end up having to sort through confusing claims about old cases; exactly the judicially-inefficient minitrials the categorical approach avoids. *See, e.g.*, *Moncrieffe v. Holder*, 569 U.S. 184, 200-01 (2013).

Moreover, the government ignores the "constitutional rub" that drives the categorical approach. *Descamps*, 570 U.S. at 269. The Sixth Amendment requires that factors that expose a person to an increased maximum criminal sentence must be admitted to a court or found by a jury. *Id.* at 269-70. Here, the government has offered no reason why punishing a person by permanently removing their fundamental right to bear arms—and subjecting them to a new conviction under § 922(g)(1) for exercising that right—could be based on less, for instance untested allegations drawn from an old police report.

Ultimately, however, this Court need not fully-define its approach. Rather, it could follow the en banc Third Circuit and conclude that the government has failed to show a historical tradition of disarmament based on Duarte's prior convictions. 69 F.4th at 106.

### III. CONCLUSION

This Court should vacate Steven Duarte's conviction and dismiss the indictment against him.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: August 28, 2023          By  */s/ SONAM HENDERSON*
                                    SONAM HENDERSON
                                    Deputy Federal Public Defender
                                    Attorney for Defendant-Appellant

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this reply brief is proportionally spaced, has a typeface of 14 points or more, and contains approximately 6997 words.

DATED:  August 28, 2023                */s/ SONAM HENDERSON*
                                                          SONAM HENDERSON

## INDEX OF ADDENDUM

Act of May 8, 1792, § 1, 1 Stat. 271 (Militia Act) ........................................... A1

States, and for appropriating the same, took effect: *And provided also,* That such allowance shall not exceed the annual amount of seventy thousand dollars, until the same shall be further ascertained by law.

not to exceed $70,000.

Sec. 17. *And be it further enacted,* That the act, intituled "An act repealing after the last day of June next, the duties heretofore laid upon distilled spirits imported from abroad and laying others in their stead, and also upon spirits distilled within the United States, and for appropriating the same," shall extend to and be in full force for the collection of the several duties herein before mentioned and for the recovery and distribution of the penalties and forfeitures herein contained and generally for the execution of this act, as fully and effectually as if every regulation, restriction, penalty, provision, clause, matter, and thing therein contained were inserted in and re-enacted by this present act, subject only to the alterations hereby made.

Certain act in force for collection of the duties, &c. herein.

1791, ch. 15.

Approved, May 8, 1792.

Statute I.

Chap. XXXIII.—*An Act more effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States.*(a)

May 8, 1792.

Section 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia by the captain or commanding officer of the company, within whose bounds such citizen shall reside, and that within twelve months after the passing of this act. And it shall at all times hereafter be the duty of every such captain or commanding officer of a company to enrol every such citizen, as aforesaid, and also those who shall, from time to time, arrive at the age of eighteen years, or being of the age of eighteen years and under the age of forty-five years (except as before excepted) shall come to reside within his bounds; and shall without delay notify such citizen of the said enrolment, by a proper non-commissioned officer of the company, by whom such notice may be proved. That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack. That the commissioned officers shall severally be armed with a sword or hanger and espontoon, and that from and after five years from the passing of this act, all muskets for arming the militia as herein required, shall be of bores sufficient for

Militia how and by whom to be enrolled.

How to be armed and accoutred.

1803, ch. 15.

(a) The acts for the establishment of an uniform system for the government of the militia, are: An act more effectually to provide for the national defence by establishing an uniform militia throughout the United States, May 8, 1792, chap. 33; an act providing arms for the militia throughout the United States, July 6, 1798, chap. 65; an act in addition to an act entitled, "An act more effectually to provide for the national defence, by establishing an uniform militia throughout the United States," March 2, 1803, chap. 15; an act more effectually to provide for the organizing of the militia of the District of Columbia, March 3, 1803, chap. 20; an act establishing rules and articles for the government of the armies of the United States, April 10, 1806, chap. 20; an act in addition to the act entitled, "An act to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and to repeal the act now in force for those purposes," April 18, 1814, chap. 82; an act concerning field officers of the militia, April 20, 1816, chap. 64; an act to establish an uniform mode of discipline and field exercise for the militia of the United States, May 12, 1820, chap. 96; an act to reduce and fix the military peace establishment of the United States, March 2, 1821, chap. 12, sec. 14.

A 1

balls of the eighteenth part of a pound. And every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes.

**Executive officers, &c. exempted.**

SEC. 2. *And be it further enacted,* That the Vice President of the United States; the officers judicial and executive of the government of the United States; the members of both Houses of Congress, and their respective officers; all custom-house officers with their clerks; all post-officers, and stage drivers, who are employed in the care and conveyance of the mail of the post-office of the United States; all ferrymen employed at any ferry on the post road; all inspectors of exports; all pilots; all mariners actually employed in the sea service of any citizen or merchant within the United States; and all persons who now are or may hereafter be exempted by the laws of the respective states, shall be, and are hereby exempted from militia duty, notwithstanding their being above the age of eighteen, and under the age of forty-five years.

**1810, ch. 37, sec. 33.**

**Militia how to be arranged, and**

SEC. 3. *And be it further enacted,* That within one year after the passing of this act, the militia of the respective states shall be arranged into divisions, brigades, regiments, battalions and companies, as the legislature of each state shall direct; and each division, brigade and regiment, shall be numbered at the formation thereof; and a record made of such numbers in the adjutant-general's office in the state; and when in the field, or in service in the state, each division, brigade and regiment shall respectively take rank according to their numbers, reckoning the first or lowest number highest in rank. That if the same be convenient, each brigade shall consist of four regiments; each regiment of two battalions; each battalion of five companies; each company of

**by whom officered.**

sixty-four privates. That the said militia shall be officered by the respective states, as follows: To each division, one major-general and two aids-de-camp, with the rank of major; to each brigade, one brigadier-general, with one brigade inspector, to serve also as brigade-major, with the rank of a major; to each regiment, one lieutenant-colonel commandant; and to each battalion one major; to each company one captain, one lieutenant, one ensign, four sergeants, four corporals, one drummer and one fifer or bugler. That there shall be a regimental staff, to con-

**1803, ch. 15, sec. 3.**

sist of one adjutant and one quartermaster, to rank as lieutenants; one paymaster; one surgeon, and one surgeon's mate; one sergeant-major; one drum-major, and one fife-major.

**Each battalion to have one company of grenadiers, &c. and one company of artillery.**

SEC. 4. *And be it further enacted,* That out of the militia enrolled, as is herein directed, there shall be formed for each battalion at least one company of grenadiers, light infantry or riflemen; and that to each division there shall be at least one company of artillery, and one troop of horse: there shall be to each company of artillery, one captain, two lieutenants, four sergeants, four corporals, six gunners, six bombadiers, one

**Officers how to be armed.**

drummer, and one fifer. The officers to be armed with a sword or hanger, a fusee, bayonet and belt, with a cartridge-box to contain twelve cartridges; and each private or matross shall furnish himself with all the equipments of a private in the infantry, until proper ordnance and field

**Troops of horse how officered, &c.**

artillery is provided. There shall be to each troop of horse, one captain, two lieutenants, one cornet, four sergeants, four corporals, one saddler, one farrier, and one trumpeter. The commissioned officers to furnish themselves with good horses of at least fourteen hands and an half high, and to be armed with a sword and pair of pistols, the holsters of which to be covered with bearskin caps. Each dragoon to furnish himself with a serviceable horse, at least fourteen hands and an half high, a good saddle, bridle, mailpillion and valise, holsters, and a breast-plate and crupper, a pair of boots and spurs, a pair of pistols, a sabre, and a cartouch-box, to

**Artillery and horse of whom to be formed;**

contain twelve cartridges for pistols. That each company of artillery and troop of horse shall be formed of volunteers from the brigade, at the

A 2

Case: 22-50048, 08/28/2023, ID: 12782055, DktEntry: 47, Page 46 of 47

discretion of the commander-in-chief of the state, not exceeding one company of each to a regiment, nor more in number than one eleventh part of the infantry, and shall be uniformly clothed in regimentals, to be furnished at their own expense; the colour and fashion to be determined by the brigadier commanding the brigade to which they belong.

to be uniformly clad at their own expense.

1803, ch. 15.

Sec. 5. *And be it further enacted*, That each battalion and regiment shall be provided with the state and regimental colours by the field officers, and each company with a drum and fife, or bugle-horn, by the commissioned officers of the company, in such manner as the legislature of the respective states shall direct.

What colors &c. and by whom to be furnished.

Sec. 6. *And be it further enacted*, That there shall be an adjutant-general appointed in each state, whose duty it shall be to distribute all orders from the commander-in-chief of the state to the several corps; to attend all public reviews when the commander-in-chief of the state shall review the militia, or any part thereof; to obey all orders from him relative to carrying into execution and perfecting the system of military discipline established by this act; to furnish blank forms of different returns that may be required, and to explain the principles on which they should be made; to receive from the several officers of the different corps throughout the state, returns of the militia under their command, reporting the actual situation of their arms, accoutrements, and ammunition, their delinquencies, and every other thing which relates to the general advancement of good order and discipline: all which the several officers of the divisions, brigades, regiments, and battalions, are hereby required to make in the usual manner, so that the said adjutant-general may be duly furnished therewith: from all which returns he shall make proper abstracts, and lay the same annually before the commander-in-chief of the state.

Adjutant-general in each state, his duty.

1803, ch. 15.

Sec. 7. *And be it further enacted*, That the rules of discipline, approved and established by Congress in their resolution of the twenty-ninth of March, one thousand seven hundred and seventy-nine, shall be the rules of discipline to be observed by the militia throughout the United States, except such deviations from the said rules as may be rendered necessary by the requisitions of this act, or by some other unavoidable circumstances. It shall be the duty of the commanding officer at every muster, whether by battalion, regiment, or single company, to cause the militia to be exercised and trained agreeably to the said rules of discipline.

Rules of discipline.

Sec. 8. *And be it further enacted*, That all commissioned officers shall take rank according to the date of their commissions; and when two of the same grade bear an equal date, then their rank to be determined by lot, to be drawn by them before the commanding officer of the brigade, regiment, battalion, company, or detachment.

Officers how to take rank.

Sec. 9. *And be it further enacted*, That if any person, whether officer or soldier, belonging to the militia of any state, and called out into the service of the United States, be wounded or disabled while in actual service, he shall be taken care of and provided for at the public expense.

Provision in case of wounds, &c.

Sec. 10. *And be it further enacted*, That it shall be the duty of the brigade-inspector to attend the regimental and battalion meetings of the militia composing their several brigades, during the time of their being under arms, to inspect their arms, ammunition, and accoutrements; superintend their exercise and manœuvres, and introduce the system of military discipline before described throughout the brigade, agreeable to law, and such orders as they shall from time to time receive from the commander-in-chief of the state; to make returns to the adjutant-general of the state, at least once in every year, of the militia of the brigade to which he belongs, reporting therein the actual situation of the arms, accoutrements, and ammunition of the several corps, and every other thing which, in his judgment, may relate to their government and the

Brigade inspector's duty.

1803, ch. 15.

A 3

**274**                SECOND CONGRESS.  Sess. I. Ch 34.  1792.

general advancement of good order and military discipline; and the adjutant-general shall make a return of all the militia of the state to the commander-in-chief of the said state, and a duplicate of the same to the President of the United States.

<span style="float:left">Artillery &c.<br>now existing,</span>

And whereas sundry corps of artillery, cavalry, and infantry now exist in several of the said states, which by the laws, customs, or usages thereof have not been incorporated with, or subject to the general regulations of the militia:

<span style="float:left">to retain their<br>privileges.</span>

SEC. 11. *Be it further enacted,* That such corps retain their accustomed privileges, subject, nevertheless, to all other duties required by this act, in like manner with the other militia.

APPROVED, May 8, 1792.

<span style="float:left">STATUTE I.</span>

--------

<span style="float:left">May 8, 1792.</span>

CHAP. XXXIV.—*An Act relative to the compensations to certain officers employed in the collection of the duties of impost and tonnage.*

<span style="float:left">[Obsolete.]<br>Additional<br>specific allow-<br>ance from 1st of<br>July next to cer-<br>tain surveyors<br>and collectors.<br>1790, ch. 35,<br>sec. 53.<br>Act of March<br>2, 1799, ch. 23.</span>

SECTION 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That from and after the last day of June next, in addition to the fees and emoluments which may accrue to the officers employed in the collection of the duties of impost and tonnage, by the provisions already made, they shall severally have and be entitled to the respective allowances following, to wit: The surveyors of Newburyport, Salem, St. Mary's and Wilmington, in North Carolina, the yearly sum of one hundred dollars each; the surveyors of Beverly, North Kingston, East Greenwich, Warren, Bristol, Pawcatuck river, Providence, Patuxet, New Haven, Lewellensburg, Alexandria, Beaufort, Hertford, Winton, Bennet's creek, Plymouth, Windsor, Skewarkey, Murfreesborough, Nixonton, Indiantown, Currituck inlet, Pasquotank river bridge, and Newbiggen creek, the yearly sum of eighty dollars each; the surveyor of Portsmouth, the yearly sum of sixty dollars; the surveyors of Ipswich, Portland, Newport, Stonington, Middleton, Bermuda hundred, Petersburg, Richmond, and Savannah, the yearly sum of fifty dollars each; the surveyors of Gloucester, New London, and Swansborough, the yearly sum of thirty dollars each; the surveyors of Hudson, Little Egg Harbour, Suffolk, Smithfield, Urbanna, and Fredericksburg, the yearly sum of twenty dollars each; the collector of the district of Wilmington, in North Carolina, the yearly sum of one hundred and fifty dollars; the collectors of the districts of Portsmouth, Gloucester, Albany, Annapolis, Vienna, Nottingham, Yorktown, Dumfries, and Louisville, the yearly sum of one hundred dollars each; the collector of the district of Fairfield, the yearly sum of eighty dollars; the collectors of the districts of Marblehead, Plymouth, Barnstable, Nantucket, New Bedford, Dighton, York, Biddeford, and Pepperelborough, Bath, Wiscasset, Machias, Newport, New Haven, Perth Amboy, Great Egg Harbour, Wilmington, in Delaware, Chester, Cedar Point, Georgetown, Hampton, South Quay, Washington, Plank Bridge, and Georgetown, in South Carolina, the yearly sum of fifty dollars each; the naval officer of the district of Portsmouth, the yearly sum of one hundred dollars; the naval officers of the districts of Newburyport, Newport, Providence, Wilmington, in North Carolina, and Savannah, the yearly sum of fifty dollars each; the collector of the district of Salem and Beverly, one fourth of one per centum on the amount of all monies by him received on account of the said duties; and to the collectors of the districts of Portsmouth, Newburyport, Gloucester, Marblehead, Plymouth, Nantucket, Edgartown, New Bedford, Dighton, York, Biddeford, and Pepperelborough, Portland, Bath, Wiscasset, Penobscot, Frenchman's bay, Machias, Newport, Providence, New Haven, Fairfield, Perth Amboy, Burlington, Great Egg Harbour, Wilmington, in Delaware, Oxford, Vienna, Snowhill, Annapo-

<span style="float:right">A 4</span>