# Exhibit A

(Brief for the United States, *United States v. Rahimi,* S. Ct. No. 22-915)

No. 22-915

# In the Supreme Court of the United States

UNITED STATES OF AMERICA, PETITIONER

*v.*

ZACKEY RAHIMI

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

**BRIEF FOR THE UNITED STATES**

ELIZABETH B. PRELOGAR
 *Solicitor General
  Counsel of Record*
NICOLE M. ARGENTIERI
 *Acting Assistant Attorney
  General*
BRIAN H. FLETCHER
 *Deputy Solicitor General*
VIVEK SURI
 *Assistant to the Solicitor
  General*
WILLIAM A. GLASER
 *Attorney*

 *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

**QUESTION PRESENTED**

Whether 18 U.S.C. 922(g)(8), which prohibits the possession of firearms by persons subject to domestic-violence protective orders, violates the Second Amendment on its face.

(I)

# TABLE OF CONTENTS

Page

Opinion below.............................................................. 1
Jurisdiction.................................................................. 1
Constitutional and statutory provisions involved................... 1
Statement................................................................... 1
Summary of argument.................................................. 6
Argument.................................................................... 9
    A.  The Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens................................................ 10
        1.  This Court's precedents recognize that Congress may disarm persons who are not law-abiding, responsible citizens ......................... 11
        2.  History confirms that Congress may disarm persons who are not law-abiding, responsible citizens.................................................. 13
        3.  The Nation has a long tradition of disarming persons who are not law-abiding, responsible citizens................................................ 22
    B.  Section 922(g)(8) complies with the Second Amendment................................................. 27
        1.  Individuals subject to domestic-violence protective orders are not responsible .................. 29
        2.  Section 922(g)(8)'s strict requirements confirm its constitutionality............................................ 32
        3.  Restrictions like Section 922(g)(8) are commonplace throughout the United States........ 34
    C.  The contrary arguments lack merit........................... 36
        1.  Congress may disarm persons subject to protective orders even if they are among "the people" ............................................ 36
        2.  Congress may disarm persons subject to protective orders even if the Founders did not ... 38

(III)

IV

Table of Contents—Continued:                                    Page

    3.  The Fifth Circuit misunderstood the historical
        inquiry required by this Court's precedents ........ 41
    4.  Judge Ho's criticisms of protective orders lack
        merit ............................................................................ 44
Conclusion ...................................................................................... 46
Appendix  —  Constitutional and statutory provisions .......... 1a

## TABLE OF AUTHORITIES

Cases:

*Abbott* v. *Abbott*, 67 Me. 304 (1877) ....................................... 40
*Chouk* v. *Chouk*, No. 2022-CA-1193,
    2023 WL 2193405 (Ky. Ct. App. Feb. 24, 2023) ............... 35
*Clementz-McBeth* v. *Craft*, No. 2-11-16,
    2012 WL 776851 (Ohio Ct. App. Mar. 12, 2012) .............. 35
*Counterman* v. *Colorado*, 143 S. Ct. 2106 (2023) .............. 37
*Dickerson* v. *New Banner Institute, Inc.*,
    460 U.S. 103 (1983) ................................................................ 27
*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008) ......................... 6, 10-13, 16-18, 36-39, 43
*Duckworth* v. *Arkansas*, 314 U.S. 390 (1941) .................... 39
*Kanter* v. *Barr*, 919 F.3d 437 (7th Cir. 2019) ..................... 28
*McDonald* v. *City of Chicago*,
    561 U.S. 742 (2010) ........................................... 8, 10, 11, 35
*McIntyre* v. *Ohio Elections Commission*,
    514 U.S. 334 (1995) ................................................................ 39
*NYSRPA* v. *Bruen*,
    142 S. Ct. 2111 (2022) .............. 5, 6, 10-13, 15, 22, 24, 35-39,
                                41, 42, 46
*NYSRPA* v. *City of New York*,
    140 S. Ct. 1525 (2020) ......................................................... 28
*Parke* v. *Raley*, 506 U.S. 20 (1992) ....................................... 44

V

Cases—Continued:                                            Page

*Patterson* v. *Winn*, 5 Pet. 233 (1831) .................................. 23

*Rehaif* v. *United States*, 139 S. Ct. 2191 (2019) ................. 38

*Robertson* v. *Baldwin*, 165 U.S. 275 (1897) ........................ 36

*State* v. *Hogan*, 58 N.E. 572 (Ohio 1900) ............................ 26

*State* v. *Rhodes*, 61 N.C. 453 (1868) .................................... 40

*State* v. *Shelby*, 2 S.W. 468 (Mo. 1886) ............................... 26

*Thompson* v. *Thompson*, 218 U.S. 611 (1910) .................... 40

*United States* v. *Bena*, 664 F.3d 1180
   (8th Cir. 2011) ................................................................ 29

*United States* v. *Boyd*, 999 F.3d 171 (3d Cir.),
   cert. denied, 142 S. Ct. 511 (2021) .................................... 29

*United States* v. *Bullock*, No. 18-cr-165,
   2023 WL 4232309 (S.D. Miss. June 28, 2023) ................. 38

*United States* v. *Castleman*, 572 U.S. 157 (2014) ........... 9, 29

*United States* v. *Daniels*, No. 22-60596,
   2023 WL 5091317 (5th Cir. Aug. 9, 2023) ........................ 37

*United States* v. *Hayes*, 555 U.S. 415 (2009) ................... 1, 9

*United States* v. *McGinnis*, 956 F.3d 747
   (5th Cir. 2020), cert. denied,
   141 S. Ct. 1397 (2021) ...................................................... 5

*United States* v. *Skoien*, 614 F.3d 638
   (7th Cir. 2010), cert. denied,
   562 U.S. 1303 (2011) ................................................... 28, 30

*Voorhees* v. *Jackson*, 10 Pet. 449 (1836) ............................ 44

*Williams-Yulee* v. *Florida Bar*,
   575 U.S. 433 (2015) ......................................................... 44

*Zuber* v. *Allen*, 396 U.S. 168 (1969) .................................... 39

VI

Constitution and statutes:                              Page

U.S. Const.:

    Amend. I.............................................................. 36

    Amend. II ............................ 2, 5-13, 16, 18, 22, 27-29, 32,
                                  35-37, 40-45, 1a

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 .................... 24

Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2,
   75 Stat. 757 ........................................................... 26

Bipartisan Safer Communities Act,
   Pub. L. No. 117-159, Div. A, Tit. II,
   § 12004(c)(2), 136 Stat. 1329.................................... 4

Federal Firearms Act, ch. 850, § 2(d)-(f),
   52 Stat. 1251 .......................................................... 26

Firearms Owners' Protection Act,
   Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 452 ................ 27

Gun Control Act of 1968, Pub. L. No. 90-618,
   § 102, 82 Stat. 1220 ................................................ 26

Omnibus Consolidated Appropriations Act, 1997,
   Pub. L. No. 104-208, Div. A, Tit. I, Sec. 101(f)
   [tit. VI, § 658(b)(2)], 110 Stat. 3009-372 ............................ 27

Violent Crime Control and Law Enforcement
   Act of 1994, Pub. L. No. 103-322, § 110401(c),
   108 Stat. 2014 ....................................................... 27

18 U.S.C. 921(a)(32) ................................................... 4

18 U.S.C. 922(g) ........................................................ 38

18 U.S.C. 922(g)(1) ................................................ 28, 38

18 U.S.C. 922 (g)(3) .................................................. 37

18 U.S.C. 922(g)(5)(A) ................................................ 28

18 U.S.C. 922(g)(5)(B) ................................................ 28

18 U.S.C. 922(g)(8)............ 2, 4-10, 28, 29, 33-36, 38, 42-45, 1a

18 U.S.C. 922(g)(8)(A) ......................................... 4, 33, 1a

18 U.S.C. 922(g)(8)(B) ......................................... 4, 33, 1a

18 U.S.C. 922(g)(8)(C) ...................................... 4, 33, 45, 1a

VII

Statutes—Continued:                                           Page

18 U.S.C. 922(g)(8)(C)(i)..............................................33, 45, 1a

18 U.S.C. 922(g)(8)(C)(ii) .........................................33. 45, 1a

18 U.S.C. 924(a)(2) (2018) .................................................4, 2a

18 U.S.C. 924(a)(8).................................................................4

Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of
    the Province of Massachusetts Bay* 52-53 (1869)............23

Act of June 14, 1701, ch. 7, 1 *Laws of New
    Hampshire* 679 (Albert Stillman Batchellor
    ed., 1904)................................................................................23

Act of Dec. 1775, *The Public Records of the Colony of
    Connecticut From May, 1775 to June, 1776,
    inclusive* 193 (Charles J. Hoadly ed., 1890)....................22

Act of 1776, 7 *Records of the Colony of Rhode Island
    and Providence Plantations in New England*
    567 (John Russell Bartlett ed., 1862)...............................22

Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves,
    Public and Private, of the Province
    of Massachusetts Bay* 480 (1886).......................................22

Act of 1777, ch. 6, § 9, 24 *The State Records of North
    Carolina* (Walter Clark ed., 1905) ....................................22

Act of May 1777, ch. 3, 9 *The Statutes at Large:
    Being a Collection of All the Laws of Virginia,
    from the First Session of the Legislature, in the
    Year 1619*, at 282 (William Waller Hening ed., 1821)......22

Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General
    Assembly of the State of New-Jersey*
    90 (1777).................................................................................22

Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts
    120 (1890)...............................................................................23

Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at
    Large of Pennsylvania from 1682 to 1801*,
    at 209-210 (1906) ................................................................24

VIII

Statutes—Continued:                                     Page

Act of Nov. 27, 1786, ch. 21, *A Collection of all such
Acts of the General Assembly of Virginia, of a
Public and Permanent Nature, as are now in
Force* 33 (1794) .................................................................... 23

Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special
Statutes of the Commonwealth of Massachusetts*
145-147 (1805)...................................................................... 23

Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of
New-York*, 95-96 (2d ed. 1807).......................................... 23

Act of Feb. 18, 1794, § 1, *The Laws of the State of
New Hampshire* 460 (1815) ............................................... 23

Act of Apr. 30, 1855, §§ 1-2, *in* 2 *The General Laws of
the State of California, from 1850 to 1864, inclusive*
1076-1077 (Theodore H. Hitchell ed., 1865) ..................... 26

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17.............. 24

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92.......... 25

Act of Feb. 23, 1867, ch. 12, § 1,
1867 Kan. Sess. Laws 25 ...................................................... 26

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59 ........... 25

Act of Feb. 17, 1876, No. 128, § 1,
1876 Ga. Laws 112 ................................................................ 25

Act of Feb. 28, 1878, ch. 46, § 2,
1878 Miss. Laws 17525 ................................................... 25, 26

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170.......... 25

Act of Nov. 26, 1878, No. 14, § 3,
1878 Vt. Acts & Resolves 30 ................................................ 25

Act of Mar. 4, 1879, ch. 188, § 4,
1879 Wis. Sess. Laws 274..................................................... 25

Act of Mar. 12, 1879, ch. 198, § 2,
1879 N.C. Sess. Laws 355 .................................................... 25

Act of Mar. 27, 1879, ch. 59, § 4,
1879 Conn. Pub. Acts 394..................................................... 25

IX

Statutes—Continued:                               Page

Act of Mar. 27, 1879, ch. 155, § 8,
16 Del. Laws 225 (1879)....................................................25

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34 .........................25

Act of June 12, 1879, § 2, 1879 Ohio Laws 192....................25

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80 ...............25

Act of Apr. 9, 1880, ch. 806, § 3,
1880 R.I. Acts & Resolves 110.........................................25

Act of Apr. 24, 1880, ch. 257, § 4,
1880 Mass. Acts 232.........................................................25

Act of May 5, 1880, ch. 176, § 4,
1880 N.Y. Laws, Vol. 2, at 297 ........................................25

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1,
1881 Fla. Laws 87 ......................................................24, 25

Act of Apr. 8, 1881, ch. 548, § 1,
16 Del. Laws 716 (1881).................................................24

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73 ........................25

Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112...............25

Act of Feb. 10, 1882, ch. 4, §§ 1-2,
1882 N.J. Acts 13-14 .......................................................25

Act of Mar. 29, 1882, ch. 135, § 1,
1882 W. Va. Acts 421 ......................................................25

Act of May 3, 1882, ch. 424, § 2,
1882 Md. Laws 656 ..........................................................25

Act of Mar. 5, 1883, ch. 105, § 1,
1883 Kan. Sess. Laws 159 ...............................................25

Act of Apr. 3, 1883, ch. 329,
1883 Wis. Sess. Laws, Vol. 1, at 390:

§ 2 ..................................................................................25

§ 3 ..................................................................................26

Act of Apr. 13, 1883, ch. 374, § 1,
1883 R.I. Acts & Resolves 157.........................................25

X

Statutes—Continued:                                                   Page

Act of May 10, 1883, § 1, ch. 375,
    1883 N.Y. Laws 556 ......................................................... 25

Act of June 2, 1883, No. 138, § 1,
    1883 Mich. Pub. Acts 144 .............................................. 25

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory
    of Wash. 67 .......................................................................... 25

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86 ........... 25

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51 ............. 25

Act of Mar. 14, 1890, ch. 73, § 97,
    1890 Wyo. Territory Sess Laws 140 ................................ 25

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69............. 25

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39 ............... 25

Act of Mar. 6, 1893, ch. 514, § 1,
    1893 N.C. Pub. Laws 468 ............................................... 25

Act of Nov. 16, 1896, No. 111, § 1,
    1896 Vt. Acts & Resolves 83 .......................................... 25

Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221 ............. 25

Act of Feb. 17, 1899, ch. 1, § 52,
    1899 N.C. Pub. Laws 20-21 ........................................... 25

Ordinance of Oct. 9, 1652, *Laws and Ordinances of
    New Netherland, 1638-1674*, at 138
    (E.B. O'Callaghan ed., 1868)............................................. 23

Resolves of Apr. 6, 1776, 8 *The Statutes at Large of
    Pennsylvania from 1682-1801* (1902) .............................. 22

Ala. Code § 13A-11-72(a)................................................... 34

Alaska Stat. § 18.66.100(c)(6)-(7).......................................... 35

Am. Samoa Code Ann.:

    § 47.0204(b)(5) .............................................................. 35

    § 47.0204(c)(1) .............................................................. 35

Ariz. Rev. Stat. Ann. § 13-3602(G)(4) ................................. 35

Cal. Fam. Code § 6389(a)................................................... 34

Colo. Rev. Stat. § 13-14-105.5(1)(a)..................................... 34

XI

Statutes—Continued:                                                     Page

Conn. Gen. Stat. § 53a-217(a)(4)............................................34
Del. Code Ann. tit. 10 § 1045(a)(8) .......................................35
D.C. Code § 16-1004(h)(2)....................................................34
Fla. Stat. § 790.233(1).........................................................34
Haw. Rev. Stat. § 134-7(f)....................................................34
Ill. Comp. Stat. Ch. 430 Stat. 65/8.2......................................34
Ind. Code § 34-26-5-9(d)(4) .................................................35
Iowa Code § 724.26(2)(a)......................................................34
Kan. Stat. Ann. § 21-6301(a)(17) ..........................................34
Ky. Gen. Stat. ch. 29, Art. 29, § 1 (Edward I. Bullock
    & William Johnson eds., 1873).........................................25
Ky. Rev. Stat. Ann. § 403.740(1)(c) ......................................35
La. Child Code Ann. art. 1570(I)...........................................34
La. Rev. Stat. Ann. § 46:2136.3(A) .......................................34
Me. Rev. Stat. Ann. tit. 15, § 393(1)(D) ...............................34
Md. Code Ann. Pub. Safety § 5-133(b)(12)...........................34
Mass. Gen. Laws ch. 140, § 129B(1)(vii)...............................34
Mass. Rev. Stat. ch. 134, § 16 (1836)....................................24
Mich. Comp. Laws Ann. § 600.2950(1)(e)............................35
Minn. Stat. § 624.713, subdiv. 1(13) .....................................24
Miss. Rev. Code ch. 77, § 2964 (1880) ..................................25
1 Mo. Rev. Stat. ch. 24, Art. II, § 1274
    (John A. Hockaday et al. eds., 1879)...........................25, 26
Mont. Code Ann. § 40-15-201(f) ...........................................35
Neb. Rev. Stat. Ann. § 42-924(1)(a)(vii)...............................35
Nev. Rev. Stat. Ann. § 33.0305(1) ........................................35
N.H. Rev. Stat. Ann. § 173-B:5(II) ......................................34
N.J. Rev. Stat. § 2C:25-29(b)................................................34
N.M. Stat. Ann. § 30-7-16.D ................................................34
N.Y. Crim. Proc. Law § 530.14(2) ........................................34
N.C. Gen. Stat. § 14-269.8(a) ...............................................35

XII

Statutes—Continued:                                                 Page

N.D. Cent. Code § 14.07.1-02.4.g ........................................ 35

8 N. Mar. I. Code:

    § 1916(b)(5)........................................................ 35

    § 1916(c)(1) ........................................................ 35

Ohio Rev. Code Ann. § 3113.31 ........................................... 35

Or. Rev. Stat. 166.255(1)(a).................................................34

23 Pa. Cons. Stat. Ann. § 6108(a.1)(1)..................................34

P.R. Laws Ann. tit. 8, § 621 ................................................34

R.I. Gen. Laws § 11-47-5(b).................................................34

S.C. Code Ann. § 16-25-30(A)(4) .........................................34

S.D. Codified Laws § 25-10-24 ............................................35

Tenn. Code Ann. § 39-13-113(h)(1) ......................................34

Tex. Fam. Code Ann. § 85.022(d) ........................................34

Utah Code Ann. § 76-10-503(b)(xi)........................................34

Vt. Stat. Ann. tit. 15, § 1104(a)(1)(E) ...................................35

V.I. Code Ann. Tit. 23, § 456a(a)(8).......................................34

Va. Code Ann. § 18.2-308.1:4(A)...........................................34

Wash. Rev. Code § 9.41.040(2)(a)(iv) ....................................35

W. Va. Code Ann. § 61-7-7(7)...............................................35

Wis. Stat. § 813.12(4m)(a) ...................................................35

Bill of Rights, 1 W. & M. Sess. II, c. 2

    (1688) (Eng.)...................................................... 13, 14

Militia Act of 1662, 14 Car. 2, c. 3, § 13 (Eng.).................... 14

Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.) ....... 15

Miscellaneous:

Avanti Adhia et al., *Nonfatal use of firearms in*
*intimate partner violence: Results of a national*
*survey*, 147 Prev. Med. 106,500 (June 2021) .................... 30

Theodore Barlow, *The Justice of Peace* (1745)................... 15

4 William Blackstone, *Commentaries on the Laws of*
*England* (10th ed. 1787).............................................. 15, 43

XIII

Miscellaneous—Continued:                 Page

Anthony A. Braga et al., *Firearm Instrumentality: Do Guns Make Violent Situations More Lethal*, 2021 Ann. Rev. Criminology 147 .............................. 29

Nick Bruel & Mike Keith, *Deadly Calls and Fatal Encounters: Analysis of U.S. law enforcement line of duty deaths when officers responded to dispatched calls for service and conducted enforcement, 2010-2014* (2016) ................................ 31

1 Richard Burn, *The Justice of the Peace, and Parish Officer* (2d ed. 1756) ............................................ 15

*Calendar of State Papers, Domestic Series*:

     *Charles II, 1661-1662* (Mary Anne Everett Green ed., 1861) .................................................... 14

     *1670* (Mary Anne Everett Green ed., 1895) ................ 14

     *May 1,1684–February 5, 1685* (F.H. Blackburne Daniell & Francis Bickley eds., 1938) .................... 14

     *Of the Reign of William III, 1 April, 1700– 8 March, 1702* (Edward Bateson ed., 1937) ........... 14

*Chickasaw, The Scout, in* R.W. Surby, *Grierson Raids* (1865) ...................................... 20

Nicholas Collin, *Remarks on the Amendments to the Federal Constitution . . . by a Foreign Spectator*, No. 11 (Nov. 28, 1788), *in Three Neglected Pieces of the Documentary History of the Constitution and Bill of Rights* (Stanton D. Krauss ed., 2019) .................. 17

Cong. Globe App., 34th Cong., 1st Sess. (Aug. 7, 1856) ...................................................... 19

Cong. Globe, 39th Cong., 1st Sess. (1866):

     pp. 908-909 .......................................................... 21

     p. 915 ................................................................... 20

XIV

Miscellaneous—Continued:                                    Page

Reinie Cordier et al., *The Effectiveness of
Protection Orders in Reducing Recidivism in
Domestic Violence: A Systematic Review and
Meta-Analysis*, 22 Trauma, Violence, & Abuse 804
(2021) ............................................................................ 30

James Davis, *The Office and Authority of a Justice
of Peace* (1774) .............................................................. 23

*The Documentary History of the Ratification of the
Constitution*:

    Vol. 2 (Merrill Jensen ed., 1976) ..................................... 17

    Vol. 6 (John P. Kaminski & Gaspare J. Saladino
    eds., 2000) ................................................................... 18

    Vol. 7, Letter from Jeremy Belknap to Ebenezer
    Hazard (Feb. 10, 1788) (John P. Kaminski &
    Gaspare J. Saladino eds., 2001) ................................. 18

Joseph Gales, *Prevention of Crime*, *in* O.H. Smith,
*Early Indiana Trials and Sketches* (1858) ..................... 19

Robert Gardiner, *The Compleat Constable*
(3d ed. 1708) ................................................................. 15

Lisa B. Geller et al., *The role of domestic violence in
fatal mass shootings in the United States, 2014-
2019*, 8 Injury Epidemiology 38 (2021) ....................... 32

Joseph Greenleaf, *An Abridgment of Burn's Justice
of the Peace and Parish Officer* (1773) ........................... 23

A.J. Grover, *Impeachment of Franklin* Pierce
(Aug. 1, 1856), *in* The Liberator, Aug. 22, 1856 ............. 20

H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. (1866) ........ 21

H.R. Rep. No. 30, 39th Cong., 1st Sess. (1866) ................. 21

1 William Hawkins, *A Treatise of the Pleas of the
Crown* (1716) ................................................................. 15

XV

Miscellaneous—Continued:                                    Page

Hdqrs. Dep't of the Missouri, General Orders,
No. 86 (Aug. 25, 1863), *in The War of the Rebellion:
A Compilation of the Official Records of the Union
and Confederate Armies*, ser. 1, vol. 22, pt. 2 (1888)....... 20

William Waller Hening, *The New Virginia Justice*
(1795) ................................................................... 23

*High-Handed Outrage in Kansas*, Holmes County
Republican, Oct. 30, 1856 ........................................ 20

John Holmes, *The Statesman, or Principles of
Legislation and Law* 186 (1840)................................ 19

G. Jacob, *Lex Constitutionis* (2d ed. 1737) ........................ 15

Giles Jacob, *The Modern Justice* (1716) ............................ 15

4 *Journals of the Continental Congress 1774-1789*
(Worthington Chauncey Ford ed., 1906)...................... 22

*Kansas Legislature: Some Criticisms on Pending
Bills*, The Topeka Daily Capital, Feb. 2, 1883 ................ 21

Aaron J. Kivisto & Megan Porter, *Firearm Use
Increases Risk of Multiple Victims in Domestic
Homicides*, 48 J. Am. Acad. Psychiatry L. 26 (2020)...... 29

Eliphalet Ladd, *Burn's Abridgement, Or The
American Justice* (2d ed. 1792)................................ 23

Tom Lininger, *A Better Way to Disarm Batterers*,
54 Hast. L. J. 525 (Mar. 2003) .................................. 31

TK Logan et al., *Relationship Characteristics and
Protective Orders Among a Diverse Sample of
Women*, 22 J. Fam. Violence 237 (2007) ...................... 30

49 *The London Magazine or Gentleman's Monthly
Intelligencer* (Nov. 1780) ........................................ 16

Lord Lonsdale to Deputy Lieutenants of
Cumberland (May 20, 1722), *in* Historical
Manuscripts Commission, *Fifteenth Report,
Appendix, Part VI* 39-40 (1897) ................................ 14

XVI

Miscellaneous—Continued:                                    Page

Kellie R. Lynch et al., *Firearm-related Abuse
and Protective Order Requests Among
Intimate Partner Violence Victims*,
37 J. Interp. Violence 12,974 (2021) .................................. 30

Joyce Lee Malcolm, *To Keep and Bear Arms: The
Origins of an Anglo-American Right* (1994)................... 15

Nat'l Ctr. on Protection Orders and Full Faith &
Credit, Battered Women's Justice Project,
*State Statutory Provisions Addressing
Mutual Protective Orders* (rev. 2017) ............................ 45

Nat'l Inst. of Justice, Office of Justice Programs,
U.S. Dep't of Justice:

   Jeffrey Fagan, *The Criminalization of Domestic
   Violence: Promises and Limits* (Jan. 1996) ........... 40

   Andrew R. Klein, *Special Report, Practical
   Implications of Current Domestic Violence
   Research: For Law Enforcement,
   Prosecutors and Judges* (June 2009)................. 30, 31

W. Nelson, *The Office and Authority of a Justice of
Peace* (7th ed. 1721) .......................................................... 15

New-York Daily Tribune, Oct. 2, 1856 ................................. 20

*No Guns for Abusers*, Wash. Post., Nov. 6, 1993 .............. 32

Order of Council to Lord Lieutenants
(Sept. 5, 1745), *in* Historical Manuscripts
Commission, *Report on the Manuscripts
of the Marquess of Lothian, Preserved at
Blickling Hall, Norfolk* 148 (1905).................................... 14

James Parker, *Conductor Generalis*:

   (1764) ............................................................................... 23

   (Robert Hodge printing 1788)...................................... 23

   (Robert Campbell printing 1792).................................. 23

XVII

Miscellaneous—Continued:                                    Page

21 *The Parliamentary History of England,
   from The Earliest Period to the Year 1803*
   (T.C. Hansard 1814) ............................................................ 16

*The Popular Sources of Political Authority:
   Documents on the Massachusetts Constitution of
   1780* (Oscar Handlin & Mary Handlin eds., 1966).......... 17

Privy Council to Lord Newport (Jan. 8, 1661),
   *in Transactions of the Shropshire
   Archaeological and Natural History
   Society*, pt. 2, 3d ser., vol. 4 (1904) ..................................... 14

Privy Council to the Earl of Carlisle (July 30, 1714),
   *in* Historical Manuscripts Commission, *Tenth
   Report, Appendix, Part IV* 343 (1885).............................. 14

2 *The Remembrancer, or, Impartial Repository of
   Public Events, for the Year 1780* (1780) .......................... 16

1 *The Remembrancer, or, Impartial Repository of
   Public Events, for the Year 1781* (1780) .......................... 16

Randolph Roth, *Why Guns Are and Are Not the
   Problem, in* Jennifer Tucker et al. eds.,
   *A Right to Bear Arms?: The Contested
   Role of History in Contemporary Debates
   on the Second Amendment* (2019) .................................... 41

*The Sale of Pistols*, New York Times, June 22, 1874........ 21

42 *The Scots Magazine* (Aug. 1780).................................... 16

2 Joseph Shaw, *The Practical Justice of Peace, and
   Parish and Ward-Officer* (6th ed. 1756) .......................... 15

Reva B. Siegel, *"The Rule of Love": Wife Beating
   as Prerogative and Privacy*,
   105 Yale L.J. 2117 (1996) ............................................. 40, 41

Sharon G. Smith et al., *Intimate Partner Homicide
   and Corollary Victims in 16 States: National
   Violent Death Reporting System, 2003-2009*,
   104 Am. J. Pub. Health 461 (Mar. 2014).......................... 31

XVIII

Miscellaneous—Continued:                                    Page

*State Convention of the Suffrage men of Rhode
    Island*, Vermont Gazette, Dec. 13, 1842 ........................... 19
Violence Policy Center, *When Men Murder Women:
    An Analysis of 2018 Homicide Data* (Sept. 2020) .......... 41
11A Charles Alan Wright et al., *Federal Practice and
    Procedure* (2013) ................................................................. 33

# In the Supreme Court of the United States

----------

No. 22-915

UNITED STATES, PETITIONER

*v.*

ZACKEY RAHIMI

----------

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

----------

**BRIEF FOR THE UNITED STATES**

----------

### OPINION BELOW

The opinion of the court of appeals (Pet. App. 1a-41a) is published at 61 F.4th 443.

### JURISDICTION

The judgment of the court of appeals was entered on March 2, 2023. The petition for a writ of certiorari was filed on March 17, 2023, and granted on June 30, 2023. The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

### CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are reproduced in the appendix. App., *infra*, 1a-2a.

### STATEMENT

"Firearms and domestic strife are a potentially deadly combination." *United States* v. *Hayes*, 555 U.S. 415, 427 (2009). To address that acute danger, Congress

(1)

2

enacted 18 U.S.C. 922(g)(8), which disarms individuals who have been found to pose a specific threat of domestic violence and are subject to protective orders. At least 48 States and territories have adopted similar laws, which continue a longstanding history and tradition of disarming those who are not law-abiding, responsible citizens. But the Fifth Circuit invalidated Section 922(g)(8) on its face, holding that the Second Amendment bars Congress and the States from enacting these measures to keep firearms out of the hands of individuals who endanger their intimate partners.

1. In December 2019, respondent Zackey Rahimi and his girlfriend C.M., with whom he shares a child, had an argument in a parking lot. C.A. ROA 217. Rahimi threatened to take the child away and C.M. tried to leave, but Rahimi grabbed her wrist, knocking her to the ground. *Ibid.* He then dragged her back to his car, picked her up, and pushed her inside, causing her to hit her head on the dashboard. *Ibid.* Realizing that a bystander had seen him, he retrieved a gun and fired at the witness. *Ibid.* In the meantime, C.M. escaped the car and fled. *Ibid.* Rahimi later called her and threatened to shoot her if she told anyone about the assault. *Ibid.*

In February 2020, after giving Rahimi notice and conducting a hearing in which Rahimi participated, a Texas state court granted C.M. a protective order, which was effective for two years (subject to extension in specified circumstances). J.A. 1-11. The court found that Rahimi had "committed family violence" and that such violence was "likely to occur again in the future." J.A. 2. The court prohibited Rahimi from committing family violence and from threatening, harassing, or approaching C.M. or her family. J.A. 3-4. The order also

3

suspended Rahimi's handgun license, prohibited him from possessing a firearm, and warned him that possessing a firearm while the order remained in effect could be a federal felony. J.A. 5. Rahimi signed an acknowledgement that he had "received a copy of this protective order." J.A. 11.

Rahimi, however, defied the order. He tried multiple times to communicate with C.M. C.A. ROA 218. And in May 2020, he approached her house in the middle of the night, prompting police to arrest him. *Ibid.* Then in November 2020, he threatened another woman with a gun, leading Texas to charge him with aggravated assault with a deadly weapon. *Id.* at 219.

Rahimi also participated in a series of five shootings in December 2020 and January 2021. First, after a man who had bought drugs from him "started talking 'trash,'" Rahimi fired into the man's house with an AR-15 rifle. C.A. ROA 209. The next day, after colliding with another car, he shot at the other driver, fled, returned to the scene, fired more shots, and fled again. *Ibid.* Three days later, Rahimi fired a gun in the air in a neighborhood in the presence of children. *Id.* at 210. A few weeks after that, a truck flashed its headlights at Rahimi when he sped past it on a highway; in response, Rahimi cut across the highway, followed the truck off an exit, and fired multiple shots at another car that had been traveling behind the truck. *Ibid.* Finally, in early January, Rahimi pulled out a gun and fired multiple shots in the air after a fast-food restaurant declined a friend's credit card. *Ibid.*

Police officers identified Rahimi as a suspect in those shootings and secured a search warrant for his house. C.A. ROA 210. The search uncovered a .45-caliber pis-

4

tol, a .308-caliber rifle, magazines, ammunition, and a copy of the protective order. *Id.* at 211.

2. A federal grand jury in the Northern District of Texas indicted Rahimi for violating 18 U.S.C. 922(g)(8). J.A. 12-14. Section 922(g)(8), which Congress enacted in 1994, prohibits individuals subject to certain domestic-violence protective orders from possessing a firearm in or affecting commerce. At the time of Rahimi's conduct, a knowing violation of Section 922(g)(8) was punishable by up to ten years of imprisonment. 18 U.S.C. 924(a)(2) (2018). Congress has since increased the maximum prison term to 15 years. See 18 U.S.C. 924(a)(8); Bipartisan Safer Communities Act, Pub. L. No. 117-159, Div. A, Tit. II, § 12004(c)(2), 136 Stat. 1329.

To trigger Section 922(g)(8), a protective order must satisfy three conditions. First, a court must have issued it after notice and a hearing at which the person had an opportunity to participate. 18 U.S.C. 922(g)(8)(A). Second, the order must forbid the person from harassing, stalking, or threatening an "intimate partner," the person's child, or an intimate partner's child. 18 U.S.C. 922(g)(8)(B); see 18 U.S.C. 921(a)(32) (defining "intimate partner"). Third, the order must either (1) include a finding that the person poses a "credible threat" to the physical safety of the partner or child or (2) explicitly prohibit the use, attempted use, or threatened use of physical force against the partner or child. 18 U.S.C. 922(g)(8)(C).

Rahimi's protective order satisfied those requirements. Rahimi received notice and an opportunity to participate in the hearing. J.A. 2, 17. C.M. was Rahimi's intimate partner because they had a child together. *Ibid.* And the order both contained a finding that Rahimi posed a credible threat to C.M.'s physical

5

safety and prohibited the use or threatened use of physical force against C.M. J.A. 2-3, 17.

Rahimi moved to dismiss the indictment, arguing that Section 922(g)(8) facially violates the Second Amendment. C.A. ROA 41-59. The district court denied the motion, observing that the Fifth Circuit had found Section 922(g)(8) constitutional in *United States* v. *McGinnis*, 956 F.3d 747 (2020), cert. denied, 141 S. Ct. 1397 (2021). Pet. App. 78a-80a. Rahimi then pleaded guilty. C.A. ROA 68-69, 160. The court sentenced him to 73 months of imprisonment, to be followed by three years of supervised release. *Id.* at 96.

3. The Fifth Circuit at first affirmed, reasoning that its decision in *McGinnis* foreclosed Rahimi's Second Amendment challenge. Pet. App. 73a n.1; see *id.* at 72a-77a. But after this Court decided *NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022), the Fifth Circuit withdrew its opinion. Pet. App. 70a-71a. After receiving supplemental briefing, the court reversed. *Id.* at 42a-69a. The court subsequently withdrew that opinion and issued an amended opinion that again reversed. *Id.* at 1a-41a.

The Fifth Circuit held that Section 922(g)(8) violates the Second Amendment on its face. Pet. App. 7a-27a. The court began by reasoning that Rahimi "is included in 'the people' and thus within the Second Amendment's scope." *Id.* at 8a. It acknowledged that this Court has described the right to keep and bear arms as a right belonging to "ordinary, law-abiding citizens," but it interpreted that phrase to exclude only "'felons,'" "'the mentally ill,'" and other "groups that have historically been stripped of their Second Amendment rights." *Id.* at 8a-9a (citation omitted). The Fifth Circuit concluded that, although Rahimi was "hardly a model citizen," he was

6

not a "convicted felon" or otherwise excluded from the Amendment's scope. *Id.* at 10a-11a.

The court of appeals stated that, because Rahimi presumptively holds Second Amendment rights, the government bore the burden of identifying historical analogues to Section 922(g)(8). Pet. App. 17a. The court then rejected each analogue the government offered. For example, the government cited a 17th-century English statute disarming individuals judged to be dangerous, but the court concluded that the statute was "not a forerunner of our Nation's historical tradition of firearm regulation." *Id.* at 18a. And the government cited colonial and early state laws disarming categories of individuals legislatures "considered to be dangerous," but the court dismissed those laws because they operated on a categorical basis, while Section 922(g)(8) rests on individualized findings. *Id.* at 19a.

Judge Ho concurred. Pet. App. 29a-41a. He found Section 922(g)(8) "difficult to justify" because it disarms individuals "based on civil protective orders" rather than "criminal proceedings." *Id.* at 36a. He expressed concern that such orders are susceptible to "abuse." *Id.* at 37a.

### SUMMARY OF ARGUMENT

The Second Amendment does not prohibit Congress from disarming Rahimi and other individuals subject to domestic-violence protective orders.

A. Although the Second Amendment guarantees an individual right to keep and bear arms, that right is not unlimited. As this Court recognized in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), and reiterated in *NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022), the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens.

7

The history of the right to keep and bear arms—before, during, and after the Founding Era—confirms that understanding. English law allowed the government to disarm individuals who were "dangerous" or not "peaceable." Second Amendment precursors proposed during the Founding Era guaranteed the right to keep and bear arms only to "honest and lawful" citizens or those who posed no "danger of public injury." And commentators in the 19th century recognized the government's authority to disarm individuals who were not "orderly," "peaceable," or "well-disposed."

Tradition further confirms that reading of the Second Amendment. American legislatures have long disarmed individuals whom they have found to be dangerous, irresponsible, or otherwise unfit to possess arms. For example, during the Revolutionary War, the Continental Congress recommended, and many States adopted, laws disarming loyalists. States in the 19th century disarmed minors, intoxicated persons, and vagrants. And Congress in the 20th century disarmed felons and persons with mental illnesses. Although different statutes disqualified different groups at different times, they reflect the same enduring principle: Legislatures may disarm those who are not law-abiding, responsible citizens.

B. Section 922(g)(8) fits within that history and tradition because it disarms persons who are not law-abiding, responsible citizens. Individuals subject to domestic-violence protective orders pose an obvious danger to their intimate partners because guns often cause domestic violence to escalate to homicide and because abusers often use guns to threaten and injure their victims. Armed abusers additionally endanger people be-

8

yond their partners—such as children, bystanders, and police officers.

A protective order must, moreover, satisfy strict requirements to trigger Section 922(g)(8). An order must either contain a judicial finding that the person poses a credible threat to the physical safety of another, or explicitly prohibit the use, attempted use, or threatened use of physical force. A court must have issued the order after notice and a hearing. And the disqualification lasts only as long as the order remains in effect. Those requirements confine Section 922(g)(8) to a particularly dangerous and irresponsible subset of persons subject to protective orders.

Finally, at least 48 States and territories have adopted laws that disarm, or authorize courts to disarm, individuals who are subject to domestic-violence protective orders. That consensus confirms that the persons subject to Section 922(g)(8) are among those who can permissibly be disarmed because they cannot be trusted with firearms. It also distinguishes Section 922(g)(8) from the outlier laws found unconstitutional in *Heller*, *Bruen*, and *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010).

C. The Fifth Circuit failed to justify its extraordinary conclusion that the Second Amendment prevents Congress and the States from disarming individuals whom courts have found to pose a specific threat of domestic violence. The court emphasized that the Second Amendment protects the right of "the people" to keep and bear arms. But just as Congress may ban dangerous and unusual weapons regardless of whether they qualify as "arms," so too it may disarm persons who are not law-abiding, responsible citizens regardless of whether they are among "the people."

9

The Fifth Circuit also noted that laws disarming domestic abusers did not exist at the Founding. But this Court has emphatically rejected demands for an exact historical match. And such demands would be particularly anomalous in addressing domestic violence, which has been the subject of significant legal and social change since the Founding and which has also become increasingly deadly due to technological advances in firearms. Instead, the Court has instructed that a modern law complies with the Second Amendment if it fits within a broader tradition of firearm regulation. And Section 922(g)(8) fits comfortably within the tradition of disarming individuals who are not law-abiding, responsible citizens.

## ARGUMENT

In cases of domestic violence, firearms pose a grave threat. See *United States* v. *Hayes*, 555 U.S. 415, 427 (2009). More than a million acts of domestic violence occur in the United States every year, and the presence of a gun substantially increases the chance that violence will escalate to homicide. *United States* v. *Castleman*, 572 U.S. 157, 159-160 (2014). "All too often," this Court has recognized, "the only difference between a battered woman and a dead woman is the presence of a gun." *Id.* at 160 (brackets and citation omitted).

In Section 922(g)(8), Congress responded to that threat by temporarily disarming individuals who are subject to domestic-violence protective orders. The overwhelming majority of States have adopted similar laws. Those commonsense measures continue an established tradition of regulations dating to the Founding and before. As those historical regulations show, the right codified in the Second Amendment has never been understood to prevent legislatures from disarming indi-

10

viduals who are not law-abiding, responsible citizens. Section 922(g)(8) is thus entirely consistent with the Second Amendment because Rahimi and others who have been found to pose a threat of domestic violence plainly are not law-abiding, responsible citizens.

The Fifth Circuit's contrary decision was profoundly mistaken. It conflicts with this Court's precedents—indeed, it employs a mode of analysis that this Court has specifically disapproved. It misreads the history of the Second Amendment. And it endangers victims of domestic violence, their families, police officers, and the public. This Court should reverse.

## A. The Second Amendment Allows Congress To Disarm Persons Who Are Not Law-Abiding, Responsible Citizens

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Amendment guarantees an individual right to possess and carry arms for self-defense. But as this Court has repeatedly emphasized, "the right secured by the Second Amendment is not unlimited." *District of Columbia* v. *Heller*, 554 U.S. 570, 626 (2008); see *NYSRPA* v. *Bruen*, 142 S. Ct. 2111, 2128 (2022); *McDonald* v. *City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion).

In determining the scope of the right to keep and bear arms, a court should consider the right's history and the Nation's tradition of firearms regulation. See *Bruen*, 142 S. Ct. at 2126. History and tradition establish, for example, that the Second Amendment does not guarantee an unlimited right to possess every kind of weapon; rather, Congress may ban "dangerous and unusual weapons." *Heller*, 554 U.S. at 627. History and tradition similarly establish that the Amendment does

11

not guarantee an unlimited right to carry weapons in every kind of place; rather, Congress may ban weapons in "sensitive places." *Bruen*, 142 S. Ct. at 2133.

So too Congress may regulate who may possess weapons in the first place. In particular, this Court's precedents have recognized that Congress may disarm individuals who are not "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. The history of the right to keep and bear arms and the American tradition of firearms regulation confirm that reading.

### 1. *This Court's precedents recognize that Congress may disarm persons who are not law-abiding, responsible citizens*

In *Heller*, this Court described the right to keep and bear arms as a "right of law-abiding, responsible citizens." 554 U.S. at 635. The Court also made clear that legislatures may adopt categorical prohibitions on the possession of arms by those who are not law-abiding and responsible, identifying "longstanding prohibitions on the possession of firearms by felons and the mentally ill" as "examples" of "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26.

The plurality in *McDonald* similarly observed that the Second Amendment protects "the safety of * * * law-abiding members of the community." 561 U.S. at 790. And it repeated *Heller*'s "assurances" that the Amendment allows Congress to disarm felons and individuals with mental illnesses. *Id.* at 786.

*Bruen* reaffirmed that reading of the Second Amendment. This Court reiterated *Heller*'s and *McDonald*'s holding that the Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home." *Bruen*, 142 S. Ct. at 2122. And the Court agreed with the plaintiffs in that case that

12

"ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense." *Ibid.* In all, the Court's opinion used the term "law-abiding, responsible citizens" and its variants more than a dozen times to describe the Amendment's scope.[1] The concurrences reiterated the point.[2]

Many aspects of Second Amendment doctrine rest on the premise that the Amendment protects only law-abiding, responsible citizens. In judging whether a modern firearms regulation is consistent with a historical precursor, a court must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. In judging whether a weapon is dangerous and unusual, a court must consider whether the weapon is "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And States may require applicants for gun permits to pass background checks and take safety courses because such requirements ensure

---

[1] See *Bruen*, 142 S. Ct. at 2125 ("law-abiding, adult citizens"); *id.* at 2131 ("law-abiding, responsible citizens") (citation omitted); *id.* at 2133 ("a law-abiding citizen's right to armed self-defense" and "law-abiding citizens"); *id.* at 2134 ("ordinary, law-abiding, adult citizens"); *id.* at 2135 n.8 ("law-abiding citizens"); *id.* at 2138 ("law-abiding citizens"); *id.* at 2138 n.9 ("'law-abiding, responsible citizens'" and "ordinary citizens") (citation omitted); *id.* at 2149 ("the responsible") (citation omitted); *id.* at 2150 ("law-abiding citizens" and "responsible arms carrying"); *id.* at 2156 ("law-abiding, responsible citizens" and "law-abiding citizens").

[2] See *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("law-abiding residents"); *id.* at 2158 ("law-abiding citizens" and "[o]rdinary citizens"); *id.* at 2159 ("law-abiding person," "right of law-abiding people," "law-abiding New Yorker," and "ordinary person"); *id.* at 2161 ("right of ordinary law-abiding Americans"); *id.* at 2161 (Kavanaugh, J., concurring) ("ordinary, law-abiding citizens") (citation omitted).

13

that those who carry guns "are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (citation omitted). Those legal principles all reflect the understanding that the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens.

### 2. *History confirms that Congress may disarm persons who are not law-abiding, responsible citizens*

The Second Amendment's history illuminates its meaning. See *Bruen*, 142 S. Ct. at 2128-2129. Because the Amendment "codified a right inherited from our English ancestors," a court should begin with English law. *Id.* at 2127 (citation omitted). Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," a court should also consider evidence of how the Founding generation understood the right. *Id.* at 2136 (citation and emphasis omitted). And because evidence of the "public understanding of a legal text in the period after its enactment or ratification" is probative of original meaning, a court should consider how the Second Amendment was understood in the 19th century. *Heller*, 554 U.S. at 605 (emphasis omitted); see *Bruen*, 142 S. Ct. at 2136-2138. Historical evidence from each of those eras—before, at, and after the Founding—leads to the same conclusion: Congress may disarm persons who are not law-abiding, responsible citizens.

***Pre-Founding.*** Parliament first recognized a legal right to possess arms in the Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Ibid.* To prevent the repetition of that abuse, the Bill guaranteed that "the Subjects which are

14

Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Ibid.*

While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of irresponsible ones. It thus did not displace the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdom." 14 Car. 2, c. 3, § 13 (Eng.). Consistent with the Militia Act, the Crown often directed local officials to disarm those whom it did not trust to use weapons responsibly —for instance, those who had "disturbed the public Peace."[3] Contrary to the Fifth Circuit's assumption, Pet. App. 18a-19a, that practice continued after the adoption of the English Bill of Rights.[4] Indeed, many

---

[3] Privy Council to Lord Newport (Jan. 8, 1661), *in Transactions of the Shropshire Archaeological and Natural History Society*, pt. 2, 3d ser., vol. 4, at 156 (1904); see, *e.g.*, *Calendar of State Papers, Domestic Series, Charles II, 1661-1662*, at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) (instructions to "cause good watch to be kept in the highways" and to disarm "such as travel with unusual arms at unseasonable hours"); *Calendar of State Papers, Domestic Series, 1670*, at 237 (May 26, 1670) (Mary Anne Everett Green ed., 1895) (instructions to disarm "dangerous and disaffected persons"); *Calendar of State Papers, Domestic Series, May 1,1684–February 5, 1685,* at 26 (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds., 1938) (instructions to dispose of arms seized from "dangerous and disaffected persons").

[4] See, *e.g.*, *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Mar-*

15

18th-century justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[5]

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); see *Bruen*, 142 S. Ct. at 2139-2142. Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, and that it made violations punishable by forfeiture of the weapons.[6] The Statute thus allowed the government to disarm persons whose conduct revealed their unfitness to carry arms.

The understanding that the government could lawfully disarm irresponsible subjects remained intact at the time of the American Revolution, as one widely discussed episode illustrates. In 1780, London officials reacted to widespread rioting by confiscating the rioters' arms. See Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-131 (1994). The House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights. See *id.* at 131-132. Members de-

---

*quess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar).

[5] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); see, *e.g.*, Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

[6] See, *e.g.*, 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787); 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

16

fended the confiscation on the ground that it applied only to the "disorderly" "mob," not to "sober citizens" or "citizens of character."[7] The press similarly distinguished "the riotous mob" from "citizens of character."[8] And private groups that supported the right to bear arms warned that the confiscation did not set a precedent for disarming "peaceable Subjects."[9]

In short, although the English Bill of Rights secured a right to possess arms, the government could (and did) disarm those who could not be trusted to use arms lawfully and responsibly. Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, that background strongly suggests that the Second Amendment likewise allows Congress to disarm individuals who are not law-abiding, responsible citizens.

***Founding era.*** Many precursors to the Second Amendment described the class of persons entitled to keep and bear arms using synonyms for "law-abiding, responsible citizens." In 1780, for example, the town of Williamsburg proposed amending the newly drafted

---

[7] See, *e.g.*, 21 *The Parliamentary History of England, from The Earliest Period to the Year 1803*, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); *id.* at 730-731 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]").

[8] 49 *The London Magazine or Gentleman's Monthly Intelligencer* 518 (Nov. 1780); see, *e.g.*, 42 *The Scots Magazine* 419 (Aug. 1780) (distinguishing "suspicious persons" from "reputable citizens").

[9] See 2 *The Remembrancer; or, Impartial Repository of Public Events, for the Year 1780*, at 139 (1780) (resolutions adopted in York); 1 *The Remembrancer; or Impartial Repository of Public Events, for the Year 1781*, at 24 (1780) (resolutions adopted in Middlesex); *id.* at 112 (resolutions adopted in Huntingdonshire).

17

Massachusetts constitution to provide that "the people have a right to keep and bear Arms for their Own and the Common defence." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966). The town explained: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Lawfull Subjects of Government* we Ought Never to be deprived of them." *Ibid.* (emphasis added).

Anti-Federalists expressed a similar understanding of the right at Pennsylvania's ratifying convention. They proposed a bill of rights that, among other things, forbade "disarming the people, or any of them, *unless for crimes committed, or real danger of public injury from individuals.*" 2 *The Documentary History of the Ratification of the Constitution* (*Documentary History*) 598 (Merrill Jensen ed., 1976) (emphasis added). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which was widely read and proved "highly influential," *Heller*, 554 U.S. at 604. A contemporary commentator, discussing the proposal, agreed that Congress should have the power to disarm individuals who posed a "real danger of public injury." Nicholas Collin, *Remarks on the Amendments to the Federal Constitution . . . by a Foreign Spectator*, No. 11 (Nov. 28, 1788), *in Three Neglected Pieces of the Documentary History of the Constitution and Bill of Rights* 40 (Stanton D. Krauss ed., 2019).

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from

18

keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). A contemporary described the proposal as an effort to protect "the right of *peaceable citizens* to bear arms." Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), *in* 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. *Ibid.*

Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. See *Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id.* at 603-605. The precursors discussed above reveal a common conception that the government may disarm those who are not law-abiding, responsible citizens.

***Post-Founding.*** Antebellum commentators shared the Founding generation's understanding of the Second Amendment's scope. Not every commentator who discussed the right specifically addressed the government's power to disarm certain individuals—just as not every commentator specifically discussed its power to prohibit dangerous and unusual weapons or to bar carrying weapons in sensitive places. But the commentators that did address the issue confirmed that the government may disarm those who are not responsible or law-abiding.

19

For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, *if he demeans himself peaceably*, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). "Thus are the rights of self defence guarded and secured," he added, "to every one *who entitles himself by his demeanor* to the protection of his country." *Ibid.* (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. And Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime, in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).

Opponents of slavery voiced similar views during the Bleeding Kansas conflict of the mid-1850s. On the one hand, they supported disarming groups responsible for violence in Kansas. Senator (and future Vice President) Henry Wilson, for instance, complained that "armed bandits" were "violating law, order, and peace," and called for legislation "to disarm any armed bands, from the slave States or the free States, who enter the Territory for unlawful purposes." Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856). Senator Benjamin Wade likewise called on Congress to "[d]isarm these lawless bands." *Id.* at 1091. On the other hand, opponents of slavery criticized Kansas authorities for dis-

arming "peaceable" free-state settlers.[10] A petition published in William Lloyd Garrison's newspaper even urged the impeachment of President Pierce for his efforts to disarm "peaceable citizens." A.J. Grover, *Impeachment of Franklin Pierce* (Aug. 1, 1856), *in* The Liberator, Aug. 22, 1856, at 140.

Sources from during the Civil War reflect the same understanding. In 1863, a Union general ordered that "all loyal and peaceable citizens in Missouri will be permitted to bear arms." Hdqrs. Dep't of the Missouri, General Orders, No. 86 (Aug. 25, 1863), *in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, ser. 1, vol. 22, pt. 2, at 475 (1888). A war memoir recounted a Union soldier's belief that "it was unconstitutional to disarm peac[e]able citizens." *Chickasaw, The Scout*, *in* R.W. Surby, *Grierson Raids* 253 (1865). And after the war, Senator Henry Wilson defended Congress's "power to disarm ruffians or traitors, or men who are committing outrages against law or the rights of men." Cong. Globe, 39th Cong., 1st Sess. 915 (1866).

As Reconstruction began, many southern States sought to disarm Black citizens, prompting "an outpouring of discussion" about the right to keep and bear arms. *Heller*, 554 U.S. at 614. Participants in that discussion affirmed the right to possess arms for self-defense, yet cautioned that the right protected only

---

[10] See, *e.g.*, New-York Daily Tribune, Oct. 2, 1856, at 4 ("When [a Kansas official] entered the houses of peaceable citizens and demanded that they should deliver up their arms, he * * * violated one of those provisions of the Constitution which a free people should guard with the most jealous care."); *High-Handed Outrage in Kansas*, Holmes County Republican, Oct. 30, 1856, at 1 (denouncing the disarmament of "[p]eaceable American [c]itizens" in Kansas as a violation of their "constitutional rights").

21

"peaceable" or "well-disposed" citizens. In Georgia, for example, the Freedmen's Bureau issued a circular explaining that "[a]ll men, without distinction of color, have the right to keep arms," but that "[a]ny person, white or black, may be disarmed if convicted of making an improper and dangerous use of arms." H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866). The Bureau also recognized that the "freedmen of South Carolina have shown by their peaceful conduct that they can safely be trusted with fire-arms." H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866). And a Reconstruction order guaranteed the "constitutional rights of all loyal and well-disposed inhabitants" in South Carolina, but added that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908-909.

Commentators continued to interpret the Second Amendment the same way later in the century. One newspaper article argued that "pistols cannot safely be committed to every irresponsible hand," that the Constitution does not protect "the right of every drunken loafer to bear about in his pocket the implements of murder," and that the right instead belongs only to those "whom it was safe to trust with firearms." *The Sale of Pistols*, New York Times, June 22, 1874, at 4. Another article referred to the "constitutional right of every peaceable citizen to carry arms for his own defense." *Kansas Legislature: Some Criticisms on Pending Bills*, The Topeka Daily Capital, Feb. 2, 1883, at 6.

All in all, post-ratification sources point in the same direction as English and Founding Era sources. Although different commentators used different terms— "peaceable," "well-disposed," and so on—they recog-

nized that a legislature could disarm those who were not law-abiding, responsible citizens.

### 3. The Nation has a long tradition of disarming persons who are not law-abiding, responsible citizens

"[T]his Nation's historical tradition of firearm regulation" further illuminates the Second Amendment's scope. *Bruen*, 142 S. Ct. at 2126. And the United States has a longstanding tradition, dating to colonial times and continuing to the present, of disarming persons whom legislatures have found are not law-abiding, responsible citizens.

Most relevant here, early American legislatures denied arms to classes of individuals considered unfit to possess them. When the Revolutionary War began, for example, the Continental Congress recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic.[11] Similarly, after putting down Shays' Rebellion in 1787, Massachusetts required the rebels, as a condition

---

[11] See 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).

of being pardoned, to surrender their arms, which would be returned to them after three years if they kept the peace.[12]

Colonies and early States also punished irresponsible use of arms with forfeiture of the arms. Early American justice-of-the-peace manuals explained that the Statute of Northampton—which the colonies inherited along with other pre-colonization statutes, see *Patterson* v. *Winn*, 5 Pet. 233, 241 (1831)—empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[13] Some 17th- and 18th-century American statutes expressly recodified that rule.[14] Others made forfeiture part of the penalty for offenses such as unsafe storage of guns or gunpowder.[15] Although those laws involved

---

[12] See Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805).

[13] See, *e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[14] See Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[15] See Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674*, at 138 (E.B. O'Callaghan ed., 1868); Act of

24

forfeiture of arms involved in an offense, rather than bans on possessing arms, they show that legislatures could restrict an individual's ability to bear arms if his conduct suggested that he would not use them responsibly.

A few decades later, States began to adopt surety statutes that required certain potentially irresponsible individuals who carried firearms to post bond. See *Bruen*, 142 S. Ct. at 2148. The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. See *Bruen*, 142 S. Ct. at 2148 n.23 (collecting statutes). Those laws, too, confirm that irresponsible individuals were subject to special restrictions that did not (indeed, could not) apply to ordinary, law-abiding citizens. See *id.* at 2122 (holding a proper-cause requirement unconstitutional as applied to ordinary citizens).

Continuing in the 19th century, as guns became more lethal and more widely available, see p. 41, *infra*, legislatures disarmed a range of individuals whom they deemed unfit to carry firearms. At least 29 jurisdictions banned or restricted the sale of firearms to, or the possession of firearms by, individuals below specified ages.[16] Several States banned the sale of guns to per-

---

Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210 (1906).

[16] See Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No.

sons of unsound mind.[17]  At least a dozen States disarmed "tramps"—that is, vagrants.[18]  Some States forbade intoxicated persons from buying or carrying

67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[17] See Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[18] See Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

26

guns.[19] One State forbade the carrying of arms by "any person who has ever borne arms against the government of the United States."[20] Another disarmed certain individuals in identified categories if they were "not known to be peaceable and quiet persons."[21]

State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State* v. *Shelby*, 2 S.W. 468, 469 (1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State* v. *Hogan*, 58 N.E. 572, 575 (1900).

The tradition of disarming unfit persons continued into the 20th century. In the 1930s, Congress disqualified violent criminals, fugitives from justice, and persons under felony indictment. See Federal Firearms Act, ch. 850, § 2(d)-(f), 52 Stat. 1251. In the 1960s, Congress disqualified felons in general, drug users and addicts, and persons with mental illnesses. See Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757; Gun

---

[19] See Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

[20] See Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25.

[21] See Act of Apr. 30, 1855, §§ 1-2, *in* 2 *The General Laws of the State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore H. Hitchell ed., 1865).

27

Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1220. In the 1980s, Congress disqualified noncitizens who are unlawfully present in the United States and persons who have been dishonorably discharged from the Armed Forces. See Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 452. And in the 1990s, Congress disarmed persons subject to domestic-violence protective orders, see Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110401(c), 108 Stat. 2014, and domestic-violence misdemeanants, see Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, Div. A, Tit. I, Sec. 101(f) [tit. VI, § 658(b)(2)], 110 Stat. 3009-372. That series of statutes reflects Congress's longstanding judgment that "firearms must be kept away from persons * * * who might be expected to misuse them." *Dickerson* v. *New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983).

From the earliest days of the Republic to modern times, in short, legislatures have disarmed individuals who could not be trusted with firearms. Different legislatures have disarmed different groups at different times: loyalists and rebels in the 18th century; underage individuals and persons of unsound mind in the 19th century; and felons, drug addicts, and domestic abusers in the 20th century. But those disqualifications all reflect the same enduring principle: The Second Amendment allows Congress to disarm individuals who are not law-abiding, responsible citizens.

### B. Section 922(g)(8) Complies With The Second Amendment

This case concerns Congress's power to disarm those who are not "responsible." In this context, a person is not "responsible" if his possession of a firearm would pose a danger of harm to himself or others. That under-

28

standing is consistent with the history recounted above: English law allowed the disarmament of dangerous individuals, see pp. 14-15, *supra*; an influential Second Amendment precursor contemplated the disarmament of individuals who posed a "real danger of public injury," see p. 17, *supra*; 19th century sources recognized legislatures' power to disarm individuals whose possession of arms would endanger the public, see pp. 18-22, *supra*; and American legislatures have been disarming such individuals since the 17th century, see pp. 22-27, *supra*. Members of this Court have also recognized that, whatever the outer limits of Congress's power to disqualify categories of persons from possessing arms, Congress may at a minimum disarm "dangerous individuals," *NYSRPA* v. *City of New York*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., dissenting), or individuals "who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety," *Kanter* v. *Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).

In exercising that authority, Congress need not require case-by-case findings of dangerousness like those required by Section 922(g)(8). Congress may make categorical judgments about responsibility; "[t]hat *some* categorical limits are proper is part of the original meaning" of the Second Amendment. *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), cert. denied, 562 U.S. 1303 (2011). Congress also may disarm persons who are not law-abiding, or who are not citizens. See, *e.g.*, 18 U.S.C. 922(g)(1) (felons); 18 U.S.C. 922(g)(5)(A) (noncitizens who are present in the United States unlawfully); 18 U.S.C. 922(g)(5)(B) (noncitizens with nonimmigrant visas). This Court, however, need not address those issues—or determine the full scope of

29

the "law-abiding, responsible citizens" principle—to re-
solve this case. The Court need only hold that a person
is not responsible and thus may be disarmed if his pos-
session of a firearm would endanger himself or others.

Judged by that standard, Section 922(g)(8) complies
with the Second Amendment. Because persons who are
subject to domestic-violence protective orders pose an
obvious danger to others, they are not "responsible" in-
dividuals, and the Second Amendment allows Congress
to disarm them. See, *e.g.*, *United States* v. *Boyd*, 999
F.3d 171, 186 (3d Cir.), cert. denied, 142 S. Ct. 511
(2021); *United States* v. *Bena*, 664 F.3d 1180, 1184 (8th
Cir. 2011).

### 1. Individuals subject to domestic-violence protective orders are not responsible

As this case shows, individuals subject to the protec-
tive orders covered by Section 922(g)(8) pose a grave
danger to others. Most obviously, their possession of
firearms imperils their intimate partners. "Domestic
violence often escalates in severity over time," and "the
presence of a firearm increases the likelihood that it will
escalate to homicide." *Castleman*, 572 U.S. at 160. The
presence of a gun in a household with a domestic abuser
increases the risk of homicide fivefold. Aaron J. Kivisto
& Megan Porter, *Firearm Use Increases Risk of Mul-
tiple Victims in Domestic Homicides*, 48 J. Am. Acad.
Psychiatry L. 26, 26 (2020). And domestic assaults with
guns are around 12 times likelier to cause death than
assaults without guns. See Anthony A. Braga et al., *Fire-
arm Instrumentality: Do Guns Make Violent Situa-
tions More Lethal*, 2021 Ann. Rev. Criminology 147, 153.

Armed domestic abusers pose additional dangers.
Abusers often use guns to intimidate their partners—
for instance, by brandishing or firing guns during argu-

30

ments. See Andrew R. Klein, Nat'l Inst. of Justice, Office of Justice Programs, U.S. Dep't of Justice, *Special Report*, *Practical Implications of Current Domestic Violence Research: For Law Enforcement, Prosecutors and Judges* 26 (June 2009). Abusers also use guns to threaten, pistol-whip, and shoot their partners or their partners' children, relatives, and pets. See Avanti Adhia et al., *Nonfatal use of firearms in intimate partner violence: Results of a national survey*, 147 Prev. Med. 106,500, at 2, 5 (June 2021). Such tactics enable abusers to cause acute physical harm, to "degrade, isolate, and control" their partners, and to perpetuate their pattern of abuse. *Id.* at 2 (citation omitted).

Those concerns apply with particular force to cases involving protective orders. Victims who seek judicial protection are likely to have experienced especially severe abuse. See TK Logan et al., *Relationship Characteristics and Protective Orders Among a Diverse Sample of Women*, 22 J. Fam. Violence 237, 241 (2007). They are likelier than other victims to report that their abusers used guns to threaten, pistol-whip, or shoot them. See Kellie R. Lynch et al., *Firearm-related Abuse and Protective Order Requests Among Intimate Partner Violence Victims*, 37 J. Interp. Violence 12,974, 12,984 (2021). Rahimi, for example, fired a gun during his December 2019 assault on C.M. and threatened to shoot her if she told anyone about the attack. C.A. ROA 217.

Nor does the entry of a protective order guarantee the end of the abuse. Domestic abuse has a high recidivism rate, see *Skoien*, 614 F.3d at 644, and abusers often persist in their abuse despite protective orders, see Reinie Cordier et al., *The Effectiveness of Protection Orders in Reducing Recidivism in Domestic Violence: A Systematic Review and Meta-Analysis*, 22 Trauma,

31

Violence, & Abuse 804, 825 (2021). A victim's decision to obtain an order can even prompt violent retaliation. See Tom Lininger, *A Better Way to Disarm Batterers*, 54 Hast. L.J. 525, 567 (Mar. 2003).

Armed domestic abusers also endanger people other than their partners. In around a quarter of the cases where an abuser killed an intimate partner, the abuser also killed someone else, such as a child, family member, or roommate. See Sharon G. Smith et al., *Intimate Partner Homicide and Corollary Victims in 16 States: National Violent Death Reporting System, 2003-2009*, 104 Am. J. Pub. Health 461, 463-464 (Mar. 2014). Some of those additional victims tried to intervene; others were in the wrong place at the wrong time. *Id.* at 464. Rahimi, for example, shot at a bystander who witnessed his attack on C.M. C.A. ROA 217.

Deprived of their victims, moreover, persons subject to protective orders often go on to abuse other intimate partners or family members. See Klein 18. One study found that more than 40% of individuals arrested for violating a protective order abused more than one victim. *Ibid.* Nine months after C.M. obtained the protective order in this case, for example, Rahimi threatened another woman with a gun. C.A. ROA 219.

Armed domestic abusers endanger the police too. One study found that domestic disputes were "the most dangerous type of call for responding officers," causing more officer deaths in the line of duty than any other type of call. Nick Bruel & Mike Keith, *Deadly Calls and Fatal Encounters: Analysis of U.S. law enforcement line of duty deaths when officers responded to dispatched calls for service and conducted enforcement, 2010-2014*, at 15 (2016). In almost all of those cases, the responding officers were killed with a gun. *Ibid.*

32

Finally, armed domestic abusers endanger the public at large. In more than two-thirds of the mass shootings that occurred from 2014 to 2019, the shooter either had a history of domestic violence or fired at a partner or family member as part of the shooting. Lisa B. Geller et al., *The role of domestic violence in fatal mass shootings in the United States, 2014-2019*, 8 Injury Epidemiology 38, at 5 (2021). This case again illustrates the danger: After the issuance of the protective order, Rahimi went on a spree of five shootings. See p. 3, *supra*.

In sum, Rahimi and other persons subject to protective orders fall squarely within the category of irresponsible individuals whom the Second Amendment has always allowed Congress to disarm. As a member of Congress remarked, "if you are not responsible enough to keep from doing harm to your spouse or your children, then society does not deem you responsible enough to own a gun." *No Guns for Abusers*, Wash. Post., Nov. 6, 1993, at A24 (quoting Rep. Robert Torricelli).

### 2. *Section 922(g)(8)'s strict requirements confirm its constitutionality*

A protective order triggers disarmament under Section 922(g)(8) only if it satisfies stringent requirements, which confine the statute to the most dangerous domestic abusers and guard against the risk of inadvertently disarming law-abiding, responsible citizens. This Court need not decide here whether the Second Amendment requires those limits—some state laws omit similar conditions, see Illinois Cert. Amicus Br. 5-7—but their inclusion in Section 922(g)(8) makes this case particularly straightforward.

First, a protective order disqualifies a person from possessing guns only if it restrains him from "harassing, stalking, or threatening" an intimate partner or child,

33

or from "engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child." 18 U.S.C. 922(g)(8)(B). That requirement limits Section 922(g)(8) to the domestic-violence context, in which guns pose a particularly serious threat. See pp. 29-32, *supra*.

Second, a protective order can result in disarmament only if it satisfies at least one of the two conditions listed in Section 922(g)(8)(C) (and here the order satisfied both, see pp. 4-5, *supra*). Under the first condition, Section 922(g)(8) applies if the order includes a finding that the person "represents a credible threat to the physical safety" of the intimate partner or child. 18 U.S.C. 922(g)(8)(C)(i). If a court has found that a person poses a "credible threat" to someone else's "physical safety," that person, by definition, is not a responsible citizen.

Section 922(g)(8) also applies if the order "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force" that "would reasonably be expected to cause bodily injury." 18 U.S.C. 922(g)(8)(C)(ii). Congress reasonably determined that a court would specifically forbid "physical force" only if it perceived a real danger that the person would, in fact, use such force. Under traditional equitable principles, after all, courts do not grant injunctive relief to address "an unfounded fear" or a "possibility of some remote future injury." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1, at 139, 141 (2013). Rather, courts grant such relief only to address "a likelihood [of] irreparable harm" or a "presently existing actual threat." *Id.* at 138, 141.

Third, Section 922(g)(8) applies only if a court issued the order after giving the person "actual notice" and "a hearing." 18 U.S.C. 922(g)(8)(A). Those safeguards en-

34

sure that individuals receive a fair opportunity to respond to the allegations against them before they are disarmed. The requirement of notice and a hearing also minimizes the risk that law-abiding, responsible citizens will lose their ability to possess guns because of erroneous orders.

Finally, Section 922(g)(8) prohibits someone from possessing guns only if he "*is* subject to" a protective order. 18 U.S.C. 922(g)(8) (emphasis added). The prohibition ends when the order expires. In this case, for instance, the order (and the resulting disqualification) initially lasted two years, subject to a time-limited extension based on Rahimi's confinement. See J.A. 6.

### 3. *Restrictions like Section 922(g)(8) are commonplace throughout the United States*

The overwhelming majority of States and territories likewise restrict gun possession by persons subject to protective orders. See Illinois Cert. Amicus Br. 4-9. At least 32 jurisdictions disarm persons subject to orders that satisfy specified criteria.[22] Statutes in at least 16

---

[22] See Ala. Code § 13A-11-72(a); Cal. Fam. Code § 6389(a); Colo. Rev. Stat. § 13-14-105.5(1)(a); Conn. Gen. Stat. § 53a-217(a)(4); D.C. Code § 16-1004(h)(2); Fla. Stat. § 790.233(1); Haw. Rev. Stat. § 134-7(f); 430 Ill. Comp. Stat. 65/8.2; Iowa Code 724.26(2)(a); Kan. Stat. Ann. § 21-6301(a)(17); La. Rev. Stat. Ann. § 46:2136.3(A); Me. Rev. Stat. Ann. tit. 15, § 393(1)(D); Md. Code Ann. Pub. Safety § 5-133(b)(12); Mass. Gen. Laws ch. 140, § 129B(1)(vii); Minn. Stat. § 624.713, subdiv. 1(13); N.H. Rev. Stat. Ann. § 173-B:5(II); N.J. Rev. Stat. § 2C:25-29(b); N.M. Stat. Ann. § 30-7-16.D; N.Y. Crim. Proc. Law § 530.14(2); Or. Rev. Stat. 166.255(1)(a); 23 Pa. Cons. Stat. Ann. § 6108(a.1)(1); P.R. Laws Ann. tit. 8, § 621; R.I. Gen. Laws § 11-47-5(b); S.C. Code Ann. § 16-25-30(A)(4); Tenn. Code Ann. § 39-13-113(h)(1); Tex. Fam. Code Ann. § 85.022(d); Utah Code Ann. § 76-10-503(b)(xi); Va. Code Ann. § 18.2-308.1:4(A); V.I. Code Ann.

35

more jurisdictions specifically permit, or have been read by appellate courts to permit, the imposition of a firearm disqualification as part of a protective order.[23] That adds up to at least 48 jurisdictions that restrict gun possession by persons subject to protective orders or permit courts to impose such restrictions.

That legislative consensus confirms that persons subject to protective orders are not, in fact, among the law-abiding, responsible citizens protected from disarmament by the Second Amendment. Modern evidence, to be sure, "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28. But the modern laws discussed above do not contradict earlier evidence; rather, they continue the Nation's long tradition of disarming irresponsible citizens.

The ubiquity of those restrictions also distinguishes Section 922(g)(8) from the handgun bans found unconstitutional in *Heller* and *McDonald*, and the may-issue licensing regime found unconstitutional in *Bruen*. See *Bruen*, 142 S. Ct. at 2123; *McDonald*, 561 U.S. at 750;

---

tit. 23, § 456a(a)(8); Wash. Rev. Code § 9.41.040(2)(a)(iv); W. Va. Code Ann. § 61-7-7(7); Wis. Stat. § 813.12(4m)(a).

[23] See Alaska Stat. § 18.66.100(c)(6)-(7); Am. Samoa Code Ann. § 47.0204(b)(5) and (c)(1); Ariz. Rev. Stat. Ann. § 13-3602(G)(4); Del. Code Ann. tit. 10, § 1045(a)(8); Ind. Code § 34-26-5-9(d)(4); Mich. Comp. Laws Ann. § 600.2950(1)(e); Mont. Code Ann. § 40-15-201(f); Neb. Rev. Stat. § 42-924(1)(a)(vii); Nev. Rev. Stat. Ann. 33.0305(1); N.C. Gen. Stat. § 14-269.8(a); N.D. Cent. Code § 14.07.1-02.4.g; 8 N. Mar. I. Code § 1916(b)(5) and (c)(1); S.D. Codified Laws § 25-10-24; Vt. Stat. Ann. tit. 15, § 1104(a)(1)(E); *Chouk* v. *Chouk*, No. 2022-CA-1193-ME, 2023 WL 2193405, at *1 (Ky. Ct. App. Feb. 24, 2023) (citing Ky. Rev. Stat. Ann. § 403.740(1)(c)); *Clementz-McBeth* v. *Craft*, No. 2-11-16, 2012 WL 776851, at *5-*7 (Ohio Ct. App. Mar. 12, 2012) (citing Ohio Rev. Code Ann. § 3113.31).

36

*Heller*, 554 U.S. at 628-629. The handgun bans in *Heller* and *McDonald* were "extreme outlier[s]; only a few jurisdictions in the entire country had similar laws." *Bruen*, 142 S. Ct. at 2160 (Alito, J., concurring). The licensing regime in *Bruen* was likewise an "outlier"; only six States had similar laws. *Id.* at 2161 (Kavanaugh, J., concurring). Laws like Section 922(g)(8), in contrast, are common throughout the Nation.

### C. The Contrary Arguments Lack Merit

The Fifth Circuit, Judge Ho, and Rahimi have advanced various arguments against Section 922(g)(8)'s constitutionality. Those arguments lack merit.

#### 1. *Congress may disarm persons subject to protective orders even if they are among "the people"*

The Fifth Circuit emphasized that the Second Amendment guarantees the right of "the people" to keep and bear arms and that Rahimi, "while hardly a model citizen, is nonetheless among 'the people.'" Pet. App. 11a; see *id.* at 8a, 19a-20a. Rahimi similarly argues that the Amendment secures "an unqualified right belonging to all of 'the people,'" and that Congress has no power to make "judgment[s] about who should be trusted with firearms." Br. in Opp. 22 (citation omitted); see *id.* at 20-28. That is incorrect.

The Bill of Rights secures rights "inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions." *Robertson* v. *Baldwin*, 165 U.S. 275, 281 (1897). "In incorporating these principles into the fundamental law there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed." *Ibid.* The First Amendment, for example, allows legislatures to ban true threats, even

37

though a threat is a form of "speech." See *Counterman* v. *Colorado*, 143 S. Ct. 2106, 2114 (2023). And the Second Amendment allows legislatures to ban dangerous and unusual weapons, such as short-barreled shotguns, even though they are "arms." See *Heller*, 554 U.S. at 624-625. So too, history and tradition establish that the Second Amendment allows legislatures to disarm persons who are not law-abiding, responsible citizens, regardless of whether they are among "the people."

The Fifth Circuit claimed that the government's reading lacks a "limiting principle" and would allow Congress to disarm "speeders" or those "who do not recycle." Pet. App. 11a. But the "law-abiding, responsible citizens" principle no more allows Congress to disarm anyone it pleases than the sensitive-places doctrine allows Congress to ban guns anywhere it pleases. See *Bruen*, 142 S. Ct. at 2133. Rather, this Court's references to "law-abiding" and "responsible" citizens reflect the Second Amendment's history and tradition and exclude only criminals and individuals whose possession of firearms would endanger themselves or others (such as underage individuals, persons with mental illnesses, drug users, and persons subject to protective orders). And it trivializes the profound harms of domestic violence to liken disarming domestic abusers to disarming "speeders" or those "who do not recycle."

If anything, it is the Fifth Circuit's rejection of the "law-abiding, responsible citizens" principle that leads to untenable consequences. The Fifth Circuit, relying on the decision below, has held in another case that Congress lacks the power to disarm a habitual drug user. See *United States* v. *Daniels*, No. 22-60596, 2023 WL 5091317, at *1, *4 (Aug. 9, 2023); 18 U.S.C. 922(g)(3). And a district court in the circuit, also relying on the

38

decision below, has held that Congress lacks the power to disarm a felon with convictions for manslaughter and aggravated assault. See *United States* v. *Bullock*, No. 18-cr-165, 2023 WL 4232309, at *2, *22, *28 (S.D. Miss. June 28, 2023); 18 U.S.C. 922(g)(1). Affirming the Fifth Circuit's decision here could thus wreak havoc on other parts of Section 922(g), which "probably does more to combat gun violence than any other federal law." *Rehaif* v. *United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting).

### 2. Congress may disarm persons subject to protective orders even if the Founders did not

The Fifth Circuit stated that there is "no tradition—from 1791 or 1866—of prohibiting gun possession * * * for people * * * subject to civil protective orders." Pet. App. 27a n.11 (citation omitted). Rahimi similarly emphasizes that "no one attempted to disarm domestic abusers as a class" at the Founding. Br. in Opp. 28. Those observations do not support invalidation of Section 922(g)(8).

This Court's precedents make clear that a modern regulation can comply with the Second Amendment even if it lacks "a historical twin." *Bruen*, 142 S. Ct. at 2133 (emphasis omitted). For example, the Amendment allows Congress to disarm felons, see *Heller*, 554 U.S. at 626, even though the first federal law disarming felons dates to 1938, see p. 26, *supra*. And although "the historical record yields relatively few 18th- and 19th-century 'sensitive places'"—for example, "legislative assemblies, polling places, and courthouses"—the Amendment allows "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places." *Bruen*, 142 S. Ct. at 2133. Relatedly, the Court has dismissed, as "bordering on the frivolous," the ar-

39

gument that the Amendment protects "only those arms in existence in the 18th century." *Heller*, 554 U.S. at 582. The notion that the Amendment permits only those regulations that existed in the 18th century has no more merit. Cf. *McIntyre* v. *Ohio Elections Commission*, 514 U.S. 334, 373 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or 1868 is *ipso facto* unconstitutional.").

The Fifth Circuit's and Rahimi's argument also conflicts with common sense. Past lawmakers' failure to adopt a given regulation does not necessarily (or even ordinarily) reflect doubts about its constitutionality. The idea of adopting such a regulation may never have occurred to the lawmakers. They may have considered the regulation unnecessary, impractical, or politically inexpedient. Or they may have failed to act because of the "sluggishness of government, the multitude of matters that clamor for attention, and the relative ease with which men are persuaded to postpone troublesome decisions." *Duckworth* v. *Arkansas*, 314 U.S. 390, 400 (1941) (Jackson, J., concurring in result); see *Zuber* v. *Allen*, 396 U.S. 168, 185 n.21 (1969) ("Congressional inaction frequently betokens unawareness, preoccupation, or paralysis.").

Of course, an absence of a history of similar regulations may be "relevant" to the Second Amendment inquiry. *Bruen*, 142 S. Ct. at 2131. But this Court has never treated it as dispositive. Instead, both *Bruen* and *Heller* relied on historical authorities invalidating or disapproving analogous regulations "on constitutional grounds." *Ibid.*; see *id.* at 2145-2147; *Heller*, 554 U.S. at 629. Neither the Fifth Circuit nor Rahimi has cited any such authorities here.

40

The absence of historical laws specifically targeting domestic abusers is especially unilluminating because it is readily explained by legal, social, and technological factors that have nothing to do with the Second Amendment. To start, past generations could not have disarmed persons subject to protective orders because such orders did not exist. For much of the Nation's history, the common-law doctrine of interspousal tort immunity precluded courts from hearing abused wives' civil suits against their husbands. See *Thompson* v. *Thompson*, 218 U.S. 611, 618 (1910); Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2161-2170 (1996). State laws authorizing courts to issue protective orders emerged only in the late 1970s. See Jeffrey Fagan, Nat'l Inst. of Justice, Office of Justice Programs, U.S. Dep't of Justice, *The Criminalization of Domestic Violence: Promises and Limits* 3 (Jan. 1996).

Past inaction also reflected the now-discredited belief that public authorities should not intervene to prevent domestic violence because doing so could undermine marital harmony. See Siegel 2154-2170. A 19th-century state court thus refused to hear battery charges against a man who beat his wife because it preferred the "lesser evil of trifling violence" to the "greater evil of raising the curtain upon domestic privacy." *State* v. *Rhodes*, 61 N.C. 453, 459 (1868). Another state court refused to hear allegations that a man violently attacked his wife because it would be "better to draw the curtain, shut out the public gaze, and leave the parties to forget and forgive." *Abbott* v. *Abbott*, 67 Me. 304, 307 (1877) (citation omitted). As late as the 1960s, police manuals stated that officers responding to domestic-violence complaints "should never create a police prob-

41

lem when there is only a family problem." Siegel 2171 (citation and emphasis omitted).

Finally, because of technological differences, the combination of firearms and domestic strife did not pose the same threat in the past that it poses today. Guns in the 18th century generally fired only one shot, often misfired, took a long time to load, and could not be kept loaded for long periods. See Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). Household homicides were rare in colonial times and only rarely committed with guns. See *id.* at 108, 116-117. But later technological developments—such as metallic cartridges; cheap, mass-produced revolvers; and guns capable of firing multiple shots—have led to the increased use of guns in homicides, including domestic homicides. See *id.* at 123-127. Now, more than half of the women who are killed by their intimate partners are killed with guns. See Violence Policy Center, *When Men Murder Women: An Analysis of 2018 Homicide Data* 5 (Sept. 2020). The Second Amendment allows Congress to address those "novel modern conditions." *Bruen*, 142 S. Ct. at 2134 (citation omitted).

### 3. The Fifth Circuit misunderstood the historical inquiry required by this Court's precedents

The Fifth Circuit also reasoned that the government had failed to identify an adequate historical analogue to Section 922(g)(8). Pet. App. 16a-27a. But the court's analysis of the historical evidence was flawed on multiple levels.

As an initial matter, the Fifth Circuit erred in reducing the inquiry into the Second Amendment's original

42

meaning to a search for a specific historical analogue. "The test [this] Court set forth in *Heller* and [*Bruen*] requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. That inquiry into original meaning "will often involve reasoning by analogy" to historical statutes, but it need not always do so. *Id.* at 2132. Here, the government has provided extensive evidence apart from historical analogues—for example, parliamentary and congressional debates, precursors to the Second Amendment, treatises, and commentaries—showing that the Second Amendment permits Congress to disarm persons who are not law-abiding, responsible citizens.

Moreover, this Court has emphasized that even when the government defends a modern law by invoking historical statutes, it need only cite a "historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. 2133. In judging whether a modern law is "analogous enough" to "historical precursors" to "pass constitutional muster," a court should ask whether the laws "impose a comparable burden" and are "comparably justified." *Ibid.* Here, the government has identified many historical laws that impose the same type of burden as Section 922(g)(8) (disqualifying someone from possessing arms) for the same type of reason (the person is not responsible enough to be trusted with arms). See pp. 22-27, *supra*.

The Fifth Circuit suggested that Section 922(g)(8) differs from historical laws by disarming persons based on civil orders rather than criminal convictions. See Pet. App. 23a. But legal sources from the 17th, 18th, and 19th centuries recognize the government's power to disarm irresponsible individuals regardless of their criminal records. See pp. 13-22, *supra*. States have

43

long disarmed groups other than criminals—for example, loyalists, minors, and intoxicated persons. See pp. 22-27, *supra*. And this Court has approved not only laws disarming "felons," but also laws disarming "the mentally ill." *Heller*, 554 U.S. at 626.

The Fifth Circuit next claimed that Section 922(g)(8) protects only "identified individuals," while historical gun laws sought to protect "society generally." Pet. App. 24a. That is a false dichotomy. Although a crime such as murder "affects the individual," it "likewise affects the community" by destroying "the order and peace of society." 4 William Blackstone, *Commentaries on the Laws of England* 6 (10th ed. 1787). In any event, some historical laws (such as surety laws) did seek to protect identified individuals. See p. 24, *supra*. And as Rahimi's conduct illustrates, armed domestic abusers do endanger society generally. See pp. 2-3, *supra*.

The Fifth Circuit also suggested that historical gun laws operated on a categorical basis, whereas Section 922(g)(8) rests on individualized findings. Pet. App. 19a. But while some historical laws disarmed broad categories of individuals, others (such as the Militia Act and surety laws) called for case-by-case judgments. See pp. 14-15, 24, *supra*. It would be bizarre if Congress could disarm irresponsible persons based on categorical judgments, but not based on individualized judicial findings.

More fundamentally, the Fifth Circuit's divide-and-conquer approach to the historical evidence was badly misguided. A court applying the Second Amendment should not isolate each historical precursor and ask if it differs from the challenged regulation in some way. A court should instead examine the historical evidence as a whole, determine whether it establishes a category of permissible regulation (such as "dangerous and unusual

44

weapons" or "sensitive places"), and determine whether the challenged law fits in that category. The historical evidence here shows that the Second Amendment permits laws disarming persons who are not law-abiding, responsible citizens, and Section 922(g)(8) plainly qualifies as such a law.

### 4. *Judge Ho's criticisms of protective orders lack merit*

Judge Ho argued that Section 922(g)(8) violates the Second Amendment because state courts supposedly issue protective orders "automatically," "without any actual threat of danger." Pet. App. 36a, 39a. State judges, he claimed, "face enormous pressure to grant" such orders and have "no incentive to deny them." *Id.* at 38a.

That argument is unsound. Judges, including state judges, are presumed to decide cases based on the facts and the law, not based on "pressure" and "incentives." See *Williams-Yulee* v. *Florida Bar*, 575 U.S. 433, 446-447 (2015). And a judicial decree, such as a protective order, is entitled to a "presumption of regularity." *Parke* v. *Raley*, 506 U.S. 20, 30 (1992). "There is no principle of law better settled, than that every act of a court of competent jurisdiction shall be presumed to have been rightly done, till the contrary appears." *Voorhees* v. *Jackson*, 10 Pet. 449, 472 (1836). When trial courts do err, moreover, appellate courts stand ready to correct their mistakes. Judge Ho cited two anecdotal examples of improper protective orders, but as he acknowledged, each of those orders was soon rescinded or reversed on appeal. See Pet. App. 39a.

Judge Ho's argument also ignores the strict requirements that a protective order must satisfy to trigger Section 922(g)(8). See pp. 32-34, *supra*. By requiring notice and a hearing, for example, Section 922(g)(8) screens out *ex parte* orders. And while Judge Ho

45

claimed that some state courts issue protective orders "automatically," Pet. App. 39a, he provided no reason to believe that any court would "automatically" find that a defendant poses a credible threat to a partner's physical safety, see 18 U.S.C. 922(g)(8)(C)(i), or "automatically" include an express prohibition upon the use of physical force capable of causing bodily injury, see 18 U.S.C. 922(g)(8)(C)(ii).

Judge Ho separately argued that family courts often issue "'mutual' protective orders," which forbid "*both* parties from harming one another." Pet. App. 39a. That allegedly "common practice," he continued, means that Section 922(g)(8) "effectively disarms *victims* of domestic violence." *Id.* at 39a-40a. But the overwhelming majority of States forbid or restrict mutual protective orders. See Nat'l Ctr. on Protection Orders and Full Faith & Credit, Battered Women's Justice Project, *State Statutory Provisions Addressing Mutual Protective Orders* 3-14 (rev. 2017) (collecting statutes from 48 States and territories). And even if a court issues such an order, the order would not automatically include mutual findings that each party poses a credible threat to the other, or mutual prohibitions on using physical force capable of causing bodily injury. See 18 U.S.C. 922(g)(8)(C).

\* \* \* \* \*

In *Bruen*, this Court emphasized that the Second Amendment must be interpreted based on text, history, and tradition. But the Court was equally emphatic that the Nation's history and tradition of firearms regulation give Congress and the States ample room to protect the public—including by disarming those who are not law-abiding, responsible citizens. Section 922(g)(8) falls squarely within that established tradition. The Fifth

46

Circuit could conclude otherwise only by transforming the analysis of the Second Amendment's original meaning into the very sort of "regulatory straitjacket" the Court disapproved in *Bruen*. 142 S. Ct. at 2133.

## CONCLUSION

This Court should reverse the judgment of the court of appeals.

Respectfully submitted.

ELIZABETH B. PRELOGAR
  *Solicitor General*
  *Counsel of Record*
NICOLE M. ARGENTIERI
  *Acting Assistant Attorney*
  *General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
VIVEK SURI
  *Assistant to the Solicitor*
  *General*
WILLIAM A. GLASER
  *Attorney*

AUGUST 2023

# APPENDIX

## TABLE OF CONTENTS

Page

Appendix — Constitutional and statutory provisions:

U.S. Const. Amend. II...................................1a

18 U.S.C. 922(g)(8) ......................................1a

18 U.S.C. 924(a)(2) (2018)............................2a

## APPENDIX

1.   U.S. Const. Amend. II provides:

A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed.

2.   18 U.S.C. 922(g)(8) provides:

**Unlawful acts**

(g)   It shall be unlawful for any person—

(8)   who is subject to a court order that—

(A)   was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

(B)   restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C)(i)   includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

(ii)   by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; * * *

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or am-

(1a)

2a

munition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

3.   18 U.S.C. 924(a)(2) (2018) provides:

**Penalties**

(2)   Whoever knowingly violates subsection (a)(6), (d), (g), (h), (i), (j), or (*o*) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both.