# Exhibit B

(Government's Petition for Certiorari,
*Attorney General v. Range*, S. Ct. No. 23-374)

**No.**

# In the Supreme Court of the United States

───────

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

BRYAN DAVID RANGE

───────

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT*

───────

**PETITION FOR A WRIT OF CERTIORARI**

───────

ELIZABETH B. PRELOGAR
  *Solicitor General*
    *Counsel of Record*
BRIAN A. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
VIVEK SURI
  *Assistant to the Solicitor*
    *General*
MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
KEVIN B. SOTER
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**QUESTION PRESENTED**

Whether 18 U.S.C. 922(g)(1), the federal statute that prohibits a person from possessing a firearm if he has been convicted of "a crime punishable by imprisonment for a term exceeding one year," *ibid.*, complies with the Second Amendment.

(I)

**PARTIES TO THE PROCEEDING**

Petitioners (defendants-appellees below) are Merrick B. Garland, Attorney General, and Steven M. Dettelbach, Director, Bureau of Alcohol, Tobacco, Firearms and Explosives.* Respondent (plaintiff-appellant below) is Bryan David Range.

**RELATED PROCEEDINGS**

United States District Court (E.D. Pa.):

*Range* v. *Lombardo*, No. 20-cv-3488 (Aug. 31, 2021)

United States Court of Appeals (3d Cir.):

*Range* v. *Attorney General United States*, No. 21-2835 (June 6, 2023)

---

* Director Dettelbach succeeded Acting Directors Gary M. Restaino, Marvin Richardson, and Regina Lombardo as defendant-appellee.

(II)

# TABLE OF CONTENTS

Page

Opinions below ................................................................ 1
Jurisdiction ...................................................................... 2
Constitutional and statutory provisions involved ...................... 2
Statement ........................................................................ 2
Reasons for granting the petition ......................................... 6
    A.   The court of appeals erred in holding Section
        922(g)(1) unconstitutional as applied to Range ............ 7
        1.   This Court's precedents recognize that
            Congress may disarm felons ................................. 8
        2.   Text, history, and tradition confirm that
            Congress may disarm felons ................................ 11
        3.   A person may not obtain an as-applied
            exemption from Section 922(g)(1) based on the
            nature of his crime or his individual
            circumstances ........................................................ 19
    B.   The decision below conflicts with the decisions of
        other courts of appeals and has significant
        practical consequences ................................................ 22
    C.   This Court should hold this certiorari petition
        pending the resolution of *Rahimi* ............................... 25
Conclusion ...................................................................... 28
Appendix A — Court of appeals en banc opinion
                (June 6, 2023) ............................................. 1a
Appendix B — Court of appeals panel opinion
                (Nov. 16, 2022) ........................................ 99a
Appendix C — District court order (Aug. 8, 2023) ............ 141a
Appendix D — District court order (Aug. 31, 2021) ......... 143a
Appendix E — District court memorandum
                (Aug. 31, 2021) ........................................ 145a
Appendix F — Court of appeals order sur petition for
                rehearing en banc (Jan. 6, 2023) ............ 159a
Appendix G — Constitutional and statutory provisions... 161a

(III)

IV

## TABLE OF AUTHORITIES

Cases:                                                                          Page

*Austin* v. *United States*, 509 U.S. 602 (1993)...................... 15

*Avery* v. *Everett*, 18 N.E. 148 (N.Y. 1888).................... 14, 15

*Barrett* v. *United States*, 423 U.S. 212 (1976)..................... 18

*Binderup* v. *Attorney General United States*,
836 F.3d 336 (2016), cert. denied,
582 U.S. 943 (2017)........................................................ 3, 17

*Blanton* v. *City of North Las Vegas*,
489 U.S. 538 (1989)............................................................ 20

*Branzburg* v. *Hayes*, 408 U.S. 665 (1972) .......................... 19

*Bucklew* v. *Precythe*, 139 S. Ct. 1112 (2019) ...................... 14

*Burgess* v. *United States*, 553 U.S. 124 (2008)...................... 7

*Calero-Toledo* v. *Pearson Yacht Leasing Co.*,
416 U.S. 663 (1974).............................................................. 15

*Deming, In re*, 10 Johns. 232 (N.Y. 1813) .......................... 15

*Dickerson* v. *New Banner Institute, Inc.*,
460 U.S. 103 (1983).............................................................. 18

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008)................................................... 8, 10-13

*Heller* v. *District of Columbia*, 670 F.3d 1244
(D.C. Cir. 2011) ..................................................................... 9

*Iancu* v. *Brunetti*, 139 S. Ct. 2294 (2019)........................... 25

*Lewis* v. *United States*, 445 U.S. 55 (1980) ........................ 18

*Lewis* v. *United States*, 518 U.S. 322 (1996) ...................... 19

*Logan* v. *United States*, 552 U.S. 23 (2007) .......................... 3

*Mathis* v. *United States*, 579 U.S. 500 (2016) ...................... 7

*McDonald* v. *City of Chicago*, 561 U.S. 742 (2010) .............. 9

*Medina* v. *Whitaker*, 913 F.3d 152 (D.C. Cir.),
cert. denied, 140 S. Ct. 645 (2019) .............................. 14, 20

*NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022) ...... 4, 9, 10, 18-20

*NYSRPA* v. *City of New York*, 140 S. Ct. 1525 (2020)......... 9

V

Cases—Continued:                                            Page

*Pontarelli* v. *United States Dep't of the Treasury*,
   285 F.3d 216 (3d Cir. 2002) ................................................ 22

*Rehaif* v. *United States*, 139 S. Ct. 2191 (2019) .................. 24

*Richardson* v. *Ramirez*, 418 U.S. 24 (1974) ........................ 12

*Spencer* v. *Kemna*, 523 U.S. 1 (1998) .................................... 12

*Steel Co.* v. *Citizens for a Better Env't*,
   523 U.S. 83 (1998) ................................................................ 27

*United States* v. *Barton*, 633 F.3d 168 (3d Cir. 2011) ........ 17

*United States* v. *Bullock*, No. 18-cr-165, 2023 WL
   4232309 (S.D. Miss. June 29, 2023) .................................... 25

*United States* v. *Cunningham*, 70 F.4th 502
   (8th Cir. 2023), reh'g denied, No. 22-1080,
   2023 WL 5606171 (Aug. 30, 2023)................................ 22, 23

*United States* v. *Daniels*,
   77 F.4th 337 (5th Cir. 2023) ........................................ 26, 27

*United States* v. *Harper*, No. 21-cr-236,
   2023 WL 5672311 (M.D. Pa. Sept. 1, 2023)...................... 25

*United States* v. *Jackson*, 69 F.4th 495
   (8th Cir. 2023), reh'g denied, No. 22-2870,
   2023 WL 5605618 (Aug. 30, 2023)................................ 22, 23

*United States* v. *McCane*, 573 F.3d 1037
   (10th Cir. 2009), cert. denied, 559 U.S. 970 (2010)........... 23

*United States* v. *Quailes*, No. 21-cr-176,
   2023 WL 5401733 (M.D. Pa. Aug. 22, 2023) .................... 25

*United States* v. *Rahimi* 610 F.4th 443 (5th Cir.),
   cert. granted, 143 S. Ct. 2688 (2023) .................................. 7

*United States* v. *Skoien*, 614 F.3d 638 (7th Cir. 2010),
   cert. denied, 562 U.S. 1303 (2011) ...................................... 17

*United States* v. *Verdugo-Urquidez*,
   494 U.S. 259 (1990)............................................................. 13

*Vincent* v. *Garland*, 80 F.4th 1197 (10th Cir. 2023) ..... 23, 24

*Voisine* v. *United States*, 579 U.S. 686 (2016) .................... 12

VI

Constitution, statutes, and regulation:                    Page

    U.S. Const.:

        Pmbl.................................................................. 13

        Art. I, § 2, Cl. 1 ............................................... 13

        Art. III............................................................ 6, 27

        Amend. II .................... 4, 6-11, 13, 16, 17, 21-23, 26, 161a

        Amend. IV ....................................................... 13

        Amend. V......................................................... 19

        Amend. VI ....................................................... 18, 19

        Amend. X......................................................... 13

        Amend. XIV, §§ 1-2....................................... 12

        Amend. XVII, Cls. 1-2.................................. 13

    Act of Oct. 3, 1961, Pub. L. No. 87-342, § 2,

      75 Stat. 757 .................................................... 7

    18 U.S.C. 3559(a) ............................................... 7

    18 U.S.C. 921(a)(20) ...................................... 2, 161a

    18 U.S.C. 921(a)(20)(A) ................................. 2, 161a

    18 U.S.C. 921(a)(20)(B) ................................. 2, 161a

    18 U.S.C. 922(g) ........................................... 18, 24, 27

    18 U.S.C. 922(g)(1)................. 2-7, 11, 13, 17-25, 27, 28, 162a

    18 U.S.C. 922(g)(3)........................................ 27

    18 U.S.C. 922(g)(5)........................................ 12

    18 U.S.C. 922(g)(7)........................................ 12

    18 U.S.C. 922(g)(8)........................................ 26, 162a

    18 U.S.C. 924(a)(8)........................................ 2

    18 U.S.C. 925(c)............................................. 3, 21

    62 Pa. Cons. Stat. Ann. § 481(a) (West Supp. 1995).............3

    3 Jac. 1, c. 5, § 16 (1605) (Eng.) ........................... 15

    27 C.F.R. 478.144.................................................. 3

VII

Miscellaneous:                                                    Page

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ........................................................ 12

William Blackstone, *Commentaries on the Laws of England*:

    Vol. 1 (1765) ........................................................ 15

    Vol. 4 (1769) ................................................. 14, 15

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) ................................. 14

Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice:

    *Federal Denials*, https:// https://www.fbi.gov/file-repository/federal_denials.pdf/view (last visited Oct. 5, 2023) ........................................... 24

    *National Instant Criminal Background Check System Operational Report 2020-2021* (Apr. 2022), https://www.fbi.gov/file-repository/nics-2020-2021-operations-report.pdf/view ............. 24

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868) ......... 12

*The Federalist* No. 74 (Alexander Hamilton) (Jacob E. Cooke ed. 1961) ...................................................... 20

David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354 (1982) ...................... 16

*The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780* (Oscar Handlin & Mary Handlin eds., 1966) .................... 16

*The Public Records of the Colony of Connecticut From May, 1775 to June, 1776* (Charles J. Hoadly ed., 1890) ........................................................................... 16

S. Rep. No. 353, 102d Cong., 2d Sess. (1992) ...................... 21

VIII

Miscellaneous—Continued:                                   Page

3 Joseph Story, *Commentaries on the Constitution
of the United States* (1833)..................................................11

U.S. Sent. Comm'n, *Quick Facts: Felon in
Possession of a Firearm* (July 2023),
https://www.ussc.gov/sites/default/files/pdf/
research-and-publications/quick-
facts/Felon_In_Possession_FY22.pdf .............................24

# In the Supreme Court of the United States

———

No.

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

BRYAN DAVID RANGE

———

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT*

———

**PETITION FOR A WRIT OF CERTIORARI**

———

The Solicitor General, on behalf of the Attorney General and the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Third Circuit in this case.

**OPINIONS BELOW**

The opinion of the en banc court of appeals (App., *infra*, 1a-98a) is reported at 69 F.4th 96. The opinion of the court of appeals panel (App., *infra*, 99a-140a) is reported at 53 F.4th 262. The memorandum of the district court (App., *infra*, 145a-158a) is reported at 557 F. Supp. 3d 609.

(1)

2

## JURISDICTION

The judgment of the en banc court of appeals was entered on June 6, 2023. On August 25, 2023, Justice Alito extended the time within which to file a petition for a writ of certiorari to and including October 5, 2023. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are reproduced in the appendix. App., *infra*, 161a-162a.

## STATEMENT

1. In 18 U.S.C. 922(g)(1), Congress prohibited a person from possessing a firearm in or affecting commerce if he has been convicted of "a crime punishable by imprisonment for a term exceeding one year." *Ibid.* A knowing violation is punishable by up to 15 years of imprisonment. See 18 U.S.C. 924(a)(8).

Section 922(g)(1) is subject to several exceptions. The provision does not cover certain offenses "relating to the regulation of business practices." 18 U.S.C. 921(a)(20)(A). It also does not cover state offenses that are classified by state law as misdemeanors and that are punishable by two years of imprisonment or less. See 18 U.S.C. 921(a)(20)(B). And it does not cover convictions that have been expunged or set aside, or offenders who have been pardoned or had their civil rights restored. See 18 U.S.C. 921(a)(20).

Until 1992, Congress also allowed an individual to obtain relief from Section 922(g)(1)'s bar to possessing a firearm by demonstrating to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that "the circumstances regarding the disability, and [his] record and reputation, are such that [he] will not be likely to

3

act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. 925(c); see *ibid.* (granting authority to the Attorney General); 27 C.F.R. 478.144 (delegating authority to the Director of ATF). But since 1992, Congress has effectively suspended that provision by prohibiting the use of federal funds to process applications for relief. See *Logan* v. *United States*, 552 U.S. 23, 28 n.1 (2007).

2. In 1995, respondent Bryan Range pleaded guilty in Pennsylvania state court to making a false statement to obtain food stamps, in violation of 62 Pa. Cons. Stat. Ann. § 481(a) (West Supp. 1995). App., *infra*, 2a. Pennsylvania law classified that crime as a misdemeanor but made it punishable by up to five years of imprisonment. *Id.* at 3a. Range was sentenced to three years of probation. *Ibid.* Under Section 922(g)(1), that conviction disqualified Range from possessing firearms. *Ibid.*

Range sued the Attorney General and the Director of ATF in the U.S. District Court for the Eastern District of Pennsylvania. App., *infra*, 4a. He sought a declaratory judgment that Section 922(g)(1) violates the Second Amendment as applied to him and an injunction prohibiting its enforcement against him. *Ibid.*

The district court granted the government's motion for summary judgment. App., *infra*, 145a-158a. The court explained that, in *Binderup* v. *Attorney General United States*, 836 F.3d 336 (2016) (en banc), cert. denied, 582 U.S. 943 (2017), the Third Circuit had set out a multifactor test for determining whether Section 922(g)(1) could constitutionally be applied to a person convicted of a given crime. App., *infra*, 150a. Applying that framework, the court concluded that Range's crime

4

justified disqualifying him from possessing firearms. *Id.* at 151a-157a.

3. A panel of the Third Circuit affirmed. App., *infra*, 99a-140a. The panel determined that this Court's intervening decision in *NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022), had superseded *Binderup*'s multifactor test. App., *infra*, 108a n.9. Applying the textual and historical method required by *Bruen*, the panel rejected Range's claim that Section 922(g)(1) violated the Second Amendment as applied to him. *Id.* at 107a-139a. It determined that "'the people' constitutionally entitled to bear arms are the 'law-abiding, responsible citizens' of the polity, * * * a category that properly excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses, whether or not those crimes are violent." *Id.* at 100a (citation omitted); see *id.* at 111a-114a. It further concluded that, "even if Range falls within 'the people,' the Government ha[d] met its burden to demonstrate that [Section 922(g)(1)'s] prohibition is consistent with historical tradition." *Id.* at 100a; see *id.* at 115a-132a.

4. The Third Circuit granted rehearing en banc. App., *infra*, 157a-158a. The en banc court reversed and remanded. *Id.* at 1a-98a.

a. The en banc court first concluded that, despite his conviction, Range remained "one of 'the people' who have Second Amendment rights." App., *infra*, 8a; see *id.* at 8a-13a. It acknowledged this Court's repeated statements that the Second Amendment protects the right of "'law-abiding, responsible citizens'" to keep and bear arms, but it dismissed those statements as "hopelessly vague" "dicta." *Id.* at 9a, 11a.

5

The en banc court then concluded that the government "ha[d] not carried its burden" of showing that "applying § 922(g)(1) to Range * * * 'is consistent with the Nation's historical tradition of firearm regulation.'" App., *infra*, 13a (citation omitted). The court rejected the government's argument that governments in the Founding Era often punished felonies with death, reasoning that the "greater does not necessarily include the lesser" and that "founding-era governments' execution of some individuals * * * does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id.* at 17a. The court also rejected the government's reliance on historical laws punishing various offenses with forfeiture of the arms involved in those offense, reasoning that "confiscation of the instruments of crime * * * differs from a status-based lifetime ban on firearm possession." *Id.* at 18a.

Although the en banc court described its decision as "narrow" and stated that it had held Section 922(g)(1) unconstitutional only as applied to "people like Range," it neither specified which of Range's circumstances were relevant its decision nor otherwise attempted to define the scope of its holding. App., *infra*, 19a. The court remanded the case to the district court for entry of declaratory and injunctive relief. *Id.* at 20a; see *id.* at 141a-142a (order granting relief on remand).

b. Judge Porter issued a concurrence arguing that *state* laws from the 18th and 19th centuries cannot provide appropriate historical analogues for *federal* firearms restrictions such as Section 922(g)(1). App., *infra*, 21a-27a. Judge Ambro issued a concurrence, which was joined by two other judges, stating that "the majority opinion * * * speaks only to [Range's] situation, and

6

not to those of murderers, thieves, sex offenders, domestic abusers, and the like." *Id.* at 28a; see *id.* at 28a-35a.

c. Judge Shwartz issued a dissent, which was joined by one other judge, arguing that the en banc court's opinion was "inconsistent with [this] Court's jurisprudence" and that Section 922(g)(1) has "a historical basis." App., *infra*, 36a; see *id.* at 36a-43a. Judge Krause issued a dissent arguing that "legislatures have historically possessed the authority to disarm entire groups, like felons, whose conduct evinces disrespect for the rule of law" and that "the doctrinal and practical ramifications" of the en banc court's contrary decision "are profound and pernicious." *Id.* at 47a; see *id.* at 43a-87a. Judge Roth issued a dissent arguing that, because Range had failed to allege that the particular guns he seeks to possess satisfy Section 922(g)(1)'s interstate-commerce element, he lacks Article III standing to challenge Section 922(g)(1). *Id.* at 88a-98a.

## REASONS FOR GRANTING THE PETITION

The en banc Third Circuit held a longstanding federal statute unconstitutional as applied to Range—and opened the courthouse doors to an untold number of future challenges by other felons based on their own particular offenses, histories, and personal circumstances. The court of appeals' decision contradicts the historical understanding of the right to keep and bear arms, as well as this Court's assurances that the Second Amendment does not cast doubt on felon-disarmament laws. It also conflicts with recent decisions of the Eighth and Tenth Circuits expressly rejecting felony-by-felony litigation about 18 U.S.C. 922(g)(1)'s constitutionality. And the decision below threatens public safety and poses serious problems of judicial administration by re-

7

quiring judges to make ad hoc assessments of the risks of allowing convicted criminals to possess guns—a high-stakes task that Congress has already determined cannot be performed with sufficient reliability, and one for which the judiciary is particularly ill-suited.

This Court should not leave the decision below in place. But because the Court is already considering closely related Second Amendment issues in *United States* v. *Rahimi*, cert. granted, 143 S. Ct. 2688 (No. 22-915) (oral argument scheduled for Nov. 7, 2023), plenary review is not warranted at this time. The Court should instead hold the petition for a writ of certiorari pending its decision *Rahimi*, and then dispose of the petition as appropriate.

### A. The Court Of Appeals Erred In Holding Section 922(g)(1) Unconstitutional As Applied To Range

For more than six decades, Congress has restricted the possession, receipt, and transportation of firearms by felons—*i.e.*, persons who have been convicted of crimes "punishable by imprisonment for a term exceeding one year." 18 U.S.C. 922(g)(1); see Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757.* Contrary to the court of appeals' decision, that longstanding law

---

* "[T]he term 'felony' is commonly defined to mean a crime punishable by imprisonment for more than one year." *Burgess* v. *United States*, 553 U.S. 124, 130 (2008). And federal law classifies crimes punishable by more than a year of imprisonment as felonies. See 18 U.S.C. 3559(a). But some States use different terminology; Pennsylvania classifies Range's crime as a misdemeanor, even though it was punishable by up to five years of imprisonment. This brief uses the term "'felony'" as it is "commonly defined," *Burgess*, 553 U.S. at 130, not as it is defined in Pennsylvania law. See, *e.g.*, *Mathis* v. *United States*, 579 U.S. 500, 503 (2016) (referring to Section 922(g)(1) as the felon-in-possession statute).

8

complies with the Second Amendment and is not subject to individualized Second Amendment challenges based on the nature of a particular criminal's offense or circumstances.

### 1. This Court's precedents recognize that Congress may disarm felons

a. In *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), this Court held that the Second Amendment protects the "right of law-abiding, responsible citizens" to possess handguns in the home for self-defense. *Id.* at 635. Consistent with that interpretation, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and it described those restrictions as "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26. The Court incorporated that understanding into its holding, ruling that the plaintiff was entitled to possess a handgun only if he was "not disqualified from the exercise of Second Amendment rights"—meaning, among other things, that he was "not a felon" and was "not insane." *Id.* at 631, 635. The Court stated that those "exceptions" to the Second Amendment had "historical justifications," which the Court would have "time enough to expound upon" "if and when those exceptions come before" it. *Id.* at 635.

In approving felon-disarmament laws, the *Heller* Court adopted a position that had been urged by the plaintiff, many of his amici, and the United States. The plaintiff assured the Court that, although the Second Amendment secured an individual right to keep and bear arms, "basic firearm safety laws," such as the "prohibition on possession of guns by felons," would "easily" pass constitutional muster. Resp. Br. at 57, *Heller, su-*

9

*pra* (No. 07-290). Many amici who supported the plaintiff similarly assured the Court that "bans on ownership by felons" are among the "many valid restrictions on the right to keep and bear arms," NRA Amicus Br. at 22, *Heller*, *supra* (No. 07-290), and that laws disarming "convicted felons" are "consistent with centuries of common law," Texas Amicus Br. at 35, *Heller*, *supra* (No. 07-290). And the United States devoted a section of its amicus brief to marshalling "historical evidence" that the right to keep and bear arms "simply does not extend to felons." U.S. Amicus Br. at 25-26, *Heller*, *supra* (No. 07-290).

In embracing the same view, the Court's decision in *Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws * * * prohibiting possession by felons." *NYSRPA* v. *City of New York*, 140 S. Ct. 1525, 1540-1541 (2020) (Alito, J., dissenting). Or, as then-Judge Kavanaugh put it, "the Court in *Heller* affirmatively *approved* * * * felon-in-possession laws * * * based on a history-and-tradition-based test." *Heller* v. *District of Columbia*, 670 F.3d 1244, 1278 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

b. This Court's decision in *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), reaffirmed that understanding of the Second Amendment. The plurality observed that the Court had "made it clear in *Heller* that [its] holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" *Id.* at 786 (citation omitted). The *McDonald* plurality "repeat[ed] those assurances." *Ibid.*

Similarly, in *NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022), the Court repeatedly used the term "law-abiding

10

citizen" to describe the class of persons protected by the Second Amendment. See *id.* at 2122 ("ordinary, law-abiding citizens"); *id.* at 2125 ("law-abiding, adult citizens"); *id.* at 2131 ("law-abiding, responsible citizens") (citation omitted); *id.* at 2133 ("a law-abiding citizen's right to armed self-defense" and "law-abiding citizens"); *id.* at 2134 ("ordinary, law-abiding, adult citizens"); *id.* at 2135 n.8 ("law-abiding citizens"); *id.* at 2138 ("law-abiding citizens"); *id.* at 2138 n.9 ("law-abiding, responsible citizens") (citation omitted); *id.* at 2150 ("law-abiding citizens"); *id.* at 2156 ("law-abiding, responsible citizens" and "law-abiding citizens"). And Justice Kavanaugh's concurrence repeated *Heller*'s statement that "prohibitions on the possession of firearms by felons" are "presumptively lawful regulatory measures." *Id.* at 2162 (Kavanaugh, J., concurring) (brackets and citation omitted).

Many aspects of Second Amendment doctrine rest on the premise that the Amendment protects only law-abiding citizens, not felons. In judging whether modern firearms regulations are consistent with their historical precursors, courts must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. In judging whether the Second Amendment protects particular types of weapons, courts must consider whether those weapons are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And the government may require gun owners to pass background checks—which include a check for felony convictions—because such checks ensure that those who carry guns "are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (citation omitted).

11

### 2. *Text, history, and tradition confirm that Congress may disarm felons*

Three independent but mutually reinforcing legal principles support *Heller*'s approval of felon-disarmament laws. First, felons disqualified from possessing firearms under Section 922(g)(1) are not among "the people" protected by the Second Amendment. Second, the Second Amendment has historically been understood to protect law-abiding individuals, not convicted felons. Third, the Second Amendment has historically been understood to protect only responsible individuals, and felons, as a category, are not responsible.

a. The Second Amendment secures "the right of *the people* to keep and bear arms." U.S. Const. Amend. II (emphasis added). "'The people'" is "a term of art employed in select parts of the Constitution" to refer to "a class of persons who are part of a national community." *Heller*, 554 U.S. at 580 (brackets and citation omitted). The Second Amendment thus guarantees the right to bear arms only to "members of the political community," not to all persons. *Ibid.*

The Second Amendment's background illuminates the reasons for that limitation. The Founders codified the right to bear arms in large part because they regarded it as an important "safeguard against tyranny." *Heller*, 554 U.S. at 600. Justice Story, for instance, described the right to bear arms as the "palladium of the liberties of a republic" and explained that it "enable[s] the people to resist and triumph over" the "usurpation and arbitrary power of rulers." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (1833). It makes sense that a right that was codified in order to enable the polity to "resist tyr-

12

anny," *Heller*, 554 U.S. at 598, would be limited to the members of that polity.

Consistent with that understanding, persons who do not belong to the political community have historically been denied the right to bear arms. For example, the right to bear arms has historically been reserved to "citizens." *Heller*, 554 U.S. at 635; see *id.* at 581 ("Americans"). Noncitizens at the Founding lacked the "right to bear arms"—just as they lacked other "rights of members of the polity," such as the right to "vote, hold public office, or serve on juries." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998). Even today, federal law disarms certain noncitizens—specifically, those who are unlawfully present in the United States, those who are present on nonimmigrant visas, and those who have renounced U.S. citizenship. See 18 U.S.C. 922(g)(5) and (7).

Like noncitizens, felons disarmed under Section 922(g)(1) are not among "the people" protected by the Second Amendment because they have forfeited their membership in the political community. Cf. *Voisine* v. *United States*, 579 U.S. 688, 715 (2016) (Thomas, J., dissenting) (tying *Heller*'s approval of felon disarmament to the understanding that certain individuals "are beyond the scope of the 'People' protected by the Second Amendment"). States have long denied felons the rights of members of the polity—the right to vote, see U.S. Const. Amend. XIV, § 2; *Richardson* v. *Ramirez*, 418 U.S. 24, 41-56 (1974); the right to hold public office, see *Spencer* v. *Kemna*, 523 U.S. 1, 8-9 (1998); and the right to serve on juries, see *ibid.* And as a leading 19th-century scholar explained, "the felon" has "been almost universally excluded" from "the *people* in whom is vested the sovereignty of the State." Thomas M. Coo-

13

ley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868).

The court of appeals reasoned that other constitutional provisions use the term "the people" and that the term's meaning cannot "var[y] from provision to provision." App., *infra*, 10a. But while the phrase "the people" refers to members of the political community throughout the Constitution, see *Heller*, 554 U.S. at 580, the scope of that community varies from provision to provision. For example, noncitizens are not among "the people" protected by the Second Amendment, see *id.* at 581, but certain noncitizens are among "the people" protected by the Fourth Amendment, see *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265, 271-273 (1990). The same is true of felons. And many other constitutional provisions use the term "the people" in a manner that excludes felons who have forfeited the rights that come with membership in the polity. Such felons are not among "the people" who adopted the Constitution, see U.S. Const. Pmbl; or "the people" who are entitled to elect members of Congress, see U.S. Const. Art. I, § 2, Cl. 1; Amend. XVII, Cls. 1-2; or "the people" who reserved powers not delegated to the government, see U.S. Const. Amend. X. So too, felons disarmed under Section 922(g)(1) are not among "the people" entitled to keep and bear arms.

b. Quite apart from the Second Amendment's textual limitation of the right to bear arms to the people, the right has historically been understood to extend only to law-abiding persons. It thus does not extend to felons.

In England before the Founding, felons had no right to keep and bear arms. The standard penalty for a fel-

14

ony was death. See 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769). That punishment extended even to non-violent felonies, such as smuggling, *id.* at 155; fraudulent bankruptcy, *id.* at 156; violating quarantine, *id.* at 162; forging a marriage license, *id.* at 163; and cutting down a cherry tree, *id.* at 4. A felon awaiting execution would be held in prison—where he would have no access to arms. See *id.* at 131 (discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony"). A conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels—including, of course, his arms. See *id.* at 379-382. A convicted felon, finally, was deemed "already dead in law" even before his execution. *Id.* at 374. That status, known as "civil death," involved "an extinction of civil rights, more or less complete." *Avery* v. *Everett*, 18 N.E. 148, 150 (N.Y. 1888). A convicted felon thus had no "right to vote, to sit as a juror, *to bear arms*, [or] to marry"; indeed, "his physical conditions were such that he could do none of these things." *Id.* at 156 (Earl, J., dissenting) (emphasis added).

Early Americans accepted that legislatures had the power to subject felons to similar deprivations. Thus, "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew* v. *Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted). As in England, the death penalty extended even to non-violent crimes, such as forgery and horse theft. See *Medina* v. *Whitaker*, 913 F.3d 152, 158 (D.C. Cir.), cert. denied, 140 S. Ct. 645 (2019). Many States also subjected certain felons to the complete forfeiture of their estates or their goods and chattels. See Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332

15

nn. 275-276 (2014) (collecting statutes). And at least some States enacted statutes carrying forward the common-law doctrine of civil death. See, *e.g.*, *In re Deming*, 10 Johns. 232, 233 (N.Y. 1813) (per curiam).

Those punishments were justified by the belief that a person can lose his legal rights by violating "his part of the [social] contract." 4 Blackstone 375. Capital punishment, for example, was justified on the ground that the right to life can be "forfeited for the breach of th[e] laws of society." 1 Blackstone 129. The confiscation of felons' estates was likewise justified on the ground that "property was a right derived from society which one lost by violating society's laws." *Austin* v. *United States*, 509 U.S. 602, 612 (1993); see *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U.S. 663, 682 (1974) ("[A] breach of the criminal law * * * was felt to justify denial of the right to own property."). And civil death was justified on the ground that someone who has committed a felony should no longer possess "any rights growing out of organized society." *Avery*, 18 N.E. at 155 (Earl, J., dissenting).

Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming persons convicted of such crimes. They did, however, enact laws disarming persons who had committed certain offenses that were not punishable by death. For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending the service of the church of England." 4 Blackstone 55; see 3 Jac. 1, c. 5, § 16 (1605) (Eng.). In 1624, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the col-

16

ony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). And in 1775, Connecticut enacted a statute providing that a person who was convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (Charles J. Hoadly ed., 1890). The fact that legislatures disarmed individuals who committed those offenses suggests, *a fortiori*, the constitutionality of disarming those who commit felonies.

Moreover, some Founding Era sources expressly recognized that the right to bear arms extended only to law-abiding individuals. In 1780, for example, the Town of Williamsburg, Massachusetts, adopted a resolution proclaiming: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Lawfull Subjects of Government* we Ought Never to be deprived of them." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966) (emphasis added). And Anti-Federalists at the Pennsylvania ratifying convention proposed a bill of rights that, among other things, forbade "disarming the people or any of them, *unless for crimes committed*, or real danger of public injury from individuals." 2 *The Documentary History of the Ratification of the Constitution* 598 (Merrill Jensen ed., 1976) (emphasis added).

c. Finally, the government's brief in *Rahimi* explains that the Second Amendment allows Congress to disarm irresponsible individuals—that is, individuals whose possession of firearms would endanger them-

17

selves or others. See Gov't Br. at 10-27, *Rahimi*, *supra* (No. 22-915). English law before the Founding allowed the disarmament of dangerous individuals; an influential Second Amendment precursor contemplated the disarmament of individuals who posed a "real danger of public injury"; 19th-century sources recognized legislatures' power to disarm individuals whose possession of arms would endanger the public; and American legislatures have been disarming such individuals since the 17th century. See *id.* at 27-28.

In exercising that power, Congress need not require case-by-case findings of dangerousness. Congress may make categorical judgments about responsibility; "[t]hat *some* categorical limits are proper is part of the original meaning" of the Second Amendment. *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), cert. denied, 562 U.S. 1303 (2011). For example, past legislatures enacted laws categorically disarming loyalists, see Gov't Br. at 22, *Rahimi*, *surpa* (No. 22-915); minors, see *id.* at 24 & n.16; and vagrants, see *id.* at 25 & n.18—each time without requiring case-by-case findings of dangerousness or irresponsibility.

Section 922(g)(1) is consistent with that tradition of imposing categorical limits on the right to keep and bear arms. Common sense suggests that "felons are more likely to commit violent crimes" than are law-abiding individuals. *United States* v. *Barton*, 633 F.3d 168, 175 (3d Cir. 2011). "[N]umerous studies" show a "link between past criminal conduct and future crime, including gun violence." *Binderup* v. *Attorney General United States*, 836 F.3d 336, 400 (3d Cir. 2016) (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments), cert. denied, 582 U.S. 943 (2017); see *id.* at 400 n.160 (collecting studies). And this Court

18

has repeatedly recognized that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms. *Dickerson* v. *New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983); see, *e.g.*, *Lewis* v. *United States*, 445 U.S. 55, 67 (1980) ("The federal gun laws * * * [focus on the] fact of conviction * * * in order to keep firearms away from potentially dangerous persons."); *Barrett* v. *United States*, 423 U.S. 212, 220 (1976) ("The history of [Section 922(g)] reflects a similar concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.").

d. The court of appeals rejected the government's historical arguments, concluding that the government had failed to identify appropriate "historical analogues" to Section 922(g)(1) (at least as applied to "people like Range"). App., *infra*, 15a, 19a. But the court erred in reducing the inquiry into the Second Amendment's original meaning to a search for a specific analogue. "The test [this Court] set forth in *Heller* and [*Bruen*] requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. That inquiry into original meaning "will often involve reasoning by analogy" to historical statutes, but it need not always do so. *Id.* at 2132. Here, regardless of whether past laws are analogous to Section 922(g)(1), the available historical evidence establishes that laws such as Section 922(g)(1) are consistent with the right to keep and bear arms as it was understood at the Founding.

Moreover, even when the government defends a modern law by invoking historical statutes, it need only cite a "historical *analogue*, not a historical *twin*." *Bruen*,

19

142 S. Ct. at 2133. The court of appeals rejected the potential analogues identified by the government on the ground that none of them imposed "the *particular*" consequence at issue here, namely, "lifetime disarmament" of convicted criminals. App., *infra*, 17a. But as Judge Krause observed, demanding "a Founding-era statute that imposed the 'particular' restriction for the same length of time on the same group of people as a modern law" is tantamount to demanding a "'historical twin.'" *Id.* at 69a-70a (Krause, J., dissenting) (citations omitted).

### 3. *A person may not obtain an as-applied exemption from Section 922(g)(1) based on the nature of his crime or his individual circumstances*

a. To uphold Section 922(g)(1), this Court need only recognize that Congress may disarm individuals who have been convicted of crimes that satisfy the common definition of a felony—that is, crimes punishable by imprisonment for more than one year. In interpreting other provisions of the Bill of Rights that require the Court to distinguish among different types of crimes, the Court has traditionally focused on the "maximum authorized penalty"—which "provides an 'objective indication of the seriousness with which society regards the offense'"—rather than on "the particularities of an individual case." *Lewis* v. *United States*, 518 U.S. 322, 328 (1996) (brackets and citation omitted). For example, the Grand Jury Clause applies only to "capital" or "infamous" crimes, U.S. Const. Amend. V, and a crime is "infamous" if it is punishable by "imprisonment for more than a year," *Branzburg* v. *Hayes*, 408 U.S. 665, 687 n.24 (1972) (citation omitted). The Sixth Amendment right to a jury trial similarly does not extend to petty offenses, and an offense is petty if it is punishable

20

by a prison term of six months or less. See *Blanton* v. *City of North Las Vegas*, 489 U.S. 538, 541-545 (1989).

This Court should follow a similar approach in interpreting the Second Amendment, which is subject to the same "body of rules" as "the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (citation omitted). In particular, when a person has been convicted of a crime punishable by more than one year of imprisonment, a court need not inquire further into the nature of the crime in order to determine whether disarmament is justified. Rather, the maximum authorized penalty for the offense by itself establishes that the crime is serious enough to support disarmament. See *Medina*, 913 F.3d at 160-161.

b. A regime of individualized as-applied challenges to Section 922(g)(1) would be unsound in principle and unworkable in practice. To begin, it would distort the separation of powers. In our constitutional system, the Legislative Branch traditionally determines the consequences of criminal convictions—not only the punishment, but also the collateral consequences, such as disfranchisement, disqualification from jury duty, ineligibility for public benefits, sex-offender registration, and disarmament. The Executive Branch, in turn, traditionally grants clemency if it determines that the punishment or the collateral consequences prescribed by law do not fit a particular offender's circumstances. If federal courts were to create a system of as-applied exemptions from Section 922(g)(1), they would in effect usurp the Executive Branch's role of deciding when to make "exceptions" to the "rigor" and "severity" of the "criminal code" enacted by Congress. *The Federalist* No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed. 1961).

21

A regime of individualized as-applied challenges would also treat the right to possess arms differently from other rights that criminals forfeit upon conviction. As discussed above, States have long denied convicts the right to vote, the right to serve on juries, and the right to hold public office. See pp. 12-13, *supra*. This Court has never suggested that a felon can challenge those disabilities on the ground that they do not fit his felony or his circumstances. This Court should not treat the right to possess arms any differently.

A regime of individualized as-applied challenges to Section 922(g)(1) would, moreover, pose serious problems of judicial administration. Neither the court of appeals nor Range has offered a workable test for identifying the applications of Section 922(g)(1) that, in their view, violate the Second Amendment. The court, in fact, did not even try to craft a test, instead ruling that Section 922(g)(1) violates the Constitution as applied to "people like Range." App., *infra*, 19a.

Range, for his part, suggests that Congress may disarm only "dangerous" felons. See App, *infra*, 15a n.9. Congress previously tried a variant of that approach: Until 1992, felons could obtain relief from Section 922(g)(1) by demonstrating to ATF that they would "not be likely to act in a manner dangerous to public safety." 18 U.S.C. 925(c). But Congress found that program unworkable and abandoned it. See pp. 2-3, *supra*. A congressional report explained that judging whether applicants posed "a danger to public safety" was "a very difficult and subjective task" that "could have devastating consequences for innocent citizens if the wrong decision is made." S. Rep. No. 353, 102d Cong., 2d Sess. 19, 20 (1992). Another report explained that "too many * * * felons whose gun ownership rights were restored went

22

on to commit crimes with firearms." H.R. Rep. No. 183, 104th Cong., 1st Sess. 15 (1996). The regime that Range appears to envision would, if anything, be even less feasible than the system of administrative relief that Congress tried and abandoned. Unlike an administrative agency, courts "possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety." *Pontarelli* v. *United States Dep't of the Treasury*, 285 F.3d 216, 231 (3d Cir. 2002) (en banc).

### B. The Decision Below Conflicts With The Decisions Of Other Courts Of Appeals And Has Significant Practical Consequences

1. The Third Circuit's decision in this case conflicts with the decisions of other courts of appeals. In a pair of recent decisions, the Eighth Circuit held that Section 922(g)(1) complies with the Second Amendment. See *United States* v. *Jackson*, 69 F.4th 495, 501-506 (2023), reh'g denied, No. 22-2870, 2023 WL 5605618 (Aug. 30, 2023); *United States* v. *Cunningham*, 70 F.4th 502, 506 (2023), reh'g denied, No. 22-1080, 2023 WL 5606171 (Aug. 30, 2023). The Eighth Circuit reasoned that "history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." *Jackson*, 69 F.4th at 504. It added that, even if "dangerousness is considered the traditional *sine qua non* for dispossession," history demonstrates that Congress may prohibit "possession by categories of persons based on a conclusion that the category as a whole present[s] an unacceptable risk of danger if armed." *Ibid.* Finally, the court determined that "there is no need for felony-by-felony litigation regarding [Section 922(g)(1)'s] consti-

23

tutionality." *Id.* at 502. Based on that conclusion, the court rejected as-applied challenges to Section 922(g)(1) by defendants with felony convictions for drug dealing, see *id.* at 504-506, and for driving under the influence, see *Cunningham*, 70 F.4th at 504. The Eighth Circuit has denied petitions for rehearing en banc in each of those cases. See *Jackson*, 2023 WL 5605618, at *1; *Cunningham*, 2023 WL 5606171, at *1.

The Tenth Circuit, too, has held that Section 922(g)(1) complies with the Second Amendment. Before *Bruen*, the Tenth Circuit had upheld Section 922(g)(1) based on *Heller*'s assurances regarding the constitutionality of "longstanding prohibitions on the possession of firearms by felons." *United States* v. *McCane*, 573 F.3d 1037, 1047 (2009) (citation omitted), cert. denied, 559 U.S. 970 (2010). The Tenth Circuit recently determined that *Bruen* had not superseded its earlier decision. See *Vincent* v. *Garland*, 80 F.4th 1197, 1197-1202 (2023). The court also explained that, under its precedent, it had "no basis to draw constitutional distinctions based on the type of felony involved." *Id.* at 1202. The court accordingly upheld Section 922(g)(1) as applied to someone who had been convicted of bank fraud. *Id.* at 1199.

Those decisions establish, at a minimum, a 2-1 circuit conflict over the question presented. It is not clear whether the Third Circuit would have reached a different result if it had been presented with the facts in *Jackson*, *Cunningham*, and *Vincent*, because the challengers in those cases may not have been "like Range." App., *infra*, 19a. But it is clear that the Eighth and Tenth Circuits would have reached a different result here, because those courts have categorically rejected "felony-by-felony determinations," *Cunningham*, 70

24

F.4th at 506, and "constitutional distinctions based on the type of felony involved," *Vincent*, 80 F.4th at 1202.

2. The court of appeals' decision also has significant practical consequences. Section 922(g) "is no minor provision." *Rehaif* v. *United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting). It "probably does more to combat gun violence than any other federal law." *Ibid.* And Section 922(g)(1) is by far the most frequently applied of Section 922(g)'s disqualifications. In Fiscal Year 2022, the government obtained more than 8600 convictions under Section 922(g); more than 7600 of those convictions (around 88%) were under Section 922(g)(1). See U.S. Sent. Comm'n, *Quick Facts: Felon in Possession of a Firearm* (July 2023). In addition, felony convictions are "the leading reason" for background checks to result in the denial of firearms transactions. Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *National Instant Criminal Background Check System Operational Report 2020-2021*, at 18 (Apr. 2022). Felony convictions have resulted in more than one million denials since the creation of the federal background-check system in 1998, and in more than 75,000 denials in 2021 (the most recent year for which statistics are available). See *id.* at 19; Crim. Justice Info Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *Federal Denials*.

Although the court of appeals described its as-applied invalidation of Section 922(g)(1) as "narrow," App., *infra*, 19a, its decision has far-reaching practical effects. The court did not identify any criteria—apart from "people like Range," *ibid.*—for deciding which applications of Section 922(g)(1) would, in its view, violate the Second Amendment. Nor, conversely, did the court identify the applications of the statute that would, in its

25

view, comport with the Amendment. The court's decision thus creates significant uncertainty about the constitutionality of other Section 922(g)(1) prosecutions in the Third Circuit.

Experience since the issuance of the court of appeals' decision bears out those concerns. Prosecutors in the Third Circuit are facing a wave of challenges to Section 922(g)(1). One district court in the Third Circuit has already relied on the decision below to hold Section 922(g)(1) unconstitutional as applied to an armed career criminal who had four felony convictions for trafficking heroin and cocaine, see *United States* v. *Quailes*, No. 21-cr-176, 2023 WL 5401733, at *1-*2 (M.D. Pa. Aug. 22, 2023), and an armed career criminal with "thirteen prior felony and eight misdemeanor convictions," including convictions for "multiple armed robberies and drug trafficking," *United States* v. *Harper*, No. 21-cr-236, 2023 WL 5672311, at *1 (M.D. Pa. Sept. 1, 2023). And a district court outside the circuit—relying on the Third Circuit's legal analysis in this case—has held Section 922(g)(1) unconstitutional as applied to a felon with convictions for manslaughter and aggravated assault. See *United States* v. *Bullock*, No. 18-cr-165, 2023 WL 4232309, at *2, *18, *21, *23, * 29 (S.D. Miss. June 28, 2023).

### C. This Court Should Hold This Certiorari Petition Pending The Resolution Of *Rahimi*

The decision below—which held an Act of Congress unconstitutional, conflicts with decisions of other courts of appeals, and has important practical consequences—would ordinarily warrant this Court's review. See, *e.g.*, *Iancu* v. *Brunetti*, 139 S. Ct. 2294, 2298 (2019) (noting that this Court's "usual" approach is to grant review "when a lower court has invalidated a federal statute"). But the Court has already granted review in *Rahimi* to

26

decide the constitutionality of 18 U.S.C. 922(g)(8), the statute that disarms individuals who are subject to domestic-violence protective orders. See Pet. at I, *Rahimi*, *supra* (No. 22-915). The Court should therefore hold this petition for a writ of certiorari until it decides *Rahimi*.

This case substantially overlaps with *Rahimi*. Both cases concern Congress's authority to prohibit a category of individuals from possessing firearms. In each case, the government argues that the Second Amendment allows Congress to disarm individuals who are not law-abiding, responsible citizens. In each, the government relies on statements in *Heller*, *McDonald*, and *Bruen* that the right to keep and bear arms belongs to law-abiding, responsible citizens; on Second Amendment precursors that express a similar understanding; and on 19th-century laws prohibiting unfit individuals from possessing arms. See pp. 16-17, *supra*; Gov't Br. at 10-27, *Rahimi*, *supra* (No. 22-915). Each case also raises similar methodological questions about how to apply the historical test set forth in *Bruen*. Indeed, as Judge Krause's dissent observed, the Third Circuit's view of *Bruen*—under which "*any* difference between a historical law and contemporary regulation defeats an otherwise-compelling analogy"—"tracks precisely the Fifth Circuit's deeply disturbing decision in * * * *Rahimi*." App., *infra*, 46a, 71a; see *id.* at 70a-71a. And the Fifth Circuit has stated that its interpretation of the Second Amendment in *Rahimi* "accords with" the Third Circuit's decision in this case. *United States* v. *Daniels*, 77 F.4th 337, 343 n.2 (5th Cir. 2023).

This Court should also hold this petition because it will receive multiple petitions this Term concerning the constitutionality of status-based disqualifications in

27

Section 922(g). On the same day that the government is filing this petition, it is also filing a petition in a case in which the Fifth Circuit invalidated 18 U.S.C. 922(g)(3), the provision disarming unlawful users of controlled substances. See *Daniels*, 77 F.4th at 340. Petitions concerning other status-based disqualifications could also come before this Court. Holding such petitions for *Rahimi* would be more efficient than granting multiple overlapping petitions over the course of the Term.

Finally, this Court could receive additional certiorari petitions concerning the constitutionality of Section 922(g)(1) by the time it resolves *Rahimi*. As discussed above, the Eighth and Tenth Circuits recently issued decisions holding that Section 922(g)(1) complies with the Second Amendment. See p. 22-23, *supra*. In addition, the Second Circuit held oral argument earlier this year in an appeal concerning Section 922(g)(1)'s constitutionality. See *Zherka* v. *Garland*, No. 22-1108 (argued May 8, 2023).

One of those cases may provide a better vehicle than this case for resolving Section 922(g)(1)'s constitutionality. Judge Roth's dissent argued that Range had failed to establish Article III standing because he had failed to plead that the particular firearms he wishes to possess satisfy Section 922(g)(1)'s interstate-commerce element. See App., *infra*, 88a-98a. The government does not agree with that argument, but this Court would have an independent obligation to address that issue before it could reach the merits in this case. See *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 94-102 (1998). In addition, this case involves an offense classified by state law as a misdemeanor. The state-law label should not, in the government's view, affect the constitutional analysis, but this Court may prefer to resolve Section

28

922(g)(1)'s constitutionality in the context of an offense that is expressly classified as a felony—the typical context in which Section 922(g)(1) applies.

For all those reasons, this Court should hold this petition for *Rahimi*. After deciding *Rahimi*, the Court should either (1) grant this petition, vacate the court of appeals' judgment, and remand the case for reconsideration in light of *Rahimi* or (2) grant plenary review in this case or in another case that provides a more suitable vehicle for resolving Section 922(g)(1)'s constitutionality.

### CONCLUSION

This Court should hold the petition for a writ of certiorari pending the disposition of *United States* v. *Rahimi*, cert. granted, 143 S. Ct. 2688 (No. 22-915) (oral argument scheduled for Nov. 7, 2023), and then dispose of the petition as appropriate.

Respectfully submitted.

ELIZABETH B. PRELOGAR
  *Solicitor General*
BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
VIVEK SURI
  *Assistant to the Solicitor*
  *General*
MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
KEVIN B. SOTER
  *Attorneys*

OCTOBER 2023