**FEDERAL PUBLIC DEFENDER**
CENTRAL DISTRICT OF CALIFORNIA
321 EAST 2nd STREET
LOS ANGELES, CALIFORNIA 90012-4202
213-894-2854
213-894-0081 FAX

**CUAUHTEMOC ORTEGA**
*Federal Public Defender*
**AMY M. KARLIN**
*Chief Deputy*

**ANGELA VIRAMONTES**
*Riverside Branch Chief*
**KELLEY MUNOZ**
*Santa Ana Branch Chief*
**K. ELIZABETH DAHLSTROM**
*Chief, Capital Habeas Unit*

Direct Dial: (213) 894-5308

November 20, 2023

Molly C. Dwyer, Clerk of the Court
United States Court of Appeals for the Ninth Circuit

Re:  *United States v. Duarte,* Case No. 22-50048 (Pasadena—December 4,
      2023); Fed. R. App. P. 28(j) Letter

Dear Ms. Dwyer:

Appellant submits this Rule 28(j) letter to address pertinent authority that
recently came to Appellant's attention.

The government claims the Founders couldn't have intended to extend
Second Amendment protections to former felons, since at the Founding felons
were generally put to death.  (GAB 39.)  The opening and reply briefs show that
argument to be inaccurate: most Founding-era felonies were not capital, meaning
that there would have been many people in Founding-era America who had been
convicted of felonies, served their terms, and returned to freedom, with no bar on
possessing weapons analogous to 18 U.S.C. § 922(g)(1).  (*See* AOB 13-14, 19-21;
ARB 19-21.)

But another key factor placing former felons in Founding-era America was
the Transportation Act of 1717, which permitted British courts to send convicted
felons to the colonies in lieu of other sentences.  *See* 4 George 1 c.11, *An Act for
the Further Preventing Robbery, Burglary, and Other Felonies, and for the More*

*Effectual Transportations of Felons* (1717).[1]  Those convicted of "felonious stealing" and similar property crimes were transported to work as servants for seven-year terms, while those convicted of capital crimes were generally transported for fourteen-year terms.  *Id.*

A staggering number of felons—estimated at more than 50,000—were transported to America under this regime, ultimately constituting a *quarter* of total British immigration to the colonies between 1718 and 1775.  *See* A. Roger Ekirch, *Bound for America: A Profile of British Convicts Transported to the Colonies, 1718-1775*, 42 William and Mary Q. 184, 188 (1987).  Many of these transported felons were unskilled laborers but others had trades like soldier, cooper, carpenter, smith, and even barrister.  *Id.* at 196.  While these transports were seemingly barred from possessing arms during their terms of servitude, *see Range v. Att'y Gen.*, 53 F.4th 262, 276*, rev'd en banc*, 69 F.4th 96 (3d. Cir. 2023), it appears nothing prevented them from possessing weapons once they regained their freedom.  The presence of numerous transported prior felons in Founding-era America thus emphasizes the absence of any relevant historical analogue to 18 U.S.C. § 922(g)(1).

Sincerely,

/s/ *Sonam Henderson*
SONAM HENDERSON
Deputy Federal Public Defender

---

[1] Copies of the Act and Professor Ekirch's article are attached.

## **Certificate of Compliance re Length**

      Pursuant to Federal Rule of Appellate Procedure 28(j) and Circuit Rule 28-6, I hereby certify that the body of the foregoing letter (not including the letterhead, preliminary information, the greeting, or the signature block) contains 350 words.


                                    */s/ Sonam Henderson*
                                    SONAM HENDERSON
                                    Deputy Federal Public Defender

# EXHIBIT 1

Transportation Act of 1717

enable his Majesty to appoint commissioners to take, examine, state and determine the debts due to the army, *the commissioners appointed by his Majesty in pursuance thereof, or any four or more of them, were and are authorized to take, state and determine such accounts, claims and demands, as are therein mentioned, and after such determinations respectively, to certify the same to the respective paymasters therein mentioned, and to whom the same were or are respectively due; and the said paymaster or paymasters respectively were and are thereby directed and required to make out debentures to the officers, engineers, gunners and other persons to whom the monies so certified to be due should respectively belong, in the manner and form by that act prescribed: and it was thereby enacted, That the said debentures should carry an interest after the rate of four pounds per centum per annum, to commence from the twenty fourth day of June one thousand seven hundred and seventeen, and to be paid and payable quarterly, according to some other act or acts of that session of parliament in that behalf: and whereas it is conceived, that the said interest after the rate of four pounds per centum per annum, due and to grow due upon the debentures made forth, or to be made forth by virtue of the said former act, or any other act or acts of parliament in that behalf, may with more ease to the proprietors thereof, be satisfied half-yearly, as annuities after the same rate, by the cashier for the time being of the governor and company of the bank of England; and that the payments thereof may be accounted for in the manner and form by this and the said first act above-recited prescribed, for, touching or concerning the several annuities thereby made payable by such cashier: be it therefore further enacted, &c.*

So much of the said general fund as shall be sufficient to answer the interest on the debentures made out by virtue of the act 3 Geo. 1. c. 7. shall be issued half-yearly to the cashier of the bank, who shall apply the same accordingly: accountant general of the bank to inspect the payments. Paymasters to certify to the said cashier and accountant what debentures have been made forth; who shall enter the same in books, and give certificates *gratis* to the proprietors, who after June 24, 1717, shall be intitled to the said interest at 4l. per centum. Annuities to be personal estates and be deemed capital stock, and transferrable or deviseable. So much of the general fund as will satisfy the said annuities, shall be issued half-yearly to the cashier of the bank. Annuities subject to redemption. *Redeemed 5 Geo. 1. c. 3.*

## CAP. XI.

*An act for the further preventing robbery, burglary, and other felonies, and for the more effectual transportations of felons, and unlawful exporters of wool; and for declaring the law upon some points relating to pirates.*

**W**HEREAS it is found by experience, That the punishments This act is inflicted by the laws now in force against the offences of robbery, larceny and other felonious taking and stealing of money and goods, have not proved effectual to deter wicked and evil-disposed persons from being guilty of the said crimes: and whereas many offenders to whom royal mercy hath been extended, upon condition of transporting themselves to the West-Indies, have often neglected to perform the

*This act is improved, 6 Geo. 1. c. 23.*

said

Case: 22-50048, 11/20/2023, ID: 12826827, DktEntry: 60, Page 6 of 27

said condition, but returned to their former wickedness, and been at last for new crimes brought to a shameful and ignominious death: and whereas in many of his Majesty's colonies and plantations in America, there is great want of servants, who by their labour and industry might be the means of improving and making the said colonies and plantations more useful to this nation: be it enacted by the King's most excellent majesty, by and with the advice and consent of the lords spiritual and temporal and the commons, in this present parliament assembled, and by the authority of the same, That

**Persons who before the 20th of Jan. 1717, have been convicted of offences within the benefit of clergy; and also such as shall hereafter be convicted,**

where any person or persons have been convicted of any offence within the benefit of clergy, before the twentieth day of January one thousand seven hundred and seventeen, and are liable to be whipt or burnt in the hand, or have been ordered to any workhouse, and who shall be therein on the said twentieth day of January; as also where any person or persons shall be hereafter convicted of grand or petit larceny, or any felonious stealing or taking of money or goods and chattels, either from the person, or the house of any other, or in any other manner, and who by the law shall be entitled to the benefit of clergy, and liable only to the penalties of burning in the hand or whipping, (except persons

**except receivers and buyers of stolen goods,**

convicted for receiving or buying stolen goods, knowing them to be stolen) it shall and may be lawful for the court before whom they were convicted, or any court held at the same place with the like authority, if they think fit, instead of ordering any such offenders to be burnt in the hand or whipt, to order and direct, That such offenders, as also such offenders in any work-

**shall be sent to the plantations for 7 years.**

house, as aforesaid, shall be sent as soon as conveniently may be, to some of his Majesty's colonies and plantations in America for the space of seven years; and that court before whom they

**The court before whom convicted to contract for their transportation.**

were convicted, or any subsequent court held at the same place, with like authority as the former, shall have power to convey, transfer and make over such offenders, by order of court, to the use of any person or persons who shall contract for the performance of such transportation, to him or them, and his and their assigns, for such term of seven years; and where any per-

**Persons convicted of offences, for which they are excluded the benefit of clergy,**

sons have been convicted, or do now stand attainted of any offences whatsoever, for which death by law ought to be inflicted, or where any offenders shall hereafter be convicted of any crimes whatsoever, for which they are by law to be excluded the benefit of clergy, and his Majesty, his heirs or successors, shall be graciously pleased to extend royal mercy to any such offenders, upon the condition of transportation to any part of America, and such intention of mercy be signified by one of his Majesty's principal secretaries of state, it shall and may be lawful to and for any court having proper authority, to allow such offenders the benefit of a pardon under the great seal, and to order and direct the like transfer and conveyance to any person or persons, (who will contract for the performance of such

**and also receivers and buyers of stolen goods may be transported for 14 years;**

transportation) and to his and their assigns, of any such beforementioned offenders, as also of any person or persons convicted of receiving or buying stolen goods, knowing them to be stolen, for the term of fourteen years, in case such condition of transpor-

portation be general, or else for such other term or terms as shall be made part of such condition, if any particular time be specified by his Majesty, his heirs and successors, as aforesaid; and such person or persons so contracting, as aforesaid, his or their assigns, by virtue of such order of transfer, as aforesaid, shall have a property and interest in the service of such offenders for such terms of years.

*and the persons contracting for their transportation, shall have a property in their service.*

II. And be it further enacted by the authority aforesaid, That if any offender or offenders, so ordered by any such court to be transported for any term of seven years or fourteen years, or other time or times, as aforesaid, shall return into any part of *Great Britain* or *Ireland* before the end of his or their said term, he or she so returning, as aforesaid, shall be liable to be punished as any person attainted of felony without the benefit of clergy; and execution may and shall be awarded against such offender or offenders accordingly: provided nevertheless, That his Majesty, his heirs and successors, may pardon and dispense with any such transportation, and allow of the return of any such offender or offenders from *America*, he or they paying their owner or proprietor, at the time of such pardon, dispensation or allowance, such sum of money as shall be adjudged reasonable by any two justices of the peace residing within the province where such owner dwells; and where any such offenders shall be transported, and shall have served their respective terms, according to the order of any such court, as aforesaid, such services shall have the effect of a pardon to all intents and purposes, as for that crime or crimes for which they were so transported, and shall have so served, as aforesaid.

*Returning before the expiration of the term, shall be punished with death.*

*The King may pardon such transportation, the offender paying his owner such sum as two justices shall adjudge.*

*Service of the term shall have the effect of a pardon.*

III. And be it further enacted by the authority aforesaid, That every such person or persons to whom any such court shall order any such offenders to be transferred or conveyed, as aforesaid, before any of them shall be delivered over to such person or persons, or his or their assigns, to be transported, as aforesaid, he or they shall contract and agree with such person or persons as shall be ordered and appointed by such court, as aforesaid, and give sufficient security to the satisfaction of such court, that he or they will transport, or cause to be transported effectually such offenders so conveyed to him or them, as aforesaid, to some of his Majesty's colonies and plantations in *America*, as shall be ordered by the said court, and procure an authentick certificate from the governor, or the chief custom-house officer of the place (which certificate they are hereby required to give forthwith, without fee or reward, as soon as conveniently may be) of the landing of such offenders so transferred, as aforesaid, in that place whereto they shall be ordered, (death and casualties of the sea excepted) and that none of the said offenders shall be suffered to return from the said place to any part of *Great Britain* or *Ireland* by the wilful default of such person or persons so contracting as aforesaid, or by the wilful default of his or their assigns.

*Contractors to give security for the transportation of such offenders,*

*and procure certificates from the governor, &c.*

*where landed, and that they shall not be suffered to return by his default.*

IV. *And whereas there are several persons who have secret acquaintance with felons, and who make it their business to help persons*

*Persons taking rewards for helping to stolen goods;*

to their *stolen goods, and by that means gain money from them, which is divided between them and the felons, whereby they greatly encourage such offenders:* be it enacted by the authority aforesaid, That where-ever any person taketh money or reward, directly or indirectly, under pretence or upon account of helping any person or persons to any stolen goods or chattels, every such person so taking money or reward, as aforesaid, (unless such person doth apprehend, or cause to be apprehended, such felon who stole the same, and cause such felon to be brought to his trial for the same, and give evidence against him) shall be guilty of felony, and suffer the pains and penalties of felony, according to the nature of the felony committed in stealing such goods, and in such and the same manner as if such offender had himself stolen such goods and chattels, in the manner, and with such circumstances as the same were stolen.

*unless they cause the felon to be brought to trial, shall be guilty of felony.*

V. *And whereas there are many idle persons, who are under the age of one and twenty years, lurking about in divers parts of London, and elsewhere, who want employment, and may be tempted to become thieves, if not provided for: and whereas they may be inclined to be transported, and to enter into services in some of his Majesty's colonies and plantations in* America; *but as they have no power to contract for themselves, and therefore that it is not safe for merchants to transport, or take them into such services;* be it enacted by the authority aforesaid, That where any person of the age of fifteen years or more, and under the age of twenty one, shall be willing to be transported, and to enter into any service in any of his Majesty's colonies or plantations in *America,* it shall and may be lawful for any merchant, or other, to contract with any such person for any such service, not exceeding the term of eight years; provided such person so binding him or herself do come before the lord mayor of *London,* or some other justice of the peace of the city, if such contract be made within the same, or the liberties thereof, or before some other two justices of the peace of the place where such contract shall be made, if made elsewhere, and before such magistrate or magistrates acknowledge such consent, and do sign such contract in his or their presence, and with his or their approbation; and that then it shall be lawful for any such merchant or other, to transport such person so binding him or herself, and to keep him or her within any of the said plantations or colonies, according to the tenor of such contract, as aforesaid; any law or statute to the contrary in any wise notwithstanding; which said contract and approbation of such magistrate or magistrates, with the tenor of such contract, shall be certified by such magistrate or magistrates to the next general quarter-sessions, of the peace, held for that county where such magistrate or magistrates shall reside, to be registred by the clerk of the peace without fee or reward.

*Merchants, or others, may contract with persons of the age of 15, and under 21, to serve them in* America *for 8 years.*
*Provided such person acknowledge his consent before a justice of peace,*
*and sign the same with his approbation.*

*Such contract, &c. to be certified to the quarter-sessions.*

VI. And be it further enacted by the authority aforesaid, That from and after the said twentieth day of *January* one thousand seven hundred and seventeen, if any person or persons shall be in prison for want of sufficient bail, for unlawful exportation of wool

*After Jan. 20, 1717, persons imprisoned for exportation of wool, &c. re-*

Case: 22-50645 Document: 123-10 Page: 50328827 Date Entry: 60, Page 9 of 27

wool or wool-fells, and shall refuse to appear or plead to a declaration or information to be delivered to such person or persons, or to the gaoler, keeper or turnkey of the prison, at the said prison, for the said offence, by the space of one term, judgment shall be entred against him by default; and in case judgment shall be obtained against any such person or persons by default, verdict, or otherwise, and such person or persons shall not pay the sum recovered against him or them for the said offence, within the space of three months after entring up of such judgment, the court before whom such judgment shall be obtained shall, by order of court, cause such offender or offenders to be transported, in the same manner as felons aforesaid, for the term of seven years; and if such offender or offenders shall return into *Great Britain* or *Ireland*, before the expiration of the said seven years, he or they shall suffer as felons, and have execution awarded against them, as persons attainted of felony, without benefit of clergy.

*[margin: fusing to plead, judgment shall be entred against them by default; and not paying the sum recovered, shall be transported as felons,*

*and returning, shall suffer as such.]*

VII. And it is hereby declared, That all and every person and persons who have committed or shall commit any offence or offences, for which they ought to be adjudged, deemed and taken to be pirates, felons or robbers, by an act made in the parliament holden in the eleventh and twelfth years of the reign of his late majesty King *William* the Third, intituled, *An act for the more effectual suppression of piracy*, may be tried and judged for every such offence in such manner and form as in and by an act made in the twenty eighth year of the reign of King *Henry* the Eighth is directed and appointed for the trial of pirates, and shall and ought to be utterly debarred and excluded from the benefit of clergy for the said offences; any law or statute to the contrary thereof in any wise notwithstanding.

*[margin: Offenders against the act 11 & 12 W. c. 7. may be tried as is directed by 28 Hen. 8. c. 15.*

*and excluded from clergy.]*

VIII. Provided always, That nothing in this act contained shall extend or be construed to extend to such persons as shall be convicted or attainted in that part of *Great Britain* called *Scotland*.

*[margin: This act shall not extend to Scotland.]*

IX. And be it also enacted, That this act shall extend to all his Majesty's dominions in *America*, and shall be taken as a publick act.

*[margin: But to all the King's dominions in America, and be taken as a publick act.]*

## CAP. XII.

*An act for inforcing and making perpetual an act of the twelfth year of her late Majesty, intituled,* An act for the preserving of all such ships and goods thereof, which shall happen to be forced on shore, or stranded upon the coasts of this kingdom, or any other of her Majesty's dominions; *and for inflicting the punishment of death on such as shall wilfully burn or destroy ships.*

WHEREAS the act made in the twelfth year of the reign of her late majesty Queen *Anne*, intituled, An act for the preserving of all such ships and goods thereof, which shall happen to be forced on shore, or stranded upon the coasts of this king-

*[margin: 12 Ann. stat. 2. c. 18.]*

# EXHIBIT 2

A. Roger Ekirch, *Bound for America: A Profile of British Convicts Transported to the Colonies, 1718-1775*, 42 William and Mary Q. 184 (1987)

# Bound for America: A Profile of British Convicts Transported to the Colonies, 1718-1775

## A. Roger Ekirch

DURING the eighteenth century, transportation became Great Britain's foremost criminal punishment. At a time when men felt their lives and property to be threatened daily by crime, the idea of exiling felons to the American colonies carried enormous appeal. Criminals had been banished from time to time during the seventeenth century, but after Parliament passed the Transportation Act in 1718, assize and quarter sessions courts made banishment the leading penalty for property offenses, the most common variety of crime. In some jurisdictions over half of all convicted criminals drew sentences of transportation. At the Old Bailey, London's chief criminal court, more than two-thirds of all felons from 1718 to 1775 were ordered for exile. By contrast, only about one in every six received the death penalty. Consigned to merchants, most transports were shipped to Maryland and Virginia and sold as servants. "Draining the Nation of its offensive Rubbish, without taking away their Lives," was how a 1731 pamphleteer characterized the primary aim of British penal policy. Transportation, noted another, entailed "sending annually abroad certain people, who only hurt society at home."[1]

The English were not alone in trying to purge society of threatening

Mr. Ekirch is a member of the Department of History, Virginia Polytechnic Institute and State University. The research on which this article draws was supported by the Mellon Fellowship Fund, Cambridge University, the Master and Fellows of Peterhouse, Cambridge, the National Endowment for the Humanities, the American Philosophical Society, and Virginia Polytechnic Institute and State University.

[1] George Ollyffe, *An Essay Humbly Offer'd for an Act of Parliament to Prevent Capital Crimes* . . . (London, [1731]), 11-12; John Callander, ed., *Terra Australis Cognita: Or, Voyages to the Terra Australis* . . . (Edinburgh, 1766), I, 20. Old Bailey figures are incomplete for the years 1718, 1722, 1724, 1727-1729. *The Proceedings on the King's Commissions of the Peace, Oyer and Terminer, and Gaol Delivery for the City of London; and Also the Gaol Delivery for the County of Middlesex, Held at Justice-Hall in the Old Bailey* (London, 1718-1775). For the sentencing practices of other courts see, for example, Douglas Hay, "Crime, Authority and the Criminal Law: Staffordshire, 1750-1800" (Ph.D. diss., University of Warwick, 1975), 487; J. M. Beattie, "Crime and the Courts in Surrey, 1736-1753," in J. S. Cockburn, ed., *Crime in England, 1550-1800* (Princeton, N.J., 1977), 174-185; and Peter King,

offenders. Authorities in Scotland and Ireland also transported criminals to America. Extant newspaper reports, though not abundant, indicate that Irish assize and quarter sessions courts regularly banished felons,[2] whereas nearly one-half of the persons sentenced by the High Court of Justiciary in Scotland were ordered for exile. A Scottish attorney commented in 1767 that "in many cases it is absolutely necessary for the Safety of the State, and the good order of Society, that the Country should be rid of certain Criminals."[3]

This article offers a profile of British malefactors who were banished from 1718 to 1775, when the American Revolution brought the convict trade to an end. Although the subject of transportation has received intermittent attention from historians, little is known about the thousands of men and women who were exiled to the colonies. Next to African slaves, they constituted the largest body of immigrants ever to be compelled to go to America. Source materials for studying the lives of convicts are sparse but permit at least tentative answers to a number of questions. How many people were transported and where did they come from? What types of offenses had they committed? What were their ages, sex, and occupations? As criminals, how different were they from ordinary British citizens? Did they move in the mainstream of eighteenth-century life or had they already become "outcasts" before being expelled from British shores?[4] Answers to these questions not only will provide a fresh

---

"Crime, Law and Society in Essex 1740-1820" (Ph.D. diss., University of Cambridge, 1984).

Felons were shipped to Maryland and Virginia because of commercial, not penal, priorities. The Chesapeake region, besides having a limited demand for cheap white labor, offered merchants valuable cargoes of tobacco and grain to carry home to Britain. Of 7,010 criminals transported from London between 1718 and 1744 whose destinations can be determined, as many as 6,815 (97.2%) were sent to the Chesapeake. Marion and Jack Kaminkow, eds., *Original Lists of Emigrants in Bondage from London to the American Colonies, 1719-1744* (Baltimore, 1967), 180-201; Peter Wilson Coldham, ed., *Bonded Passengers to America* (Baltimore, 1983), I, 172-174.

[2] See, for example, *Belfast News-Letter,* Apr. 12, 1765, Dec. 5, 1766, Apr. 21, Sept. 4, 1767, Feb. 5, Mar. 18, 1768, Mar. 14, May 26, Sept. 12, 1769, Nov. 2, 1770; Audrey Lockhart, "Some Aspects of Emigration from Ireland to the North American Colonies between 1660 and 1775" (M.Litt. thesis, Trinity College, Dublin, 1971), 171-174; and David Noel Doyle, *Ireland, Irishmen and Revolutionary America, 1760-1820* (Dublin, 1981), 64-65.

[3] "Information for John Gray Profiscal of the Sheriff Court of Haddington against Duncan Kennedy . . . ," Feb. 2, 1767, J.C. 3/34/634-635, and Books of Adjournal, 1718-1775, J.C. 3/8-39, Scottish Record Office, Edinburgh.

[4] For two accounts of transportation that touch only briefly on these concerns see Richard B. Morris, *Government and Labor in Early America* (New York, 1946), 323-337, and Abbot Emerson Smith, *Colonists in Bondage: White Servitude and Convict Labor in America, 1607-1776* (Chapel Hill, N.C., 1947), 110-135. For an analysis of the convict trade see Kenneth Morgan, "The Organization of the Convict Trade to Maryland: Stevenson, Randolph & Cheston, 1768-1775," *William and Mary Quarterly,* 3rd Ser., XLII (1985), 201-227.

perspective on transportation but will also shed new light on the lower orders of eighteenth-century Anglo-America.

Transported felons came from every corner of the British Isles, from the Cornish cliffs to the Scottish Highlands, with variations from one area to another depending on population density, rates and types of crime, and the sentencing practices of local courts. As a result, the whole body of transports was arguably more geographically diverse than any other set of British immigrants to the New World.

The smallest proportion came from Scotland. In Scotland's complex judicial system, authority to order transportation was held by various courts, including hereditary jurisdictions such as Argyllshire until 1747, when the Heritable Jurisdiction Act vested their powers in royal courts. Perpetrators of the most serious crimes were tried by the High Court of Justiciary, Scotland's supreme royal court, which sat in Edinburgh and on circuit.[5] From 1718 to 1775 this court, sitting in Edinburgh, sentenced 395 persons, of whom 181 were transported to America. When smaller jurisdictions and the Justiciary's three circuit courts are taken into account, it appears that 700 to 800 Scottish criminals were transported during the period under examination, a much smaller number than for either England or Ireland.[6] Scots were occasionally tried in English courts, but the number sentenced to transportation must have been minute, judging from the fact that of 1,126 felons hanged at Tyburn during the first half of the eighteenth century whose origins can be determined, only 30 were native Scots.[7]

A much larger proportion of transports was Irish. From 1737 to 1743, according to a parliamentary report, Ireland transported 1,938 men and women. The province of Leinster, site of Dublin, provided 904 (46.7 percent). Munster sent 553 (28.5 percent); Connaught, 145 (7.5 percent); and Ulster, 336 (17.3 percent). If these figures offer a reasonably accurate index for other years, more than 16,000 people may have been transport-

[5] "Information for John Gray," Feb. 2, 1767, J.C. 3/34/630-631; Stephen J. Davies, "The Courts and the Scottish Legal System, 1600-1747: The Case of Stirlingshire," in V.A.C. Gatrell *et al.*, eds., *Crime and the Law: The Social History of Crime in Western Europe since 1500* (London, 1980), 120-154.

[6] High Court figures are missing for the years 1722-1725. Books of Adjournal, 1718-1775, J.C. 3/8-39. My calculation does not include Scottish political prisoners transported during the 18th century, of whom there were over 1,200. Smith, *Colonists in Bondage,* 197-203. David Dobson identifies 437 criminals as having been ordered for transportation from 1718 to 1775 (*Directory of Scots Banished to the American Plantations, 1650-1775* [Baltimore, 1984]). Unfortunately, Dobson does not furnish adequate information on the judicial records that he consulted, making it impossible, on the basis of this figure, to estimate more accurately the total number of transports during those years.

[7] Peter Linebaugh, "Tyburn: A Study of Crime and the Labouring Poor in London during the First Half of the Eighteenth Century" (Ph.D. diss., University of Warwick, 1975), 332.

ed from Ireland between 1718 and 1775. Newspaper announcements of convict vessels departing from Irish ports give a strong impression of a continuous trade to the colonies. Between 1744 and 1775, for example, at least forty such vessels left Ireland for America.[8]

Numerous Irish criminals ended up in English courts. By the early eighteenth century, swarms of immigrants eager for work were crossing the Irish Sea, many of whom turned to crime. In addition, London reputedly served as a magnet to rogues on the run from Irish authorities. "To prevent these desperadoes coming here," magistrate Saunders Welch observed in 1754, "will be the prevention of many robberies." Of persons hanged at Tyburn, Irish criminals made up nearly 15 percent.[9]

The majority of British convicts marked for transportation were native Englishmen sentenced in English courts. A large number of these sentences originated in London and nearby counties. By 1750, London held 11 percent of the English population; it also had a higher rate of crime than did rural areas. Roughly the same number of felons were sentenced to transportation by courts in London, Middlesex, and the Home Counties of Essex, Hertfordshire, Kent, Sussex, and Surrey as in "other parts of the Kingdom," according to Duncan Campbell, a London merchant who traded in convicts.[10] If one assumes that by "Kingdom" Campbell meant England and Wales, surviving transportation figures lend credence to his estimate. From 1769 to 1776, for instance, English and Welsh courts annually ordered an average of 933 felons for transportation, of whom 505 (54.1 percent) received their sentences in London, Middlesex, and the Home Counties.[11] A sizable number of London convicts were newcomers from other parts of England as well as from Ireland. London's growth during the eighteenth century was fueled by a steady stream of migrants seeking employment. One inhabitant claimed in 1757 that as many as "two thirds of the grown persons at any time in London come from distant parts." The exact percentage of non-natives among transport-

[8] Minutes, Feb. 9, 1743/44, *Journals of the House of Commons of the Kingdom of Ireland* (Dublin, 1796-1800), VII, 561-614. For scattered references to convict vessels see Lockhart, "Aspects of Irish Emigration," 181-208. In a few instances, Lockhart used records other than Irish newspapers.

[9] Welch to Lord [?], Feb. 18, 1754, S.P. 36/153/26-27, Public Record Office; Linebaugh, "Tyburn," 332. See also M. Dorothy George, *London Life in the Eighteenth Century* (New York, 1965 [orig. publ. London, 1925]), 119-121.

[10] Campbell to Evan Nepean, Jan. 29, 1787, C.O. 201/1/209, P.R.O. Campbell included Buckinghamshire in his estimate along with London, Middlesex, and the Home Counties. Buckinghamshire, however, lay in the Norfolk assize circuit, and in the discussion below I am counting it as a county outside the London area.

[11] Though transportation ended in 1775, totals include figures until mid-1776 because English courts continued to sentence criminals to transportation during the early stages of the American Revolution. John Howard, *An Account of the Principal Lazarettos in Europe* (Warrington, 1789), 246-247; E. A. Wrigley, "A Simple Model of London's Importance in Changing English Society and Economy, 1650-1750," *Past & Present,* No. 37 (1967), 44-70.

ed convicts is impossible to determine, but only 40.8 percent of the felons hanged at Tyburn were native Londoners, while nearly as many, 38.5 percent, came from elsewhere in England and Wales.[12]

Outside the environs of London, convicts were sent to the colonies by courts in practically every county, ranging from tiny Radnor in Wales, where from 1769 to 1776 justices ordered only 2 felons for exile, to nearby Somerset, where officials banished 269 over that same period. The map shows the distribution of transports among the seven assize circuits of England and Wales. Differing population sizes largely explain the variations, but other circumstances, such as London's high rate of crime, also played a role that only intensive study of local courts and criminal offenses could describe with precision. Why, for example, did the six counties of the northern circuit provide less than 9 percent of transports when these counties possessed nearly 21 percent of the country's population?[13]

Over 30,000 felons boarded ship in England for transportation to America from the beginning of the convict trade in 1718 to its end in 1775. Approximately 18,600 were transported from London and nearby counties, according to records kept by the English Treasury. Inasmuch as nearly as many came from other areas in England and Wales, the total number of English and Welsh transports may have ranged close to 35,000. Adding some 16,000 from Ireland and possibly 800 from Scotland, we find that Great Britain may have transported more than 50,000 people during the period. Estimates that have put the figure closer to 30,000 are too conservative.[14] Transported convicts composed perhaps a quarter of British immigrants to colonial America during the eighteenth century.[15]

[12] Linebaugh, "Tyburn," 332; George Burrington quoted in W. A. Speck, *Stability and Strife: England, 1714-1760* (Cambridge, Mass., 1977), 66.

[13] Wales and Cheshire did not technically constitute an assize circuit; instead, great sessions courts were the principal tribunals. Howard, *Account of the Principal Lazarettos,* 246-247. Population figures for the Northern circuit counties (Cumberland, Durham, Northumberland, Westmorland, Lancashire, and Yorkshire) are taken from the 1781 "b" estimates in Phyllis Deane and W. A. Cole, *British Economic Growth, 1688-1959: Trends and Structure,* 2d ed. (Cambridge, 1967), 103.

[14] The Treasury paid subsidies to merchants for the transportation of London-area felons, so it kept reasonably accurate records of their numbers. The original records can be found in Treasury Money Books in the Public Record Office, which I have used in conjunction with Kaminkow and Kaminkow, eds., *Lists of Emigrants in Bondage,* 180-203, and Coldham, ed., *Bonded Passengers,* I, 172-177. The Treasury ceased paying subsidies in 1772, so I have had to estimate the number of London-area felons that were transported from then until 1775. Also, Treasury records include 331 convicts from Buckinghamshire; I do not include these convicts in my estimate for London, Middlesex, and the Home Counties. For the commonly accepted figure of 30,000 convicts, see, for example, Smith, *Colonists in Bondage,* 116-117, 364, n.28. Smith did not give sufficient consideration to the large numbers transported from Ireland.

[15] This estimate was formed in conjunction with immigration figures supplied in R. C. Simmons, *The American Colonies: From Settlement to Independence* (New York,

## Distribution of Convicts in English/Welsh Assize Circuits, 1769-1776



According to popular lore, the severity of British justice during the eighteenth century meant that petty offenders filled the ranks of transported convicts. While the country's infamous "bloody code," containing upwards of 160 capital offenses by the 1760s, ensured that great criminals were hanged, minor ones—beggars, petty thieves, prostitutes—were exiled to America. Typical perhaps was the unfortunate woman banished by a London court in September 1772. Pregnant and famished, she had perpetrated a felony by stealing bacon and a mess of soup.[16]

Most transports had committed noncapital felonies and could therefore ordinarily escape the death penalty by claiming benefit of clergy. The Transportation Act empowered courts to banish such offenders for seven years. Nevertheless, a good many transports were serious criminals. Noncapital felonies included crimes ranging from manslaughter to bigamy, but the predominant offense for which felons were transported was grand larceny. In counties composing the Norfolk assize circuit, for example, assize and quarter sessions courts between 1750 and 1772 sentenced 566 offenders to transportation. Grand larcenists numbered 523 (92.4 percent). The crime was defined as the theft of goods valued at a shilling and above, not including thefts exceeding 4s. from shops or those exceeding 39s. from homes. For an unskilled laborer, whose daily income did not much exceed a shilling, the loss of that sum or more to a thief did not represent a trifling crime.[17]

Then, also, noncapital criminals who were not common offenders often

---

16 1976), 182. Of course, because some felons died in transit, smaller numbers actually arrived in the colonies. Mortality rates, though initially above 10%, seem to have declined during the century. Landing certificates of 1719-1736 for over 3,700 transports suggest a minimum mortality rate of 11% to 16%, but later figures kept by the Bristol convict firm of Stevenson, Randolph & Cheston just before the Revolution show that only 2.5% of 974 convicts died in transit. Landing Certificates, 1718-1736, Guildhall Records Office, London (Library of Congress photocopies); Morgan, "Convict Trade to Maryland," *WMQ*, 3d Ser., XLII (1985), 213. For a more detailed discussion of mortality rates aboard convict vessels, see my forthcoming book on the transportation of British convicts during the 18th century.

16 William Blackstone, *Commentaries on the Laws of England* . . . (Oxford, 1765-1769), IV, 18; Purdie & Dixon's *Virginia Gazette* (Williamsburg), Jan. 2, 1772.

17 Howard, *Account of the Principal Lazarettos,* 252; John H. Langbein, "Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder Sources," *University of Chicago Law Review,* L (1983), 40; Speck, *Stability and Strife,* 56-57. Petty larceny was a transportable offense, but courts imposed corporal punishment in such cases unless a sudden rash of thefts plagued the community. According to the magistrate and novelist Henry Fielding, transporting petty larcenists had "such an Appearance of extreme Severity, that few Judges" were "willing to inflict such a Punishment" (*A Proposal for Making an Effectual Provision for the Poor* . . . [London, 1753], 72); Beattie, "Crime and the Courts in Surrey," in Cockburn, ed., *Crime in England,* 177. Vagrants could also be sentenced to transportation, but this practice was not widespread (communication from Joanna Innes, Mar. 17, 1984).

escaped being transported because of the discretionary nature of Britain's legal system. Though outwardly harsh, it permitted a surprising degree of flexibility, popular participation, and compassion. Many such offenders, in fact, were never formally tried because victims of crimes were responsible for bringing prosecutions. Frequently they chose not to do so because of the trouble and the expense. Further, according to J. A. Sharpe, communities possessed a "number of methods of resolving conflicts, or of bringing sanctions against a delinquent, which were seen as offering less disruptive, perhaps more effective, and certainly cheaper remedies against certain offenders than did formal prosecution." Such individuals might have been sent to a house of correction or a local manor court, bound over by a magistrate to keep the peace, exhorted by the parish priest, or ostracized by the community. Among persons who were instead tried at assizes and quarter sessions, most were likely "persistent offenders" or "outsiders who attracted an unusually hostile response."[18]

If brought to trial, noncapital criminals still enjoyed a good chance of escaping transportation, especially those who impressed courts as objects of mercy rather than threatening offenders. In filing bills of indictment, prosecutors could choose to "downvalue" the worth of stolen goods or "downcharge" offenses to ones that were not transportable. In addition, many juries returned so-called "partial verdicts" by finding defendants guilty of lesser crimes than the offenses with which they were charged.[19] Once guilt was established, judges, too, could show mercy by sentencing offenders to punishments other than transportation even when the crimes constituted transportable offenses. In 1737 the Recorder of London, William Thomson, noted of proceedings at the Old Bailey, "If the Court find at the tryal any thing to render the prisoners objects of mercy they usually change the sentence from transportation to burning in the hand or whipping." Conversely, in 1741 a judge remarked that a convicted thief in Surrey was not "an Object of mercy and therefore I ordered him, instead of being burnt in the hand, to be Transported for Seven Years."[20] Finally,

[18] Sharpe, "The History of Crime in Late Medieval and Early Modern England: A Review of the Field," *Social History,* VII (1982), 195, and *Crime in Seventeenth-Century England: A County Study* (Cambridge, 1983), 181. See also Langbein, "Shaping the Eighteenth-Century Criminal Trial," *Univ. Chicago Law Rev.,* L (1983), 47-50; J. M. Beattie, "Judicial Records and the Measurement of Crime in Eighteenth-Century England," in Louis A. Knafla, ed., *Crime and Criminal Justice in Europe and Canada* (Waterloo, Ont., 1981), 131-135; and John Brewer, "An Ungovernable People? Law and Disorder in Stuart and Hanoverian England," *History Today,* XXX (Jan. 1980), 24. For how a justice of the peace dealt with minor offenders by not binding them over for trial at quarter sessions or the assizes see Elizabeth Crittal, ed., *The Justicing Notebook of William Hunt, 1744-1749* (Devizes, Wiltshire, 1982).

[19] Langbein, "Shaping the Eighteenth-Century Criminal Trial," *Univ. Chicago Law Rev.,* L (1983), 50-55.

[20] Report of Recorder Thomson, Apr. 6, 1737, S.P. 36/40/229; Report of Justice Fortescue, Oct. 26, 1741, S.P. 36/57/56. See also Report of Justice Raymond, May 10, 1728, S.P. 36/6/194-195. At the Old Bailey from 1718 until

after sentencing had been completed, judges could recommend deserving criminals for royal pardons. How often these were granted by the king is difficult to determine, though from 1761 to 1770 as many as 284 convicts originally sentenced to transportation received lesser punishments or free pardons setting them at liberty.[21] In short, abundant opportunities existed by which noncapital offenders were able to escape being transported. Those who failed to receive mercy at some stage of the judicial process were reasonably serious criminals.

In Ireland sentencing patterns were probably similar, with one exception. In addition to ordinary criminals, Irish courts routinely banished large numbers of "vagabonds" (that is, vagrants). Of 1,938 transports between 1737 and 1743, surviving records list offenses for 990. Within this group, 531 were vagabonds and 459 were felons. Grand larcenists predominated among the latter. Of 208 felons between 1737 and 1743 whose crimes can be determined, 187 were guilty of grand larceny (89.9 percent), 19 of petty larceny (9.1 percent), and 2 of other infractions (1.0 percent). As in England, noncapital property offenses made up a large portion of transportable crimes.[22]

Sentencing in Scotland was different since transportation was chiefly employed to punish capital offenders, including some criminals who had committed serious acts of violence. Among the 181 men and women sent to America by the High Court of Justiciary from 1718 to 1775 were 22 persons charged with murder or infanticide, 10 with robbery, and 3 with rape.[23] Among the remainder were horse thieves, kidnappers, and counterfeiters. The court showed special leniency to defendants who petitioned for banishment before their cases came to trial, a special Scottish right. In 1763 a person in Edinburgh noted how "great criminals, who fear the Consequence of a Trial," commonly petitioned to be transported. Sometimes, however, the court proved willing to forgo the death penalty even after guilt had been established. "It is generally the same Crime," commented an attorney, "to which the punishment of Death and the punishment of Transportation are applied, but differently applied according to the different Circumstances and degrees of guilt."[24]

---

the early 1730s, a system also prevailed whereby judges sometimes altered transportation sentences during subsequent court sessions, that is, after the original trials had taken place. See Report of Thomson, July 18, 1735, S.P. 36/35/141, and J. M. Beattie, *Crime and the Courts in England, 1660-1800* (Princeton, N.J., forthcoming). I am grateful to Professor Beattie for sharing his research with me.

[21] Criminal Pardons, 1761-1770, in Joseph Redington and Richard Arthur Roberts, eds., *Calendar of Home Office Papers of the Reign of George III* (London, 1878-1899), I, 109-115, 226-231, 354-358, 477-494, 662-669, II, 116-124, 252-263, 410-420, 566-574, III, 148-158.

[22] Minutes, Feb. 9, 1743/44, *Ireland Commons Jours.*, VII, 570-610.

[23] Books of Adjournal, 1718-1775, J.C. 3/8-39.

[24] Petition of William Dunbar, Aug. 24, 1763, H.O. 104/1, P.R.O.; "Information for John Gray," Feb. 2, 1767, J.C. 3/34/631-632.

There were British transports, other than those from Scotland, who had committed such major felonies as murder, highway robbery, and burglary. However ruthless the reputation of the "bloody code," capital offenders frequently escaped the gallows by being banished instead. These were "steadily winnowed," John H. Langbein has remarked, from the pool of capital offenders "through the pre-trial, trial, and post-verdict phases of the criminal procedure." In a sample of two hundred felons, for instance, who appeared at the Old Bailey, roughly half of these could have been charged with a capital offense. Yet, of that number, only nine were eventually executed. Convicted criminals who offered some prospect of rehabilitation but posed a potential menace were exiled to the colonies.[25]

Juries especially showed little enthusiasm for the death penalty. As in the case of noncapital offenders, jurors frequently returned so-called "partial verdicts" by finding defendants guilty of lesser crimes than the capital offenses with which they were charged.[26] Moreover, offenders convicted of capital crimes remained eligible for royal clemency, usually extended on a judge's recommendation. In a large majority of cases, clemency took the form of transportation pardons whereby felons were banished to America for either fourteen years or life, rather than for the normal seven years reserved for noncapital felons. At the Old Bailey, 1,121 felons were sentenced to death between 1749 and 1771. Although 678 (60.5 percent) met their appointed fate, as many as 401 (35.8 percent) obtained transportation pardons; the remaining 42 (3.8 percent) either died in jail or received free pardons. The 443 who escaped hanging included 111 highwaymen, 90 housebreakers, 68 horse thieves, and 9 murderers. Meanwhile, on the Norfolk and Midland assize circuits, less than 30 percent of capital felons were executed; most such offenders were ordered for transportation.[27] Quite a few transports were thus capital criminals and the beneficiaries of either partial verdicts or executive clemency. For example, of the 517 property offenders sentenced to transportation in Surrey from 1736 to 1753, 128 men and women (24.8 percent) had received partial verdicts, while another 92 (17.8 percent) had

[25] Langbein, "Shaping the Eighteenth-Century Criminal Trial," *Univ. Chicago Law Rev.,* L (1983), 47.

[26] See Beattie, "Crime and the Courts in Surrey," in Cockburn, ed., *Crime in England,* 172-184, and John H. Langbein, "*Albion's* Fatal Flaws," *Past & Present,* No. 98 (1983), 106.

[27] Howard, *Account of the Principal Lazarettos,* 252-255. Blackstone estimated that judges recommended one-half of all capital felons for royal mercy (*Commentaries,* IV, 19). For a fuller discussion of pardons see Peter King, "Decision-Makers and Decision-Making in the English Criminal Law, 1750-1800," *Historical Journal,* XXVII (1984), 38-51; Beattie, "Crime and the Courts in Surrey," in Cockburn, ed., *Crime in England,* 179-185; Langbein, "*Albion's* Fatal Flaws," *Past & Present,* No. 98 (1983), 109-114. Cf. Douglas Hay, "Property, Authority and the Criminal Law," in Douglas Hay *et al., Albion's Fatal Tree: Crime and Society in Eighteenth-Century England* (New York, 1975), 42-49. For the use of royal pardons in Ireland and Scotland see respectively Lockhart, "Aspects of Irish Emigration," 171-174, and Howard, *Account of the Principal Lazarettos,* 248.

obtained transportation pardons. In short, as many as 220 Surrey convicts (42.6 percent) ordered for transportation were in some sense capital offenders.[28]

What social characteristics did transports share? Did they represent a narrow segment of Britain's population or something like a cross section? The most obvious fact is that a large majority were male. A census for Maryland in 1755 reveals that of 1,981 transports, 1,574 (79.5 percent) were men and boys.[29] In close accord are figures drawn from lists of felons brought into four Maryland counties at different times. As shown in Table I, males strongly predominated, numbering 1,693 (81.6 percent) of 2,074 convicts. This proportion does not seem to have changed significantly over time. Combined totals for the counties of Kent and Queen Anne's during the first half of the century indicate that males made up 83.0 percent of transports. They composed 81.0 percent of the convicts sent to Baltimore and Anne Arundel counties during the early 1770s. Males were especially preponderant among capital felons pardoned for fourteen years or life. Among the 393 capital transports who have been identified in county records were 342 men (87.0 percent) and only 51 women. In contrast, noncapital convicts included 1,331 men (80.3 percent) and 326 women.[30]

Such high proportions of male offenders reflected the degree to which most crime in Britain, especially serious crime, was committed by men. Then, too, courts treated women more leniently and were less likely to order them transported. As a rule, judges and juries favored banishment

TABLE I
SEX OF TRANSPORTS RECEIVED IN MARYLAND

| County | Years | Male | | Female | | Total |
|--------|-------|------|-----|--------|------|-------|
| | | N | % | N | % | N |
| Kent | 1719-1744 | 333 | 82.8 | 69 | 17.2 | 402 |
| Queen Anne's | 1727-1750 | 207 | 83.1 | 42 | 16.9 | 249 |
| Baltimore | 1770-1774 | 475 | 82.8 | 99 | 17.3 | 574 |
| Anne Arundel | 1771-1775 | 678 | 79.9 | 171 | 20.1 | 849 |
| Totals | | 1693 | 81.6 | 381 | 18.4 | 2074 |

Sources: Kent County Bonds and Indentures, 1719-1744, Queen Anne's County Land Records, 1727-1750, Baltimore County Convict Record, 1770-1774, Anne Arundel County Convict Record, 1771-1775, Maryland Hall of Records, Annapolis.

[28] Beattie, "Crime and the Courts in Surrey," in Cockburn, ed., *Crime in England,* 178, 180.

[29] "An Account of the Number of Souls in the Province of Maryland, in the Year 1755," *Gentleman's Magazine,* XXXIV (1764), 261.

[30] Actually, the proportion of males ordered for transportation in Britain was probably slightly higher than figures for convicts received in the colonies suggest. Duncan Campbell claimed that during voyages to America half as many women died as men because of "their Sobriety" and "their Constitutions being less impaired." Testimony of Duncan Campbell, Apr. 1, 1779, *Journals of the House of*

Case: 22-50048, 11/20/2023, ID: 12826827, DktEntry: 60, Page 22 of 27

TABLE II

AGES OF TRANSPORTS ON THE *GILBERT*, 1721, AND THE *JONATHAN*, 1724

| | Convicts | |
| Age | N | % |
| --- | --- | --- |
| 10-14 | 1 | .7 |
| 15-19 | 24 | 15.7 |
| 20-24 | 58 | 37.9 |
| 25-29 | 32 | 20.9 |
| 30-34 | 13 | 8.5 |
| 35-39 | 11 | 7.2 |
| 40-44 | 5 | 3.3 |
| 45-49 | 2 | 1.3 |
| 50-54 | 3 | 2.0 |
| 55-59 | 3 | 2.0 |
| 60+ | 1 | .7 |
| Total | 153 | 100.2 |

Source: Landing Certificates, 1718-1736, Guildhall Records Office, London (Library of Congress photocopies).

over lesser punishments only for women who constituted a clear menace. Of the defendants tried for noncapital larceny at the Surrey assizes from 1736 to 1753, only 21 percent of the women, in contrast to 40 percent of the men, were transported.[31]

Information on the ages of transports is scarce. The 1755 Maryland census merely differentiated between adults and children under sixteen, the latter forming 4.4 percent of the colony's transports.[32] Fortunately, landing certificates filed for two convict vessels in the early 1720s provide a breakdown of ages that is probably close to the mark. The data for 153 felons shipped aboard the *Gilbert* and the *Jonathan* from London to Annapolis show that the typical transport was in his early twenties and that the bulk ranged from fifteen to twenty-nine years of age, a bracket containing about one-quarter of England's population at the beginning of the eighteenth century.[33] (See Table II.) One hundred fifteen convicts

---

*Commons* (London, 1547-1900), XXXVII, 311. On the other hand, figures drawn from landing certificates suggest a much smaller difference in mortality rates between the sexes. For 19 voyages between 1719 and 1736, the mortality rate was 15.6% for men and 13.7% for women. Guildhall Landing Certificates, 1718-1736. Then, again, mortality rates declined during the century, so that differences in mortality would have had a less pronounced impact on sex ratios by the late colonial period. See n. 15 above.

[31] Beattie, "Crime and the Courts in Surrey," in Cockburn, ed., *Crime in England,* 182-183.

[32] "Account of the Number of Souls in the Province of Maryland," *Gentleman's Mag.,* XXXIV (1764), 261.

[33] E. A. Wrigley and R. S. Schofield, *The Population History of England, 1541-1871: A Reconstruction* (London, 1981), 218. These landing certificates, of course, would not have included elderly transports who might have died in transit.

(75.2 percent) were under thirty years of age, and only 14 (9.2 percent) were forty years or older. Transported convicts, on average, were probably not much younger than other British criminals. While youth constituted a criterion for partial verdicts and transportation pardons, it permitted some felons to escape transportation altogether by receiving free pardons or alternative forms of punishment. And though elderly offenders were occasionally reprieved from transportation, such cases were infrequent.[34]

The occupations of convicts covered a broad spectrum. Those of males encompassed diverse trades and callings, from soldiers and silversmiths to coopers and chimney sweeps, including a former cook for the Duke of Northumberland. One Irish convict styled himself a metal refiner, chemist, and doctor, while another jack-of-all-trades was reputedly handy at "almost any Business."[35] A handful came from "respectable" backgrounds; one may instance Henry Justice, a Middle Temple barrister sentenced in May 1736 to seven years transportation. No petty felon, he had smuggled numerous rare books out of the library of Trinity College, Cambridge, and the main university library. Also well-to-do was a thief transported in 1772 for stealing several silver spoons; besides a yearly stipend of £200, his estate included £4,000 in ready cash. Other transports were known for their "polite" manners and "genteel" bearing.[36]

Still, the callings of most transports were those of the lower orders. Some idea of their occupations can be gleaned from information on the male felons aboard the *Gilbert* and the *Jonathan.* As shown in Table III, nearly half, forty-eight of ninety-eight, possessed no identifiable skill and were presumably laborers. Sixteen of these were minors and perhaps too young to have acquired a trade; thirty-two were older and probably never had an opportunity to learn one. Twenty-one of the remaining fifty had low-skilled occupations such as weaving and fishing; twenty-seven were tradesmen and craftsmen such as barbers, perukers, carpenters, tailors, and shoemakers; and two, an attorney and a miller, enjoyed relatively lucrative occupations. As might be expected, not one of the ninety-eight

[34] King, "Decision-Makers and Decision-Making," *Hist. Jour.,* XXVII (1984), 40-41, 43, 45; Leon Radzinowicz, *A History of English Criminal Law and Its Administration from 1750* (London, 1948), I, 115. In the case of 976 runaway convict servants from Virginia and Maryland for whom ages were given in advertisements in the *Va. Gaz.,* the *Maryland Gazette* (Annapolis), and the *Pennsylvania Gazette* (Philadelphia) during the mid-1700s, 580 (59.4%) were under 30 years of age, and 143 (14.7%) were 40 years or older. Because some runaways had already spent several years as servants, they are older than convicts just arriving in the colonies.

[35] *Md. Gaz.,* Apr. 10, 1766, Nov. 12, 1767; *Va. Gaz.,* July 4, 1751.

[36] *Va. Gaz.,* Nov. 26, 1736; Purdie and Dixon's *Va. Gaz.,* June 11, 1772; *Pa. Gaz.,* Aug. 28, 1760; *Md. Gaz.,* Sept. 11, 1766, Sept. 15, 1774. See also Purdie and Dixon's *Va. Gaz.,* Apr. 11, 1771, Jan. 30, 1772; *Md. Gaz.,* Aug. 7, 1760; Rind's *Va. Gaz.,* July 13, 1769; *A Genuine . . . Account of the Life and Transactions of W. Parsons, Esq., Who Was Executed at Tyburn, . . . Feb. 11, 1750-1, Etc.* (London, 1751), 7.

BOUND FOR AMERICA 197

TABLE III
OCCUPATIONS OF MALE TRANSPORTS

| Occupational Group | Gilbert/Jonathan Convicts | | Nottingham Convicts | |
|---|---|---|---|---|
| | N | % | N | % |
| Unskilled Laborers[a] | 48 | 49.0 | 36 | 65.5 |
| Low-skilled Laborers | 21 | 21.4 | 13 | 23.6 |
| Skilled Craftsmen and Tradesmen | 27 | 27.6 | 6 | 10.9 |
| Wealthy Tradesmen and Professionals | 2 | 2.0 | | |
| Totals | 98 | 100.0 | 55 | 100.0 |

[a] Includes persons for whom no occupation was recorded.

Sources: Guildhall Landing Certificates, 1718-1736; K. Tweedale Meaby, *Nottinghamshire: Extracts from the County Records of the Eighteenth Century* (Nottingham, 1947), 353-358.

was a member of Britain's aristocracy or landed gentry.[37] The evidence that most transports came from the lower orders receives even stronger confirmation from records for fifty-five male convicts sentenced to transportation in Nottinghamshire, a county with agricultural, industrial, and commercial interests. Tried between 1723 and 1775, these convicts included thirty-six laborers and other individuals without specified skills, plus thirteen with low-skilled occupations. Just six of the fifty-five were craftsmen and tradesmen.

Young, male, and minimally skilled, a majority of transports belonged to that stratum of society most vulnerable to economic dislocation. While most of their offenses were crimes against property, lawbreaking was for them not so much a source of gain as a way to make do during harsh times. "The immediate general cause of most Villanies," wrote the clergyman Francis Hare in 1731, "is certainly the extreme Misery and Poverty great Numbers are reduced to."[38] It is now reasonably clear that levels of crime

[37] The number of men with trades listed in the certificates actually may have been exaggerated since "fictitious handicrafts" were sometimes attributed to transports in order to increase sales (Smith, *Colonists in Bondage,* 221). Significantly, of 1,401 runaway convict servants from Virginia and Maryland during the mid-1700s, skilled trades were listed in only about a quarter of the cases, despite the fact that masters in search of skilled servants would more likely have invested in runaway advertisements. On the point that the absence of stated occupations probably meant that individuals did not have skilled callings, see David W. Galenson's discussion regarding indentured servants in *White Servitude in Colonial America: An Economic Analysis* (Cambridge, 1981), 45-47, 61, 75-78. Though occupations for working women are not as easily identified, there is no reason to doubt that most female offenders came from the lower orders.

[38] *A Sermon Preached to the Societies for the Reformation of Manners . . .* (London, 1731), 30.

rose during the eighteenth century when economic conditions deteriorated. In the countryside a close relationship existed between criminal indictments filed at court and the rising cost of basic foodstuffs, particularly wheat. In London and other cities flooded by migrants seeking work, crime sharply accelerated during peacetime, most notably in the immediate aftermath of England's wars with France and Spain. The end of foreign conflict brought widespread unemployment, as large numbers of workers in war-related industries found themselves out of work, along with thousands of soldiers and sailors hardened by the brutality of military service. "At the conclusion of a war," lamented Sir Stephen Janssen, "we turn adrift so many thousand Men, great Numbers fall heedlessly to thieving as soon as their Pockets are empty."[39]

The number of offenses committed by the typical felon sentenced to transportation is impossible to calculate, but most had probably been multiple offenders prone to steal so long as their circumstances remained urgent. A weaver's apprentice, John Meff, later recalled committing a series of thefts because his "Business" was not "sufficient to maintain" his wife and children. One authority believed most malefactors guilty of "one Evil" after "another" in order to "supply their immediate Necessities"—until "at last they come under the Sentence of Felons, *viz.* Transportation or the Gallows." Then, too, nonrecidivists, guilty only of single larcenies, often never came to trial but were instead punished informally in their communities.[40]

For some criminals, breaking the law virtually became a profession. Though sometimes drawn to thieving by necessity, crime for them constituted a more regular source of income. Often belonging to organized gangs, experienced felons committed particularly serious offenses such as horse theft and highway robbery that demanded skill and planning. A successful highway robbery, for instance, normally required pinpoint scheduling, trusted lookouts, several armed men, and a shop owner to receive the stolen merchandise. By necessity, professional thieves employed an extended network of informants, fences, and quasi-legitimate contacts.[41] So far-flung were the operations of one notorious gang that in

[39] J. M. Beattie, "The Pattern of Crime in England, 1660-1800," *Past & Present,* No. 62 (1974), 47-95, quotation on p. 94. Douglas Hay, "War, Dearth and Theft in the Eighteenth Century: The Record of the English Courts," *ibid.,* No. 95 (1982), 117-160.

[40] *Select Trials at the Sessions-House in the Old Bailey* . . . (Dublin, 1742), I, 71; Joshua Gee, *The Trade and Navigation of Great-Britain Considered* . . . (London, 1738), 87.

[41] How prevalent organized crime actually was in 18th-century Britain remains a difficult question, but see Hay, "War, Dearth and Theft in the Eighteenth Century," *Past & Present,* No. 95 (1982), 134-135; Gerald Howson, *Thief-Taker General: The Rise and Fall of Jonathan Wild* (London, 1970), *passim;* John Styles, "Criminal Records," *Hist. Jour.,* XX (1977), 981; J. A. Sharpe, "History of Crime in England," *Soc. Hist.,* VII (1982), 199-200; and Beattie, *Crime and the Courts in England.* For the transportation of gang members, see, for example, [?] Pope to

1764 its chief nemesis, Alderman John Hewitt, calculated that "this family confederacy" contained "at least one hundred" members "dispersed in different parties" throughout Britain. "Their house in Northumberland," he wrote the earl of Halifax, was "a kind of garrison, and the repository of the stolen property and cattle from all parts of the Kingdom." Members of the gang included not only the infamous pickpocket and shoplifter, "Long Peg," who had been transported five times, but at least fourteen other former transports.[42] Neither romantic revolutionaries nor petty crooks, gang members were tough, often violently determined men and women jaded by alternating bouts of poverty and quick wealth. Remarked one London resident: "It will be to the Advantage of Society in generall [that] such offenders should be transported."[43]

Such, then, was the typical malefactor cast for transportation: a young male laborer drawn to crime by economic necessity. More than a handful of transported felons also belonged to organized gangs. It is scarcely surprising that Americans reacted angrily to the practice of transportation. To be sure, they bought convicts for servants, but British penal policy provoked some of the most heated protests voiced by colonists during the so-called "era of salutary neglect." Typical of prevailing sentiment was the bitter comment in 1731 by the provincial council of Jamaica that if "it be prudence in England to banish rogues; it must certainly be prudence here to endeavour to keep them out." Benjamin Franklin, who advocated exporting rattlesnakes to Mother England, called transportation an "insult and contempt, the cruellest perhaps that ever one people offered another." Colonies such as Maryland, New Jersey, and Pennsylvania vainly attempted to impose prohibitive duties on transported felons. In 1731 Jamaica levied a duty of £100 per convict, though the tax was quickly opposed by Whitehall.[44]

---

Col. Negus, Feb. 21, 1724/25, S.P. 35/55/61a; Sir John Shelley to [?], May 5, 1729, S.P. 36/11/120; Report of Thomson, Sept. 25, 1732, S.P. 36/28/150; J. Lenthal to [Newcastle], Oct. 7, 1738, S.P. 44/131/37-38; *London Magazine,* XX (1751), 43; Sir John Fielding, *An Account of the Origins and Effects of a Police . . .* (London, 1758), 19; and Andrew Knapp and William Baldwin, eds., *The Newgate Calendar . . .* (London, 1825), II, 125.

[42] Hewitt to Halifax, Nov. 22, 1764, in [John Hewitt], *A Journal of the Proceedings of J. Hewitt . . .* (n.p., 1790), 207, *passim;* Hewitt to Halifax, July 17, 1763, S.P. 44/139/252-256. Other gangs also included former transports, many of them returning early from exile in the colonies. For example, the so-called "Hastings Outlaws" were a band of smugglers transported in the late 1730s who returned to ply their trade along the Sussex coast. In Devon, numerous fugitive transports from America made up a gang in the early 1750s that terrorized the countryside; years earlier, the foremost chieftain of crime in London, Jonathan Wild, relied heavily on fugitive convicts. Cal Winslow, "Sussex Smugglers," in Hay *et al., Albion's Fatal Tree,* 124n; Sidney Stafford Smythe to Earl of Holdernesse, Sept. 28, 1753, S.P. 36/123/94; Howson, *Thief-Taker General,* 92, 239.

[43] Thomas Lane to [Holdernesse?], Mar. 22, 1760, S.P. 36/145/85-86.

[44] Council of Jamaica to Gov. Hunter, enclosed in Hunter to Newcastle, Dec. 15, 1731, in W. Noël Sainsbury *et al.,* eds., *Calendar of State Papers, Colonial Series*

If the ranks of transports did not normally include Britain's most dangerous criminals, for whom the death penalty was reserved, neither were they filled with many beggars, petty thieves, and prostitutes. The principal exception consisted of large numbers of Irish vagrants. Otherwise, in addition to grand larcenists, who made up the majority of transports, more than a few convicts were capital felons such as burglars and highway robbers, some of whom bore long criminal histories. Being young, male, and poor, they seemed an especially dangerous lot. As criminals too dangerous to be suffered at home, transports, in the words of a Maryland colonist, represented the "abandoned Outcasts of the British Nation." And while most of them were sold in America as servants, not many were experienced tradesmen and artisans; besides those with low-skilled occupations, one-half or more were probably common unskilled laborers. Among indentured servants, in contrast, unskilled workers constituted a declining minority during the century, largely because of growing colonial demand for skilled labor. In London, unskilled laborers decreased from 43 percent of male servants during the years 1718-1759 to just 15 percent by 1773-1775.[45]

Transportation was intended to serve British, not colonial, needs. In addition to ridding Britain of large numbers of noncapital offenders, it extended a measure of mercy to thousands of capital felons whose crimes, in the minds of courts and crown officials, were not sufficiently heinous to necessitate the death penalty but were alarming enough to warrant banishment for fourteen or more years. As a resident of the village of Alton remarked after urging that a notorious troublemaker be transported, "We were in Hopes that we should then have been ridd of Him and the Fears which he had put us all in."[46] The attraction of transportation lay in providing a much-needed alternative to the existing penal system without putting the public at serious risk. Not, at least, the British public.

---

(London, 1860-     ), XXXVIII, 377; Franklin to the Printer of the [London] *Chronicle,* May 9, 1759, in Leonard W. Labaree *et al.,* eds., *The Papers of Benjamin Franklin* (New Haven, Conn., 1959-     ), VIII, 351; "Americanus," *Pa. Gaz.,* May 9, 1751; Smith, *Colonists in Bondage,* 119-122.

[45] "Philanthropos," *Md. Gaz.,* Aug. 20, 1767; Galenson, *White Servitude,* 62, 139, *passim.*

[46] Philo Georgius to [Newcastle], Mar. 2 [1730/31], S.P. 36/22/155.