

U.S. Department of Justice

*United States Attorney's Office*
*Central District of California*

*Suria M. Bahadue*
*Assistant United States Attorney*
*Criminal Appeals Section*
*suria.bahadue@usdoj.gov*

*1000 United States Courthouse*
*312 North Spring Street*
*Los Angeles, California 90012*
*(213) 894-5487 (telephone)*

March 6, 2024

Molly Dwyer
Clerk of Court
U.S. Court of Appeals
(Via Ninth Circuit CM/ECF)

Re:  *United States v. Steven Duarte*, C.A. No. 22-50048
 (Arg. & Sub.—December 4, 2023—Pasadena)

Dear Ms. Dwyer:

The Government submits this letter pursuant to Federal Rule of Appellate Procedure 28(j) to address new authority that bears on this appeal.

In *United States v. Dubois*, --- F.4th ---, 2024 WL 927030, at *3-6 (11th Cir. Mar. 5, 2024), the Eleventh Circuit held that 18 U.S.C. § 922(g)(1) is constitutional as applied to a nonviolent felon.

Specifically, the Eleventh Circuit concluded that *New York State Rifle & Pistol Ass'n, Inc., v. Bruen*, 142 S. Ct. 2111 (2022), did not overrule its prior precedent, *United States v. Rozier*, 598 F.3d 768, 770-71 (11th Cir. 2010), upholding the constitutionality of § 922(g)(1).  *See Dubois*, 2024 WL 927030, at *3-6.  In *Rozier*, the Eleventh Circuit had concluded that under *District of Columbia v. Heller*, 554 U.S. 570 (2008), felons are unqualified as a "class" from possessing a firearm under the Second Amendment.  *Rozier*, 598 F.3d at 770-71 (relying on *Heller's* recognition that a felon-in-possession ban constitutes a presumptively lawful longstanding prohibition).

*Bruen*, the Eleventh Circuit held, did not abrogate *Rozier*. *See Dubois*, 2024 WL 927030, at *3-6. As the government argued here (GAB 21), *Bruen* "left no doubt" that "its decision [w]as a faithful application of *Heller*, not a departure from it." *Dubois*, 2024 WL 927030, at *5. And while the *Bruen* majority did not mention felon-in-possession bans, it confirmed that *Heller* "correctly 'relied on the historical understanding of the Amendment to demark the limits on the exercise of that right.'" *Id.* Accordingly, because *Heller* "did not cast doubt on felon-in possession prohibitions" and because *Bruen* was "in keeping with *Heller*," *Bruen* "could not have clearly abrogated" *Rozier*, particularly when the *Bruen* majority made no mention of felons or § 922(g)(1). *Id.* at *6 (cleaned up).

With this decision, the Eleventh Circuit joins the Eighth and Tenth Circuits that have upheld § 922(g)(1) as constitutional as applied to felons—nonviolent or otherwise—following *Bruen*. *See, e.g.*, *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023); *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023).

Very truly yours,

E. MARTIN ESTRADA
United States Attorney


 /s/ *Suria M. Bahadue*

SURIA M. BAHADUE
Assistant United States Attorney
Criminal Appeals Section

2

# *United States v. Dubois,* --- F.4th ---, 2024 WL 927030 (11th Cir. Mar. 5, 2024)

2024 WL 927030
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Andre Michael DUBOIS, A.K.A. Larry Davis,
A.K.A. Andre Dubois, Defendant-Appellant.

No. 22-10829
|
Filed: 03/05/2024

Appeal from the United States District Court for the Northern District of Georgia, D.C. Docket No. 1:20-cr-00305-WMR-JKL-1

**Attorneys and Law Firms**

Ryan Karim Buchanan, Gabriel Adam Mendel, Lawrence R. Sommerfeld, U.S. Attorney Service-Northern District of Georgia, DOJ-USAO, Northern District of Georgia, Atlanta, GA, Natasha S. Cooper, Office of the U.S. Trustee, Atlanta, GA, for Plaintiff-Appellee.

Nicole Kaplan, W. Matthew Dodge, Stephanie A. Kearns, Federal Defender Program, Atlanta, GA, for Defendant-Appellant.

Before William Pryor, Chief Judge, and Rosenbaum and Abudu, Circuit Judges.

**Opinion**

William Pryor, Chief Judge:

**\*1** This appeal by Andre Dubois, a federal prisoner, of his convictions and sentence for three federal firearm offenses requires us to answer five questions. First, did *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L.Ed.2d 387 (2022), which held that the Second Amendment protects a right to bear arms outside the home, abrogate our precedent upholding the felon-in-possession ban? *See* 18 U.S.C. § 922(g)(1); *United States v. Rozier*, 598 F.3d 768, 770–71 (11th Cir. 2010). Second, was there sufficient evidence from which a reasonable jury could find that Dubois knew that he possessed a firearm? Third, is Dubois's Georgia marijuana conviction a "controlled substance offense" under the Sentencing Guidelines? *See* United States Sentencing Guidelines Manual § 2K2.1(a)(4)(A) (Nov 2021). Fourth, does our precedent interpreting the guidelines' stolen-gun enhancement, *see id.* § 2K2.1(b)(4)(A), violate due process or intervening Supreme Court precedent? And fifth, did the district court plainly err by sentencing Dubois to pay a $25,000 fine without explanation? Because our precedent forecloses Dubois's challenges to the felon-in-possession statute and the stolen-gun enhancement; the evidence could permit a reasonable jury to convict him on all counts; his marijuana conviction is a controlled substance offense; and unchallenged evidence proves that he can afford his fine, we affirm Dubois's convictions and sentence.

## I. BACKGROUND

In 2018, Andre Dubois entered an Express Copy Print & Ship store in Suwanee, Georgia, and attempted to ship a box containing firearms to the Commonwealth of Dominica. Federal officials seized the shipment and charged Dubois with three counts: attempting to smuggle firearms out of the United States, *see* 18 U.S.C. § 554; delivering firearms to a common carrier for shipment without written notice, *see id.* § 922(e); and possessing a firearm as a felon, *see id.* § 922(g)(1). The only factual dispute at trial was whether Dubois knew that the box he tried to ship contained firearms —an element of all three charges. Dubois stipulated that he was the customer who delivered the package and that he knew that he was a felon when he did so.

At trial, the prosecution presented evidence that on April 23, 2018, a car parked outside the ship store. Dubois exited the passenger side and walked into the store carrying a large, sealed box on his shoulder. Jeffrey Morris was working the front desk. Morris asked Dubois to state his name, phone number, and return address; the recipient's name, phone number, and shipping address; and the contents of the package. Dubois said that his name was "Larry Davis" and provided a Georgia return address and New York phone number. He said that the recipient's name was "Monette Paul" and provided a Dominica shipping address and phone number. And he said that the package contained two frying pans.

Dubois behaved strangely during the transaction. Dubois read some of the information that he gave Morris from a piece of paper that he had pulled from his pocket. And he made or took three phone calls during his brief exchange with Morris to "double check" the information he provided. When Morris

tried to verify the return address using the store's online database, it came back as an "unknown" address. Because this notification sometimes appeared for new addresses not yet programmed in the database, Morris asked Dubois whether his address was new. Dubois replied, "it's a newer address." Morris testified that he asked Dubois twice whether the information that he provided was accurate, and both times Dubois said that it was. Morris also specifically asked Dubois whether, "if [he] opened the box, there would be two frying pans in it." Dubois replied, "yes." And on the customer invoice—which Dubois signed "Larry Davis"—Dubois certified that his shipment complied with federal law, that the information he provided was "true and correct," and that "the contents of th[e] shipment [we]re as stated" on the invoice. Dubois paid for the shipment in cash before exiting the store.

**\*2** Federal officials seized the package after a carrier employee identified a suspicious object during an x-ray screen. Officials discovered a loaded revolver, two disassembled pistols, and over 400 bullets, all wrapped in aluminum foil and hidden in two individually packaged deep fryers. According to an investigator, firearm smugglers often try to evade detection by packaging firearms in this manner.

An investigation into the shipper's identity revealed that the information Dubois gave Morris was false. Agents began their investigation by looking for "Larry Davis," the listed sender, but they could not find anyone with that name associated with the listed address or phone number. Nor could agents locate "Monette Paul," the listed recipient. Finally, using the ship store's surveillance footage, agents identified Dubois as the shipper by tracing the logo on the shipper's sweatshirt to Dubois's former employer. An agent testified that "every shipper" he has encountered "who has attempted or successfully made an illegal export from the United States ... provided false information on the shipping documents."

At the close of the prosecution's case, Dubois moved for acquittal on all counts. *See* FED. R. CRIM. P. 29(a). He argued that all three counts failed as a matter of law because the prosecution failed to introduce sufficient evidence that Dubois knew that the package that he attempted to ship contained firearms. And he argued that his section 922(g)(1) charge was unconstitutional because nonviolent felons maintain a Second Amendment right to possess firearms—though he acknowledged that "existing precedent" foreclosed this argument. The district court denied Dubois's motion, and the jury convicted him on all counts.

A probation officer prepared a presentence investigation report recommending an imprisonment range of 130 to 162 months and a fine range of $25,000 to $250,000 under the Sentencing Guidelines. The officer assigned Dubois a base offense level of 20 after concluding that Dubois's 2013 Georgia conviction for possession with intent to distribute marijuana was a "controlled substance offense." *See* U.S.S.G. §§ 2K2.1(a)(4)(A), 4B1.2(b). And the officer applied a two-level enhancement because one of the firearms that Dubois possessed had been reported as stolen. *See id.* § 2K2.1(b)(4)(A).

The presentence investigation report also described Dubois's "[f]inancial [c]ondition" and his "[a]bility to [p]ay" a fine. The report stated that the probation officer had requested "signed authorization forms and financial documents" from Dubois, but Dubois never provided this information. So the probation officer obtained Dubois's financial information by consulting public records, Dubois's bond report, and Dubois's pretrial services record. The officer calculated Dubois's net worth as exceeding $54,000 by subtracting his student loan debt and unpaid court fines from the value of a condo that he had inherited from his mother. And the officer found that Dubois had a monthly income exceeding $3,000. Last, the probation officer determined that Dubois was "able-bodied and could work while in custody to make minimal payments towards any fine the Court orders." Based on this information, the officer concluded that Dubois "ha[d] the ability to pay a fine within the fine guideline range" of $25,000 to $250,000.

Dubois objected to three parts of the presentence investigation report. First, he objected to the description of his offense conduct on the ground that "he is not guilty of the offense charged" because "the government did not prove that he knew what was in the box." Second, Dubois objected to the probation officer's application of an enhanced base offense level of 20 because his Georgia marijuana conviction does not qualify as a categorical controlled substance offense under the guidelines. Last, he objected to the stolen-gun enhancement on the ground that applying it "on a strict liability basis" violates due process and that its accompanying commentary "impermissibly expands" the guideline beyond its plain text. Dubois did not object to the probation officer's recommended fine range or to the finding that Dubois could afford a fine within that range. And aside from the description of his

offense conduct, Dubois did not object to any of the factual findings in the report.

**\*3** The district court overruled Dubois's objections and, on March 1, 2022, sentenced Dubois to a below-guideline prison sentence of 110 months and a low-end fine of $25,000. It did not provide reasoning for the fine amount during the sentencing hearing, but Dubois's counsel made no specific objection to the amount or to Dubois's ability to pay it. His counsel made only a general objection: "I'll object to the sentence as procedurally and substantively unreasonable and also object to the substantive reasonableness specifically of both the sentence and the fine."

Dubois appealed his convictions and sentence. While his appeal was pending, but before the parties filed their briefs, the Supreme Court decided in *Bruen* that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 142 S. Ct. at 2122. Dubois later moved to stay his appeal pending two decisions. *See United States v. Rahimi*, No. 22-915 (U.S. argued Nov. 7, 2023); *Jackson v. United States*, No. 22-6640 (U.S. argued Nov. 27, 2023). We denied his motion to stay and his motion for reconsideration.

## II. STANDARDS OF REVIEW

We review *de novo* a challenge to the sufficiency of the evidence, "viewing the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility determinations in the government's favor." *United States v. Green*, 981 F.3d 945, 960 (11th Cir. 2020). We will affirm the jury's verdict so long as "any reasonable construction of the evidence could have allowed the jury to find 'the essential elements of the crime' beyond a reasonable doubt." *United States v. Colston*, 4 F.4th 1179, 1190 (11th Cir. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We also review *de novo* the interpretation and constitutionality of the Sentencing Guidelines. *United States v. Amedeo*, 370 F.3d 1305, 1312 (11th Cir. 2004) (interpretation); *United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015) (constitutionality). And we review *de novo* the denial of a motion for a judgment of acquittal. *United States v. Seher*, 562 F.3d 1344, 1364 (11th Cir. 2009). We review for plain error an unpreserved challenge to a criminal fine. *See United States v. Hernandez*, 160 F.3d 661, 665 (11th Cir. 1998).

## III. DISCUSSION

We proceed in five parts. First, we explain that our precedent forecloses Dubois's argument that section 922(g)(1) violates the Second Amendment. Second, we explain that sufficient evidence supports the jury's finding that Dubois knew that he possessed a firearm. Third, we explain that Dubois's state marijuana conviction is a "controlled substance offense" under the Sentencing Guidelines. Fourth, we explain that the application of the stolen-gun enhancement on a strict-liability basis complies with due process and Supreme Court precedent. Fifth, we explain that the imposition of a $25,000 fine was not plain error.

### A. Our Precedent Bars Dubois's Second Amendment Challenge.

Dubois challenges the denial of his motion for a judgment of acquittal on the felon-in-possession charge. *See* 18 U.S.C. § 922(g)(1). Dubois does not dispute that his conduct falls squarely within the federal offense: he possessed firearms and ammunition after sustaining a felony conviction for drug trafficking. He instead argues that the statute violates his right to bear arms under the Second Amendment. Dubois concedes that Circuit precedent bars his challenge; we upheld section 922(g)(1) under the Second Amendment in *Rozier*, 598 F.3d at 770–71. But Dubois argues that *Bruen* abrogated *Rozier* and requires us to vacate his conviction. We disagree.

**\*4** In *District of Columbia v. Heller*, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court sustained a Second Amendment challenge to a District of Columbia law that prohibited private possession of handguns. The Court adopted an approach "bas[ed] o[n] both text and history" for analyzing gun restrictions and ruled the prohibition unconstitutional. *Id.* at 595, 128 S.Ct. 2783. It held that law-abiding citizens have a Second Amendment

right to possess handguns in the home for self-defense. *Id.* at 635–36, 128 S.Ct. 2783.

*Heller* cautioned that the Second Amendment right "is not unlimited." *Id.* at 626, 128 S.Ct. 2783. Importantly, the Court stated that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* The Court labeled these federal regulations "presumptively lawful." *Id.* at 627 n.26, 128 S.Ct. 2783. And it explained that the Second Amendment guarantees a right to "law-abiding, responsible citizens" who "use arms in defense of hearth and home." See *id.* at 635, 128 S.Ct. 2783.

Two years after *Heller*, we rejected a challenge to section 922(g)(1) in *Rozier*. Like Dubois, Rozier possessed a firearm and ammunition after having been convicted of a felony drug crime. 598 F.3d at 769 & n.1. He challenged his conviction on the ground that section 922(g)(1) violates the Second Amendment. *Id.* at 770. We disagreed because, under *Heller*, "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment." *Id.* at 771. "[T]he first question" under *Heller*, we explained, "is whether one is *qualified* to possess a firearm." *Id.* at 770. And felons are unqualified as "a class" because they are not "law-abiding citizen[s]." *Id.* at 771. *Heller* "made this clear" by labeling the felon-in-possession ban " 'a presumptively lawful longstanding tradition.' " *Id.* (quoting *United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir. 2010)); *accord McDonald v. City of Chicago*, 561 U.S. 742, 786, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality opinion) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' .... We repeat those assurances here." (quoting *Heller*, 554 U.S. at 626–27, 128 S.Ct. 2783)). And we said that this language from *Heller* was "not dicta" because it limited the Second Amendment right to "*law-abiding* and *qualified* individuals." *Rozier*, 598 F.3d at 771 n.6.

After *Heller* and *Rozier* came *Bruen*, which involved a challenge to New York's gun-licensing regime. 142 S. Ct. at 2122. New York prohibited law-abiding citizens from obtaining a license to carry outside the home unless they first proved "a special need for self-defense." *Id.* The Court ruled the scheme unconstitutional because "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.*

*Bruen* began its analysis by rejecting, as inconsistent with *Heller*, the second part of a two-step test that then prevailed in most circuits. See *id.* at 2125–30. Under that test, a court would first ask whether the challenged law burdened conduct that falls within the scope of the Second Amendment, "as historically understood." *See, e.g.*, *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). If it did, the court would review the regulation under either intermediate or strict scrutiny. See *id.* We embraced this two-part framework in dicta beginning in 2012, *see GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012), but we have never actually applied the second, means-end-scrutiny step, *see United States v. Jimenez-Shilon*, 34 F.4th 1042, 1052–53 (11th Cir. 2022) (Newsom, J., concurring).

**\*5** *Bruen* approved "[s]tep one of the predominant framework" as "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." 142 S. Ct. at 2127. But *Bruen* rejected the second, "means-end scrutiny" step as incompatible with *Heller*, which "expressly rejected" applying a "judge-empowering interest-balancing inquiry" to analyze Second Amendment challenges. *Id.* at 2127, 2129 (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 634, 128 S.Ct. 2783). *Bruen* then reiterated that "*Heller*'s text-and-history standard" is the correct test

for determining the constitutionality of gun restrictions. *See id.* at 2138.

The Supreme Court left no doubt that it viewed its decision as a faithful application of *Heller*, not a departure from it. *See, e.g., id.* at 2122 (stating that its holding is "consistent with *Heller*"); *id.* at 2131 (stating that its test "[f]ollow[s] the course charted by *Heller*"); *id.* (stating that "[t]he test that [the Court] set forth in *Heller*" is the same one that courts must "apply today"). That approval of *Heller* included the recognition that the Second Amendment is "subject to certain reasonable, well-defined restrictions." *Id.* at 2156 (citing *Heller*, 554 U.S. at 581, 128 S.Ct. 2783). Although the Court did not mention felon-in-possession bans, it confirmed that *Heller* correctly "relied on the historical understanding of the Amendment to demark the limits on the exercise of that right." *Id.* at 2128. And *Bruen*, like *Heller*, repeatedly described the right as extending only to "law-abiding, responsible citizens." *See, e.g., id.* at 2131 (quoting *Heller*, 554 U.S. at 635, 128 S.Ct. 2783).

To determine whether *Bruen* abrogates *Rozier*, we apply our prior-panel-precedent rule: " 'a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*.' " *In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015) (quoting *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008)). An intervening Supreme Court decision abrogates our precedent only if the intervening decision is both "clearly on point" and "clearly contrary to" our earlier decision. *Edwards v. U.S. Att'y Gen.*, 56 F.4th 951, 965 (11th Cir. 2022) (emphasis omitted) (citation and internal quotation marks omitted). If the Supreme Court "never discussed" our precedent and did not "otherwise comment[ ] on" the precise issue before the prior panel, our precedent remains binding. *See United States v. Vega-Castillo*, 540 F.3d 1235, 1238–39 (11th Cir. 2008). To abrogate a prior-panel precedent, "the later Supreme Court decision must 'demolish' and 'eviscerate' each of its 'fundamental props.' " *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022) (alterations adopted) (citation omitted), *cert. denied*, *Del Castillo v. Ladapo*, ––– U.S. ––––, 143 S. Ct. 486, 214 L.Ed.2d 277 (2022). So, for example, if our precedent relied on "a line of Supreme Court precedents that the [Supreme] Court itself emphasizes in a later decision is not implicated by that later decision," the Supreme Court's intervening decision "cannot have" abrogated our precedent. *Id.*

*Bruen* did not abrogate *Rozier*. Because the Supreme Court "made it clear in *Heller* that [its] holding did not cast doubt" on felon-in-possession prohibitions, *McDonald*, 561 U.S. at 786, 130 S.Ct. 3020 (plurality opinion), and because the Court made it clear in *Bruen* that its holding was "[i]n keeping with *Heller*," 142 S. Ct. at 2126, *Bruen* could not have clearly abrogated our precedent upholding section 922(g)(1). *See Del Castillo*, 26 F.4th at 1223–25. Indeed, the *Bruen* majority did not mention felons or section 922(g)(1). *See Vega-Castillo*, 540 F.3d at 1238–39.

**\*6** Dubois argues that we may depart from *Rozier* because *Bruen* abrogated "[a]ll prior precedent relying on the two-step analysis." But *Rozier* upheld section 922(g)(1) on the threshold ground that felons are categorically "disqualified" from exercising their Second Amendment right under *Heller*. *Rozier*, 598 F.3d at 770–71 (quoting *Heller*, 554 U.S. at 635, 128 S.Ct. 2783). We interpreted *Heller* as limiting the right to "law-abiding and qualified individuals" and as clearly excluding felons from those categories by referring to felon-in-possession bans as presumptively lawful. *Rozier*, 598 F.3d at 771 & n.6. And far from "demolish[ing]" or "eviscerat[ing]" *Rozier*'s reliance on *Heller*, *see Del Castillo*, 26 F.4th at 1224, *Bruen* repeatedly stated that its decision was faithful to *Heller*. We require clearer instruction from the Supreme Court before we may reconsider the constitutionality of section 922(g)(1). Because *Rozier* binds us, Dubois's challenge based on the Second Amendment necessarily fails.

*B. Sufficient Evidence Supported the Verdict.*

Dubois also argues that the district court erred by denying his motion for a judgment of acquittal on all counts because there was insufficient evidence that he knew that the box he attempted to ship contained a firearm. We disagree. Viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found beyond a reasonable doubt that Dubois knew that the box contained firearms. *See Colston*, 4 F.4th at 1189–90.

Although there is no direct evidence that Dubois knew that the box contained firearms, the prosecution may and often does prove knowledge using circumstantial evidence. *Id.* at 1190 ("Guilty knowledge can rarely be established directly."). And there is ample circumstantial evidence that allowed a reasonable jury to find that Dubois knew that firearms were in the box. For example, there is substantial evidence that Dubois tried to make the illicit shipment untraceable to either himself or the intended recipient—efforts that would be inexplicable if Dubois did not know that the box contained illegal contraband. In particular, the jury heard that Dubois gave Morris fake names, addresses, and phone numbers for both himself and the recipient; that Dubois falsely certified that this information was accurate; and that he paid for the transaction in cash. *See United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977) (stating that "concealment, assumption of a false name, and related conduct[ ]" may be evidence of guilt (citation omitted)). The parties also stipulated at trial that Dubois knew that he was a felon when he possessed the box. Dubois's felon status provides a plausible motivation for his lying about the shipment and supports an inference that he knew the box contained firearms or ammunition as opposed to some other contraband. Dubois also knew some of the contents of the package: he told Morris that the box contained "two frying pans," and the box in fact contained "two deep fryers" in addition to the firearms and ammunition. That Dubois knew some of the contents of the box supports an inference that he knew the remaining contents as well. And by delivering the box to the ship store, Dubois "was instrumental to [the] ... success" of the criminal plan— another circumstantial "guidepost[ ]" by which we have said a jury may infer knowledge. *Colston*, 4 F.4th at 1190.

We accept Dubois's argument that the evidence also supports an inference that he was being directed by someone else to mail the package: someone else drove Dubois to the ship store; Dubois read some of the shipping information that he relayed to Morris from a piece of paper; and Dubois made or took three phone calls during the brief transaction to confirm that information. But that inference is consistent with the inference that Dubois too knew the package contained a gun. *See id.* ("[I]f a defendant ... was in frequent contact with someone who knew th[e critical] fact, then a jury may be able to infer knowledge."). This "reasonable construction of the evidence" allowed the jury to find that the prosecution proved Dubois's knowledge beyond a reasonable doubt. *See id.*

*C. Dubois's Georgia Marijuana Conviction is a "Controlled Substance Offense" Under the Sentencing Guidelines.*

**\*7** Next, Dubois argues that we should vacate his sentence because his 2013 conviction for possession with intent to distribute marijuana is not a predicate "controlled substance offense" under the Sentencing Guidelines. Although Dubois's base offense level for his firearm convictions would ordinarily be 14, *see* U.S.S.G. § 2K2.1(a)(6), the guidelines assign a base offense level of 20 if the defendant "committed any part of the instant offense subsequent to sustaining" a felony conviction for a "crime of violence or a controlled substance offense," *id.* § 2K2.1(a)(4)(A). The guidelines define a "controlled substance offense" as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits ... the possession of a controlled substance ... with intent to manufacture, import, export, distribute, or dispense." *Id.* § 4B1.2(b); *see id.* § 2K2.1, cmt. n.1 (" 'Controlled substance offense' has the meaning given that term in [section] 4B1.2(b)."). The district court enhanced Dubois's base offense level under the guidelines based on his 2013 Georgia conviction for possession with intent to distribute marijuana. *See* GA. CODE § 16-13-30(j)(1) (2013).

To determine whether a state conviction qualifies as a controlled substance offense under the guidelines, we apply the "categorical approach." *Hollis v. United States*, 958 F.3d 1120, 1123 (11th Cir. 2020). This approach requires us to compare the guideline definition of "controlled substance offense" with the state statute of conviction. *United States v. Lange*, 862 F.3d 1290, 1293 (11th Cir. 2017), *abrogated on other grounds by United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (en banc). Unless "the least culpable conduct prohibited under the state law ... qualif[ies] as a

predicate [controlled substance] offense," the defendant's state conviction cannot be the basis of an enhancement under the guidelines, regardless of the actual conduct underlying the conviction. See *United States v. Laines*, 69 F.4th 1221, 1233 (11th Cir. 2023).

Dubois argues that his Georgia conviction for possession with intent to distribute marijuana does not qualify him for base-level enhancement because his statute of conviction is categorically broader than the guideline definition of "controlled substance offense." He explains that at the time of his conviction in 2013, both Georgia and federal law defined "marijuana" to include hemp. See GA. CODE § 16-13-21(16) (2011); 21 U.S.C. § 802(16) (2009). But by the time he was sentenced for his federal offenses in 2022, both definitions had been amended to exclude hemp. See GA. CODE § 16-13-21(16) (2019); 21 U.S.C. § 802(16)(B)(i) (2018). Because the law at the time of his state conviction was broader than the law at the time of his federal sentencing, he maintains that the state conviction is not a controlled substance offense.

Our precedent does not resolve Dubois's challenge. The government relies on our decision in *United States v. Bates*, 960 F.3d 1278, 1293 (11th Cir. 2020), which held that "Bates's prior Georgia convictions for possession of marijuana with intent to distribute qualified as predicate [controlled substance] offenses ... [under] the Guidelines." But there was no intervening-change-of-law problem in *Bates*. Even though *Bates* was decided *after* the amendments excluding hemp from the Georgia and federal definitions of marijuana were passed, Bates was convicted of the Georgia marijuana offense and sentenced for the federal firearm offense *before* those amendments were passed. See Brief of Appellant at 1, 10, *United States v. Bates*, 960 F.3d 1278 (11th Cir. 2020) (No. 18-12533), 2018 WL 4858856, at *1, *10.

We must decide whether marijuana is a "controlled substance" under the guideline definition of "controlled substance offense," see U.S.S.G. § 4B1.2(b), and that question comprises two sub-questions that have divided our sister circuits. First, when the predicate offense is a state crime, is the meaning of "controlled substance" nonetheless limited to drugs regulated by the federal Controlled Substances Act, 21 U.S.C. § 802, or is it instead defined by the state's drug schedules? Second, is "controlled substance" defined by reference to the relevant drug schedules in effect at the time of the defendant's prior state conviction or those in effect at the time of his federal sentencing for the instant firearm offense?

1. For a Prior State Conviction, a "Controlled Substance" is a Substance Regulated by State Law.

**\*8** The first sub-question is whether "controlled substance" is defined by reference to federal or state drug schedules. Most circuits that have addressed it have held that, for prior state convictions, a "controlled substance" is one regulated by state law, even if it is not also regulated by federal law. See *United States v. Lewis*, 58 F.4th 764, 768–69 (3d Cir. 2023); *United States v. Ward*, 972 F.3d 364, 372 (4th Cir. 2020); *United States v. Jones*, 81 F.4th 591, 599 (6th Cir. 2023); *United States v. Ruth*, 966 F.3d 642, 654 (7th Cir. 2020); *United States v. Henderson*, 11 F.4th 713, 718 (8th Cir. 2021); *United States v. Jones*, 15 F.4th 1288, 1291 (10th Cir. 2021). But two circuits have held that the meaning of "controlled substance" is limited to drugs regulated by the federal Controlled Substances Act, even for state-law convictions. See *United States v. Townsend*, 897 F.3d 66, 74–75 (2d Cir. 2018); *United States v. Bautista*, 989 F.3d 698, 702 (9th Cir. 2021); *see also United States v. Crocco*, 15 F.4th 20, 23 (1st Cir. 2021) (describing, in dicta, this federal-law-only approach as "appealing" and the majority approach as "fraught with peril"); *United States v. Gomez-Alvarez*, 781 F.3d 787, 793–94 (5th Cir. 2015) (adopting a federal-law-only approach to define "controlled substance" under section 2L1.2(b)(A)(i) of the Sentencing Guidelines).

We adopt the majority approach. A drug regulated by state law is a "controlled substance" for state predicate offenses, even if federal law does not regulate that drug. More precisely, *state law* defines which drugs qualify as a "controlled substance" if the prior conviction was under state law, and *federal law* defines which drugs qualify as a "controlled substance" if the prior conviction was under federal law. This approach is compelled by the text of the guidelines and our precedent.

We begin with the text. "When interpreting the guidelines, we apply the traditional rules of statutory construction." *United States v. Stines*, 34 F.4th 1315, 1318 (11th Cir. 2022) (citation and internal quotation marks omitted). And "in every statutory-interpretation case, we start with the text—and, if we find it clear, we end there as well." *Heyman v. Cooper*,

[31 F.4th 1315, 1318 (11th Cir. 2022)](#) (citation and internal quotation marks omitted). The text of the guidelines makes clear that a "controlled substance" includes a substance that is regulated only by the law of the state of conviction.

Although the guidelines do not define "controlled substance," they define "controlled substance offense" broadly to include "an offense under federal *or state* law." [U.S.S.G. § 4B1.2(b)](#) (emphasis added). As a matter of ordinary language, if state law can define what qualifies as a controlled substance offense, "it follows that it can also define what drugs are controlled substances." [Lewis, 58 F.4th at 769](#).

Moreover, [section 4B1.2(b)](#) does not expressly reference the federal Controlled Substances Act in its definition of controlled substance offense. See [U.S.S.G. § 4B1.2(b)](#) ("an offense under federal or state law ... that ... prohibits ... the possession of a controlled substance (or a counterfeit substance) with intent to ... distribute"). This omission is notable because "the Guidelines often do cross-reference the United States Code in that way." [Lewis, 58 F.4th at 769](#). Indeed, the immediately preceding provision does so when defining "crime of violence." See [U.S.S.G. § 4B1.2(a)(2)](#) ("any offense under federal or state law ... that ... is ... the use or unlawful possession of a firearm *described in* [26 U.S.C. [section] 5845(a)](#) or explosive material *as defined in* [18 U.S.C. [section] 841(c)](#)" (emphasis added)). "With this definition, the Sentencing Commission demonstrated that it knew how to" define state offenses by reference to federal law "when it meant to do so." See [Dupree, 57 F.4th at 1278](#); accord [Ruth, 966 F.3d at 651](#) ("The Sentencing Commission clearly knows how to cross-reference federal statutory definitions when it wants to."). But it did not do so here. We must respect the Commission's decision to "use[ ] particular language in one section but omit[ ] it in another." [Dupree, 57 F.4th at 1278](#) (alterations adopted) (quoting [Dep't of Homeland Sec. v. MacLean, 574 U.S. 383, 391, 135 S.Ct. 913, 190 L.Ed.2d 771 (2015)](#)). "This 'interpretive canon applies with particular force' where," as here, "the provision that includes specific language is in 'close proximity' to the provision that excludes it." [Id.](#) (alterations adopted) (quoting [MacLean, 574 U.S. at 392,](#)

135 S.Ct. 913) (referring to [section 4B1.2(b) and section 4B1.2(a)](#) as "sister subsections").

**\*9** Our precedent supports our rejection of the federal-law-only approach. We have held that a state statute need not include the same elements as a generic "federal analogue[ ]" crime to constitute a controlled substance offense because "the sentencing guidelines d[o] not define 'controlled substance offense' by reference to those analogues." [United States v. Pridgeon, 853 F.3d 1192, 1198 (11th Cir. 2017)](#) (citing [United States v. Smith, 775 F.3d 1262, 1268 (11th Cir. 2014)](#)). And the identity of "marijuana" as the substance possessed is undoubtedly an element of Dubois's statute of conviction, which criminalizes "possess[ion] with intent to distribute *marijuana*." [GA. CODE § 16-13-30(j)(1)](#) (2013) (emphasis added).

The two sister-circuit decisions adopting the federal-law-only approach do not persuade us. The Second Circuit selected that rule by relying on the presumption that "the application of a federal law does not depend on state law." [Townsend, 897 F.3d at 71](#) (citing [Jerome v. United States, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943)](#) ("[W]e must generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law.")). But that presumption is overcome by the plain text of [section 4B1.2(b)](#), which defines "controlled substance offense" with express reference to state law. *E.g.,* [Lewis, 58 F.4th at 769](#).

Nor are we swayed by the reasoning of the Ninth Circuit that our approach undermines the guidelines' "goal[ ]" of uniformity. See [Bautista, 989 F.3d at 702](#); U.S.S.G. ch.1, pt. A, intro. cmt. 1.3 (explaining that one of Congress's "objectives" in enacting the Sentencing Reform Act of 1984 was to create "reasonable uniformity in sentencing"). Although we have cited the guidelines' goal of sentencing uniformity, we have cautioned that this goal cannot "alone justify" a particular interpretation of a guideline and cannot "be used to contradict the [guideline's] text." See [United States v. Bryant, 996 F.3d 1243, 1257–58 (11th Cir. 2021)](#) (citation and internal quotation marks omitted); *see also* [Est. of Keeter v. Comm'r of Internal Revenue, 75 F.4th 1268, 1281 (11th Cir. 2023)](#) (stating that "we are not at liberty" to "override" plain text by recourse to "broad

purposes" (citation and internal quotation marks omitted)). In any event, as another circuit has explained, "the sentencing goal of uniformity is illusory" in this context because both approaches yield some differential treatment between similarly situated defendants. *See* *Lewis*, 58 F.4th at 770 (explaining how "uniformity is unattainable" under any interpretation).

Because Dubois's underlying conviction was under Georgia law, we consult Georgia law to determine whether the substance that he trafficked is a "controlled substance" under the guidelines. We recognize that the Georgia and federal definitions of "marijuana" were the same at all relevant times: both definitions included hemp at the time of Dubois's state conviction but excluded it at the time of his federal sentencing. But we reject the parties' suggestion that we need not decide which sovereign's law controls to decide this appeal. As our following discussion illustrates, our answer to this "whose law" question informs our answer to the "what time" question that follows.

2. "Controlled Substance" is Defined by the Law in Effect at the Time of the Prior State Conviction.

Next, we must decide whether the guideline definition of "controlled substance offense" incorporates the state drug schedules in effect when Dubois was convicted of his state drug offense or the version in effect when he was sentenced for his federal firearm offense. We presume under the categorical approach that Dubois was convicted for trafficking hemp, which the parties agree was the least culpable conduct criminalized. So if district courts must look to the time of conviction, the district court correctly concluded that Dubois's 2013 Georgia marijuana conviction is a "controlled substance offense" under the guidelines because hemp was a controlled substance under Georgia law at that time. But if district courts must instead look to the time of sentencing, hemp's delisting from the state drug schedules before sentencing means that Dubois's 2013 conviction is not a controlled substance offense and that the enhancement was improper.

**\*10** Our sister circuits are split on this timing question. Three have adopted a time-of-state-conviction approach. *See* *Lewis*, 58 F.4th at 771; *United States v. Clark*, 46 F.4th 404, 406 (6th Cir. 2022), *cert. denied*, ––– U.S. ––––, 144 S. Ct. 107, 217 L.Ed.2d 29 (2023); *United States v.* *Perez*, 46 F.4th 691, 703 (8th Cir. 2022). Two others follow a time-of-federal-sentencing approach. *See* *United States v. Abdulaziz*, 998 F.3d 519, 524 (1st Cir. 2021); *Bautista*, 989 F.3d at 703; *see also* *United States v. Gibson*, 55 F.4th 153, 159, 166 (2d Cir. 2022) (concluding that a time-of-sentencing rule is "more appropriate" but declining to decide whether "the district court should consult the [Controlled Substances Act] version at the time of the defendant's current offense or the version at the time of his sentencing for this offense, since the controlled substance schedules were narrower than state law at both times"), *adhered to on reh'g*, 60 F.4th 720 (2d Cir. 2023).

We adopt a time-of-state-conviction rule: the term "controlled substance," *see* U.S.S.G. §§ 2K2.1(a)(4)(A), 4B1.2(b), means a substance regulated by state law when the defendant was convicted of the state drug offense, even if it is no longer regulated when the defendant is sentenced for the federal firearm offense. This rule follows from the text of the guidelines and Supreme Court precedent.

We begin again with the text. The guideline assigns the defendant a base offense level of 20 if he "committed any part of the instant offense subsequent to sustaining one felony conviction of ... a controlled substance offense." *Id.* § 2K2.1(a)(4)(A). The phrase "subsequent to" supports a backward-looking approach in defining the contents of the prior state conviction because that phrase "direct[s] the court's attention to events that occurred in the past." *Clark*, 46 F.4th at 409. True, the guideline defining "controlled substance offense" includes present-tense language: it refers to a felony offense "that *prohibits* ... the possession of a controlled substance ... with intent to ... distribute." U.S.S.G. § 4B1.2(b) (emphasis added). But as the Supreme Court has explained in a similar context, an ordinary reader would understand that the guideline refers to a conviction that occurred in the past and that the definition provision "use[s] the present tense to refer to [that] past conviction[ ]." *See* *McNeill v. United States*, 563 U.S. 816, 822, 131 S.Ct. 2218, 180 L.Ed.2d 35 (2011). Defining an earlier conviction by reference to laws that did not exist at the time of that conviction would be an unusual interpretation of this ordinary language.

The Supreme Court's decision in *McNeill* supports this interpretation. *McNeill* involved "a closely related question" under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). *Clark,* 46 F.4th at 409. The Act imposes a 15-year mandatory minimum sentence for a person convicted of a federal firearm offense who "has three previous convictions" of a "serious drug offense." 18 U.S.C. § 924(e)(1). A "serious drug offense" includes "an offense under State law, involving ... possessing with intent to ... distribute[ ] a controlled substance ... for which a maximum term of imprisonment of ten years or more is prescribed by law." *Id.* § 924(e)(2)(A)(ii). McNeill argued that his prior state drug convictions were not "serious drug offenses" because the state had lowered the maximum penalty for those offenses after he was convicted. *McNeill,* 563 U.S. at 818, 131 S.Ct. 2218.

The Supreme Court unanimously held that the "plain text" of the Armed Career Criminal Act requires sentencing courts to consider the maximum penalties in place at the time of the state conviction, not those in place at the time of the federal firearms sentencing. *Id.* at 820, 131 S.Ct. 2218. The Court reasoned that the phrase "previous convictions" in the Act calls for a "backward-looking" inquiry, answerable only by "consult[ing] the law that applied at the time of that conviction." *Id.* And the Court explained that the "[u]se of the present tense in the definition of 'serious drug offense' "—which refers to a maximum penalty that "*is* prescribed by law"—"does not suggest otherwise." *Id.* (emphasis added). The "natural reading" of the text clearly "is concerned with convictions that have already occurred"; Congress "used the present tense to refer to past convictions." *Id.* at 820, 822, 131 S.Ct. 2218. It would be "absurd," the Court explained, to permit "subsequent changes in state law [to] erase an earlier conviction" under the Act. *Id.* at 822–23, 131 S.Ct. 2218. That interpretation would also yield "dramatically different federal sentences" for defendants "who violated [ section] 922(g) on the same day and who had identical criminal histories" based "solely" on the happenstance of their federal sentencing dates. *Id.* at 823, 131 S.Ct. 2218. The time-of-state-conviction approach, in contrast, promotes fair notice and uniformity by allowing "a defendant to know even before he violates [ section] 922(g) whether [the Act] would apply." *Id.* Although this interpretation of the Armed Career Criminal Act does not bind our interpretation of the guidelines, *McNeill*'s analysis "is nonetheless instructive" because the two provisions are similar. *See United States v. Patton,* 114 F.3d 174, 177 (11th Cir. 1997); *cf. United States v. Fritts,* 841 F.3d 937, 940 n.4 (11th Cir. 2016) ("Because the relevant parts of the definition of 'violent felony' under the [Armed Career Criminal Act] and 'crime of violence' under the Sentencing Guidelines are identical, this Court often considers cases interpreting the language in the Sentencing Guidelines as authority in cases interpreting the language in the [Act].").

**\*11** The four reasons that led the Supreme Court in *McNeill* to adopt a time-of-state-conviction approach under the Armed Career Criminal Act apply readily to our interpretation of the Sentencing Guidelines. First, just as the phrase "previous convictions" in the Act requires a backward-looking approach in defining "controlled substance" under the Act, the phrase "subsequent to sustaining one felony conviction" in the guidelines requires a backward-looking approach in defining "controlled substance" under the guidelines. Second, just as the present-tense phrase "is prescribed by law" does not change that result under the Armed Career Criminal Act, the present-tense term "prohibits" does not change it under the guidelines either. Third, just as "[i]t cannot be correct that subsequent changes in state law can erase an earlier conviction" under the Act, *McNeill,* 563 U.S. at 823, 131 S.Ct. 2218, it cannot be correct that later changes in state law can erase an earlier conviction under the guidelines. Finally, because the Supreme Court declined to adopt an approach under the Act that would make its "applicability depend on the timing of the federal sentencing proceeding," *id.,* we decline to adopt such an approach under the guidelines.

The circuits that have adopted a time-of-federal-sentencing interpretation bypassed *McNeill*'s reasoning on a ground not applicable here. Those circuits all applied the federal-law-only approach for defining which drugs are controlled substances under the guidelines. *See Bautista,* 989 F.3d at 702; *Abdulaziz,* 998 F.3d at 523 & n.2 (applying the federal-law-only approach because the government forfeited, by not timely raising, the argument

that a state-law approach applied); *see also Gibson, 55 F.4th at 164*. Having selected that approach, the issue before those courts became which version of the *federal* drug schedules courts must consult to determine whether a prior drug conviction involved a "controlled substance." The question in *McNeill* was different, these courts reasoned, because it involved an intervening change in *state law*, not federal law. *Bautista*, 989 F.3d at 703 ("Unlike in *McNeill*, the state law in our case has not changed. Rather, federal law has changed."); *Gibson*, 55 F.4th at 162 ("[T]he focus [in *McNeill*] was not on federal law but only on North Carolina law."); *Abdulaziz*, 998 F.3d at 530 ("[I]n *McNeill*, the Court did not consider —because it had no occasion to consider—the issue of what temporal version of the *federal* drug schedules was relevant."). Putting aside whether that distinction warrants a departure from *McNeill*'s reasoning, the distinction is absent here. Because we hold that *state law* defines which drugs are controlled substances for state predicate offenses, the focus here, as in *McNeill*, is state law. And Dubois's arguments for applying a time-of-sentencing rule run headlong into *McNeill*.

To sum up, we hold that a "controlled substance" under section 4B1.2(b)'s definition of "controlled substance offense" is, for prior state offenses, a drug regulated by state law at the time of the conviction, even if it is not federally regulated, and even if it is no longer regulated by the state at the time of federal sentencing. Because Georgia law regulated marijuana—including hemp—at the time of Dubois's 2013 conviction, the district court did not err by enhancing Dubois's base-offense level under section 2K2.1(a)(4)(A).

*D. Our Precedent Bars Dubois's Challenge to the Stolen-Gun Enhancement.*

The district court enhanced Dubois's base offense level under the guidelines after finding that one of the guns he possessed had been stolen. *See* U.S.S.G. § 2K2.1(b)(4)(A) ("If any firearm ... was stolen, increase by 2 levels."). We have held that this enhancement does not require proof that the defendant *knew* that the gun was stolen. *See United States v. Richardson*, 8 F.3d 769, 770 (11th Cir. 1993) ("The provisions of [section] 2K2.1(b)(4) are not ambiguous; there is clearly no mens rea requirement."); *accord United States v. Holden*, 61 F.3d 858, 860 (11th Cir. 1995). Dubois argues that the guideline's lack of a mens rea element violates his Fifth Amendment right to due process. But we rejected that argument in *Richardson*: "the lack of a mens rea element in the sentencing enhancement for possession of a stolen firearm does not offend due process because [section] 2K2.1(b)(4) does not create a crime separate and apart from the underlying felony." 8 F.3d at 770.

**\*12** Dubois acknowledges that our precedent bars his challenge, but he asks us to "revisit" and "overturn" it in the light of *Kisor v. Wilkie*, ––– U.S. ––––, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019). *Kisor* holds that courts may not give controlling deference to an agency's interpretation of its own regulation unless the regulation is "genuinely ambiguous." *Id.* at 2414. And we have extended this rule to commentary interpreting the Sentencing Guidelines. *Dupree*, 57 F.4th at 1276. The commentary to the stolen-gun guideline states that the enhancement applies "regardless of whether the defendant knew or had reason to believe that the firearm was stolen." U.S.S.G. § 2K2.1 n.8(B). Dubois argues that deference to this commentary violates *Kisor* because the commentary "impermissibly expands the application of the guideline" beyond its plain meaning.

Dubois attacks a strawman. *Richardson* did not mention the commentary to the stolen-gun enhancement—the decision rested only on the guideline's text, which this Court held was "not ambiguous" and "clearly" imposed "no mens rea requirement." 8 F.3d at 770. It is true that our later decision in *Holden* cites both *Richardson* and the challenged commentary when reiterating that "knowledge that [the gun] is stolen property is not a prerequisite to the application of [section] 2K2.1(b)(4)." *Holden*, 61 F.3d at 860. But the *Holden* Court did not purport to give the commentary "controlling weight," so that decision does not implicate *Kisor*'s limitations on *Auer* deference. *See Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1179 (11th Cir. 2021). Even if it had, to the extent that *Holden*'s reasoning departs from

*Richardson*'s, *Richardson*'s controls. *See MacPhee v. MiMedx Grp.*, 73 F.4th 1220, 1250 (11th Cir. 2023) (under the "earliest case" rule, when prior panel precedents conflict, the earlier case controls (citation and internal quotation marks omitted)); *Thompson v. Alabama*, 65 F.4th 1288, 1301 (11th Cir. 2023) (a later panel is bound by "the reasoning" of "the first panel's ruling" (citation and internal quotation marks omitted)). We affirm the application of the stolen-gun enhancement.

### E. The District Court did Not Plainly Err by Imposing a Fine.

Dubois's final challenge is to the district court's imposition of a low-end $25,000 fine. He argues that he is unable to pay the fine and that the district court was required to, but did not, provide reasons for imposing it. We reject his challenge and affirm the fine.

The guidelines require the district court to impose a fine in every case, unless "the defendant establishes" that he is presently unable to pay a fine and will not likely become able to pay one in the future. U.S.S.G. § 5E1.2(a). If the defendant fails to prove present and future inability to pay, the district court must impose a fine, *see id.*, and will consider eight factors to determine the appropriate amount, *see id.* § 5E1.2(d). But if "the defendant did not object to the fine at sentencing," the sentencing court is "not require[d] ... to make specific findings of fact with respect to the Sentencing Guideline factors"; we will affirm if "the record support[s] the fine." *See United States v. Gonzalez*, 541 F.3d 1250, 1256 (11th Cir. 2008) (citation and internal quotation marks omitted); *Hernandez*, 160 F.3d at 665–66 (affirming fine, despite presentence investigation report finding that "the defendant does not have the ability to pay a fine," because the defendant did not object to the fine at sentencing and "the record suggest[ed] that [he] may be able to pay" it).

Although we ordinarily review for clear error a finding that a defendant can afford a fine, *see United States v. McGuinness*, 451 F.3d 1302, 1307 (11th Cir. 2006), we review only for plain error if the defendant fails to object on the basis of his inability to pay the fine, *see Hernandez*, 160 F.3d at 665. To preserve clear-error review, an objection must be specific enough to "adequately apprise[ ] the trial court of the true basis for [the] objection." *United States v. Williford*, 764 F.2d 1493, 1502 (11th Cir. 1985) (citation and internal quotation marks omitted). So "a general objection or an objection on other grounds will not suffice." *United States v. Gallo-Chamorro*, 48 F.3d 502, 507 (11th Cir. 1995). Nor will "vague reference[s] to [the] concern." *Williford*, 764 F.2d at 1502. The defendant also must "specifically and clearly object" to any disputed facts listed in the presentence investigation report; otherwise, those facts are deemed admitted, and the district court is entitled to rely on them at sentencing. *United States v. Corbett*, 921 F.3d 1032, 1043 (11th Cir. 2019) (citation and internal quotation marks omitted).

**\*13** Dubois failed to object on the basis of his inability to pay the fine in response to the presentence investigation report or during his sentencing hearing, so we review his objection for plain error. In his objections to the report, Dubois did not challenge the probation officer's assertion that he could afford a fine of up to $250,000. Nor did he challenge any of the findings about his assets, liabilities, income, or ability to work for pay while incarcerated. And during the sentencing hearing, defense counsel made only a vague, general objection—challenging both the fine and sentence as "substantively unreasonable." "This abstract and general objection did not inform the district court of [Dubois]'s specific objections to [the fine], and [Dubois] thereby deprived the court of the opportunity to consider (and if necessary correct) them." *See United States v. Carpenter*, 803 F.3d 1224, 1238 (11th Cir. 2015). Dubois's counsel never argued that Dubois could not afford to pay the fine or otherwise asked the district court for " 'further findings with respect to the fine.' " *Gonzalez*, 541 F.3d at 1256 (quoting *Hernandez*, 160 F.3d at 666). These challenges, which Dubois raises for the first time on appeal, are not challenges to the substantive reasonableness of the fine. *See United States v. Bradley*, 644 F.3d 1213, 1304 (11th Cir. 2011) (explaining that the defendant's inability to pay a fine does not make it "substantively unreasonable"); *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) (explaining that challenging the district court's "fail[ure] to adequately explain the chosen sentence" challenges the sentence's *procedural* reasonableness, not its *substantive* reasonableness).

The district court did not plainly err by imposing a $25,000 fine without explanation because the record contains unchallenged evidence of Dubois's ability to pay it. *See* [Hernandez, 160 F.3d at 665–66](). Even on appeal, Dubois does not dispute the probation officer's findings that Dubois had a total net worth of over $54,000 (more than double the fine amount), that he had an additional monthly income of over $3,000, or that he was "able-bodied and could work while in custody to make minimal payments towards any fine." Nor does he dispute that he failed to respond to the probation officer's request for financial information, which we have said may support the inference that the defendant is concealing additional assets. *See, e.g.*, [id. at 666]() (stating that a defendant's "unwillingness to answer specific questions concerning his financial dealings put to him by the probation officer who prepared the [presentence investigation report] may permit the inference that he is still concealing assets"). The district court was permitted to rely on this undisputed record evidence to find that Dubois could pay a $25,000 fine.

## IV. CONCLUSION

We **AFFIRM** Dubois's convictions and sentence.

[Rosenbaum](), Circuit Judge, joined by [Abudu](), Circuit Judge, Concurring:

I concur in today's decision, including the conclusion that we must look to state law at the time of the prior conviction to determine whether, under [U.S.S.G. § 2K2.1(a)(4)(A)](), the defendant has a prior conviction that qualifies him for a sentencing enhancement. I reach this conclusion because the combination of the text of [U.S.S.G. § 2K2.1(a)(4)(A)]() and the Supreme Court's reasoning in [McNeill v. United States, 563 U.S. 816, 131 S.Ct. 2218, 180 L.Ed.2d 35 (2011)](), compel it.

That said, I write separately for two reasons. First, I explain that today's approach is correct regardless of the Supreme Court's forthcoming decisions in *Jackson v. United States*, No. 22-6640, and *Brown v. United States*, No. 22-6389. Second, I identify two policy reasons in favor of revising the Sentencing Guidelines to take a time-of-sentencing approach.

*A. No matter how the Court rules,*
Jackson *and* Brown *are distinguishable.*

I begin with a brief discussion of *Jackson* and *Brown*. I then explain that, however the Court rules, those decisions are unlikely to alter our conclusion that Dubois's state conviction is a "controlled substance offense" under the Sentencing Guidelines.

Both *Jackson* and *Brown* concerned the definition of "serious drug offense" in the Armed Career Criminal Act ("ACCA"), [18 U.S.C. § 924(e)](). Under that definition, a prior state offense qualifies as a "serious drug offense" if it is

> an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (*as defined in section 102 of the Controlled Substances Act* ([21 U.S.C. § 802]())), for which a maximum term of imprisonment of ten years or more is prescribed by law.

\*14 [18 U.S.C. § 924(e)(2)(A)(ii)]() (emphasis added).

Jackson challenged his ACCA enhancement, asserting that his prior cocaine-related state convictions did not qualify as "serious drug offenses." [*United States v. Jackson*, 55 F.4th 846, 850 (11th Cir. 2022)](), *cert. granted*, ––– U.S. ––––, 143 S. Ct. 2457, 216 L.Ed.2d 430 (2023). Jackson argued that his prior cocaine-related state conviction was categorically overbroad because the state's definition of "cocaine" was broader than the federal definition at the time of his federal firearm offense. [*Id.* at 851](). We rejected this argument, holding that the definition of "serious drug offense" incorporates the version of the federal Controlled Substances Act ("CSA") in effect at the time of the defendant's prior state drug conviction, not the version in effect at the time of the later federal firearm offense or sentencing. [*Id.* at 849](). Like today's decision, we relied heavily on [*McNeill*]() and its proclamation that ACCA requires a ' "backward-looking' inquiry" so as not to "erase an earlier [state] conviction for ACCA purposes." [*Id.* at 855–56]() (alteration in original) (quoting [*McNeill*, 563 U.S. at 820, 823, 131 S.Ct. 2218]()).

Similarly, Brown challenged his ACCA enhancement based on a prior state marijuana conviction. United States v. Brown, 47 F.4th 147, 148 (3d Cir. 2022), *cert. granted*, --- U.S. ----, 143 S. Ct. 2458, 216 L.Ed.2d 430 (2023). He asserted that his prior state offense no longer qualified as a "serious drug offense" after Congress amended the federal CSA to remove hemp from the definition of "marijuana." *Id.* The Third Circuit applied the federal CSA in effect when Brown committed his federal offense, not at the time of his prior state conviction or at the time of federal sentencing. *Id.* at 155.

The Supreme Court granted certiorari to resolve this timing question—whether a sentencing court applies the federal CSA at the time of the prior state conviction, federal firearm offense, or federal sentencing when imposing an ACCA enhancement.

Unlike *Jackson* and *Brown*, Dubois's case arises under the Sentencing Guidelines, not under ACCA. And that makes all the difference, if the Supreme Court concludes in *Jackson* and *Brown* that ACCA's definition of "serious drug offense" requires courts to consider the federal controlled-substances lists applicable at the time of the federal firearm offense (or sentencing) rather than at the time of the prior state offense.

ACCA defines the term "controlled substance" with express reference to the federal CSA. *See* 18 U.S.C. 924(e)(2)(A)(ii) (defining "serious drug offense" as "an offense under State law, involving ... a controlled substance (**as defined in section 102 of the Controlled Substances Act (**21 U.S.C. 802**)**" (emphasis added). During the *Jackson* and *Brown* oral arguments, the Supreme Court homed in on this part of the definition of "serious drug offense." In particular, the Justices posited that, by referencing the CSA by name, Congress may have intended for ACCA's definition of "serious drug offense" to incorporate only those substances appearing on the federal controlled-substances lists at the time of the federal firearms offense (or federal sentencing). *See* Transcript of Oral Argument at 57, *Jackson*, No. 22-6640 (U.S. argued Nov. 27, 2023) (Gorsuch, J.) ("[N]ormally when we have a cross-reference, we look at the contemporaneous version of the cross-reference."); *id.* at 56 (Sotomayor, J.) ("[W]hen you're cross-referencing something, you're taking everything with it"."); *id.* at 69 (Jackson, J.) ("Do you concede that a change in the drug schedules reflects a change in what is considered to be a serious drug offense?"); *id.* at 86 (Thomas, J.) (a change to the federal CSA "seems to be in effect an amendment of ACCA"); *id.* at 74–75 (Kagan, J.) (similar).

**\*15** In other words, by expressly referencing the CSA and incorporating its definition of "controlled substance" into ACCA, Congress intended that ACCA would effectively be amended every time that Congress amended the CSA (or the Attorney General updated the CSA lists [1]). So to trigger an ACCA enhancement, a defendant's prior state drug conviction would have to involve a substance on the federal controlled-substances lists at the time of the federal firearm offense (or federal sentencing). And if it did not, that prior state conviction could not qualify under ACCA as a "serious drug offense."

But the text of ACCA's definition of "serious drug offense" and the Guidelines' definition of "controlled substance offense" differ in three important ways that make any such holding in *Jackson* and *Brown* inapplicable to the Sentencing Guidelines context.

First, unlike ACCA, section 4B1.2(b) does not cross-reference the federal CSA (or any other specific law, for that matter) or otherwise define "controlled substance." *Compare* 18 U.S.C. § 924(e)(2)(A)(ii) *with* U.S.S.G. § 4B1.2(b). Rather, the guideline refers generally to only "an offense **under federal or state law** ... that [involves] ... **a controlled substance** ...." U.S.S.G. § 4B1.2(b) (emphasis added). This differs from ACCA, which directs that a "controlled substance" is what the federal CSA says it is, no matter how state law defines it. Under the guideline, though, for the reasons Chief Judge Pryor explains in the panel opinion, we must look to state law to discern the meaning of "controlled substance" with respect to a state conviction.

Because the guideline lacks a cross-reference to another specified law, it does not provide the same basis that ACCA's text may for us to adopt the meaning of "controlled substance" at the time of the federal firearm offense (or federal sentencing).

Second, while Congress can amend the federal CSA (and thus effectively ACCA) at any time, it cannot amend state drug schedules. Nor can the federal Sentencing Commission.

So Congress's amendment of the federal CSA or any other federal law [2] doesn't allow us to conclude that a newer version of state controlled-substances lists govern.

Nor can states amend the federal Sentencing Guidelines. So it makes little sense to condition application of the federal Guidelines on changes in state law if the text of the guideline in question does not otherwise require it.

Third, because the Guidelines lack any statutory cross-reference—and that is the only material difference between ACCA's definition of "serious drug offense" the Guidelines' definition of "controlled substance offense"—nothing allows us to persuasively distinguish *McNeill*. *McNeill* requires us to look to the state's penalty for the prior state offense at the time of the prior state conviction, not at the time of the federal firearm offense (or federal sentencing), if the state has amended that penalty. *563 U.S. at 825, 131 S.Ct. 2218*. That's so because the term "previous convictions" in ACCA directs a "backward-looking" inquiry, and "subsequent changes in state law [do not] erase an earlier conviction." *Id. at 820, 823, 131 S.Ct. 2218*.

**\*16** In the same way, section 2K2.1(a)(4) requires a backward-looking inquiry by directing courts to consider whether "the defendant committed any part of the [federal firearm] offense ***subsequent to sustaining***" a felony "controlled substance" conviction. U.S.S.G. § 2K2.1(a)(4) (emphasis added). The guideline's plain text aligns it with *McNeill* and distinguishes it from *Jackson*, however the Supreme Court rules.

Indeed, if the Supreme Court upholds our ruling in *Jackson*, then as in that case, *McNeill* drives the answer here. The only material difference between *Jackson* and Dubois's fact patterns is that Jackson's sentence was enhanced under ACCA, and Dubois's was enhanced under the Sentencing Guidelines. So if *McNeill*'s reasoning controls *Jackson*—even considering ACCA's statutory cross-reference—it must likewise dictate the outcome here, where there is no cross-reference.

But if the Supreme Court reverses *Jackson*—holding that ACCA's express reference to the CSA requires us to consult the CSA as it existed at the time of the federal offense (or federal sentencing)—that reasoning doesn't translate to the Guidelines context because the Guidelines lack an express cross-reference to another statute. So whatever the Supreme Court may decide about ACCA's unique text and the question of which version of the *federal* CSA governs under it, that decision does not bear on the distinct question of which version of the state's controlled-substances lists governs in the Guidelines context. See *Jackson*, 55 F.4th at 856 n.7 (quoting *Brown*, 47 F.4th at 154) ("longstanding principles of statutory interpretation allow different results under the Guidelines as opposed to under the ACCA").

In short, *McNeill* and the text of the Guidelines require us to conclude that Dubois's state marijuana conviction remains a "controlled substance offense" under the Sentencing Guidelines even if it would not qualify as a "serious drug offense" under ACCA. So I concur in today's judgment.

*B. The Sentencing Commission should consider revising the guidelines to take a time-of-sentencing approach.*

As I've explained, I believe that our holding today is legally compelled. But at least two policy reasons suggest that the Sentencing Commission may wish to revisit the guidelines' definition of "controlled substance offense."

First, as the First Circuit has pointed out, "[a] guideline's enhancement for a defendant's past criminal conduct—such as the enhancement that [U.S.S.G.] § 2K2.1(a)(4)(A) imposes—is reasonably understood to be based in no small part on a judgment about how problematic that past conduct is when viewed as of the time of the sentencing itself." *United States v. Abdulaziz*, 998 F.3d 519, 528 (1st Cir. 2021). So when the state that criminalized the conduct underlying the defendant's prior conviction determines that conduct no longer warrants treatment as a criminal offense, that is evidence that the state no longer views the underlying conduct as problematic. [3] As a result, it undercuts the basis for enhancing the defendant's sentence based on his prior conviction for that conduct.

**\*17** Second, whether or not section 2K2.1(a)(4)(A)'s enhancement applies, the criminal-history axis already

captures the prior sentence. *See id.* (citing U.S.S.G. § 4A1.1(a)–(c); ch. 5, pt. A). The criminal-history axis was designed specifically, at least in part, to send "a clear message ... to society that repeated criminal behavior will aggravate the need for punishment with each recurrence." U.S. Sent'g Guidelines Manual ch. 4, pt. A, introductory cmt. (U.S. Sent'g Comm'n 2018). In other words, the criminal-history axis considers that a defendant has more than once participated in conduct criminal at the time that the defendant engaged in it.

Besides that, even without the guideline's enhancement, the sentencing judge retains the discretion to account further for the defendant's criminal history at sentencing. *See Abdulaziz*, 998 F.3d at 528. But as section 2K2.1(a)(4)(A) stands, it tethers the guidelines calculation—the starting place for all sentences—to a state's legislative judgment of the past, even if the state legislature has since retracted that judgment. So it can result in a defendant serving a longer prison sentence based only on conduct that is no longer a crime. A defendant's liberty should not depend on a "quirk of timing." *Abdulaziz*, 998 F.3d at 529.

In my view, these circumstances provide good reason for the Sentencing Commission to consider expressly whether section 2K2.1(a)(4)(A) should apply to prior convictions that would not qualify as predicate crimes under the law as it exists at the time of sentencing. And if the Supreme Court takes a time-of-sentencing approach in *Brown* and *Jackson*, the Sentencing Commission may especially want to do so for the sake of consistency. But, again, regardless of those potential developments, Dubois's state marijuana conviction remains a "controlled substance offense" under the sentencing guidelines, and the district court's sentencing enhancement was proper.

**All Citations**

--- F.4th ----, 2024 WL 927030

---

**Footnotes**

1     The Controlled Substances Act authorizes the Attorney General to "remove any drug or other substance from the schedules if he finds that the drug or other substance does not meet the requirements for inclusion in any schedule." 21 U.S.C. § 811(a); *see also id.* § 812 n.1 ("Revised schedules are published in the Code of Federal Regulations, Part 1308 of Title 21, Food and Drugs.").

2     Of course, Congress could adopt alterations to U.S.S.G. § 4B1.2(b) or § 2K2.1(a)(4)(A) itself that expressly incorporate any state updates to their controlled-substances lists. But that did not happen here.

3     For instance, as of last year, twenty-three states have legalized small amounts of marijuana for recreational use, and others have acted to reduce or eliminate penalties for drug use and possession. *See* Michael Hartman, *Cannabis Overview*, Nat'l Conf. of State Legislatures (Nov. 8, 2023), https://perma.cc/S2PM-52Q8.

---

**End of Document**     © 2024 Thomson Reuters. No claim to original U.S. Government Works.