**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

FILED

JUL 17 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.   22-50048 |
| Plaintiff-Appellee, | |
| v. | D.C. No. 2:20-cr-00387-AB-1<br>Central District of California,<br>Los Angeles |
| STEVEN DUARTE, AKA Shorty, | |
| Defendant-Appellant. | **ORDER** |

**MURGUIA**, Chief Judge:

Upon the vote of a majority of nonrecused active judges, it is ordered that this case be reheard en banc pursuant to Federal Rule of Appellate Procedure 35(a) and Circuit Rule 35-3.  The three-judge panel opinion is vacated.

FILED

JUL 17 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*United States v. Duarte*, No. 22-50048

VANDYKE, Circuit Judge, dissenting from the grant of rehearing en banc:[1]

"What would you do if you were stuck in one place and every day was exactly the same, and nothing that you did mattered?" In the Ninth Circuit, if a panel upholds a party's Second Amendment rights, it follows automatically that the case will be taken en banc. This case bends to that law. I continue to dissent from this court's Groundhog Day approach to the Second Amendment.

Following the Supreme Court's recent decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the federal government acquiesced in certiorari in a handful of cases pending before the Court and presenting the same question addressed in this case.[2] The Supreme Court should have granted one or more of those cases, and this

---

[1] While dissentals are more common, judges on both this and other courts have, on occasion, penned dissents from the *grant* of en banc review. *See, e.g.*, *Feldman v. Ariz. Sec'y of State's Off.*, 841 F.3d 791, 794 (9th Cir. 2016) (O'Scannlain, J., dissenting from the grant of rehearing en banc); *United States v. Bowen*, 485 F.2d 1388, 1388 (9th Cir. 1973) (Chambers, J., same); *United States v. Seale*, 550 F.3d 377, 377 (5th Cir. 2008) (Smith, J., same). These disgrantles are understandably rare because in every circuit other than ours en banc rehearing involves the full court, where any active judge disagreeing with the court's decision to rehear the case may ultimately express that disagreement in the en banc decision itself. But because the Ninth Circuit's peculiar en banc procedures do not guarantee participation in the en banc panel to all active judges, a disgrantle is the only guaranteed way a judge on this court can publicly explain why it was inappropriate for our court to take a particular case en banc.

[2] Supplemental Brief for the Federal Parties, *Garland v. Range*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024); *Vincent v. Garland*, No. 23-683, 2024 WL 3259668 (U.S. July 2, 2024); *Jackson v. United States*, No. 23-6170, 2024 WL 3259675 (U.S. July 2, 2024); *Cunningham v. United States*, No. 23-6602, 2024 WL

case illustrates why. After *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), perhaps no single Second Amendment issue has divided the lower courts more than the constitutionality of the 18 U.S.C. § 922(g)(1) felon-disarmament rule's application to certain nonviolent felons. The Third Circuit—and for a time, this circuit—concluded that there was no analogous tradition of disarmament for at least *some* defendants. *Range v. Att'y Gen.*, 69 F.4th 96, 106 (3d Cir. 2023) (en banc), *cert. granted, judgment vacated*, --- S. Ct. ----, 2024 WL 3259661 (July 2, 2024); *United States v. Duarte*, 101 F.4th 657, 691 (9th Cir. 2024). The Eighth Circuit concluded otherwise, *United States v. Jackson*, 69 F.4th 495, 501–05 (8th Cir. 2023), *cert. granted, judgment vacated*, --- S. Ct. ----, 2024 WL 3259675 (July 2, 2024), while the Tenth and Eleventh Circuits upheld the continued constitutionality of Section 922(g)(1) under pre-*Bruen* precedent without reaching the historical question, *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023), *cert. granted, judgment vacated*, --- S. Ct. ----, 2024 WL 3259668 (July 2, 2024); *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024).

Nothing in the Supreme Court's recent *Rahimi* decision controls or even provides much new guidance for these cases, which is undoubtedly why the federal government took the unusual step of asking the Court to review one or more of these

---

3259687 (U.S. July 2, 2024); *Doss v. United States*, No. 23-6842, 2024 WL 3259684 (U.S. July 2, 2024).

pending cases immediately after *Rahimi* instead of following the Court's usual practice of GVRing (granting, vacating, and remanding) related cases. It's also why the original panel in this case, after careful consideration, saw no reason to modify our opinion after *Rahimi* came down. But the Supreme Court rejected the government's request and kicked the can down the road, GVRing all the pending Section 922(g)(1) decisions and instructing the lower courts to take another look at them in light of *Rahimi*.

The Supreme Court's docket this next term is no doubt full of important issues to decide, and this delay-the-inevitable approach to pressing Second Amendment questions would be just fine if the circuit courts were populated with judges committed to faithfully applying the considerable instruction already provided to us by the Court. But that is clearly not the case. In this circuit, you could say that roughly two-fifths of our judges are interested in faithfully applying the totality of the Supreme Court's Second Amendment precedent when analyzing new issues that have not yet been directly addressed by the Court. The other 17/29ths of our bench is doing its best to avoid the Court's guidance and subvert its approach to the Second Amendment. That is patently obvious to anyone paying attention. To say it out loud is shocking only because judges rarely say such things out loud.

For most of the judges in our circuit, any loss in a Second Amendment challenge at the Supreme Court is celebrated as a tool to further our artificial

cabining of *Bruen*. Such losses are bound to arise—as with any constitutional challenge, not all Second Amendment ones have merit. But when those losses occur, our court will grasp onto the *loss* itself as if that were the overarching guiding principle offered by the Court, using it to supplement and invigorate the cherrypicked language already mis- and over-applied from the Court's prior precedents. Like someone who eisegetes Scripture just to validate their pre-existing worldview, judges who are more interested in sidestepping than following the Court's Second Amendment precedent will latch onto phrases like "presumptively lawful" and "law-abiding citizen" while conveniently overlooking such bothersome details like the government's burden of supplying relevantly similar historical analogues.

None of our current justices spent time in this circuit, so perhaps it is understandable that they would reasonably expect all lower courts to faithfully apply *the entirety* of their Second Amendment caselaw. Let's be clear: out here on the Left Coast, that is a fantasy. The kind of subversive approach I have described will continue as long as the Supreme Court leaves an opening. Granting certiorari, vacating, and remanding *Range* et al. after deciding *Rahimi* only served to open the field a little more for our court to contort the Supreme Court's Second Amendment guidance. The Ninth Circuit is going to joyride *Rahimi* and the GVRs that followed it like a stolen Trans Am until the Supreme Court eventually corrects us (again).

* * *

Emboldened by Rahimi's loss and the Court's subsequent GVRs, the en banc panel in this case will surely rely on *Rahimi* as support for an inevitable and entirely predictable conclusion that Duarte has no Second Amendment rights. But *Rahimi* actually validates the original panel's application of the Court's prior precedents. The Supreme Court emphasized that Rahimi had been judicially determined to pose a credible threat to the safety of others. The government never tried to show that Duarte poses such a threat. The Court also relied on Section 922(g)(8)'s temporary nature. Section 922(g)(1)'s disarmament is permanent. *Rahimi* supports the panel's conclusion that Duarte could be disarmed if the government could provide historical crimes, analogous to his, that were punished by "death, estate forfeiture, or a life sentence." *Duarte*, 101 F.4th at 689. The government failed to do so. While *Rahimi* involved a distinct legal question and so its outcome is not directly controlling here, everything it clarified about the Second Amendment supports the original panel's analysis and conclusion in this case.

First, the legal question addressed in *Rahimi* is significantly different than the one presented here. Unlike Duarte, who the government concedes had no prior violent convictions, *see Duarte*, 101 F.4th at 663 n.1, *Rahimi* involved a domestic abuser with a long and well-documented history of violence with a firearm. 144 S. Ct. at 1894–95. During one incident, Rahimi dragged his girlfriend to his car, shoved

5

her head against the dashboard, and fired a gun when she tried to flee. *Id.* Rahimi later "threatened a different woman with a gun, resulting in a charge for aggravated assault with a deadly weapon," and became "the suspect in a spate of at least five additional shootings." *Id.* at 1895. A judge issued Rahimi's girlfriend a restraining order on the basis that he posed "a credible threat to the physical safety of [her] or her family." *Id.* at 1896 (cleaned up). This rendered him ineligible to possess firearms under Section 922(g)(8), which, unlike Section 922(g)(1)'s permanent bar on possession, "only prohibits firearm possession so long as the defendant 'is' subject to a restraining order." *Id.* at 1902. And unlike Duarte's as-applied challenge, Rahimi brought a facial challenge to Section 922(g)(8)—the "most difficult challenge to mount successfully." *Id.* at 1898. To recap, Rahimi, who had a proven track record of violence, brought a broad facial challenge to Section 922(g)(8)'s relatively narrow and temporary bar on firearm possession. Duarte, with no history of violence, brought a narrower as-applied challenge to Section 922(g)(1)'s permanent and complete dispossession.

The Supreme Court emphasized that its holding in *Rahimi* was a narrow one. *See id.* at 1903 ("[W]e conclude only this: ...."). It relied heavily on the distinction between those "who have been found to pose a credible threat to the physical safety of others [and] those who have not," *id.* at 1902, to "conclude only [that] [a]n individual *found by a court* to pose a credible threat to the physical safety of another

may be *temporarily* disarmed consistent with the Second Amendment," *id.* at 1903 (emphasis added). As Justice Gorsuch explained, the Court did not "decide … whether the government may disarm a person without a judicial finding that he poses a 'credible threat' to another's physical safety," "resolve whether the government may disarm an individual permanently," or "approve in advance other laws denying firearms on a categorical basis to any group of persons a legislature happens to deem … 'not responsible.'" *Id.* at 1909–10 (Gorsuch, J., concurring). These issues left unaddressed by *Rahimi* are directly implicated in this case, and the factors that the Court relied on to assure itself of Section 922(g)(8)'s constitutionality are simply not present here. Section 922(g)(1) does not require a judicial determination that a felon like Duarte would "pose[] a clear threat of physical violence to another." *Id.* at 1901. Nor is its disarmament temporary.

The historical examination in *Rahimi* directly supports the original panel's conclusion in this case. In analyzing Rahimi's facial challenge to Section 922(g)(8), the Supreme Court primarily examined two sets of historical laws: "surety" and "affray" laws. *Id.* at 1899–1901. Surety laws consisted "in obliging those persons whom there is a probable ground to suspect of future misbehavior, to stipulate with and to give full assurance … that such offense … shall not happen, by finding pledges or securities for … their good behavior." 4 William Blackstone, Commentaries *251. As applied to firearms, surety laws generally required a bond

to be posted by anyone who posed a clear threat of violence to another. *See, e.g.,* Act of May 18, 1846, in The Revised Statutes of the State of Michigan, Passed and Approved May 18, 1846 692 (1846) (requiring surety for "any person [who] shall go armed with a … pistol … on complaint of any person having reasonable cause to fear an injury or breach of the peace"). Affray laws similarly targeted individuals who misused arms, but instead of aiming to prevent future violence, they "provided a mechanism for punishing those who had menaced others with firearms." *Rahimi*, 144 S. Ct. at 1900. For example, Massachusetts punished those "as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth." Act of January 29, 1795, in 1 The General Laws of Massachusetts, From the Adoption of the Constitution, to February, 1822 454 (Theron Metcalf ed. 1823).

The Supreme Court analyzed these laws and extracted the principle that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Rahimi*, 144 S. Ct. at 1901. Because "Section 922(g)(8) restricts gun use to mitigate *demonstrated* threats of physical violence, just as the surety and going armed laws do," the Court found it to fit within that regulatory tradition. *Id.* (emphasis added). But unlike Section 922(g)(8), the burden on Duarte's Second Amendment right imposed by Section 922(g)(1) is not relevantly similar to the historical surety or affray laws, as 922(g)(1) applies universally to anyone with the status of "felon" instead of those who have more

specifically posed a "*demonstrated* threat[] of physical violence." *Id.* (emphasis added).

Section 922(g)(1) applies to anyone "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). This applies to the many felons whose crime or conduct show they pose a "clear threat of physical violence to another." *Rahimi*, 144 S. Ct. at 1901. But it equally applies to felons who have no history of or expected propensity towards violence, like Martha Stewart. When assessing the burden on the Second Amendment right imposed by the surety and affray laws, the Court in *Rahimi* found it key that the laws "involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 1902. This tracks the view of scholars who have linked these historical laws to a principle of disarming those who pose a threat of physical violence to another.[3] Here the government not only failed to show that Duarte "likely would threaten or had

---

[3] *See, e.g.*, Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 285 (2020) (highlighting these historical laws' focus on "persons guilty of committing violent crimes," "persons with violent tendencies," and other groups thought prone to commit violence); Jamie G. McWilliam, *Refining the Dangerousness Standard in Felon Disarmament*, 108 Minn. L. Rev. Headnotes 315, 324 (2024) ("[T]he danger feared by those drafting the historical disarmament laws was always physical violence."); F. Lee Francis, *Defining Dangerousness: When Disarmament is Appropriate*, 56 Tex. Tech L. Rev. 593, 597 (2024) (concluding that "violent conduct" is necessary for disarmament).

threatened another with a weapon." *Id.*  It conceded he has no history of violence. *Duarte*, 101 F.4th at 663 n.1.

The Court in *Rahimi* also found it relevant that, "like surety bonds of limited duration," Section 922(g)(8)'s burden on Rahimi's rights was "temporary." *Rahimi*, 144 S. Ct. at 1902.  "In Rahimi's case that [burden ends] one to two years after his release from prison …." *Id.*  Section 922(g)(1) contains no such time limitation. Once brought within the statute's scope, Duarte is permanently disarmed. *See* 18 U.S.C. § 922(g)(1).

Finally, the Court examined the penalty imposed by the historical surety and affray laws.  The affray laws "provided for imprisonment," *Rahimi*, 144 S. Ct. at 1902 (citation omitted), and under the surety laws, "[i]f an individual failed to post a bond, he would be jailed," *id.* at 1900 (citation omitted).  The Court then reasoned that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.* at 1902.  In other words, the Court in *Rahimi* compared both the conduct committed by Rahimi to that proscribed by the historical laws and the punishment imposed by Section 922(g)(8) to that of those laws.  Since both generally aligned, the Court upheld Section 922(g)(8)'s ban.

This is fundamentally the same reasoning already adopted by the original panel in *Duarte*.  The panel reasoned that for those crimes that were historically

punished by "death, estate forfeiture, or a life sentence," the defendants were necessarily disarmed and therefore these crimes could be used as analogies "to largely modern crimes that may not closely resemble their historical counterparts but still share with them enough relevant similarities to justify permanent disarmament." *Duarte*, 101 F.4th at 689–90 (cleaned up). Applying this reasoning in *Rahimi* led the Court to conclude that Rahimi could be disarmed under Section 922(g)(8). But applying it here leads to the opposite conclusion about Section 922(g)(1) as applied to Duarte. The government failed to show that the underlying crimes Duarte committed were analogous to any category of crime for which "death, estate forfeiture, or a life sentence" was the historical penalty. *Id.* at 691. Under the reasoning of *Rahimi*, therefore, the core logic of *Duarte* was validated notwithstanding the different outcome in the two cases.

* * *

In a circuit with a majority of judges committed to faithfully applying the Supreme Court's Second Amendment jurisprudence, I wouldn't need to write this. In that world, this court's forthcoming en banc decision denying Duarte's Second Amendment rights could be characterized as additional, desirable lower court "percolation" that might possibly assist the Supreme Court when it eventually addresses this question. But precisely because a supermajority of our court is so predictably biased against firearms, our en banc decision will once again speak

11

volumes only about Second Amendment inevitability in the Ninth Circuit, while telling us nothing about how the Supreme Court's precedents, properly construed, apply to Section 922(g)(1)'s ban.  Maybe someday we will break out of this predetermined script.