CA NO. 22-50048

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

STEVEN DUARTE,

        Defendant-Appellant.

DC NO. 2:20-cr-00387-AB-1

---

**APPELLANT'S SUPPLEMENTAL EN BANC BRIEF**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE ANDRE BIROTTE, JR.
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
SONAM HENDERSON
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081
Email: Sonam_Henderson@fd.org

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................1

II. ARGUMENT.........................................................................................3

    A.  *Rahimi* rejected the government's attempt to broadly define legislative authority to regulate firearms, and instead modeled a Second Amendment analysis under which a modern firearm regulation is constitutional only if it fits the narrowly-defined "why and how" of historical firearm regulations.................................3

    B.  By modeling a historical analysis focused on comparing a modern regulation to clearly-defined justifications and burdens of historical regulations, *Rahimi* contradicts the government's approach here. ....................................................................7

        1.  *Rahimi* expressly rejected the government's argument that *Heller* and *Bruen* allow it to disarm anyone it deems not "law-abiding" or "responsible."...................................7

        2.  The government's claim that *Heller* already upheld felon-in-position laws is similarly contrary to *Rahimi*.........................8

        3.  *Rahimi* conflicts with the government's claimed authority to permanently and automatically disarm all modern felons by categorizing them as "untrustworthy" or "dangerous."............10

            a.  The "why" and "how" of the government's historical analogues differ dramatically from § 922(g)(1). .............11

            b.  *Rahimi* does not permit the government to evade the differences between its analogues and § 922(g)(1) by claiming a generalized authority to disarm any group it categorizes as "untrustworthy" or "dangerous."........13

                (1)  The government's proposed historical "principles" operate at far too high a level of generality. ...........................................................14

# TABLE OF CONTENTS

**Page**

(2)     The government's proposed historical "principles" ignore *Rahimi*'s "how" requirement ............................................................ 16

(3)     The Eighth Circuit's recent *Jackson* decision illustrates how absurd the government's proposed approach is, while the Fifth Circuit in *Connelly* modeled a properly narrow *Rahimi* analysis. ............................................................. 17

    c.     *Rahimi* implicitly rejected the overbreadth and imprecision of the category of persons § 922(g)(1) disarms. ............................................................. 20

   4.     *Rahimi* does not support the government's claim that it can permanently disarm anyone with a *modern* "felony" conviction because many *founding-era* "felonies" were punishable by death. ............................................................. 24

C.    Section 922(g)(1) is unconstitutional as applied to Duarte. ................. 31

   1.     *Rahimi* confirms that § 922(g)(1) is unconstitutional as applied to nonviolent offenders like Duarte. ............................ 31

   2.     The panel's approach is also far more consistent with *Rahimi* than is the government's. ............................................. 33

D.    This Court has discretion to remand, but it should at least clarify that the district court is not bound by *Vongxay*. ................................... 35

III.    CONCLUSION ............................................................................. 36

CERTIFICATE OF COMPLIANCE ................................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Atkinson v. Garland*,
  70 F.4th 1018 (7th Cir. 2023) ............................................................9

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)................................................................*passim*

*Gallardo v. United States*,
  755 F.3d 860 (9th Cir. 2014) ..........................................................35

*Gonzales v. Carhart*,
  550 U.S. 124 (2007)........................................................................24

*Gregg v. Georgia*,
  428 U.S. 153 (1976)........................................................................29

*Jones v. Ryan*,
  733 F.3d 825 (9th Cir. 2013) ..........................................................29

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) ...................................................*passim*

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022)....................................................................*passim*

*Range v. Att'y Gen.*,
  69 F.4th 96 (3d Cir. 2023) ..............................................................27

*United States v. Bullock*,
  679 F. Supp. 3d 501 (S.D. Miss. 2023) ...........................................30

*United States v. Chovan*,
  735 F.3d 1127 (9th Cir. 2013) (en banc) ...........................................8

*United States v. Connelly*,
  --- F.4th ---- (5th Cir. Aug. 28, 2024)..............................12, 19, 20

*United States v. Duarte*,
  101 F.4th 657 (9th Cir.) ..........................................................*passim*

*United States v. Jackson*,
  110 F.4th 1120 (8th Cir. 2024) ............................................17, 18, 21

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. McEnry*,
   659 F.3d 893 (9th Cir. 2011) ...............................................................24

*United States v. Patrin*,
   575 F.2d 708 (9th Cir. 1978) ...............................................................35

*United States v. Rahimi*,
   602 U.S. __ (2024).........................................................................*passim*

*United States v. Vongxay*,
   594 F.3d 1111 (9th Cir. 2010) .....................................................2, 9, 35

*United States v. Williams*,
   --- F.4th ---- (6th Cir. Aug. 23, 2024).........................................*passim*

**Federal Statutes**

Act of May 8, 1792, § 1, 1 Stat. 271 .........................................................27

18 U.S.C. § 113 ..........................................................................................22

18 U.S.C. § 922 ...................................................................................*passim*

18 U.S.C. § 1464 ........................................................................................21

**Federal Constitution**

U.S. Const. amend. II...........................................................................*passim*

**State Statutes**

Alaska Stat. § 11.41.230 ............................................................................22

Cal. Penal Code § 242................................................................................22

Cal. Penal Code § 243................................................................................22

Cal. Penal Code § 245................................................................................22

Mass. Gen. Laws ch. 365, §13A ...............................................................22

Or. Rev. Stat. § 163.160.............................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Other Authorities**

William Blackstone, Commentaries on the Laws of England (1769) ....................20

Richard H. Fallon, *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321 (2000)............................................................24

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009)............................................................12, 17

Mark Motivans, *Federal Justice Statistics, 2022* (Jan. 2024) .................................21

Sean Rosenmerkel et al., *Felony Sentences in State Courts, 2006 – Statistical Tables* (revised Nov. 2010)...............................................................21

Sarah K. S. Shannon et al., *The Growth, Scope, and Spatial Distribution of America's Criminal Class, 1948–2010*, 54 Demography 1795 (2017).....................................................................................20

Orders List (U.S. July 2, 2024) ...............................................................................35

## I. INTRODUCTION

Before *United States v. Rahimi*, 602 U.S. __, 144 S.Ct. 1889 (2024), the government bore the burden under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), to show that 18 U.S.C. § 922(g)(1) is consistent with our Nation's traditions of firearm regulation even as applied to nonviolent offenders like Appellant Steven Duarte. Its burden is the same after *Rahimi*, and it still cannot carry it. While the government need not show a "historical twin," *Rahimi* emphasized that it must still demonstrate that its modern firearms regulation is "relevantly similar" to the "why and how" of historical regulations, such that it faithfully reflects "the balance struck by the founding generation." 144 S.Ct. at 1898.

Section 922(g)(1) disarms "any person … who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year," and it does so automatically, permanently, and with no opportunity to regain rights. As applied to nonviolent offenders like Duarte, § 922(g)(1) fails to reflect any balance that the founders would have recognized. The founders saw armed self-defense as every citizen's natural and fundamental right, something not subject to legislative whim. Yet § 922(g)(1) disarms approximately 19 million Americans, including one out of every three Black men, many for offenses that would not have been felonies (or even crimes) at the founding, or which do not demonstrate a propensity for firearm violence.

1

*Rahimi* supports none of the government's claims to have met its burden. The "hows" and "whys" of the historical laws the government cites differ dramatically from § 922(g)(1). And the government's argument that modern felons can be disarmed because founding-era felons were put to death fails because of, *inter alia*, the obvious definitional difference between modern felonies and founding-era ones. Ultimately, the government cannot identify any understanding of our historical tradition narrow and targeted enough to satisfy *Rahimi* and *Bruen*, but also broad enough to justify uniformly disarming every individual convicted of one of the vast and varied array of modern "felonies"—including millions of citizens with only nonviolent felony convictions.

This Court also asked the parties to address whether the case should be remanded to the district court for further proceedings. Such a remand is within this Court's discretion. But if this Court does remand, it should at least make clear that the outdated analysis in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), is no longer good law, and that the district court must apply *Bruen* and *Rahimi*.

2

## II.  ARGUMENT[1]

**A.**  ***Rahimi* rejected the government's attempt to broadly define legislative authority to regulate firearms, and instead modeled a Second Amendment analysis under which a modern firearm regulation is constitutional only if it fits the narrowly-defined "why and how" of historical firearm regulations.**

*Rahimi* concerned a facial challenge to 18 U.S.C. § 922(g)(8), which temporarily prohibits an individual from possessing firearms while subject to a domestic violence restraining order containing a judicial finding that the person represents a credible threat to the physical safety of another.  144 S.Ct. at 1894, 1896 (discussing § 922(g)(8)(C)(i)).  Facial challenges are the "most difficult challenge[s] to mount successfully," because they require "establish[ing] that no set of circumstances exists under which the Act would be valid." *Id.* at 1898 (cleaned up).  But far from being unconstitutional in every circumstance, § 922(g)(8) was "constitutional as applied to the facts of Rahimi's own case." *Id.*

In so holding, the Court both reaffirmed and clarified the test it described in *Bruen*.  While reiterating that the government need not produce a founding-era regulation that is a "'historical twin'" to the modern regulation under review, it

---

[1] The government bears the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *See Bruen*, 597 U.S. at 19.  Because the Court directed Duarte to file his supplemental brief first, he has attempted to anticipate the government's arguments.  If the government's brief makes arguments that Duarte did not anticipate, he may seek leave to file a supplemental reply brief.

made equally clear that the government must demonstrate that the modern regulation is "'relevantly similar'" to our historical tradition of firearms regulation in terms of "[w]hy and how [it] burdens the right." *Rahimi*, 144 S.Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29-30). Though the historical tradition may be expressed in "principles" drawn from multiple regulations, those principles must be definite and narrow, so as to "'apply[] faithfully the balance struck by the founding generation to modern circumstances.'" *See id.* (quoting *Bruen*, 597 U.S. at 29-30); *accord id.* at 1926 (Barrett, J., concurring) ("a court must be careful not to read a principle at such a high level of generality that it waters down the right"). The Court expressly cautioned that even laws "regulat[ing] arms-bearing for a permissible reason" may be unconstitutional "if [they do] so to an extent beyond what was done at the founding." *Id.* at 1898 (opinion of the Court).

In applying this test to § 922(g)(8), the *Rahimi* Court demonstrated its narrow understanding of the relevant "principles." Although *Rahimi* involved § 922(g)(8) and not § 922(g)(1), the government sought to use the case to establish a broad rule that the Second Amendment permits "disarming persons whom legislatures have found are not law-abiding, responsible citizens"—with "not responsible" allowing it to disarm those subject to § 922(g)(8) and "not law-

abiding" allowing it to disarm those subject to § 922(g)(1).[2]  It generated this argument by taking references in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Bruen* to "law-abiding, responsible citizens" and recasting them as affirmative limitations on the Second Amendment's reach.[3]  As historical support for this broad proposition, the government cited the same failed constitutional proposals and laws disarming Loyalists that it cited here, as well as historical surety laws, going-armed laws, and scattered laws disarming minors, vagrants, the intoxicated.[4]

But even while holding § 922(g)(8) constitutional as applied to Rahimi, the Court unanimously rejected the government's proposed "responsib[ility]" principle.  *See Rahimi*, 144 S.Ct. at 1903; *see also id.* at 1944 (Thomas, J., dissenting) ("Not a single Member of the Court adopts the Government's theory."). It explained that "responsible" was "a vague term" of "unclear" scope.  *Id.* at 1903 (opinion of the Court).  And in any case, "such a line [did not] derive from [its]

---

[2] *See* Brief for the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 5322645, at *13, 22, 26-28 (U.S.  Aug. 14, 2023) (hereinafter, "U.S. *Rahimi* Br."); Tr. of Oral Argument at 4-6, 8-9, *United States v. Rahimi*, No. 22-915 (U.S. Nov. 7, 2023), available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/22-915_986b.pdf.

[3] U.S. *Rahimi* Br. at *11-12 (referencing, *inter alia, Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. at 38 & n.9).

[4] *See id.* at *13-14, 17-18, 22-26.  (*See also* GAB-40-49.)

case law": *Heller* and *Bruen* had used that terminology only as short-hand for "ordinary citizens who undoubtedly enjoy the Second Amendment right." *Id.* Those cases "said nothing" about the Second Amendment rights of other citizens: "The question was simply not presented." *Id.*

Instead, the Court took a more targeted approach. It ignored most of the government's proposed historical analogues, and confined its analysis to two sets of founding-era laws "that specifically addressed firearms violence" and shared a tightly-defined "why and how" with § 922(g)(8). *Id.* at 1899, 1901. First were the surety laws, under which a magistrate who found "probable ground to suspect future misbehavior" (including "misuse of firearms") could temporarily require the suspect to post a bond guaranteeing good behavior. *Id.* at 1899-1900. Second were the "going armed" laws, which imposed forfeiture of arms or imprisonment as punishment for "going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Id.* at 1901 (cleaned up). Section 922(g)(8) was sufficiently analogous to these laws because it also regulated firearms violence by disarming individuals who "pose[d] a clear threat of physical violence to another." *Id.*; *see also id.* at 1894. And its burdens were limited in ways similar to those historical analogues: disarmament occurred only after a court found a credible threat to a particular individual, and the deprivation was only temporary. *Id.* at 1902.

The Court closed by making clear it was not undertaking an exhaustive historical analysis of the Second Amendment's full scope. *Id.* at 1903. Rather, it held "only" that "an individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed." *Id.* Importantly, that holding has no direct application to the substantially-more-severe § 922(g)(1), which is permanent, not temporary, and which contains no requirement of an individualized court-finding of credible threat to another's physical safety.

**B.** **By modeling a historical analysis focused on comparing a modern regulation to clearly-defined justifications and burdens of historical regulations, *Rahimi* contradicts the government's approach here.**

**1.** ***Rahimi* expressly rejected the government's argument that *Heller* and *Bruen* allow it to disarm anyone it deems not "law-abiding" or "responsible."**

Throughout this case, the government's primary argument has been that the Second Amendment grants no rights to anyone the government deems not "law-abiding" or not "responsible"—including anyone with a modern felony conviction. (*See, e.g.*, GAB-13, GAB-20-21, GAB-50; PFREB-7-9.) As described above, the government made the same argument in *Rahimi*—including as to felons—and the Supreme Court made a point of explicitly rejecting it. (*See* Section II.A, *supra*.) As the Sixth Circuit recently put it, *Rahimi* made clear that *Bruen* and *Heller* had not held "that *only* law-abiding citizens have Second Amendment rights." *United States v. Williams*, --- F.4th ----, 2024 WL 3912894, at *4 (6th Cir. Aug. 23, 2024) (emphasis in original).

7

That makes sense, since the "law-abiding-citizens-only theory also fails as a matter of history and tradition." *Id.* at *5.  As noted by the panel here, by then-Judge Barrett in her influential *Kanter* dissent, and by the Sixth Circuit post-*Rahimi*, there is no American tradition of disarming citizens simply for being less-than-virtuous (or responsible).  Rather, only civic rights held for the collective good of the community, like voting, office-holding, and jury service, were subject to virtue exclusions; "natural" rights of the individual, like armed protection of self, home, and family—and free speech, free exercise of religion, and the right to be tried by a jury of one's peers—are not subject to such limitations.  *Id.*; *United States v. Duarte*, 101 F.4th 657, 671-76 (9th Cir.), reh'g en banc granted, opinion vacated, 108 F.4th 786 (9th Cir. 2024); *Kanter v. Barr*, 919 F.3d 437, 462-63 (7th Cir. 2019) (Barrett, J., dissenting).  (*See also* AOB-21-23; ARB-13.)

## 2.    The government's claim that *Heller* already upheld felon-in-position laws is similarly contrary to *Rahimi*.

*Rahimi*'s explanation for why *Heller's* references to  "law-abiding and responsible citizens" did not set a constitutional limit also undermines another government argument.  At one point, *Heller* described "longstanding prohibitions on possession of firearms by felons and the mentally ill" as "presumptively lawful."  *Heller*, 554 U.S. at 626-27 & n.26.  The mention of "longstanding" felon-in-possession laws is somewhat puzzling, since felon-in-possession statutes are a 20th-century innovation.  *See, e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1137

8

(9th Cir. 2013) (en banc). Nevertheless, the government has seized on this line to claim that *Heller* "recogni[zed]" that prior felons have no Second Amendment rights. (*See, e.g.*, GAB-20, GAB-24-25.) *See also Vongxay*, 594 F.3d at 1115 (adopting this argument).

As *Rahimi* made clear, however, *Heller* addressed only the constitutionality of the particular prohibition on handguns in the home that was before it. *Rahimi*, 144 S.Ct. at 1902-03; *see also id.* at 1910 (Gorsuch, J., concurring) ("Nor do we purport to approve in advance other laws denying firearms on a categorical basis[.]"). The panel here anticipated *Rahimi*'s approach when it declined to treat *Heller*'s "presumptively lawful" language as dispositive, explaining "the historical pedigree of felon firearm bans was never an issue the *Heller* Court purported to resolve." *Duarte*, 101 F.4th at 669. *See also, e.g.*, *Williams*, 2024 WL 3912894, at *5-*6; *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023).

Nor is the government's argument strengthened by the fact that *Rahimi* also referenced *Heller*'s "presumptively lawful" language. The issue was discussed only in response to the defendant's suggestion that *Heller* prohibited *any* regulation of handguns in the home. *Rahimi*, 144 S.Ct. at 1902. The Court explained that, contrary to the defendant's argument, *Heller* had actually called many prohibitions that would extend the home, including some involving felons, "presumptively lawful." *Id.* In other words, *Rahimi* said only that *Heller* had not created a categorical rule barring any regulation that might touch upon firearm possession in

9

a home—not that *Heller* had affirmatively adopted an opposite rule permitting the uniform and permanent disarmament of felons. And as *Rahimi* later made clear, the *Heller* Court had no occasion to adopt such a rule because "[t]he question was simply not presented." *See id.* at 1903.

### 3. *Rahimi* conflicts with the government's claimed authority to permanently and automatically disarm all modern felons by categorizing them as "untrustworthy" or "dangerous."

Pre-*Rahimi*, the government argued that there was a historical tradition of legislatures categorically disarming groups deemed "untrustworthy," citing colonial laws banning gun ownership by slaves and Native Americans, colonial laws disarming Catholics who refused to swear loyalty during the French and Indian War, and Revolutionary War laws disarming those perceived as disloyal. (GAB-33, GAB-40-46.)[5] Post-*Rahimi*, it has (in other cases) repackaged this argument as a claim that it can disarm broad categories of people it deems

---

[5] It also pointed to never-adopted proposals from three state ratifying conventions that, it claimed, limited the right to bear arms to citizens who were law-abiding and "peaceable." (GAB-46-49.) These proposals fail as analogues for reasons previously discussed, including that such proposals were only made in a few states and were never incorporated into the Second Amendment or state constitutions. (AOB-15-19; ARB-17-19.) *See also Kanter*, 919 F.3d at 454-56 (Barrett, J., dissenting)); *Duarte*, 101 F.4th at 677-79. The proposals look no better post-*Rahimi*. The government offered two of these proposals as analogues in *Rahimi*, but the Court disregarded them. *See, e.g., Rahimi*, 144 S.Ct. at 1894-95, 1898-1901; U.S. *Rahimi* Br. at *17-18.

"dangerous."[6] Whatever the label, these arguments fail, just as they did before *Rahimi*. Both the justifications for and the burden of the government's historical disarmament laws differ dramatically from § 922(g)(1), such that any "principles" that can be extracted from them are too generalized to be "relevantly similar" to § 922(g)(1) under *Rahimi*.

### a. The "why" and "how" of the government's historical analogues differ dramatically from § 922(g)(1).

*Rahimi*, like *Bruen* before it, requires the government to show that "why and how" a modern regulation burdens the right is "relevantly similar" to historical regulations. *See Rahimi*, 144 S.Ct. at 1898; *Bruen*, 597 U.S. at 29-30. *Rahimi*'s focus on the "why and how" confirms that the panel was correct to reject the government's proposed historical analogues of wartime laws disarming Catholics, Loyalists, and laws disarming enslaved people and Native Americans. These laws were justified by very different concerns ("whys") and carried very different burdens ("hows") than § 922(g)(1).

In terms of justification, such laws did not target those who were simply "untrustworthy" in some general sense broad enough to also include all prior felons who have returned to society after serving their sentences. Rather, as the

---

[6] Supplemental Brief of the United States, *Range v. Garland*, 2024 WL 3691991, at *17, 19 (3d Cir. August 2, 2024) (hereinafter, "U.S. *Range* Suppl."); Supplemental Brief for the United States, *United States v. Williams*, 2024 WL 3521812, at *5 (6th Cir. Jul. 15, 2024) (hereinafter, "U.S. *Williams* Suppl.").

panel explained, "legislatures passed these laws to prevent armed insurrections by dangerous groups united along political, ideological, or social lines." *See Duarte*, 101 F.4th at 679-85.  (*See also* AOB-18-19; ARB-22-24.)  The Fifth Circuit similarly described these laws as being aimed at "political threats to our nascent nation's integrity."  *United States v. Connelly*, --- F.4th ----, 2024 WL 3963874, at *6 (5th Cir. Aug. 28, 2024).[7]

The burdens these laws imposed were also quite different from § 922(g)(1)'s uniform, automatic, and permanent disarmament.  *Duarte*, 101 F.4th at 680, 683-89.  (*See also* ARB-24.)  For instance, the Revolutionary War disloyalty laws "did not technically prohibit recusants from acquiring new arms."  C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 724 (2009).  At least some of the Catholic disarmament laws explicitly allowed Catholics to keep weapons necessary to their self-defense.  *Bruen*, 597 U.S. at 45

---

[7] Indeed, these groups were considered sufficiently outside of the national community that they might be best understood as falling outside "the people" and so offering no insight into when "the people" can be disarmed.  *See Duarte*, 101 F.4th at 682.  (*See also* ARB-23-24.)  In *Rahimi*, the government admitted that Catholic religious dissenters, slaves and Native Americans were not part of "the people" at the times the firearm restrictions against them were imposed.  *See* Reply Brief of the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 7106695, at *11 (U.S. Sep. 27, 2023).  Similarly, the panel here explained, "[s]ince 'an individual's undivided allegiance to the sovereign' was a 'precondition' to his 'membership in the political community,' British Loyalists 'renounced' their place among 'the [American] people' by refusing to swear a loyalty oath."  *Duarte*, 101 F.4th at 682 (quoting *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1048 (11th Cir. 2022) (alteration in *Duarte*)).

n.12 (in England); *Duarte*, 101 F.4th at 685 (citing Maryland and Virginia laws from the French and Indian War). And, as the government previously acknowledged here, both anti-Catholic and anti-Loyalist laws allowed affected individuals to regain arms simply by taking an oath. (GAB-42-43, GAB-45-46.) *See also Duarte*, 101 F.4th at 680, 683-84.

Because the how and why of these historical laws differ so starkly from those of § 922(g)(1), they cannot help the government meet *Rahimi*/ *Bruen*'s history and tradition requirements.

> **b.** ***Rahimi* does not permit the government to evade the differences between its analogues and § 922(g)(1) by claiming a generalized authority to disarm any group it categorizes as "untrustworthy" or "dangerous."**

The government's prior briefing in this case sought to evade the differences between § 922(g)(1) and its proposed analogues by claiming a broad governmental authority to disarm anyone legislators considered "untrustworthy." (GAB-33, GAB-40-46.) In other cases post-*Rahimi*, it has pointed to *Rahimi*'s discussion of "principles that underpin our regulatory tradition," 144 S.Ct. at 1898, to claim that legislatures' supposed power to make categorical judgments about groups being "dangerous" is itself such a "principle."[8] From there it has claimed it may group *all* modern felons, no matter how nonviolent, into a single broad category of

---

[8] *See* U.S. *Williams* Suppl. at *4-6, *10; U.S. *Range* Suppl. at *19-21.

legislatively-declared "dangerous" people who can be uniformly and categorically disarmed.[9]  These arguments caricature the very foundations of *Rahimi* and *Bruen*.

> **(1)    The government's proposed historical "principles" operate at far too high a level of generality.**

First, *Rahimi* provides no support for the claim that historical tradition allows legislatures to categorically and permanently disarm anyone they deem "dangerous" or "untrustworthy."  If those were actually viable "principles," *Rahimi* would have been a much shorter decision.  The Court could have simply said that there is a tradition of legislatures disarming those they deem dangerous or untrustworthy, so Congress could disarm domestic abusers for as long as it liked. But the Court did nothing like that.  Instead, it rejected as impermissibly "vague" the government's broad proposed authority to categorically disarm those it deemed "not responsible"—a very similar notion to categorically disarming those it deems "dangerous" or "untrustworthy."  *See Rahimi*, 144 S.Ct. at 1903.

Moreover, *Rahimi's* analysis shows that what it meant by "principle" is not deference to broad legislative categorization but rather a granular concept focused on comparing the "why and how" of the modern regulation with specific founding-era regulations.  *Rahimi*, 144 S.Ct. at 1898.  As described above in Section II.A, the government in *Rahimi* offered a laundry list of historical analogues that it

---

[9] *See id.*

claimed disarmed those who were not "law-abiding and responsible." But the Supreme Court rejected the government's attempt to define the relevant principle at such a high level of generality, and instead addressed only two sets of historical regulations, surety and going-armed laws, which specifically "target[ed] individuals who physically threatened others." *Id.* at 1899.

It then compared the "why and how" of those regulations to § 922(g)(8) in specific terms that focused on the regulations' substance, not generalities about legislatively-determined categories. The "why" matched because the historical and modern laws shared the same justification: controlling "a particular defendant [who] likely would threaten or had threatened another with a weapon." *Rahimi*, 144 S.Ct. at 1901-02. The "how" analysis was equally specific: § 922(g)(8) and the surety and going-armed laws all imposed only temporary, not permanent disarmament, and only after a judicial finding of credible threat to the physical safety of another person. *Id.* at 1901-1902.

Justices who joined the Court's opinion also made clear that they did not understand *Rahimi* to allow the government to legislate based on broad and generalized principles like "dangerousness" or "untrustworthiness." Justice Barrett explained that courts "must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at 1926 (Barrett, J., concurring). And Justice Gorsuch similarly warned courts against "extrapolat[ing] their own broad principles from [historical] sources," and seeking "overarching 'policies,'

15

'purposes,' or 'values,'" rather than doing the fine-grained work of historical analysis focused on a particular regulation. *Id.* at 1908-09 (Gorsuch, J., concurring). To do otherwise would be to "risk gaming away" the Second Amendment. *Id.* at 1908.

The vagueness and malleability of terms like "dangerous" or "untrustworthy" risk just the "gaming away" about which Justice Gorsuch warned. These words could mean almost anything, depending on the inclination of the legislature. Indeed, the government's own arguments illustrate this point, freely lumping together Catholics, Quakers, enslaved people, Native Americans, felons, minors, political dissidents, etc. into a generalized mush of supposed "dangerousness" or "untrustworthiness." (GAB-40-46.)[10] This cannot be what *Rahimi* permits.

> **(2) The government's proposed historical "principles" ignore *Rahimi*'s "how" requirement.**

The problems with the government's proposed authority to disarm those it deems "dangerous" or "untrustworthy," become even starker when the "how"—the comparative burdens—are considered. *Rahimi* both stated and demonstrated that "how" a regulation burdens the right is "central" to determining if it is "relevantly similar" to historical tradition. *Rahimi*, 144 S.Ct. at 1898, 1901-02. Yet the

---

[10] *See also* U.S. *Range* Suppl. at *19-20.

government's claim that it can disarm those it deems "dangerous" or "untrustworthy" appears to carry no limit on the burden that can be imposed, such as limits on the length of the disarmament, or opportunities to regain the right. By contrast, the historical disarmament statutes that the government claims form its tradition were limited in their burdens: most appeared to be temporary wartime laws; some took away existing guns but did not prevent people from acquiring new ones; many had self-defense or other necessity exceptions; and both the anti-Catholic and anti-Loyalist laws allowed those people to regain weapons simply by taking an oath. *See, e.g.,* Marshall, *Martha Stewart*, *supra*, at 724; *Duarte*, 101 F.4th at 680, 683-85; *Williams*, 2024 WL 3912894, at *9, *11. Accordingly, to adopt the government's proposed "dangerousness" or "untrustworthiness" tests would require ignoring *Rahimi*'s requirement of relevantly similar burdens.

> **(3)** **The Eighth Circuit's recent *Jackson* decision illustrates how absurd the government's proposed approach is, while the Fifth Circuit in *Connelly* modeled a properly narrow *Rahimi* analysis.**

The Eighth Circuit's post-*Rahimi* opinion in *United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024), illustrates the absurdity of the government's broad approach. There, the Eighth Circuit accepted the argument that historical tradition gave the government a generalized authority to decide that some sweeping category of persons "deviated from legal norms" or posed "an unacceptable risk of dangerousness," and then permanently disarm everyone it lumped into that

category. *Id.* at 1127-1129; *see also id.* at 1125 ("there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)"). The Eight Circuit then candidly admitted that this understanding of *Rahimi* and *Bruen* might allow "greater regulation than would an approach that employs means-end scrutiny with respect to each individual person who is regulated." *Id.* at 1129. In other words, it admitted that as it read *Bruen* and *Rahimi*, the government might have *more* authority to impose firearm restrictions than it did under the interest-balancing standard that previously prevailed in the Courts of Appeals.

This is not a tenable reading of *Bruen* and *Rahimi*. *Bruen* explicitly repudiated a system in which courts applied means-ends scrutiny only to *increase* the government's regulatory authority beyond what history and tradition would permit. 597 U.S. at 18-19. More importantly, the most basic insight of *Bruen* and *Rahimi* is that courts cannot simply defer to modern legislatures when Second Amendment rights are stake. What must be deferred to is the balance struck by the *founding generation*. *Rahimi*, 144 S.Ct. at 1898; *Bruen*, 597 U.S. at 26 ("Second Amendment is the very product of an interest balancing by the people" (cleaned up)). To posit, as the relevant principle, that modern legislatures' categorical disarmament decisions must be deferred to is an end-run around these requirements, not a "faithful application" of them.

Contrast the Eighth Circuit's misguided approach with the Fifth Circuit's post-*Rahimi* decision in *Connelly*. *Connelly* concerned a marijuana user

18

prosecuted for gun possession under § 922(g)(3). 2024 WL 3963874 at *1. The government cited the same pre-founding laws disarming political dissidents and religious minorities that it cited here, and claimed that those laws evidenced a principle of disarming the generally "dangerous" that extended to drug users. *Id.* at *5. But, in keeping with *Rahimi*, the Fifth Circuit rejected that vague, all-encompassing conception of "danger." It explained that the "danger" addressed by those historical laws was different than the "danger" represented by drug users: "The Founders did not disarm English Loyalists because they were believed to lack self-control; it was because they were viewed as political threats to our nascent nation's integrity." *Id.* at *6. "[P]olitical traitors" and "political insurrectionists" were not "'dangerous' for reasons comparable to marijuana users," and the government could not use laws aimed at one "danger" to justify regulating a different danger. *Id.*

Instead, like the Supreme Court did in *Rahimi*, the Fifth Circuit focused on only a narrow set of historical regulations with a justification relevantly similar to the law under review. For § 922(g)(3), these were historical laws against carrying or misusing weapons while intoxicated, which, like § 922(g)(3), targeted misuse of firearms by people whose judgment has been impaired by drugs and alcohol. *Id.* at *7-10. But, the Fifth Circuit concluded, those historical laws imposed very different burdens from § 922(g)(3). The historical laws at most supported banning "the *carry* of firearms *while actively intoxicated*." *Id.* at *9 (emphasis in original).

By contrast § 922(g)(3) "bans *all* possession, and it does so for an undefined set of 'user[s],' even while they are not intoxicated." *Id.* (emphasis in original). Accordingly, § 922(g)(3) was unconstitutional as to someone who used marijuana but who was not intoxicated at the time she possessed a firearm. *Id.* at *9-10.

### c. *Rahimi* implicitly rejected the overbreadth and imprecision of the category of persons § 922(g)(1) disarms.

The population of people who have been convicted of crime "punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(g)(1), encompasses approximately 19 million Americans; broken down, one out of every twelve adults (8%), one of every eight adult men (13%), and one out of every three (33%) adult Black men.[11]  That is not a well-defined group representing unique or immediate risks of physical harm to others; rather, it encompasses broad swaths of the American population.  And the fact that § 922(g)(1) disarms a third of Black men is particularly disturbing, echoing the systematic efforts to disarm Black Americans during Reconstruction.  *See Bruen*, 597 U.S. at 60-61.

Worse, the category § 922(g)(1) covers is imprecise and inconsistent with regard to the purpose of controlling violent misuse of firearms.  The task of

---

[11] *See* Sarah K. S. Shannon et al., *The Growth, Scope, and Spatial Distribution of America's Criminal Class, 1948–2010*, 54 Demography 1795, 1806-1807, 1814 (2017), available at http://users.soc.umn.edu/~uggen/Shannon_Uggen_DEM_2017.pdf

determining what offenses are "felonies" is shared jointly by the federal government and the 50 states, which have predictably come to widely disparate conclusions. The result is an arbitrary line that fails in obvious ways to identify those more likely to dangerously misuse firearms.

First, § 922(g)(1) does not distinguish between groups of prior felons with obviously different likelihoods of committing future acts of gun violence. No one can seriously dispute that Martha Stewart and Felicity Huffman are much less likely to commit acts of gun violence than those with long histories of violent felonies, but the statute treats them all equally. Nor is the issue limited to a handful of rich and famous exemplars. There are numerous nonviolent felonies on the books, many of which suggest no proclivity towards violent misuse of firearms. *See*, *e.g.*, 18 U.S.C. § 1464 (cursing on the radio); *Duarte*, 101 F.4th at 690 (noting modern felonies like releasing balloons in Florida); *Williams*, 2024 WL 3912894, at *15 ("in New Jersey, opening a bottle of ketchup at the supermarket and putting it back on the shelf is a third-degree felony, punishable by up to five years' imprisonment"). Indeed, statistics show the vast majority of felony convictions are nonviolent. *See Jackson*, 110 F.4th at 1125 n.2.[12] This suggests that § 922(g)(1) is

---

[12] Citing Sean Rosenmerkel et al., *Felony Sentences in State Courts, 2006 – Statistical Tables* 3 tbl.1.1 (revised Nov. 2010), https://bjs.ojp.gov/content/pub/pdf/fssc06st.pdf; Mark Motivans, *Federal Justice Statistics, 2022*, at 12 tbl.7 (Jan. 2024), https://uat.bjs.ojp.gov/document/fjs22.pdf.

wildly overinclusive—instead of incidentally disarming a few undeserving people who present no special risk of firearm misuse, it instead disarms millions of such people, with relatively fewer demonstrably violent people mixed in.

Adding to the arbitrariness, many jurisdictions treat as misdemeanors various offenses that appear more suggestive of potential future violence than most felonies. For instance, assaults by striking, beating, or wounding can be treated as misdemeanors in some jurisdictions, including federally.[13] In some states, even assault with a deadly weapon like a firearm can be a misdemeanor.[14] That states vary widely in whether the same conduct—including assaultive conduct—is punished as a felony only emphasizes that § 922(g)(1) does a poor and inconsistent job of categorizing people actually likely to violently misuse firearms.

*Rahimi* makes clear that the government's line-drawing must be crisp, not arbitrary. In upholding § 922(g)(8), it focused on the requirement of an individualized judicial finding of credible threat to another's safety, thus emphasizing its concern with confirming that the disarmed individual actually

---

[13] *See* 18 U.S.C. § 113. *See also*, *e.g.,* Cal. Penal Code §§ 242 & 243(d) (battery even resulting in serious bodily injury can be a misdemeanor); Or. Rev. Stat. § 163.160 (assault by intentionally physically injuring another can be a misdemeanor). Other jurisdictions, like Massachusetts, appear to make any assault (even one with no touching or harm), a felony. Mass. Gen. Laws ch. 365, §13A.

[14] *See* Cal. Penal Code § 245(a)(1)-(2); *see also*, *e.g.,* Or. Rev. Stat. § 163.160; Alaska Stat. § 11.41.230.

warranted disarmament under the government's justification. *See* 144 S.Ct. at 1901-02. To be sure, the Court noted that its reasoning did not necessarily mean "that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Id.* But it never suggested that such categories could be sloppily drawn. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (observation that legislatures can permissibly ban some categories of people only begs the question "whether *all* felons—violent and nonviolent alike—comprise one such category" (emphasis in original)).

Indeed, the Court's mention of a "*special* danger of misuse," especially combined with the broader discussion about "clear" and "credible" threats of violence to another, suggests that any categorical bans would have to be tailored to relatively small and carefully-defined groups of individuals who "likely would threaten or had threatened another with a weapon," or otherwise pose relevantly similar levels of risk. *See Rahimi*, 144 S.Ct. at 1901-02 (emphasis added); *see also id.* (§ 922(g)(8) constitutional in part because it does *not* "broadly restrict arms use by the public generally"); *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting) ("[t]he government could quickly swallow the [Second Amendment] right if it had broad

23

power to designate any group as dangerous and thereby disqualify its members from having a gun").[15]

**4.    *Rahimi* does not support the government's claim that it can permanently disarm anyone with a *modern* "felony" conviction because many *founding-era* "felonies" were punishable by death.**

The government has also claimed that a "felony" was defined at the founding as an offense resulting in total forfeiture of property and death, and so today's very differently defined "felonies" can be punished with the lesser penalty of permanent disarmament.  (GAB-34-40.)

This argument fails for the same reasons it failed prior to *Rahimi*.  (AOB-19-21; ARB-19-21.)  *First,* as the panel correctly recognized, founding-era felony

---

[15] The government has elsewhere argued that § 922(g)(1) cannot be challenged on an as-applied basis.  *See* U.S. *Range* Suppl. at *25; U.S. *Williams* Suppl. at *13.  Here, the government's brief did not make any such contention, (*see, e.g.*, GAB-9-11), so it is long since waived.  *See United States v. McEnry*, 659 F.3d 893, 902 (9th Cir. 2011).  But even if such an argument had been made, it would fail. As-applied challenges are "'the basic building blocks of constitutional adjudication,'" and are preferred to facial challenges because they do not require considering whether there is any possible constitutional application of a statute. *Gonzales v. Carhart*, 550 U.S. 124, 167-68 (2007) (quoting Fallon, *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1328 (2000)).  To permit only facial challenges would essentially allow the government to prove a statute is always constitutional by identifying just one individual against whom it could be constitutionally applied—even if that person bears no meaningful resemblance to the defendant. *See, e.g.*, *Rahimi*, 144 S.Ct. at 1898. This novel position has no basis in law or logic. *See id.* at 1910 (Gorsuch, J., concurring) (resolving a facial challenge "necessarily leaves open the question whether the statute might be unconstitutional as applied in 'particular circumstances'").

punishment was far more nuanced than the government claims, with "'many felonies' on the books in the late 18th-and early 19th-century, [but] 'not one punished with forfeiture of estate, and but a very few with death.'" *Duarte*, 101 F.4th at 689 (quoting 6 Nathan Dane, Digest of American Law 715 (1823)); *see also id.* at 689 n.15 (collecting examples of noncapital founding-era felonies); *Kanter*, 919 F.3d at 458-61 (Barrett J., dissenting). (*See also* AOB-19-21.) Thus, the notion that all felonies at the founding were actually punished by death or forfeiture is "shaky" at best. *Duarte*, 101 F.4th at 688-89.

*Second,* regardless of how many founding-era "felonies" actually led to the ultimate punishment, a "felony" today is simply not the same thing as a founding-era "felony." (*See* ARB-19.) There is an obvious mismatch between the government's claimed founding-era definition of felony—a crime punishable by death or total property forfeiture, (GAB-34)—and today's definition of a felony: any "crime punishable by imprisonment for a term exceeding one year." *See Duarte*, 101 F.4th at 689-90. That mismatch is underscored by the fact that many modern felonies were either misdemeanors at the founding—for instance, Duarte's vandalism prior—or are self-evidently not things that would have ever been punishable by death. *Id.*; *see also* Section II.B.3.c, *supra* (examples of relatively minor modern felonies).

The gap between founding-era felonies and modern felonies is apparent from the government's consistent inability to identify any meaningful limiting

principle for what a modern legislature may designate as a "felony." Indeed, in its Third Circuit *en banc* argument in *Range*, the government admitted that there is no limiting principle, and that its position is that a legislature may make "jaywalking" a "felony" that would justify permanently disarming the jaywalker.[16] Similarly, at oral argument before the panel here, the government agreed that a legislature could make tearing a tag off a mattress a "felony" and permanently disarm anyone convicted of that "felony." (Oral Argument 16:49-17:19.) When pressed for a concrete principle limiting what conduct could be made a felony, it made summary gestures to the Eighth Amendment, due process and equal protection, "inherent limitations" in the Second Amendment, and finally "the political process." (Oral Argument 18:00-22:00.) But the entire point of the Supreme Court's Second Amendment jurisprudence is that Americans need not count on the political process to protect their Second Amendment rights. *See, e.g., Bruen*, 597 U.S. at 26 (Second Amendment does not permit "judicial deference to legislative interest balancing").

*Third*, even if founding-era "felonies" were in fact invariably punishable by death *and* modern "felonies" meaningfully resembled them, the government's

---

[16] En Banc Oral Argument, at 47:20-49:05, *Range v. Att'y Gen.*, No. 21-2835 (3d Cir. 2023), available at https://www2.ca3.uscourts.gov/oralargument/audio/21-2835_Rangev.AttyGenUSA_EnBanc.mp3.

greater-includes-the-lesser argument still fails, because that is not how the Constitution treats the other natural, individual rights enshrined in the Bill of Rights.  (*See* AOB-20-21; ARB-20-21.)  As the Sixth Circuit explained post-*Rahimi*, "No one suggests that [someone with a felony conviction] has no right to a jury trial or be free from unreasonable searches and seizures." *Williams*, 2024 WL 3912894, at \*14.  Or as now-Justice Barrett once put it, "we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding." *Kanter*, 919 F.3d at 461-62 (Barrett, J., dissenting).  "The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society." *Id.*

The argument is also contrary to historical practice.  A founding-era felon who was not executed "could 'repurchase arms' after successfully completing his sentence and reintegrating into society." *Range v. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023), judgment vacated, 144 S.Ct. 2706 (2024). At least one key founding-era statute even *required* prior felons to keep arms: the Militia Act of 1792, enacted just after the Second Amendment, required "each and every" free, able-bodied white male citizen between 18 and 45 to arm himself "with a good musket or firelock"—with no exceptions for prior felons.  Act of May 8, 1792, § 1, 1 Stat. 271.

27

Nor is the government's argument supported by *Rahimi*. *Rahimi* did engage in a form of greater-includes-the-lesser reasoning, when it stated that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." 144 S.Ct. at 1902. But in *Rahimi*, the historic and modern regulations had the same purpose, or "why": "to respond to the use of guns to threaten the physical safety of others." *Id.* *Rahimi* thus permitted a lesser punishment (a less restrictive "how") only to address the same "why."

By contrast, founding-era felonies and modern felonies do not all target the same danger—there is no close fit between the "why" of founding-era capital punishment for felonies and the government's claimed right to disarm all modern felons. Founding-era felonies were punished with death for a variety of reasons, including retribution and deterring other people from committing crimes that had nothing to do with physical safety. *See, e.g.*, 4 William Blackstone, Commentaries on the Laws of England 8, 50-51, 54-57 (1769) (explaining that felonies were originally forfeiture offenses with death added depending on "degree of guilt," and noting felonies such as "dishonor[ing] [one's] lord" by "l[ying] with his wife," serving foreign princes, and offenses related to coins). In other words, the death penalty was not imposed merely—or even primarily—to reduce the risk of firearm violence. Accordingly, the different "why[s]" of founding-era capital punishment

28

do not meaningfully fit the government's claimed "why" for § 922(g)(1). *Rahimi* does not permit the government to take the solution to one problem—ensuring proper retribution for the most serious crimes—and impose a lesser version of it to deal with an entirely different problem—reducing the generalized risk of firearm violence.

Moreover, it would be a significant leap to conclude that where death is permissible, so is any rights-deprivation short of death. *Rahimi* held only that if *temporary imprisonment* was permissible to incapacitate a person from violence, then *temporary disarmament* for that purpose (a lesser punishment) was also permissible. But to treat death as just another sentence that can be subdivided into a set of lesser restrictions ignores that "'[t]he penalty of death is different in kind from any other punishment imposed under our system of criminal justice.'" *Jones v. Ryan*, 733 F.3d 825, 846 (9th Cir. 2013) (quoting *Gregg v. Georgia*, 428 U.S. 153 (1976)). Indeed, as noted above in Section II.B.4, if the government's reasoning were accepted, legislatures could permanently deprive anyone convicted of a felony of their natural individual rights under the First, Fourth, Fifth, Sixth, Eighth, or Fourteenth Amendments—or any other constitutional provision—since such a punishment would still be "less" than death. But a law prohibiting a felon who has served their sentence from practicing their religion, or a law that stripped their right to a jury trial on future charges, would be self-evidently

unconstitutional.  There is no historical basis for treating Second Amendment rights any differently.

In short, the government's "felony" argument is no more compelling than it was pre-*Rahimi*.  The fact that someone who qualified as a "felon" at the founding might have been put to death does not give the government carte blanche to strip constitutional rights from anyone convicted of a modern "felony"—which may involve only a short maximum prison term and relatively-minor conduct that the founding-generation might not have even seen as criminal.  At minimum, the massive difference between modern "felonies" and founding-era "felonies" must be accounted for somehow, as the panel did by requiring the government to prove that a particular modern "felony" would have been recognizable to the founders as subject to the most serious punishments.  *Duarte*, 101 F.4th at 690-91.[17]  But to make *no* allowance for the difference between founding-era and modern "felonies" would be to allow the government to "manipulate the Second Amendment by choosing a label," *Duarte*, 101 F.4th at 690 (cleaned up), and to ignore *Rahimi*'s warning that even laws "regulat[ing] arms-bearing for a permissible reason" may

---

[17] Alternatively, the differences between founding-era and modern definitions of a "felony" might be accounted for by concluding that disarmament could apply "only to persons convicted of a [modern] death-eligible offense," thereby limiting disarmament to felonies that are today believed to merit the type of serious punishment imposed at the founding.  *See United States v. Bullock*, 679 F. Supp. 3d 501, 505, 528 (S.D. Miss. 2023) (Reeves, J.).

be unconstitutional "if [they do] so to an extent beyond what was done at the founding." *Rahimi*, 144 S.Ct. at 1898.

## C. Section 922(g)(1) is unconstitutional as applied to Duarte.

### 1. *Rahimi* confirms that § 922(g)(1) is unconstitutional as applied to nonviolent offenders like Duarte.

Duarte's panel briefing demonstrated that § 922(g)(1) is unconstitutional as applied here because there is no historical tradition that would justify automatically and permanently disarming nonviolent offenders like Duarte. (AOB-13-23; ARB-16-24.) There are no founding-era felon-in-possession laws, and even when looking for a wider tradition of relevant firearms regulation, the most that can be said is that regulations like the going-armed laws suggest a tradition of disarming individuals for some length of time who have actually demonstrated a proclivity towards violence. (AOB-14, AOB-18-19.)

*Rahimi* only confirms these conclusions. While the government may not need to produce a "historical twin"—a founding-era law permanently disbarring anyone convicted of any crime punishable by a year or more—it must nonetheless identify a "'relevantly similar'" historical regulatory tradition and "'apply[] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 144 S.Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29-30). For the reasons explained above, that "balance" cannot be the government's claimed authority to label vast and diverse swaths of the population as a

"dangerous" or "untrustworthy" group and automatically and permanently disarm everyone in the group.

Rather, any analysis of the founding generation's "balance" must include that generation's recognition that the right to keep and bear arms for self-defense was "fundamental": "'the natural right of resistance and self-preservation.'" *Rahimi*, 144 S.Ct. at 1897; *Heller*, 554 U.S. at 594 (quoting 1 Blackstone 136, 139 (1765)); *see also Bruen*, 597 U.S. at 32-33. Indeed, the principle that individuals should, as much as possible, be permitted to keep arms is evident from the fact that most or all founding-era disarmament laws—including the surety laws discussed in *Rahimi*—contained self-defense or necessity exceptions or other means of restoring the right. *See* Section II.B.3.b(2), *supra*. *See also Williams*, 2024 WL 3912894, at *13 (for each historical law categorically disarming a group, "individuals could demonstrate that their particular possession of a weapon posed no danger to peace" and so regain their arms). Accordingly, a proper balance must reflect the importance of armed self-defense to all Americans, including those with modern felony convictions, and distinguish between nonviolent prior felons like Duarte and those whose convictions demonstrate a specific and concrete threat of violent misuse of firearms.

### 2. The panel's approach is also far more consistent with *Rahimi* than is the government's.

The panel did not accept all of Duarte's arguments, but its reasoning nonetheless reflects a careful approach, consistent with *Rahimi*, for uncovering a historical tradition reflecting the founding-generation's balance of the individual right versus the safety of others.

As it did for each of the government's arguments, the panel closely examined the claim that the default penalty for "felonies" at the founding was death or total estate forfeiture, and so anything labeled a "felony" today can be punished with the relatively less-severe penalty of disarmament. *Duarte*, 101 F.4th at 688-91. It sensibly rejected parts of that argument, including the contention that any modern offense the government chooses to make punishable by a year or more in prison is the constitutional equivalent of founding-era felonies punishable by death. *Id.* at 689-90. (*See also* Section II.B.4, *supra*.) The panel nevertheless reasoned that, if there were any offenses the founding generation thought warranted permanent disarmament, they would be the offenses that generation thought serious enough to warrant death, life imprisonment, or total forfeiture of one's possessions. *Id.* at 689-90. Building on that reasoning, it held that the government may disarm individuals convicted of modern crimes that were punished with death, life imprisonment, or total forfeiture at the founding, and of relevantly similar modern crimes. *Id.* at 690-91.

33

As explained in Section II.B.4, *supra*, it is not correct that a founding-era crime having been death-eligible also necessarily means that the founding-generation would have agreed that a person who committed such a crime but was returned to society could be permanently and irrevocably stripped of their right to armed self-defense. That aside, the panel's analysis was otherwise consistent with *Rahimi*. It did not require a historical twin; instead, it allowed many applications of a harsh modern felon-in-possession law without a showing that the founders had felon-in-possession laws. But neither did it accept the government's claimed right to label any conduct—no matter how petty—as a "felony" and permanently disarm those who committed that conduct, because that was far too broad a principle without any historical basis. *Id.* at 690.

This analysis was in keeping with *Rahimi*'s framing of what it means to derive "principles" from historical tradition. By parsing the wide expanse of modern felonies into those meaningfully resembling founding-era capital felonies and those with no such resemblance, the panel "faithfully" sought a founding-era understanding of what would make a crime serious enough to justify permanent disarmament, and heeded *Rahimi*'s caution that even laws "regulat[ing] arms-bearing for a permissible reason" may be unconstitutional "if [they do] so to an extent beyond what was done at the founding." 144 S.Ct. at 1898.

**D.** **This Court has discretion to remand, but it should at least clarify that the district court is not bound by *Vongxay*.**

When there are intervening changes of law, this Court has discretion to remand the issue to the district court for determination in the first instance. *See, e.g.*, *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978); *Gallardo v. United States*, 755 F.3d 860, 862 (9th Cir. 2014).

Here, the district court entered judgment before even *Bruen* was decided. Given the substantial shift in Second Amendment jurisprudence after *Bruen* and *Rahimi*, this Court could remand to the district court to address those decisions, just as the Supreme Court recently vacated and remanded various § 922(g)(1) cases after *Rahimi*. *See* Orders List (U.S. July 2, 2024) (remanding *Garland v. Range*, No. 23-374; *Jackson v. United States*, No. 23-6170; and *Vincent v. Garland*, No. 23-683).

Still, this case presents legal issues that this Court will likely have to resolve at some point. Accordingly, it may make sense to resolve them here. If this Court does decide to remand, however, it should at least make clear that *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), is no longer good law. As previously explained, *Vongxay* did not conduct the historical analysis that *Bruen* and *Rahimi* require, but instead was premised on the holdings of prior cases reasoning, contra-*Bruen* and *Rahimi*, that there is no individual right to possess arms, and that gun regulations can be upheld on means-ends scrutiny. (AOB-26-30; ARB-5-8.) *See*

35

*also Duarte*, 101 F.4th at 664-71. Were this Court to remand without first clarifying that *Vongxay* is no longer good law, the district court may simply find that it is bound by *Vongxay*, and the case would return to this Court without a district court ruling that applies the *Bruen* and *Rahimi* test to § 922(g)(1).

## III. CONCLUSION

This Court should hold § 922(g)(1) unconstitutional as applied to Duarte, and order that his conviction be vacated and the indictment dismissed.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 17, 2024        By  */s/ SONAM HENDERSON*
                                     SONAM HENDERSON
                                     Deputy Federal Public Defender
                                     Attorney for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE

Pursuant to Circuit Rule 32-1 and this Court's August 2, 2024 Order, I certify that this supplemental brief is proportionally spaced, has a typeface of 14 points or more, and contains approximately 8382 words.

DATED:  September 17, 2024          */s/ SONAM HENDERSON*
                                   SONAM HENDERSON