No. 22-50048

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STEPHEN DUARTE,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of California,
Honorable André Birotte, Presiding.
CR No. 20-00387-AB-1

# BRIEF OF AMICI CURIAE NINTH CIRCUIT FEDERAL PUBLIC AND COMMUNITY DEFENDER OFFICES IN SUPPORT OF DEFENDANT-APPELLANT

JODI LINKER
Federal Public Defender, Northern
District of California
CARMEN SMARANDOIU
Appellate Chief
450 Golden Gate Ave., 19th Floor
San Francisco, CA 94102
(415) 436-7700

KASHA CASTILLO
Executive Director, Southern
District of California
KATIE HURRELBRINK
Appellate Attorney
225 Broadway, Suite 900
San Diego, CA 92102
(619) 234-8467

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..............................................................iii

STATEMENTS OF INTEREST OF AMICI CURIAE AND AUTHORITY TO FILE .....vii

INTRODUCTION...........................................................................1

ARGUMENT.................................................................................3

   I.   *Bruen* forecloses the government's bid to let legislatures decide whom to disarm while precluding all as-applied challenges....................................................................3

      A.   The government's proposed historical principles directly conflict with *Bruen*'s rejection of deference to legislatures and means-ends scrutiny.........................................................................4

         1.   At worst, the government's proposals would vest legislatures with unchecked authority to disarm vastly overbroad groups. .....................5

         2.   At best, the governments' proposals would reinstate means-ends balancing. ..........................6

      B.   The government's proposed bar on as-applied challenges is incompatible with history and precedent, and it would subject the Second Amendment to different rules than other fundamental rights. .....................................................8

   II.   When assessing as-applied challenges, courts must limit the analysis to facts legally relevant to § 922(g)(1). ...............13

      A.   *Rahimi* modeled an appropriately cabined as-applied analysis...........................................................15

      B.   *Rahimi*, along with other precedent, shows that as-applied challenges incorporate a limited array of facts. .......................................................................19

         1.   Courts may not consider facts unrelated to what § 922(g)(1) criminalizes—namely, possessing a gun after a felony conviction. ........19

i

2. When evaluating the predicate felonies, courts may not carry out an unbounded inquiry into the underlying conduct. ................... 23

C. An indiscriminate, anything-goes approach would raise a host of constitutional and prudential concerns. ....................................................... 26

CONCLUSION ............................................................... 31

**Cases**                                                    **Page(s)**

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)................................................................7

*Caetano v. Massachusetts*,
577 U.S. 411 (2016)................................................................9

*City of Chicago v. Morales*,
527 U.S. 41 (1999)................................................................29

*City of Los Angeles, Calif. v. Patel*,
576 U.S. 409 (2015)........................................... 16, 20, 21, 22

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985)..............................................................27

*D.C. v. Heller*,
554 U.S. 570 (2008)......................................................6, 8, 29

*Descamps v. United States*,
570 U.S. 254 (2013)..............................................................28

*Duncan v. State of La.*,
391 U.S. 145 (1968)..............................................................12

*Edenfield v. Fane*,
507 U.S. 761 (1993)................................................................7

*Erlinger v. United States*,
144 S.Ct. 1840 (2024)..........................................................12

*F.C.C. v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993)................................................................8

*Fisher v. Univ. of Texas at Austin*,
570 U.S. 297 (2013)................................................................7

*Foti v. City of Menlo Park,*
    146 F.3d 629 (9th Cir. 1998)...............................................16

*Gallinger v. Becerra,*
    898 F.3d 1012 (9th Cir. 2018)...............................................8

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)...............................................29

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by*
    *Bruen*, 597 U.S. 1...............................................6, 29

*Lewis v. United States,*
    518 U.S. 322 (1996)...............................................12

*MacDonald v. Moose,*
    710 F.3d 154 (4th Cir. 2013)...............................................21, 30, 31

*Mathis v. United States,*
    579 U.S. 500 (2016)...............................................25, 26, 28

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022)...............................................passim

*Papachristou v. City of Jacksonville,*
    405 U.S. 156 (1972)...............................................29

*Range v. Att'y Gen.,*
    69 F.4th 96 (3d Cir. 2023), *cert. granted, judgment vacated sub nom.*
    *Garland v. Range*, 144 S. Ct. 2706 (2024)...............................................passim

*Taylor v. United States,*
    495 U.S. 575 (1990)...............................................25

*Tyler v. Hillsdale Cnty. Sheriff's Dep't,*
    837 F.3d 678 (6th Cir. 2016) (Sutton, J., concurring)...............................................13

*United States v. Adams,*
914 F.3d 602 (8th Cir. 2019) (Kelly, J., concurring) ............................ 30

*United States v. Davis,*
588 U.S. 445 (2019)................................................................................ 30

*United States v. Diaz,*
___ F.3d ___, 2024 WL 4223684 (5th Cir. Sept. 18, 2024) ............. 21, 22

*United States v. Eichman,*
496 U.S. 310 (1990)................................................................................ 20

*United States v. Haymond,*
588 U.S. 634 (2019)................................................................................ 27

*United States v. Moore,*
111 F.4th 266 (3d Cir. 2024)................................................................. 14

*United States v. Price,*
111 F.4th 392 (4th Cir. 2024) ............................................................... 22

*United States v. Rahimi,*
144 S.Ct. 1889 (2024)..................................................................... passim

*United States v. Rahimi,*
61 F.4th 443 (5th Cir. 2023), *overruled*, 144 S.Ct. 1889 ...................... 24

*United States v. Salerno,*
481 U.S. 739 (1987)................................................................................ 16

*United States v. Williams,*
113 F.4th 637 (6th Cir. 2024) ............................................................... 15

## Statutes, Rules, and the Constitution     Page(s)

U.S. Const. amend. II ...................................................................... passim

18 U.S.C. § 922 ................................................................................ passim

Federal Firearms Act, Pub. L. No. 785 § 1(6), 52 Stat. 1250 (1938) ...... 12

Tex. Fam. Code Ann. § 85.025(c) ........................................................ 25

Fed. R. Evid. 401 ............................................................................... 23

Fed. R. Evid. 402 ............................................................................... 23

**Other Authorities**          **Page(s)**

Sentencing Guidelines for United States Courts, 89 Fed. Reg. 36853
(May 3, 2024) ................................................................................ 12

## STATEMENTS OF INTEREST OF AMICI CURIAE AND AUTHORITY TO FILE

The Ninth Circuit Federal Public and Community Defenders represent indigent defendants in this Court. As the institutional defenders for indigent federal defendants, these organizations have an interest in all federal criminal law issues. These organizations also defend the majority of indigent defendants charged under 18 U.S.C. § 922(g)(1). The outcome and reasoning in this case will significantly affect their clients' ability to challenge their § 922(g)(1) charges or convictions under the Second Amendment to the United States Constitution. Accordingly, Amici have a strong interest in the accurate development of the law in this area.

Amici affirm that no publicly held corporation owns stock in them. No counsel for either party authored this brief in whole or in part. And no party, party's counsel, person, or other entity contributed money to preparing this brief.

Both parties have consented to this brief's filing.

## INTRODUCTION

This case presents one of the most important Second Amendment questions to emerge after *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022): Can the government constitutionally disarm, for life, a person who sustains a felony conviction? *See* 18 U.S.C. § 922(g)(1). In Steven Duarte's case, the panel said "no." Its conclusion comports with historical evidence and ordinary constitutional principles. Modern felonies comprise a broad and heterogeneous assortment of crimes, punishable by a wide range of imprisonment, many of which involve no violence. But if the government can demonstrate, on an as-applied basis, that lifetime disarmament for a certain felony is consistent with the principles underlying the Nation's regulatory tradition, *United States v. Rahimi*, 144 S.Ct. 1889, 1898 (2024), then § 922(g)(1) passes constitutional muster. If the government cannot do so, as in Mr. Duarte's case, the prosecution is unconstitutional.

In its most recent supplemental brief, however, the government asks courts to defer to Congress's judgment in § 922(g)(1) that all felons should be disarmed for life and to disallow as-applied challenges, claiming that Congress has the authority to make categorical judgments and that any other approach would not be administratively feasible. *See* Appellee's Supplemental Brief, *Range v. Att'y Gen.*, No. 21-2835 (3rd Cir. Aug. 2, 2024) (hereinafter, *Range Supp.*). In the

government's view, all felonies are too "serious" and all felons too "dangerous" to ever possess arms—regardless of the nature of the felonies and their potential or actual punishment—simply because a legislature made the offense punishable by imprisonment for a term exceeding one year. *See id.*

The government's arguments cannot be squared with *Bruen*, *Rahimi*, and a wealth of other precedent. The Constitution limits legislatures, not the other way around, so any firearm regulation must be subject to both facial and as-applied challenges to ensure that no American is unconstitutionally denied the fundamental right to keep and bear arms. Indeed, the Supreme Court has long entertained as-applied challenges regarding regulatory categories, and it would be particularly perverse to disallow them with respect to § 922(g)(1) given the legislatures' unbounded authority to define crimes and set their punishment. As for administrability, much of the problem flows from the government's own attempts to introduce extraneous details into the as-applied analysis. Properly understood, as-applied § 922(g)(1) analyses are limited to a contained universe of legally relevant facts: a person's possession of a firearm and the nature of their prior felony conviction. This Court must therefore reject the government's arguments and reverse.

**ARGUMENT**

## I. *Bruen* forecloses the government's bid to let legislatures decide whom to disarm while precluding all as-applied challenges.

The government's supplemental brief in *Range* proffers two purported historical "principles" to try to justify § 922(g)(1). *Range Supp.* at 9. First, the government contends that legislatures may disarm both (a) "persons who have committed serious crimes," and (b) "categories of persons thought by a legislature to present a special danger of [firearms] misuse." *Id*. Second, the government argues that because historical legislatures had the power to make categorical disarmament decisions, defendants today may not challenge on an as-applied basis whether their crimes are serious enough, or whether they are dangerous enough, to fall within these traditions. *Id*. at 21-22, 25-29. Together, these proposals would give legislatures vast power to mete out lifetime disarmament for anybody convicted of an offense punishable by more than a year's imprisonment, with little if any judicial review.

As the panel decision persuasively explains, the historical analysis supporting these proposals is hopelessly flawed. That is reason enough to reject them. But they also violate *Rahimi* and *Bruen* in another way: They reintroduce interest balancing into Second Amendment analysis, and they ignore the Supreme Court's own recognition that historical categories of permissible regulation coexist with as-applied challenges.

**A.    The government's proposed historical principles
directly conflict with *Bruen*'s rejection of deference to
legislatures and means-ends scrutiny.**

As an initial matter, the government's proposed historical
principles would smuggle interest balancing back into Second
Amendment analysis. Prior to *Bruen*, courts assessed gun regulations
using either strict or intermediate scrutiny, both of which entailed
assessing the fit between the law's ends and the means it used to
procure them. 597 U.S. at 18–19. In practice, however, judges tasked
with "mak[ing] difficult empirical judgments about the costs and
benefits of firearms restrictions" would "often defer to the
determinations of legislatures," upholding most laws. *Bruen*, 597 U.S.
at 25–26 (cleaned up).

*Bruen* did away with "means-end scrutiny" and the "judicial
deference to legislative interest balancing" that inevitably followed. *Id.*
at 24, 26. Today, the only way to overcome the Second Amendment's
"unqualified command" is to "demonstrat[e] that [the challenged
regulation] is consistent with the Nation's historical tradition of firearm
regulation." *Id.* (cleaned up).

The government's proposals would again unmoor Second
Amendment exceptions from history. But rather than simply revert to
pre-*Bruen* norms, they would double down on that regime's deficiencies.
At worst, they would usher in an era of unprecedented judicial
deference to legislatures. At best, they would reinstitute means-ends

scrutiny. In either case, judicial oversight would be far less robust than it was even before *Bruen*.

> **1. At worst, the government's proposals would vest legislatures with unchecked authority to disarm vastly overbroad groups.**

First, the government's proposals would endorse near-total "deference to legislat[ures]." *Bruen*, 597 U.S. at 26. This is apparent on the face of the alleged historical principles. Most obviously, the government claims the power to disarm any group "thought by a legislature" to present a risk of firearms misuse, a category defined by legislative deference. *Range Supp.* at 9. Only slightly more subtle, the government asserts the authority to disarm anyone who commits a "serious" crime. *Id*. But on this view, a crime's "seriousness" would have nothing to do with the criminalized conduct. The only measure of seriousness would be the "maximum penalty," as "authorized"—once again—"by the legislature." *Id*. at 27.

As the penalty problem illustrates, the government's proposal winds up paying double deference. Legislatures get to decide that persons with felony convictions should be disarmed. But legislatures also define crimes and their punishment. The government confirmed at oral argument in *Range* that the legislature's authority to define felonies had no "limiting principle." Oral Argument Recording at 46:40-47:20, *Range v. Att'y Gen.*, 69 F.4th 96, 98 (3d Cir. 2023), *cert. granted,*

*judgment vacated sub nom. Garland v. Range*, 144 S. Ct. 2706 (2024). So "[h]abitual jaywalkers" could be disarmed for life if a legislature deemed that conduct felonious. *Id.*

Blind deference to legislatures is incompatible with *Bruen* and with the Second Amendment's status as a fundamental right. After all, the whole point of "enshrin[ing] [a] constitutional right[]" is to "take[] certain policy choices off the table." *D.C. v. Heller*, 554 U.S. 570, 636 (2008). But "[t]he government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun." *Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 597 U.S. 1. Conferring that power would not just threaten people with felony convictions. Any group "thought by a legislature" to pse a danger could be disarmed for life.

*Bruen* foreclosed that result. This Court must, too.

## 2. At best, the governments' proposals would reinstate means-ends balancing.

To assuage concerns about total deference, the government suggests that courts could carry out a minimal form of review. According to the government, "[c]ourts may properly review a disqualification's breadth, as well as a legislature's judgment that a category of persons committed offenses that are serious or that indicate they would pose a danger if armed." *Range Supp.* at 25. Specifically,

"[c]ourts may ask . . . whether these judgments are supported by evidence, common sense, or the judgments of other American legislatures today or over time." *Id*.

There is a term for an analysis that measures a law's "breadth" against the "legislat[ive] judgments" motivating it. *Id*. It is called means-ends scrutiny. *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 610–11 (2021) (conducting a "narrow[] tailor[ing]" analysis by comparing the "breadth" of challenged restrictions to their purposes). That is the very methodology *Bruen* rejected. 597 U.S. at 24.

In fact, this suggestion would go beyond even the pre-*Bruen* interest-balancing regime. As noted, courts used to assess gun regulations using either intermediate scrutiny, which requires the law to be "substantially related to the achievement of an important governmental interest," or strict scrutiny, which requires the law to be "narrowly tailored to achieve a compelling governmental interest." 597 U.S. at 18–19 (cleaned up). Under either form of review, the government bears the burden to justify its law with "evidence," *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 312 (2013) (strict scrutiny), not "mere speculation or conjecture," *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (intermediate scrutiny).

Under the government's proposal, however, courts would ask only if there was "support[]" for the legislature's judgment—perhaps in evidence, but also in non-evidentiary sources, like "common sense" and

"the judgments of other American legislatures today or over time."
*Range Supp.* at 25. And courts could conduct only an overall evaluation
of Congress's "categorical dangerousness assessment." *Id.* at 22. They
could not consider individual cases. *Id.* at 25-29.

That type of analysis closely tracks a different, much less
searching form of means-ends scrutiny: rational basis review. In this
form of review, "a legislative choice is not subject to courtroom fact-
finding and may be based on rational speculation unsupported by
evidence or empirical data." *F.C.C. v. Beach Commc'ns, Inc.,* 508 U.S.
307, 315 (1993). Likewise, it is no objection that legislative
classifications are "to some extent both underinclusive and
overinclusive under rational-basis review." *Gallinger v. Becerra*, 898
F.3d 1012, 1018 (9th Cir. 2018) (cleaned up). So deferential is this form
of scrutiny that no court after *Heller* thought to apply it to Second
Amendment challenges. But that is where the government's proposal
would lead us—with less solicitude for the arms right than even before
*Bruen* abrogated interest-balancing.

**B.    The government's proposed bar on as-applied
challenges is incompatible with history and
precedent, and it would subject the Second
Amendment to different rules than other fundamental
rights.**

Finally, the government's sweeping substantive proposals come
with a procedural twist: According to the government, courts may not

entertain as-applied challenges to any category-based disarmament laws. *Range Supp.* at 25-29. The government reasons that past legislatures disarmed categories of people, without individualized dangerousness determinations. *Id.* at 21. Therefore, litigants cannot today assert as-applied challenges based on their individual circumstances, especially because such challenges are hard to administer. *Id.* at 25-29.

That logic must be rejected for at least three reasons. First, it would fly in the face of the Supreme Court's consistent practice when evaluating categories of permissible gun regulation. The Supreme Court has identified several regulatory categories, including "dangerous and unusual weapons," "sensitive places," and "individuals who pose a credible threat to the physical safety of others." *Rahimi*, 144 S.Ct. at 1894–97. But instead of blindly deferring to legislatures' judgments about who or what falls into those categories, the Court has evaluated the legislature's categorization on an individual basis. In *Caetano v. Massachusetts*, the Court did not defer to the government's position that tasers are "dangerous and unusual weapons." 577 U.S. 411, 412 (2016). Instead, it instructed the lower court to make particularized findings about tasers' contemporary usage. *Id.* In *Bruen*, the Court rejected outright the suggestion that New York's proper-cause requirement was a "sensitive places" law. 597 U.S. at 30. That is because there was "no historical basis for New York to effectively declare the island of

Manhattan a 'sensitive place.'" *Id.* And in *Rahimi*, the Court held that 18 U.S.C. § 922(g)(8) was constitutional "[a]s applied to the facts of [Rahimi's] case," since he was subject to a § 922(g)(8)(C)(i)-compliant restraining order targeting "individuals who pose a credible threat to the physical safety of others." 144 S.Ct. at 1897–98. But it reached that conclusion only after carefully comparing that subsection to historical precursors. *See infra*, Section II.A.

Thus, the Court has never deemed a law to fall within a historical tradition just because a legislature "declare[d]" it to be so, *Bruen*, 597 U.S. at 30, let alone barred litigants from testing those traditions' boundaries on an as-applied basis. Nor, to Amici's knowledge, has the Court foreclosed as-applied challenges for any other individual right. To do so here would be to treat the Second Amendment as "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 70 (cleaned up).

Second, the government's historical argument does not pass muster. According to the government, because historical legislatures categorically "disarmed" loyalists, tramps, minors, the mentally ill, and the intoxicated, no litigant today can challenge their inclusion in any categorical group. *Range Supp.* at 19-22. But this reasoning overlooks that these historical categories baked in much more individualization than § 922(g)(1). The categories were narrowly defined: The danger they sought to avert was tightly tied to the individual person's condition,

usually a temporary one. And the condition itself caused the kind of irrational, reckless, or disloyal behavior that can lead to firearms misuse. Thus, the individual's condition produced danger, and that danger justified (generally temporary) restrictions on the right to keep and bear firearms.[1]

In contrast, conviction of an offense punishable by more than a year's imprisonment does not *cause* firearms misuse. Rather, Congress used the maximum penalty as an extremely rough proxy for predicting whether a person will commit future crimes,[2] a small subset of which may be violent, and even smaller subset of which may involve guns. *See Range Supp.* at 21-22. And even though "one of the most consistent findings in criminology [is] that criminal behavior tends to decrease with age," Sentencing Guidelines for United States Courts, 89 Fed. Reg. 36853, 36859 (May 3, 2024), § 922(g)(1) disarms forever. When

---

[1] Although the government claims those groups were "disarmed," most of its regulations in fact prohibited only the carrying or the sale or acquisition of firearms, usually on a temporary basis. *Cf. Range Supp.* at 19-21. None imposed a permanent disqualification from Second Amendment rights as § 922(g)(1) creates.

[2] That proxy is especially imprecise because § 922(g)(1)'s maximum-penalty approach treats all offenses punishable by imprisonment exceeding one year the same, whether that maximum penalty is 2 years, 20 years, or life, and regardless of the sentence actually imposed. By comparison, the first Federal Firearms Act targeted only those convicted of a "crime of violence," which included "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking," and certain aggravated assaults. Pub. L. No. 785 § 1(6), 52 Stat. 1250 (1938).

compared to the narrower and more individualized historical firearm regulations discussed above, permanent disarmament is not "comparably justified" for everyone in § 922(g)(1)'s broad and heterogeneous grouping. *Bruen*, 592 U.S. at 29.

It is no answer to point out that, in other contexts, the Court has relied on the statutory maximum as "'an objective indication of the seriousness with which society regards the offense.'" *Range Supp.* at 21-22 (quoting *Lewis v. United States*, 518 U.S. 322, 328 (1996)). In *Lewis*, the Court reaffirmed that a defendant charged only with petty offenses—a term that the Court held encompasses offenses punishable by imprisonment less than 6 months—is not entitled to a jury trial. *Lewis*, 518 U.S. at 327-30. But the "petty offense" exception to the Sixth Amendment's jury trial right has strong historical roots, *Duncan v. State of La.*, 391 U.S. 145, 160 (1968), whereas the government has been unable to locate a historical wellspring for its broad Second Amendment principles.

Third, the government's administrability concerns do not change the analysis. Just as in other contexts, there "is no efficiency exception" to the Second Amendment. *Erlinger v. United States*, 144 S.Ct. 1840, 1856 (2024). Thus, whatever administrability concerns as-applied challenges present—and as explained *infra*, that they are less significant than the government makes them out to be—the answer is not to tolerate unconstitutional denials of this fundamental right and

abolish as-applied challenges. Indeed, "[i]t is not uncommon in constitutional law to create rules that prophylactically over-protect constitutional rights. Less common, indeed unprecedented, is the attempt to create a judicial rule that prophylactically under-protects individual constitutional rights." *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 713 (6th Cir. 2016) (Sutton, J., concurring). This Court should "not go down that road." *Id.*

## II. When assessing as-applied challenges, courts must limit the analysis to facts legally relevant to § 922(g)(1).

As noted, the government has urged that § 922(g)(1) defendants should be barred from bringing as-applied challenges, claiming inter alia that they are not administrable. *Range Supp.* at 28. But the government's administrability concerns appear to arise from its own insistence that courts consider an unlimited universe of facts when evaluating as-applied challenges. The government's approach misunderstands what is at issue in an as-applied Second Amendment challenge: the application of a specific statute (§ 922(g)(1)) to the case at hand.

As an initial matter, the government frequently defends § 922(g)(1) prosecutions by pointing to information having nothing to do with the challenger's underlying felonies or any other element of § 922(g)(1). *See, e.g.*, *United States v. Duarte*, C.A.9. No. 22-50048, Dkt. 33 (Answering Brief, "AB") at 63-64 (arguing that Mr. Duarte may be

disarmed based, inter alia, on his alleged gang affiliation and supervision status); *United States v. Rojo*, C.A.9 No. 23-598, Dkt. 31 at 49 (arguing that the defendant may be disarmed, inter alia, based on drug use, the circumstances of the arrest, and even post-arrest conduct). Additionally, when addressing the felonies themselves, the government often presents untested allegations drawn from complaints, police reports, and other non-adversarial documents. *See, e.g.*, *United States v. Jackson*, C.A.8 No. 22-2870, Dkt. Id. 5249213 at 64-65 (arguing that the defendant may be disarmed based on his prior felony convictions, during which he "fled police on numerous occasions, both by car and on foot, and made an indirect threat of violence toward a responding officer," "possessed a gun at the same time he was in possession of [drugs]," and "compiled dozens of disciplinary and behavioral citations" while in custody for those priors, citing the Presentence Investigation Report). Here, the government implicitly endorsed this view by advocating against an "elements-based" evaluation. AB at 65-68.

At least one court has followed the government's lead by taking an expansive view of as-applied challenges, claiming that courts may review an apparently unlimited spectrum of "facts beyond the predicate offenses alleged in the indictment." *United States v. Moore*, 111 F.4th 266, 273 (3d Cir. 2024). Employing this approach, the Third Circuit rejected an as-applied challenge to § 922(g)(1) because the offense occurred when the challenger was on supervised release—a fact having

no bearing on the conduct that § 922(g)(1) criminalizes. Another court has taken a somewhat narrower, but still broad view, holding that courts should "evaluate a defendant's entire criminal record—not just the specific felony underlying his section 922(g)(1) prosecution," and should make the determination "after taking account of the unique circumstances of the individual, including details of his specific conviction[s]" from sources such as the Presentence Report. *United States v. Williams*, 113 F.4th 637, 663 (6th Cir. 2024).

Amici agree that such indiscriminate, anything-goes approaches pose administrability challenges. But these approaches are simply wrong, as they fail to cabin the analysis to the facts legally relevant to a defendant's § 922(g)(1) conviction and raise a host of constitutional concerns. By contrast, *Rahimi* modeled the correct approach. By following *Rahimi*'s lead, courts can ensure that as-applied analyses are consistent, manageable, and fair.

### A. *Rahimi* modeled an appropriately cabined as-applied analysis.

*Rahimi* illustrates a properly bounded as-applied analysis. Even though the record in *Rahimi* contained a wide range of sensational allegations, the Court stayed narrowly focused on those facts relevant to the defendant's legal challenge.

The arrest in *Rahimi* arose out of a disturbing series of violent encounters, involving assaults, drug dealing disputes, road rage

15

incidents, and repeated discharges of firearms in public. 144 S.Ct. at 1894–95. The statute under which federal prosecutors finally charged Rahimi, however, targeted different conduct altogether. Title 18 U.S.C. § 922(g)(8) criminalizes gun possession by a person subject to a domestic violence restraining order, issued after notice and opportunity to be heard, and that "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury[.]" 18 U.S.C. § 922(g)(8)(C)(ii). In Rahimi's case, his girlfriend had obtained such an order after the December 2019 assault. *Id*. Yet Rahimi continued possessing guns. On appeal, he challenged his § 922(g)(8) conviction under the Second Amendment, claiming that the statute was facially unconstitutional. *Id*.

Constitutional challenges to statutes take two different but related forms: An as-applied challenge targets "only the particular application of the law" in the challenger's case, *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998), while a facial challenge contends that a statute is "unconstitutional in all of its applications," *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 418 (2015). As the Supreme Court noted in *Rahimi*, courts can reject facial challenges by conducting as-applied analyses, because "if the law is constitutional in at least some of its applications," "a facial challenge fails." 144 S.Ct. at 1903 n.2 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). The

Court went on to reject Rahimi's facial challenge because the statute was "constitutional as applied to the facts of [the defendant's] own case." *Id*. at 1898.

When conducting that as-applied analysis, the Court kept the focus firmly on facts relevant to the statute of conviction. Rahimi "had received notice and an opportunity to be heard," his restraining order "prohibited him from communicating with or threatening [his girlfriend]," and the order included a finding that he "represented 'a credible threat to the physical safety' of [his girlfriend] or her family," as required by § 922(g)(8)(C)(i). *Id*. at 1896. Because his order met the requirements in § 922(g)(8)(C)(i) and was "temporary as applied to Rahimi," § 922(g)(8)'s application to Rahimi was consistent with historical tradition. *Id*. at 1898-99, 1901-03.

Specifically, the Court identified two regulatory traditions, involving surety statutes and affray statutes, which together confirmed that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id*. at 1899–1901. The Court then compared these traditions to § 922(g)(8)(C)(i) cases. First, the Court observed that this subsection "applies to individuals found to threaten the physical safety of another." *Id*. at 1901. The statute therefore "restrict[ed] gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do." *Id*. Second, the Court noted that "Section 922(g)(8)

applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another." *Id.* at 1901–02. "That matche[d] the surety and going armed laws, which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 1902. Finally, "Section 922(g)(8) only prohibits firearm possession so long as the defendant 'is' subject to a restraining order," which "[i]n Rahimi's case . . . is one to two years after his release from prison, according to [Texas law]." *Id.* Section 922(g)(8)'s application to Rahimi was therefore "like surety bonds of limited duration." *Id.* For all these reasons, the Court concluded that "Section 922(g)(8) can be applied lawfully to Rahimi." *Id.*

Notably missing from the Court's as-applied analysis is the wealth of contextual information—like Rahimi's unprovoked shootings and threat to shoot, narcotics trafficking, and dangerous driving—which portray him as a dangerous person and would seem to implicate the very historical tradition that *Rahimi* identified. Though the Court noted this information in its case background, it was entirely absent from its as-applied analysis, and played no part in validating Rahimi's prosecution and conviction. *Id.* at 1901–02.

*Rahimi* thus shows that when evaluating an as-applied Second Amendment challenge, courts do not look to an unlimited array of facts about the challenger's history and characteristics. Instead, they confine the analysis to facts legally relevant to the charged offense.

18

**B. *Rahimi*, along with other precedent, shows that as-applied challenges incorporate a limited array of facts.**

*Rahimi*'s statute-centered mode of analysis comports with how courts evaluate as-applied constitutional claims across contexts. That approach has two major consequences for as-applied challenges to § 922(g)(1): First, courts may not consider facts unrelated to the felon-in-possession conduct criminalized in the statute. And second, when considering past felony convictions, courts may not delve into the conduct underlying those convictions.

**1. Courts may not consider facts unrelated to what § 922(g)(1) criminalizes—namely, possessing a gun after a felony conviction.**

First, courts must confine their as-applied review to facts pertaining to what § 922(g)(1) actually criminalizes: possessing a gun after sustaining a felony conviction. That's because when adjudicating constitutional challenges, courts do not ask whether a given *person* can be deprived of rights in light of their overall characteristics. Rather, they determine whether a *statute* is constitutional as applied to that person's case.

This follows from what it means for a statute to "apply" in the first place. As noted above, a statute can be challenged on an as-applied basis, where the court considers just one of the statute's "applications," *Foti*, 146 F.3d at 635, or on a facial basis, where the court looks to all of

the state's "applications," *Patel*, 576 U.S. at 418. Either way, the evaluation turns on how a statute "appli[es]." *Id*. An "application" of a statute, in turn, implicates only the conduct that the statute "actually authorizes or prohibits," not conduct for which the law is "irrelevant." *Id*. at 418 (holding that searches pursuant to an exigency or a warrant are not "applications" of statute that authorizes warrantless searches, and that "the proper focus of the constitutional inquiry is searches that the law actually authorizes"). It does not sweep circumstances or conduct incidental to the targeted acts, even if those incidental facts would—under a different statutory scheme—change the constitutional calculus.

For instance, a statute punishing flag burning is often unconstitutional as applied. *E.g.*, *United States v. Eichman*, 496 U.S. 310 (1990). True, some instances of flag burning might be properly criminalized for other reasons, such as causing property damage. *Id*. at 313 n.1. But in such cases, the property damage is incidental to what the charged statute "prohibits": burning flags. *Patel*, 576 U.S. at 418. So even if a person's flag burning activities cause property damage, prosecuting them under a flag-burning statute may still violate the Constitution. *See Eichman,* 496 U.S. at 313–19 & nn.1, 5 (upholding an as-applied First Amendment challenge to the Flag Protection Act, but letting a willful injury to federal property charge go forward).

Likewise, a statute prohibiting same-sex intercourse is "unconstitutional when applied to any person." *MacDonald v. Moose*, 710 F.3d 154, 162 (4th Cir. 2013). True, some instances of same-sex intercourse might involve other conduct that could be properly criminalized, like sex with a minor. *See id*. at 165. But the age of the sexual partner has nothing to do with the conduct that the charged statute "prohibits," *Patel*, 576 U.S. at 418, namely, same-sex intercourse. *See Moose*, 710 F.3d at 165 ("The anti-sodomy provision does not mention the word 'minor[.]'"). The government is free to prosecute statutory rape under a statutory rape statute, assuming one exists. *Id*. But the government cannot defeat a constitutional challenge to a statute barring same-sex intercourse because the individual's behavior happened to be with a minor. *Id*. at 164–65.

The Fifth Circuit has employed the same reasoning when circumscribing the facts relevant to Second Amendment challenges. *United States v. Diaz,* ___ F.3d ___, 2024 WL 4223684, at *5 (5th Cir. Sept. 18, 2024). In deciding a recent as-applied challenge to § 922(g)(1), the court "consider[ed] [only] prior convictions that are 'punishable by imprisonment for a term exceeding one year.'" *Id*. (quoting 18 U.S.C. § 922(g)(1)). Past, dismissed drugs charges were "not relevant for [the court's] purposes," as they were not convictions. *Id*. Past misdemeanors were equally irrelevant, as those convictions were not "punishable by more than one year, as required by § 922(g)(1)." *Id*. New offenses joined

with the § 922(g)(1) charge could not be considered either, because "that charge must instead rely on previous history." *Id*. Only the predicate offenses identified by statute were relevant to the analysis. *Id*.; *see also United States v. Price*, 111 F.4th 392, 402 n.4 (4th Cir. 2024) (declining to consider felon status in evaluating obliterated serial number charge, because rather than "banning *felons* from possessing firearms with obliterated serial numbers," the statute "bans *all* individuals from possessing [such] firearms" (emphasis added)).

Underlying all these cases is the same basic principle: when assessing the constitutionality of a statute, only those facts relevant to what the statute "authorizes or prohibits" matter. *Patel*, 576 U.S. at 418. This principle explains why the Supreme Court in *Rahimi* did not consider the panoply of contextual facts during its as-applied analysis: those facts had nothing to do with what § 922(g)(8) "authorizes or prohibits." *Id*. For that statute, the only legally relevant facts involved Rahimi's gun possession while subject to a particular kind of restraining order. The government therefore could not defend Rahimi's conviction based on such extraneous facts as his unprovoked shootings, drug dealing, or dangerous driving. It had to, and successfully did, defend the case based on the conduct criminalized in the statute.

Translating this principle to Mr. Duarte's challenge, the analysis must focus solely on what § 922(g)(1) "prohibits," *Patel*, 576 U.S. at 418: knowingly possessing a gun after sustaining a felony conviction. Other

information—like Mr. Duarte's alleged gang affiliation and supervision status, AB at 63-64—had no bearing on his § 922(g)(1) conviction. If the government had tried at trial to admit evidence about those facts, it would have been excluded as irrelevant. Fed. R. Evid. 401, 402. And since these facts have nothing to do with the statute's application, they are irrelevant to Mr. Duarte's as-applied challenge.

To recap, to convict Mr. Duarte, the government had to prove that that he knowingly possessed a firearm following certain criminal convictions. Only these facts have legal relevance. Only these facts cause § 922(g)(1) to apply. Accordingly, this Court can consider only these facts in deciding Mr. Duarte's as-applied challenge.

### 2. When evaluating the predicate felonies, courts may not carry out an unbounded inquiry into the underlying conduct.

Second, when addressing an as-applied § 922(g)(1) challenge, courts may not consider the *conduct* that allegedly underlies the prior felony conviction. Instead, they must limit their analysis to the nature of the *conviction* itself. That is because, when evaluating an as-applied challenge, courts consider only the facts directly relevant to the statutory requirements, not every fact tangentially related to the prohibited conduct or status.

Here, too, *Rahimi* leads the way. As discussed *supra*, the record in *Rahimi* contained extensive information about the underlying conduct

that led to the court's finding that he presented a "credible threat." Yet that conduct played no role in the legal analysis. Similarly, the record contained various procedural details regarding Rahimi's restraining order, including that "the order at issue here was entered by agreement, in a civil proceeding, after Rahimi apparently waived hearing . . ., and without counsel or other safeguards that would be afforded him in the criminal context." *United States v. Rahimi*, 61 F.4th 443, 459 (5th Cir. 2023), *overruled*, 144 S.Ct. 1889. While the Fifth Circuit "emphasi[zed]" these various details in vacating Rahimi's conviction, *id.*, the Supreme Court declined to consider them. They had little to do with Rahimi's particular legal challenge, "appear[ing] to sound in due process rather than the Second Amendment." *Rahimi*, 144 S.Ct. at 1903 n.2.

On the other hand, the Court did look to those aspects of Rahimi's restraining order that bore a direct relationship to § 922(g)(8)'s elements. The Court, as noted, considered that Rahimi "had received notice and an opportunity to be heard before the order was entered," and that his order "included a finding that [he] represented 'a credible threat to the physical safety' of [his girlfriend] or her family," as § 922(g)(8)(C)(i) requires. *Id.* at 1896. Likewise, § 922(g)(8) prohibits gun possession for as long as an individual "is subject to" a qualifying restraining order. The Court therefore also considered that Rahimi would, by statute, be "subject to" his particular restraining order for one

to two years, a limited term analogous to surety statutes' duration. *Rahimi*, 144 S.Ct. at 1902 (citing Tex. Fam. Code Ann. § 85.025(c)).

All told, then, the Court did consider facts specific to Rahimi's case, but only to the extent that they directly implicated the statutory requirements in § 922(g)(8). That makes sense. Congress identified a particular collection of factors that would trigger disarmament by one subject to a restraining order: a "finding" that the defendant poses "a credible threat," made after a "hearing" for which defendant had "actual notice" and an "opportunity to participate." 18 U.S.C. § 922(g)(8)(C)(i). All other facts about that hearing and about the conduct underlying the judge's findings are, from Congress's perspective, irrelevant. Like other circumstances extraneous to the § 922(g)(8) charge, then, they had no place in analyzing how the statute "applied" to Rahimi.

The same can be said of the prior-conviction element of § 922(g)(1). Section 922(g)(1) does not target the *conduct* underlying that conviction. It does not apply to "a person who has committed" a certain offense or a "crime that, in particular case, involves" certain facts. *Taylor v. United States*, 495 U.S. 575, 601 (1990). Rather, it targets *convictions*. Section 922(g)(1) disarms anyone who "has been convicted" of a qualifying crime. 18 U.S.C. § 922(g)(1).

Congress's "use of the term 'convict[ed]'" allows for inquiries about what "the defendant had been convicted of" – that is, the nature of their felony. *Mathis v. United States*, 579 U.S. 500, 511 (2016). But it does

not allow an inquiry into "what the defendant had actually done." *Id.* In fact, Congress's judgment to predicate § 922(g)(1) liability on convictions "directly refutes an approach that would treat as consequential . . . factual circumstances *not* essential to" the conviction. *Id.* at 512.

The particular details of the defendant's underlying conduct are thus "irrelevant: Find them or not, by examining the record or anything else, a [jury or] court still may not use them" to find the prior-conviction element. *Id.* at 513. Mr. Duarte's ability to possess a firearm following his evading-police conviction, for instance, did not depend on his underlying conduct. Whether it involved a brief failure to yield or a lengthy high-speed chase, he was equally "convicted" of that crime and equally prohibited from ever possessing a firearm.

In sum, while a person's prior felony conviction is squarely related to § 922(g)(1)'s "application," the specific conduct underlying that conviction is not. This Court therefore should clarify that, in assessing an as-applied challenge, courts must limit their analysis to the criminal *conviction* itself and may not conduct a wide-ranging inquiry into the *conduct* underlying that conviction.

### C. An indiscriminate, anything-goes approach would raise a host of constitutional and prudential concerns.

The two limits set out above are not only compelled by *Rahimi*, Congress's judgment, and the fundamental meaning of a statute's

"application." They will also avoid a host of constitutional and prudential problems, which the anything-goes approach threatens to unleash.

First, an anything-goes approach would be an administrability nightmare. Courts would have to conduct a far-flung inquiry, sifting through all aspects of the defendant's life to determine whether they could be disarmed. It is hard to imagine consistent, useful standards that could guide that inquiry. Disparate outcomes would inevitably follow. Two people with the same prior felonies could receive two different results, depending on facts having nothing to do with what § 922(g)(1) actually criminalizes.

Second, the fact-finding process would present Sixth Amendment and due process concerns. The Sixth Amendment requires "a jury [to] find beyond a reasonable doubt every fact which the law makes essential to [a] punishment that a judge might later seek to impose." *United States v. Haymond*, 588 U.S. 634, 642 (2019) (cleaned up). Thus, if the government justifies its right to punish based on extraneous and unadjudicated facts—like gang affiliation or the conduct underlying a predicate conviction—the Sixth Amendment would call for a jury finding. At a minimum, "essential principle[s] of due process" would require "notice and opportunity for hearing" on the government's allegations. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). This would lead to time-consuming mini trials.

This concern is particularly acute when it comes to the facts underlying prior convictions. The most detailed factual allegations in criminal cases tend to come from police officers, prosecutors, probation officers, and other government officials. But these records are not tested through the adversarial process and can be ambiguous or conflicting. *See Descamps v. United States*, 570 U.S. 254, 270 (2013). And if a person is then prosecuted under § 922(g)(1), perhaps years or decades later, the allegations may be too dated for proper defense investigation.

That the person was found guilty following a jury trial or guilty plea does not obviate the problem. From a verdict, it is impossible to tell "what the jury in a prior trial must have accepted as the theory of the crime," and whether the jury found any particular facts true, unless implicit in the elements of the charge. *Id.* at 269. And when a defendant enters a guilty plea, "he waives his right to a jury determination of only that offense's elements; whatever he says, or fails to say, about superfluous facts cannot license a later sentencing court to impose extra punishment," let alone to justify criminal liability in the first place. *Id.* at 270. In either case, defendants lack the incentive—and sometimes, the court's permission—to contest details beyond what is necessary for a conviction or plea. *Mathis*, 579 U.S. at 512. Relying on trial transcripts or plea colloquies to "explore the manner in which the defendant committed that offense" would therefore be unconstitutional and unfair. *Id.* at 511.

Third, because Second Amendment rights would depend on an unlimited universe of prior, unadjudicated acts, it would be impossible for someone with a felony conviction to know ex ante whether their gun possession will be legal. That indeterminacy would threaten the "rule of law," which "entails . . . that all persons are entitled to be informed as to what the State commands or forbids." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (cleaned up). But without ascertainable, consistent standards governing as-applied challenges, a person could be "in one day and out the next," without even knowing it. *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). A system that only "retroactively give[s] adequate warning of the boundary between the permissible and the impermissible applications of the law" offends due process. *City of Chicago v. Morales*, 527 U.S. 41, 59 (1999).

Fourth, and closely related, the statute's applicability would be hopelessly vague. As a result, anyone who sustained a prior felony conviction would exercise their Second Amendment rights at their peril—or decide not to risk exercising them at all. When it comes to laws threatening "freedom of speech in the First Amendment, [a right] to which *Heller* repeatedly compared the right to keep and bear arms," *Bruen*, 597 U.S. at 24, courts have applied particularly exacting standards: Vagueness that may "operate[] to inhibit the exercise of [constitutional] freedoms" receives more searching review. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). Likewise, courts must reject

an unpredictable methodology that chills the exercise of Second Amendment rights.

Fifth, the anything-goes approach threatens the separation of powers. "Only the people's elected representatives in the legislature are authorized to make an act a crime." *United States v. Davis*, 588 U.S. 445, 451 (2019) (cleaned up). But an open-ended as-applied inquiry would authorize courts to uphold particular applications of the statute based not on the conduct Congress chose to criminalize—i.e., possessing a firearm after having been "convicted of" a felony—but on conduct or circumstances that Congress deemed irrelevant—e.g., possessing a firearm while gang affiliated, after sustaining arrests or misdemeanor convictions, or following the commission of certain offense conduct. In effect, an as-applied inquiry untethered from the statute and the conduct it criminalizes would be a "a judicial reformation of the [felon-in-possession] provision." *Moose*, 710 F.3d at 165 (making the same point about statutes criminalizing same-sex intercourse); *United States v. Adams*, 914 F.3d 602, 608-09 (8th Cir. 2019) (Kelly, J., concurring) (explaining that whether Congress *could* pass a concealed-carry statute "has nothing to do with whether [the defendant] can be prosecuted under § 922(g)(1) for being a felon-in-possession, unless we 'inva[de] . . . the legislative domain' by adding a concealment requirement to the statute"). Even if Congress could write a statute outlawing gun possession under those circumstances, the Constitution requires

"deliberate action by the people's representatives, rather than by the judiciary." *Moose*, 710 F.3d at 165.

An appropriately circumscribed approach to as-applied challenges would avoid all these issues. And clarifying those limits at the outset will avoid confusion in the district courts. Thus, this Court must not only recognize as-applied challenges to prosecutions that fall outside our nation's firearm traditions, but also instruct the district courts to limit their review to legally relevant facts: a person's possession of a firearm and the nature of their prior felony conviction.

## CONCLUSION

For all these reasons, this Court should reverse.

Respectfully submitted,

DATED: September 24, 2024

*s/ Carmen Smarandoiu*
Carmen Smarandoiu
Office of the Federal Public Defender,
   Northern District of California
Phillip Burton United States
   Courthouse
450 Golden Gate Avenue, Ste. 19-6884
San Francisco, CA 94102
Carmen_Smarandoiu@fd.org

*s/Katie Hurrelbrink*
Katie Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Ste. 900
San Diego, California 92101
Katie_Hurrelbrink@fd.org

Attorneys for Amici

**ADDITIONAL COUNSEL**

Fidel Cassino-DuCloux
Federal Public Defender, District of Oregon
101 Southwest Main Street, Room 1700
Portland, OR 97204

Colin Fieman
Federal Public Defender, Western District of Washington
Westlake Center Office Tower
1601 Fifth Avenue, Suite 700
Seattle, WA 98101

Andrea George
Executive Director, Federal Defenders of Eastern Washington and
Idaho
601 West Riverside Avenue, Suite 900
Spokane, WA 99201

Leilani V. Lujan
Federal Public Defender, District of Guam and the Northern Mariana
Islands
First Hawaiian Bank Building
400 Route 8, Room 501
Mongmong, GU 96910

Rachel Julagay
Executive Director, Federal Defenders of Montana, Inc.
104 2nd Street South, Suite 301
Great Falls, MT 59401

Salina M. Kanai
Federal Public Defender, District of Hawaii
Prince Kuhio Federal Building
300 Ala Moana Boulevard, Suite 7104
Honolulu, HI 96850

Jamie McGrady
Federal Public Defender, District of Alaska
188 W Northern Lights Blvd, Suite 700
Anchorage, AK 99503

Nicole Owens
Executive Director, Federal Defender Services of Idaho
702 West Idaho Street, Suite 1000
Boise, ID 83702

Jon M. Sands
Federal Public Defender, District of Arizona
850 West Adams Street, Suite 201
Phoenix, AZ 85007

Rene L. Valladares
Federal Public Defender, District of Nevada
411 E. Bonneville Avenue
Las Vegas, NV 89101

Heather Williams
Federal Public Defender, Eastern District of California
801 I Street, 3rd Floor
Sacramento, CA 95814

# CERTIFICATE OF COMPLIANCE

This brief contains 6,960 words, excluding the items exempted by Fed. R. App. P. 32(f) and including words in photos. This brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of 9th Cir. Rule 32-1.

Respectfully submitted,

DATED: September 24, 2024    *s/Katie Hurrelbrink*
Katie Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
Katie_Hurrelbrink@fd.org

Attorneys for Amici