No. 22-50048

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*
v.
STEVEN DUARTE,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of California
No. 2:20-cr-00387-AB-1
Hon. Andre Birotte, Jr.

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, AMERICAN CIVIL LIBERTIES UNION OF SOUTHERN CALIFORNIA, AMERICAN CIVIL LIBERTIES UNION OF NEVADA, AMERICAN CIVIL LIBERTIES UNION OF ARIZONA, AND AMERICAN CIVIL LIBERTIES UNION OF ALASKA IN SUPPORT OF DEFENDANT-APPELLANT STEVEN DUARTE**

David D. Cole
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW
Washington, DC 20005

Cecilia D. Wang
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104

Neil K. Sawhney
Shilpi Agarwal
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
*nsawhney@aclunc.org*

*(Additional counsel listed on next page)*

Louise Melling
M. Yasmin Cader
Ria Tabacco Mar
Brandon Buskey
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

Summer Lacey
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *amici curiae* state that they do not have a parent corporation and that no publicly held corporation owns 10 percent or more of their stock.

Date: September 24, 2024

_____
Neil K. Sawhney
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... v

STATEMENT OF INTEREST ................................................................ 1

INTRODUCTION .................................................................................. 3

ARGUMENT ......................................................................................... 7

    I.    Section 922(g)(1) is an extraordinarily broad statute that does not target dangerousness or propensity to commit violence. ..................................................................... 7

    II.    The government fails to show that section 922(g)(1)'s categorical application to people convicted of nonviolent offenses is consistent with our history and tradition. ........... 12

        A.    People with felony convictions are included among "the people" who have Second Amendment rights. ...... 13

        B.    Section 922(g)(1)'s permanent ban on possessing firearms, as applied to Mr. Duarte, is inconsistent with the principles underpinning our historical tradition. ........................................................................ 18

    III.    Section 922(g)(1) is a major contributor to mass incarceration and disproportionately impacts people of color. ................................................................................ 25

CONCLUSION .................................................................................... 30

CERTIFICATE OF COMPLIANCE ...................................................... 32

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bell v. Wolfish,*
   441 U.S. 520 (1979) .............................................................. 15

*Bianchi v. Brown,*
   111 F.4th 438 (4th Cir. 2024) ....................................... 4, 24

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) .................................................... *passim*

*Floyd v. City of New York,*
   959 F. Supp. 2d 540 (S.D.N.Y. 2013) .................................. 28

*Hudson v. Palmer,*
   468 U.S. 517 (1984) .............................................................. 15

*Kanter v. Barr,*
   919 F.3d 437 (7th Cir. 2019) ...................................... *passim*

*Medina v. Whitaker,*
   913 F.3d 152 (D.C. Cir. 2019)............................................... 7

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   597 U.S. 1 (2022) ........................................................ *passim*

*Range v. Att'y Gen.,*
   69 F.4th 96 (3d Cir. 2023) ................................... 7, 20, 21, 23

*Schrader v. Holder,*
   704 F.3d 980 (D.C. Cir. 2013)............................................. 10

*Thompson v. Souza,*
   111 F.3d 694 (9th Cir. 1997) .............................................. 15

*United States v. Bullock,*
   679 F. Supp. 3d 501 (S.D. Miss. 2023) .............................. 26

*United States v. Duarte*,
101 F.4th 657 (9th Cir. 2024)......................................................23

*United States v. Jackson*,
110 F.4th 1120 (8th Cir. 2024).....................................................7

*United States v. Johnson*,
459 F.3d 990 (9th Cir. 2006) ................................................11, 12

*United States v. Meldish*,
722 F.2d 26 (2d Cir. 1983).........................................................8

*United States v. Phillips*,
827 F.3d 1171 (9th Cir. 2016) ....................................................9

*United States v. Rahimi*,
144 S. Ct. 1889 (2024) .....................................................*passim*

*United States v. Teemer*,
394 F.3d 59 (1st Cir. 2005).......................................................12

*United States v. Vereen*,
920 F.3d 1300 (11th Cir. 2019) ................................................11

*United States v. Williams*,
113 F.4th 637 (6th Cir. 2024).....................................................17

*W. Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ...............................................................29

**Statutes**

18 U.S.C. § 921(a)(20)(B)...........................................................10

18 U.S.C. § 922(g)(1)........................................................*passim*

18 U.S.C. § 922(g)(8).................................................................24

U.S. Const. amend. I ............................................................15, 16

U.S. Const. amend. II..........................................................*passim*

U.S. Const. amend. IV...........................................................15, 16

U.S. Const. amend. V ............................................................... 16

**Other Authorities**

Charles Breyer et al., U.S. Sentencing Comm'n, *What Do Federal Firearms Offenses Really Look Like*? (July 2022) .......................... 25, 26

Jacob D. Charles, *Firearms Carceralism*,
108 Minn. L. Rev. 2811 (2024) ........................................................ 27

Jacob D. Charles & Brandon L. Garrett, *The Trajectory of Federal Gun Crimes*,
170 U. Pa. L. Rev. 637 (2022) .............................. 8, 25, 27, 29

Markus Dirk Dubber, *Policing Possession: The War on Crime and the End of Criminal Law*,
91 J. Crim. L. & Criminology 829 (2001) ................................. 8

Nicholas Eberstadt, Am. Enter. Inst., *America's Invisible Felon Population: A Blind Spot in US National Statistics* (2019) ............... 25

Pratheepan Gulasekaram*, The Second Amendment's "People" Problem*,
76 Vand. L. Rev. 1437 (2023) ............................................................ 21

Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*,
60 Hastings L.J. 1371 (2009) ............................................................ 19

Benjamin Levin, *Guns and Drugs*,
84 Fordham L. Rev. 2173 (2016) ...................................................... 28

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*,
32 Harv. J.L. & Pub. Pol'y 695 (2009) .............................. 19, 23

Ninth Cir. Model Crim. Jury Instr. 14.15 cmt. ...................................... 11

David E. Patton, *Criminal Justice Reform and Guns: The Irresistible Movement Meets the Immovable Object*,
69 Emory L.J. 1011 (2020) .............................................. 27, 28

Zach Sherwood, *Time to Reload: The Harms of the Federal Felon-in-Possession Ban in A Post-Heller World*,
70 Duke L.J. 1429 (2021) ............................................................. 26, 28

David A. Sklansky, *The Fourth Amendment and Common Law*,
100 Colum. L. Rev. 1739 (2000) ...................................................... 9, 20

Stephen F. Smith, *Overcoming Overcriminalization*,
102 J. Crim. L. & Criminology 537 (2012) ............................................ 9

U.S. Sentencing Comm'n, *Section 922(g) Firearms* (2023) ............. 25, 26

Adam Winkler, *Racist Gun Laws and the Second Amendment*,
135 Harv. L. Rev. F. 537 (2022) ..................................................... 27, 29

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union is a nationwide, non-partisan, non-profit organization with approximately two million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. The American Civil Liberties Unions of Northern California, Southern California, Nevada, Arizona, and Alaska are regional affiliates of the national organization (collectively referred to here as "the ACLU").

Founded nearly a century ago, the ACLU has appeared in numerous cases before this Court, both as merits counsel and as amicus curiae, to defend the Bill of Rights. The ACLU has long been concerned about overbroad criminal laws, which fuel mass incarceration and racial disparities. It is also committed to advancing equal protection of the law, due process, and fundamental fairness for all, and therefore condemns criminal statutes and government actions that restrict constitutional rights arbitrarily or excessively, or that otherwise violate due process.

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a), *amici* certify that all parties have consented to its timely filing. *Amici* also certify that no person or entity, other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.

At the same time, the ACLU recognizes the devastating effects that gun violence has for communities throughout the country—effects disproportionately affecting communities of color. It maintains that Congress and state legislatures can, consistent with the Constitution, impose reasonable limits on the sale, ownership, and use of firearms.

In light of these commitments, the ACLU has a strong interest in and unique perspective on cases, like this one, involving criminal law and Second Amendment rights. For that reason, it submitted an amicus brief in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Supreme Court's most recent Second Amendment case.

## INTRODUCTION

This appeal concerns 18 U.S.C. § 922(g)(1), which makes it a felony for anyone previously convicted of a "crime punishable by imprisonment for a term exceeding one year" to possess a firearm. This statute is among the most commonly used laws in the federal prosecutor's arsenal: More than ten percent of federal prosecutions and over 7,000 of the 64,000 federal convictions last year involved section 922(g)(1).

It is also among the broadest in scope: To secure a conviction, the government must simply establish that a person with *any* predicate conviction "possessed" a firearm for *any* reason for *any* amount of time. The person's prior conviction can just be for a misdemeanor, and a conviction qualifies even when the person did not actually receive a term of incarceration. People are convicted under section 922(g)(1) for the most fleeting, innocuous, or merely constructive "possession" of a firearm. The statute's expansive scope thus sweeps in a vast amount of conduct that could not otherwise justify a lifetime prohibition, on pain of imprisonment, on possessing firearms.

Steven Duarte's case exemplifies section 922(g)(1)'s far-reaching breadth. The government does not dispute that Mr. Duarte has been

convicted only of nonviolent offenses, such as vandalism and drug possession. And it has never contended that he poses a danger or threat of violence to others. Nevertheless, the government prosecuted and convicted Mr. Duarte solely under section 922(g)(1), for which he is now serving more than four years in federal prison.

Under the Supreme Court's governing Second Amendment framework, a modern restriction on the right to keep and bear arms is unconstitutional unless the government can show that it "is consistent with the Nation's historical tradition of firearm regulation." *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022); *United States v. Rahimi*, 144 S. Ct. 1889, 1896–98 (2024).[1] On appeal, the government advances two arguments for why section 922(g)(1), as applied to Mr. Duarte, satisfies this framework. Both should be rejected.

---

[1] The ACLU shares the many concerns expressed about this framework's "myopic focus on history and tradition," which "fails to give full consideration to the real and present stakes of the problems facing our society today." *Rahimi*, 144 S. Ct. at 1906 (Sotomayor, J., concurring); *see, e.g.*, *id.* at 1929–30 (Jackson, J., concurring) (*Bruen* leaves legislatures "hobbled without a clear, workable test"); *Bianchi v. Brown*, 111 F.4th 438, 473–74 (4th Cir. 2024) (Diaz, J., concurring) ("*Bruen* has proven to be a labyrinth for lower courts . . . with only the one-dimensional history-and-tradition test as a compass."). *Bruen* and *Rahimi* are nonetheless binding here, and this brief therefore applies those precedents.

The government's first argument—that, because of his felony convictions, Mr. Duarte is categorically excluded from "the people" referenced in the Second Amendment—is foreclosed by the Supreme Court's decision last term in *Rahimi*. As the Court held there, the Second Amendment's protections are not limited to "responsible" or "law-abiding" citizens. *See Rahimi*, 144 S. Ct. at 1903. That interpretation is consistent with how the phrase "the people" is used in other Bill of Rights provisions, none of which exclude people with felony convictions—much less persons deemed not "responsible, law-abiding citizens."

The second, historical argument presents a closer question. As *Rahimi* illustrated, the historical inquiry should not be so stringent as to deny legislatures sufficient latitude to address contemporary problems relating to firearms. It is enough to point to historical precedents that support the principles reflected in a modern-day gun regulation. But here, while the government has arguably shown a tradition of temporarily restricting possession by people who are found to pose a risk of violence or danger, it fails to show how that tradition can justify *permanently* disarming people who have *not* been found to pose such a risk—solely because they were convicted at any point in the past of an

offense punishable by more than one year in prison. Many convictions in that expansive category have no conceivable connection to a future risk of violence or danger. Yet section 922(g)(1) criminalizes possession by anyone convicted of any such offense—whether tax fraud, shoplifting, or a false statement on a welfare application. There is no historical support for disarming people for reasons having nothing to do with danger, simply because they were convicted of a crime. Mr. Duarte's as-applied challenge to the statute should therefore succeed.

The concern that the panel's rule may lead to unwieldy as-applied litigation and "inconsistent results" can and should be addressed. PFREB 19. This Court can decide the constitutional question without endorsing the panel's approach to resolving future challenges to the statute. All it need hold to resolve this case is that the Second Amendment prohibits applying section 922(g)(1)'s sweeping, lifetime criminal prohibition to Mr. Duarte and others like him who have been convicted only of nonviolent offenses. A narrow holding along these lines would comport with the Second Amendment as interpreted by *Bruen* and *Rahimi*, without stretching to reach broader questions not presented in this case.

# ARGUMENT

## I. Section 922(g)(1) is an extraordinarily broad statute that does not target dangerousness or propensity to commit violence.

Section 922(g)(1) encompasses an extraordinarily broad range of predicate offenses. The majority of people convicted under the statute did not commit a violent offense.[2] To the contrary, as Mr. Duarte's case illustrates, section 922(g)(1) is routinely used to convict people for firearm possession based on past convictions for nonviolent, nondangerous, or even innocuous conduct.

The statutory text makes no distinction among the types of offenses that support a conviction under section 922(g)(1). The prohibition applies equally to someone who has been convicted of a crime of poverty—such as "making a false statement to obtain food stamps"—as to someone who has been convicted of murder or rape. *See Range v. Att'y Gen.*, 69 F.4th 96, 98 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range*, 144 S. Ct. 2706 (2024); *see also, e.g.*, *Medina v. Whitaker*, 913

---

[2] *See United States v. Jackson*, 110 F.4th 1120, 1125 n.2 (8th Cir. 2024) (observing that "only 18.2 percent of felony convictions in state courts and 4.2 percent of federal felony convictions were for 'violent offenses'"). Unless otherwise indicated, all internal citations, alterations, and quotation marks are omitted throughout this brief.

F.3d 152, 154 (D.C. Cir. 2019) (false representations on mortgage-financing application); *United States v. Meldish*, 722 F.2d 26, 26 (2d Cir. 1983) (false customs declaration). As then-Judge Barrett explained, the set of offenses that can serve as a section 922(g)(1) predicate "is an immense and diverse category," including "everything from . . . mail fraud, to selling pigs without a license in Massachusetts, redeeming large quantities of out-of-state bottle deposits in Michigan, and countless other state and federal offenses." *Kanter v. Barr*, 919 F.3d 437, 466 (7th Cir. 2019) (Barrett, J., dissenting), *majority decision abrogated by Bruen*, 597 U.S. 1 (2022).[3]

---

[3] Notably, there is no historical precedent for such a broad ban on firearm possession. Even the early 20th-century federal firearm restrictions that predated section 922(g)(1) applied only to narrow categories of people who either (1) committed serious crimes of violence, such as murder and rape, or (2) used especially dangerous weapons, such as machine guns and sawed-off shotguns. *See* Jacob D. Charles & Brandon L. Garrett, *The Trajectory of Federal Gun Crimes*, 170 U. Pa. L. Rev. 637, 646–52 (2022) (detailing statutory history). The broad federal prohibition on firearm possession at issue here emerged much more recently from "the turmoil of the 1960s and the rising tough-on-crime politics of the 1980s and 1990s." *Id.* at 652; *see also, e.g.*, Markus Dirk Dubber, *Policing Possession: The War on Crime and the End of Criminal Law*, 91 J. Crim. L. & Criminology 829, 855 (2001) (observing that "possession—whether of drugs, of guns, or anything else—has emerged as the policing device of choice in the war on crime").

What's more, it's reasonable to expect that section 922(g)(1)'s coverage will only expand further as legislatures increasingly "felonize" what previously were misdemeanors or non-criminal conduct. "[M]any more crimes are classified as 'felonies' today than in the eighteenth century"—or even in the late twentieth century. David A. Sklansky, *The Fourth Amendment and Common Law*, 100 Colum. L. Rev. 1739, 1802 n.393 (2000); *see* Stephen F. Smith, *Overcoming Overcriminalization*, 102 J. Crim. L. & Criminology 537, 538 (2012) (finding that "Congress . . . created fifty-seven new crimes every year between 2000 and 2007"). Every additional felony that Congress (or a state legislature) creates—no matter how minor or divorced from the threat of violence—can serve as a predicate for a section 922(g)(1) conviction. *See United States v. Phillips*, 827 F.3d 1171, 1176 n.5 (9th Cir. 2016) ("Can Congress or the States define petty larceny as a felony? Of course. Can a conviction for stealing a lollipop then serve as a basis under § 922(g)(1) to ban a person for the rest of his life from ever possessing a firearm, consistent with the Second Amendment? That remains to be seen.").

And the statute's scope is not even limited to people with felony convictions. The ban also applies to people who have been convicted of

*misdemeanors*, so long as the state legislature imposed a sufficiently long *potential* sentence of imprisonment for the offense. *See* 18 U.S.C. § 921(a)(20)(B). Whether the judge saw fit to sentence that person to that long of a prison sentence—or any term of incarceration at all—is irrelevant. *See Schrader v. Holder*, 704 F.3d 980, 985 (D.C. Cir. 2013) (noting that the "courts of appeals have uniformly rejected the argument that the actual sentence imposed is controlling for purposes of triggering the federal firearms ban").

So, for example, a Navy veteran who had a single 40-year-old misdemeanor assault conviction arising out of a "fistfight" for which he served "no jail time" was banned for life from possessing a firearm—and subject to a felony conviction and years in prison if he tried. *See id.* at 991. Or, to take another example, a Los Angeles man was charged under section 922(g)(1) based solely on a prior state conviction for possessing marijuana—a felony that the legislature had reduced to a misdemeanor at the time of his trial, and that the district attorney eventually dismissed altogether. *See United States v. Hilt*, No. 23-55380 (9th Cir. filed Apr. 24, 2023); *see also, e.g.*, *United States v. Meyer*, No. 4:22-CR-10012-RKA (S.D. Fla. July 12, 2022), ECF No. 109 (describing § 922(g)(1)

charges based on decade-old conviction for taking a cellphone from a table in a locker room when no other person was around, a conviction for which the defendant received only probation and which state legislature later reduced to a misdemeanor).

In *Rahimi*, the Supreme Court recognized a historical tradition supporting the temporary denial of guns to persons individually determined to pose a danger to others. *See* 144 S. Ct. at 1901–02. But under section 922(g)(1), the government need not demonstrate that the accused posed or continues to pose any danger; the lifetime ban applies regardless. Indeed, there is *no* "defense that would excuse a defendant for being a felon in possession of a firearm," even "if he had obtained it innocently and his possession was transitory." *United States v. Johnson*, 459 F.3d 990, 991 (9th Cir. 2006); *see United States v. Vereen*, 920 F.3d 1300, 1309 (11th Cir. 2019) (noting that the "overwhelming majority" of circuits have rejected a temporary innocent possession defense to a § 922(g)(1) charge); Ninth Cir. Model Crim. Jury Instr. 14.15 cmt. (explaining that § 922(g)(1) "requires *no* 'act' other than the knowing possession of a firearm or ammunition by someone not authorized to do so") (emphasis added). Rather, section 922(g)(1) "bans possession

11

outright without regard to how great a danger exists of misuse in the particular case." *United States v. Teemer*, 394 F.3d 59, 64 (1st Cir. 2005). Thus, the statute would even apply to someone who possessed a firearm solely to *prevent* danger or violence—if, for example, "a schoolboy came home with a loaded gun and his ex-felon father took it from him, put it in drawer, and called the police." *See id.*

In short, as this Court has previously observed, section 922(g)(1) "impose[s] something approaching absolute liability." *Johnson*, 459 F.3d at 998. And it does so where the predicate offense has no conceivable relation to dangerousness, or even to future dangerousness. The government cannot show that applying such sweeping criminal liability to people like Mr. Duarte is consistent with the principles underpinning our tradition of regulating firearms.

## II.  The government fails to show that section 922(g)(1)'s categorical application to people convicted of nonviolent offenses is consistent with our history and tradition.

The Supreme Court's Second Amendment framework "center[s] on constitutional text and history." *Bruen*, 597 U.S. at 22. If the challenged conduct falls within the Second Amendment's scope, the government bears the burden of showing that "the challenged regulation is consistent

with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

Critically, Mr. Duarte challenges only the *application* of section 922(g)(1) to him; unlike the defendant in *Rahimi*, he does not seek to facially invalidate the statute. *See id.* And he challenges a broad categorical lifetime prohibition untethered to dangerousness, while *Rahimi* concerned a law that temporarily disarms only those persons who are individually determined to pose a specific danger to their domestic partners or partners' child. *See id.* at 1896. As explained below, this Court should uphold Mr. Duarte's as-applied challenge to section 922(g)(1).

### A. People with felony convictions are included among "the people" who have Second Amendment rights.

The Second Amendment's operative clause provides that "the right of the people to keep and bear Arms [] shall not be infringed." U.S. Const. amend. II. *Bruen*'s first step asks whether "an individual's conduct" falls within the amendment's "plain text." 597 U.S. at 17. If so, "the "Constitution presumptively protects that conduct." *Id.*

The government contends that Mr. Duarte's challenge to section 922(g)(1) falters at this first step. In its view, the fact that Mr. Duarte has felony convictions means that he is categorically excluded from the

Second Amendment's protection for all purposes—in other words, that he is no longer one of "the people" to which the amendment's protections extend. Nothing in the plain text draws a distinction between people who have been convicted of a felony and those who have not. Nevertheless, the government seizes on the Supreme Court's statements in *Heller* and *Bruen* that the right to bear arms belongs to "law-abiding, responsible citizens." PFREB at 7, 9, 15; Answering Br. 27–33. According to the government, that language limits Second Amendment rights to *only* "responsible" and "law-abiding" people.

The Supreme Court specifically "reject[ed]" this logic last term in *Rahimi*. *See* 144 S. Ct. at 1903. There, the government similarly argued that "irresponsible" people like Mr. Rahimi were beyond the Second Amendment's scope, relying (as it does here) on the Court's statements in *Heller* and *Bruen*. *See id.* The Court disagreed, holding that the government overread these descriptive statements to have proscriptive effect. Although *Heller* and *Bruen* used the "responsible" language "to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right," the Court explained, they "did not define the term and said nothing about the status of citizens who were not 'responsible.'"

*Id.* That's because "[t]he question was simply not presented." *Id.* Thus, to the extent there previously was any confusion over the legal significance of the "law-abiding, responsible citizens" language in earlier Supreme Cout decisions, *Rahimi* erased it. *See id.*; *see also id.* at 1944 (Thomas, J., dissenting) (observing that "[n]ot a single Member of the Court adopts the Government's theory" that Second Amendment rights are limited to "responsible, law-abiding citizens").

The government's interpretation also cannot be squared with the text of other provisions of the Bill of Rights. The First and Fourth Amendments, for example, both refer to rights guaranteed to "the people." Yet no court has ever held that people with felony convictions are categorically excluded from the First or Fourth Amendments' protections, and the government does not contend otherwise.[4] It simply maintains that the phrase "the people" "need not have the same meaning

---

[4] Indeed, it is well-settled that the First and Fourth Amendments protect even people *currently* incarcerated in prison on a felony sentence, although particular restrictions on their liberty may be deemed reasonable where the same restrictions would be unreasonable applied to a person who is not incarcerated. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979) (citing cases); *Thompson v. Souza*, 111 F.3d 694, 699 (9th Cir. 1997); *cf. Hudson v. Palmer*, 468 U.S. 517, 523 (1984) ("[P]risons are not beyond the reach of the Constitution.").

in the Second Amendment that it does in the First and Fourth Amendments." Answering Br. 30. But the government does not explain why; surely the more sensible and consistent view is that when the framers used the same words, they meant the same thing. *See District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (describing the phrase "the people" as a constitutional "term of art"). In any event, whether the meaning of the phrase is *exactly* the same across the Bill of Rights is beside the point. *Heller* made clear that, for purposes of the Second Amendment, it refers at a minimum to "all Americans." *Id.* at 581. And Mr. Duarte falls squarely within that group.

For similar reasons, this Court should reject the government's "political community" argument. Pointing to historical prohibitions on the rights to vote, hold public office, and serve on juries, the government contends that people convicted of felonies are not "members of the political community"—and thus excluded from "the people." PFREB at 8; Answering Br. 10, 29–31. But these restrictions on the *political* rights of people with felony convictions have nothing to do with the Second Amendment issue here. Rather, the Second Amendment, like the First, Fourth, and Fifth Amendments, guarantees a civil liberty to all in this

country. And just as persons convicted of felonies do not lose "their right[s] to speak freely, [to] practice the religion of their choice, or to a jury trial," so they do not lose the right to possess a gun. *See United States v. Williams*, 113 F.4th 637, 647 (6th Cir. 2024) (rejecting similar argument). As then-Judge Barrett explained, there is no basis to conclude that "felons . . . are categorically excluded from our national community." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting).[5]

In sum, because Mr. Duarte and other people with felony convictions are included among "the people" in the Second Amendment, the Constitution presumptively protects their conduct. Of course, "[t]hat does not mean that the government cannot prevent them from possessing guns." *See id.* (Barrett, J., dissenting). "Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Id.* That is the question to which we now turn.

---

[5] The implications of the government's position are disturbing to say the least. If the government is right about who constitutes the "political community," it could conceivably strip people with felony convictions of *any* other protections in the Bill of Rights. *Heller* and *Rahimi* foreclose that limitless logic.

**B.  Section 922(g)(1)'s permanent ban on possessing firearms, as applied to Mr. Duarte, is inconsistent with the principles underpinning our historical tradition.**

To satisfy *Bruen*'s second step, the government must show that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. As *Rahimi* made clear, the government need not identify "a dead ringer or a historical twin," 144 S. Ct. at 1898—or even a historical "cousin," *id.* at 1925 (Barrett, J., concurring). Instead, the relevant inquiry is "whether the challenged regulation is consistent with *the principles* that underpin our regulatory tradition." *Id.* at 1898 (emphasis added). Such an inquiry "permits a historical inquiry calibrated to reveal something useful and transferable to the present day." *Id.* at 1904 (Sotomayor, J., concurring).[6]

---

[6] It is true that *Heller* stated that prohibitions on possession by people with felony convictions are "presumptively lawful." 554 U.S. at 626–27 & n.26. But that was plainly dicta: The plaintiffs in *Heller* did not have felony convictions. Moreover, *Heller* did not set forth a standard for assessing Second Amendment rights; *Bruen* and *Rahimi* did. That standard requires the government to point to historical analogues that support the principles underlying any modern-day restriction on Second Amendment rights. It is that standard that governs this Court, not a statement in passing dicta. Just as *Heller*'s reference to "responsible, law-abiding citizens" does not mean that only those persons are entitled to Second Amendment rights, *Heller*'s "presumptively lawful" language

The government does not claim that any founding-era laws specifically prohibited people with felony convictions from possessing guns—let alone those who committed *any* offense, including nonviolent and nondangerous offenses, punishable by more than one year in prison.[7] It instead invokes two other categories of 18th-century laws: (1) laws authorizing capital punishment for people convicted of felonies; and (2) laws categorically disarming certain groups, including Catholics, Black people, and Native Americans. Mr. Duarte has ably argued why these historical laws fail to justify section 922(g)(1)'s application to him, and we do not seek to repeat those arguments here. Opening Br. 13–19; Reply Br. 16–25; Opp. to PFREB 5–11. Instead, we highlight two overarching flaws in the government's historical theory.

_____

does not relieve the government of its burden to demonstrate that section 922(g)(1) is consistent with historical precedent from the founding era.

[7] For good reason: "scholars have not been able to identify any such laws." *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *see* Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009) (finding that the earliest state law disarming felons "was enacted in New York in 1897"); *but see* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009) ("[O]ne can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I.").

*First*, the government's historical arguments prove too much. Start with its contention that, because nearly all people convicted of felonies at the founding could be punished by death, they necessarily could be disarmed for life. As others have explained, the government's factual premise is "shaky" on its own terms: In practice, "the consequences of a felony conviction were not as categorically severe as the government[] suggest[s]." *See Kanter*, 919 F.3d at 461 (Barrett, J., dissenting). Moreover, because felonies were far more limited in the 18th century than they are today, they did not include most crimes that form the predicate for section 922(g)(1). *See* Sklansky, *supra*, 100 Colum. L. Rev. at 1802 n.393.

Most importantly, the fact that a person could be sentenced to death for a felony "does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was *not* executed." *Range*, 69 F.4th at 105 (emphasis added); *see Kanter*, 919 F.3d at 462 (Barrett, J., dissenting) ("The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society."). The principle the government draws from these laws cannot

be that, where capital punishment is authorized, *all* other penalties—including those that permanently deny constitutional rights—are also permissible. If it did, then nothing would stop the government from stripping a person with felony convictions of, for example, their right to free speech, or any other constitutional rights. That is obviously not the law. *See id.* at 461–62; *see also* fn. 6, *supra*.

The government's reliance on historical status-based prohibitions fares no better. As an initial matter, the obvious invalidity of denying people rights based on their race or religion should bar reliance on these examples altogether. *See, e.g.*, *Range*, 69 F.4th at 104. Those examples can have no legitimate role in authorizing contemporary categorical prohibitions; a prohibition that was illegitimate from the outset cannot provide the predicate for denying constitutional rights today. *See* Pratheepan Gulasekaram, *The Second Amendment's "People" Problem*, 76 Vand. L. Rev. 1437, 1472 (2023) (arguing that an "uncritical historical inquiry," like the government's here, "glosses over and locks in gun regulations with [a] racist pedigree").

Moreover, the principle that the government seeks to draw from these laws—that Congress can impose generalized categorical

prohibitions on possessing firearms—is at far too high a level of generality to be acceptable. The government's position seems to be that the existence of any categorical prohibitions, no matter how reprehensible, justifies any categorical prohibition today. If that were accepted, the Second Amendment would afford no protection whatsoever; the government's position would permit *any* categorical bar on Second Amendment rights.[8]

But the existence of some (now universally discredited) categorical bars on disfavored groups cannot justify whatever categorical prohibition the government chooses to impose. Rather, to defeat Mr. Duarte's as-applied challenge, the government must identify a historical principle consistent with the rights curtailment at issue here—i.e., denying people their Second Amendment rights based solely on prior convictions for nonviolent, nondangerous offenses. It has failed to do so.

*Second*, the government's historical materials do not show that section 922(g)(1)'s "burden" on people like Mr. Duarte is consistent with

---

[8] Indeed, under the government's reasoning, there would appear to be no Second Amendment problem if Congress were to criminalize possession of firearms for all people under 30 years old, or people who live in urban areas, or any other arbitrarily defined group.

our regulatory tradition. *Rahimi*, 144 S. Ct. at 1901. None of the cited laws imposed a lifetime, no-exception ban on possessing firearms. The status-based prohibitions—which were not premised on prior convictions—were generally limited to wartime or periods of armed insurrection. *See United States v. Duarte*, 101 F.4th 657, 681 (9th Cir. 2024), *reh'g en banc granted, opinion vacated*, 108 F.4th 786. They also provided various avenues for people to remove the prohibition: For example, dissidents and members of minority groups could reacquire firearms if they swore a loyalty oath or otherwise showed they needed them for self-defense. *See, e.g.*, *Kanter*, 919 F.3d at 457–58 (Barrett, J., dissenting); Marshall, *supra*, 32 Harv. J.L. & Pub. Pol'y at 722–26. The founding-era felony laws provided for an even more straightforward restoration of rights: "[T]he subset of felons who were not sentenced to death or lifetime imprisonment only forfeited their firearms temporarily and did not need to petition to regain their firearm rights; they could simply repurchase arms after completing their sentences." *Range*, 69 F.4th at 135 (Krause, J., dissenting)

The absence of historical evidence of permanent firearms prohibitions is not dispositive. *See Rahimi*, 144 S. Ct. at 1925 (Barrett,

J., concurring) (noting that the government need not show that the law at issue is "an updated model of a historical counterpart"). But *Rahimi* placed great weight on the fact that 18 U.S.C. § 922(g)(8)'s prohibition is "temporary"—in Mr. Rahimi's case, it was just "one to two years after his release from prison"—and predicated on an individualized determination that the person poses a specific threat to others *See id.* at 1902. The permanent nature of section 922(g)(1)'s ban, unconnected to dangerousness, is thus further reason to conclude that the statute, as applied to Mr. Duarte, is inconsistent with historical principles.

To be clear, Congress and state legislatures should not be hampered in their legitimate goal of preventing gun violence. But it cannot do so with the blunderbuss approach that section 922(g)(1) takes, where there is no founding-era support for such an approach. Regardless of how this Court rules here, there remain numerous options for legislatures to address this very real problem. *See Bianchi v. Brown*, 111 F.4th 438, 472 (4th Cir. 2024) (the Second Amendment does "not disable[] the ability of representative democracy to respond to an urgent public safety crisis"). Under the Supreme Court's precedent, however, they must do so in a manner that is consistent with the historical principles underpinning our

tradition of regulating firearms. The government has not shown that any such principle justifies the application of section 922(g)(1) to Mr. Duarte.

## III. Section 922(g)(1) is a major contributor to mass incarceration and disproportionately impacts people of color.

As described in Part I above, section 922(g)(1) is one of the broadest criminal prohibitions in the U.S. Code. The statute's legal breadth has serious practical effects. Scholars estimate that more than 20 million Americans have felony convictions.[9] Unsurprisingly, "[f]irearms offenses are among the most common crimes prosecuted and sentenced in federal court[s]."[10] They make up more than ten percent of all federal prosecutions, and over 40 percent of convictions in some districts.[11] And "the vast majority" of people sentenced for federal firearms offenses

---

[9] Nicholas Eberstadt, Am. Enter. Inst., *America's Invisible Felon Population: A Blind Spot in US National Statistics* 3 (2019), https://www.jec.senate.gov/public/_cache/files/b23fea23-8e98-4bcd-aeed-edcc061a4bc0/testimony-eberstadt-final.pdf.

[10] Charles Breyer et al., U.S. Sentencing Comm'n, *What Do Federal Firearms Offenses Really Look Like?* (July 2022), at 2–4, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220714_Firearms.pdf.

[11] Charles & Garrett, *supra*, 170 U. Pa. L. Rev. at 639; U.S. Sentencing Comm'n, *Section 922(g) Firearms* (2023), https://www.ussc.gov/research/quick-facts/section-922g-firearms.

(nearly 90%) were convicted under section 922(g)(1).[12] The average sentence for violating the statute is five years—and it can be many times that for people facing mandatory minimums and other sentencing enhancements, such as under the Armed Career Criminal Act.[13]

But section 922(g)(1) is not only one of the most sweeping federal criminal prohibitions; it also is among those that most disproportionately targets people of color. The racial disparities are stark: Nearly 60 percent of people convicted under section 922(g) in 2023 were Black.[14] As a result of these convictions, "nearly a quarter of Black adults have been permanently stripped of the right to lawfully possess firearms." *United States v. Bullock*, 679 F. Supp. 3d 501, 524 n.22 (S.D. Miss. 2023). Section 922(g)(1)'s permanent ban, in other words, has "effectively disarm[ed] large swaths of communities of color." Zach Sherwood, *Time to Reload: The Harms of the Federal Felon-in-Possession Ban in A Post-Heller World*, 70 Duke L.J. 1429, 1464 (2021).[15]

---

[12] Breyer, U.S. Sentencing Comm'n, *supra*, at 24.

[13] U.S. Sentencing Comm'n, *Section 922(g) Firearms*, *supra*.

[14] *See id.*

[15] The disparities can be even worse at the state or local level. *See Bullock*, 679 F. Supp. 3d at 524 n.22 (noting that "although the State of New York is approximately 70% white and 18% Black, white residents accounted for only 7% of felony gun possession cases," while "Black

This disproportionate impact reflects the overrepresentation of people of color—and especially Black people—in the criminal-legal system. *See, e.g.*, Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 545 (2022). A recent study estimated that "a whopping 33% of Black men had felony convictions—a status that makes merely possessing a gun unlawful under every state's law and a federal crime punishable by up to a decade and a half in prison." Jacob D. Charles, *Firearms Carceralism*, 108 Minn. L. Rev. 2811, 2856 (2024); *see also* Charles & Garrett, *supra*, 170 U. Pa. L. Rev. at 696 ("[I]f Black Americans are more likely to be charged with a crime than White Americans, then they are that much more likely *both* to get a gun-disqualifying conviction *and* to be the one with a gun-disqualifying conviction who gets caught unlawfully possessing a firearm."). Unsurprisingly, the "vast majority" of people charged under the statute are "poor people of color." *See* Patton, *supra*, 69 Emory L.J. at 1013.

The racial disparities extend beyond the charging and sentencing

---

residents accounted for 78% of the state's felony gun possession cases"); *see also* David E. Patton, *Criminal Justice Reform and Guns: The Irresistible Movement Meets the Immovable Object*, 69 Emory L.J. 1011, 1022 & n.64 (2020).

contexts. Section 922(g)(1) enables disparate law enforcement practices—such as heavily criticized "stop-and-frisk" policies—that have been shown to especially target communities of color. *See, e.g.*, Sherwood, *supra*, 70 Duke L.J. at 1463–64; Benjamin Levin, *Guns and Drugs*, 84 Fordham L. Rev. 2173, 2195–96 (2016) (explaining that New York City's "stop-and-frisk strategy produced a system in which police arrested people of color at greater rates than whites" even though "studies show that blacks who are stopped and frisked are less likely than whites to be in possession of guns or other contraband").

For example, police officers implementing stop-and-frisk policies to uncover evidence of gun possession often rely significantly on racial stereotyping—whether expressly or as a result of implicit bias. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 562 (S.D.N.Y. 2013) (finding that New York City's stop-and-frisk policy used indirect racial profiling). Similarly, federal agents using fake "stash house" sting operations to find illegally possessed guns "overwhelmingly target people of color." Patton, *supra*, 69 Emory L.J. at 1023–24 ("In the Northern District of Illinois, only six out of ninety-four defendants charged in fake stash-house sting cases were White and non-Hispanic").

In producing racially disparate harms, section 922(g)(1) is a legacy of our nations' earlier firearm restrictions. As the government's own historical arguments reveal, "[f]or a significant portion of American history, gun laws bore the ugly taint of racism" and were "racially motivated." Winkler, *supra*, 135 Harv. L. Rev. F. at 537–38 (discussing prohibitions imposed by post-Reconstruction "Black Codes"). In a similar way, the disproportionate prosecution of people of color under section 922(g)(1)—enabled by the statute's expansive breadth—"reinforce[s] race and class-based hierarchies by using the blunt instrument of incarceration to counteract what are often other and deeper-rooted problems." Charles & Garrett, *supra*, 170 U. Pa. L. Rev. at 696.

To be sure, these racial harms do not bear directly on the Second Amendment analysis at issue. But they are an important reminder that "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).

## CONCLUSION

The Supreme Court has held that, to override the Second Amendment's protection, the government must show that its regulation is consistent with the historical principles underpinning our founding-era tradition of restricting firearms. Because the government has failed to point to any such support for permanently disarming every person convicted of an offense punishable by more than one year, this Court should uphold Mr. Duarte's as-applied challenge to section 922(g)(1). The Court should accordingly vacate Mr. Duarte's conviction and dismiss the indictment against him.

Date: September 24, 2024

Neil K. Sawhney
Shilpi Agarwal
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
*nsawhney@aclunc.org*

David D. Cole
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW
Washington, DC 20005

Cecillia Wang
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104

Louise Melling
M. Yasmin Cader
Ria Tabacco Mar
Brandon Buskey
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

Summer Lacey
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 6,117 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I further certify that this brief is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

Date: September 24, 2024

_____

Neil K. Sawhney

*Counsel for Amici Curiae*