No. 22-50048

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

STEVEN DUARTE, AKA Shorty,
Defendant–Appellant.

————————————

On Appeal from the United States District Court for the
Central District of California, No. 2:20-CR-387
(Hon. André Birotte, Jr.)

————————————

## SUPPLEMENTAL EN BANC BRIEF FOR THE UNITED STATES

————————————

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Chief, Criminal Division

DAVID R. FRIEDMAN
Chief, Criminal Appeals Section
Central District of California

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney
General

LISA H. MILLER
Deputy Assistant Attorney General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ....................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ............................................................................. 2

I.    *Rahimi* Supports the Government's Argument that § 922(g)(1) Is Constitutional As Applied to Duarte..................................................... 2

      A.    In upholding 18 U.S.C. § 922(g)(8), *Rahimi* clarified the analytical framework governing Second Amendment challenges.................................................................. 3

      B.    Section 922(g)(1) is constitutional under the analysis required by *Rahimi*...................................................... 5

      C.    *Rahimi* underscores several methodological errors in the panel's opinion and Duarte's arguments. .................................. 12

            1.    *Rahimi* confirms that the proper focus is on historical principles, not historical twins. ........................................ 13

            2.    *Rahimi* undermines Duarte's "how" and "why" analysis. . 15

            3.    *Rahimi* does not call into question legislative determinations of dangerousness. ......................................................... 17

            4.    *Rahimi* indicates that the proper focus is not on whether the prior felony offense was "violent."................................... 21

            5.    *Rahimi* clarifies that the appropriate standard is "relevantly similar," not "distinctly similar." .................................... 24

            6.    *Rahimi*'s rejection of a "responsible" standard does not cast doubt on § 922(g)(1)...................................................... 24

      D.    At the very least, *Rahimi* shows that any error was not plain. ..... 26

II.    This Court Should Not Remand for Further Proceedings.................... 27

A.   Because § 922(g)(1) can constitutionally be applied to Duarte without further factual development, a remand is unnecessary. ............................................................................ 27

B.   A remand would be inconsistent with Rule 52(b)'s plain-error standard. ......................................................................... 28

    1.   Appellate courts must apply the plain-error standard to unpreserved claims rather than remanding such claims..... 28

    2.   No valid exception to Rule 52(b)'s plain-error standard would permit a remand here............................................ 30

        a.   Rule 52(b)'s plain-error standard applies even when a defendant has satisfied Rule 12(c)(3)'s "good cause" standard for an untimely motion. ........................... 31

        b.   This Court's exception to the plain-error standard for "pure questions of law" is erroneous........................ 36

        c.   This Court's exception to the plain-error standard for "change[s] in the law" is erroneous......................... 37

CONCLUSION..................................................................................... 38

CERTIFICATE OF COMPLIANCE ........................................................ 39

# TABLE OF AUTHORITIES

## Cases

*Binderup v. Attorney General*,
  836 F.3d 336 (3d Cir. 2016) ..................................................................... 12

*Blanton v. City of North Las Vegas*,
  489 U.S. 538 (1989) ................................................................................. 18

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ................................................................................. 18

*Bucklew v. Precythe*,
  587 U.S. 119 (2019) ................................................................................... 7

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022) ................................................................................... 10

*Davis v. United States*,
  589 U.S. 345 (2020) ................................................................................. 35

*Dickerson v. New Banner Institute, Inc.*,
  460 U.S. 103 (1983) ................................................................................. 12

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................. 3, 5, 6, 9, 10, 20, 25

*Epic Systems Corp. v. Lewis*,
  584 U.S. 497 (2018) ................................................................................. 32

*Folajtar v. Attorney General*,
  980 F.3d 897 (3d Cir. 2020) ............................................................... 19, 22

*Greer v. United States*,
  593 U.S. 503 (2021) ................................................................. 29, 34, 35, 37

*Henderson v. United States*,
  568 U.S. 266 (2013) ....................................................................... 29, 36, 37

*Johnson v. United States*,
  520 U.S. 461 (1997) ................................................................. 29, 35, 37, 38

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) ................................................................. 22

*Kemp v. United States*,
596 U.S. 528 (2022) ............................................................................. 32

*Lewis v. United States*,
518 U.S. 322 (1996) ............................................................................. 18

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ............................................................................... 6

*Medina v. Whitaker*,
913 F.3d 152 (D.C. Cir. 2019) ............................................................. 19

*Molina-Martinez v. United States*,
578 U.S. 189 (2016) ............................................................................. 30

*Musacchio v. United States*,
577 U.S. 237 (2016) ............................................................................. 36

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) ................................................................... 3, 4, 6, 20

*People v. Parra*,
70 Cal. App. 4th 222 (Cal. Ct. App. 1999) .......................................... 23

*Puckett v. United States*,
556 U.S. 129 (2009) ............................................................... 2, 26, 29

*Range v. Attorney General*,
69 F.4th 96 (3d Cir. 2023) (en banc), *vacated*, 144 S. Ct. 2706 (2024) ......... 27

*State v. Hogan*,
58 N.E. 572 (1900) ............................................................................. 12

*State v. Shelby*,
2 S.W. 468 (1886) ............................................................................. 12

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023), *vacated on grant of reh'g en banc*,
93 F.4th 1150 (9th Cir. 2024) ............................................................. 28

*United States v. Ameline,*
409 F.3d 1073 (9th Cir. 2005) (en banc) ..................................................... 30

*United States v. Barton,*
633 F.3d 168 (3d Cir. 2011)...................................................................... 23

*United States v. Booker,*
543 U.S. 220 (2005) .............................................................................. 30

*United States v. Christensen,*
828 F.3d 763 (9th Cir. 2015)..................................................................... 38

*United States v. Diaz,*
116 F.4th 458 (5th Cir. 2024) ................................................................... 26

*United States v. Diaz,*
864 F.2d 544 (7th Cir. 1988)..................................................................... 23

*United States v. Dorsey,*
105 F.4th 526 (3d Cir. 2024).................................................................... 37

*United States v. Duarte,*
101 F.4th 657 (9th Cir. 2024) .................................. 7, 14, 16, 21, 23, 24, 31

*United States v. Dubois,*
94 F.4th 1284 (11th Cir. 2024)................................................................. 26

*United States v. Gay,*
98 F.4th 843 (7th Cir. 2024) ................................................................... 27

*United States v. Gomez,*
115 F.4th 987 (9th Cir. 2024) .................................................................. 36

*United States v. Gonzalez-Aparicio,*
663 F.3d 419 (9th Cir. 2011)..................................................................... 36

*United States v. Grovo,*
826 F.3d 1207 (9th Cir. 2016).................................................................. 37

*United States v. Guerrero,*
921 F.3d 895 (9th Cir. 2019)..................................................................... 31, 34

v

*United States v. Herrera*,
    51 F.4th 1226 (10th Cir. 2022) ................................................. 33

*United States v. Jackson*,
    110 F.4th 1120 (8th Cir. 2024) ..........................................12, 26

*United States v. Johnson*,
    95 F.4th 404 (6th Cir. 2024) .................................................... 37

*United States v. Jones*,
    88 F.4th 571 (5th Cir. 2023) ................................................27, 37

*United States v. Keys*,
    133 F.3d 1282 (9th Cir. 1998) (en banc) .................................. 35

*United States v. Langston*,
    110 F.4th 408 (1st Cir. 2024) .................................................. 37

*United States v. Maez*,
    960 F.3d 949 (7th Cir. 2020)..................................................... 33

*United States v. McAdory*,
    935 F.3d 838 (9th Cir. 2019)..................................................... 36

*United States v. Miles*,
    86 F.4th 734 (7th Cir. 2023) .................................................... 37

*United States v. Montero-Camargo*,
    208 F.3d 1122 (9th Cir. 2000) (en banc) ................................... 6

*United States v. Moore*,
    111 F.4th 266 (3d Cir. 2024).................................................... 26

*United States v. Mung*,
    989 F.3d 639 (8th Cir. 2021).................................................... 32

*United States v. Perez-Garcia*,
    96 F.4th 1166 (9th Cir. 2024) .............................................10, 22

*United States v. Rahimi*,
    144 S. Ct. 1889 (2024)....................................................*passim*

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) (en banc) ..................................... 17

*United States v. Torres-Rosario*,
  658 F.3d 110 (1st Cir. 2011) ...................................................... 23

*United States v. Valdivias-Soto*,
  112 F.4th 713 (9th Cir. 2024) .................................................... 37

*United States v. Vongxay*,
  594 F.3d 1111 (9th Cir. 2010) ...................................................... 5

*United States v. Vonn*,
  535 U.S. 55 (2002) ............................................................... 33, 35

*United States v. Williams*,
  113 F.4th 637 (6th Cir. 2024) .............................................. 23, 26

*United States v. Young*,
  470 U.S. 1 (1985) ....................................................................... 35

*United States v. Zhou*,
  838 F.3d 1007 (9th Cir. 2016) ................................................... 36

## Statutes, Rules, and Constitutional Provisions

U.S. Const. amend. V ................................................................... 18

18 U.S.C. § 922 ............................................................................ 21

Alaska Stat. § 11.41.200 ............................................................ 21

Alaska Stat. § 11.41.210 ............................................................ 21

Alaska Stat. § 11.41.220 ............................................................ 21

Cal. Health & Safety Code § 11351.5 ....................................... 23

Cal. Penal Code § 29800............................................................ 23

Cal. Veh. Code § 2800.2 ............................................................ 23

Fed. R. Crim. P. 12 ..................................................................... 32

Fed. R. Crim. P. 51 ................................................................ 28

Fed. R. Crim. P. 52 ..........................................................26, 29

Fed. R. Evid. 201, advis. Comm. Note (1972) ........................ 28

Or. Rev. Stat. § 163.165 ...................................................... 21

Or. Rev. Stat. § 163.175 ...................................................... 21

Or. Rev. Stat. § 163.185 ...................................................... 21

**Historical Statutes**

Act of Dec. 1775, *in The Public Records of the Colony of Connecticut From May, 1775 to June 1776, inclusive* 193 (Charles J. Hoadly ed., 1890) .............. 8

Act of March 7, 1923, ch. 266, § 5, 1923 N.D. Laws 380 ................. 9

Act of May 4, 1923, ch. 119, § 3, 1923 N.H. Laws 138 .................. 9

Act of June 13, 1923, ch. 339, § 2, 1923 Cal. Stat. 696 .................. 9

Act of Feb. 26, 1925, ch. 260, § 2, 1925 Or. Gen. Laws 468 ........... 9

Act of Mar. 5, 1925, ch. 47, § 2, 1925 Nev. Laws 54 ..................... 9

Act of Mar. 12, 1925, ch. 207, § 4, 1925 Ind. Laws 495-496 ........... 9

Act of Apr. 29, 1925, ch. 284, § 4, 1925 Mass. Acts 323 ................. 9

Act of June 5, 1925, 1925 W.V. Acts 25-26 ................................ 9

Act of June 2, 1927, No. 373, § 2, 1927 Mich. Acts 887-888 .......... 9

Act of June 19, 1931, ch. 1098, § 2, 1931 Cal. Stat. 2316 ............... 9

Act of Jan. 9, 1934, No. 26, § 8, 1933-1934 Haw. Terr. Sess. Laws 39 ............ 9

Act of July 8, 1936, §§ 2-3, 1932 P.R. Laws 128 .......................... 9

An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, § 2, 75 Stat. 757 (1961) ...................................................... 10

Federal Firearms Act, ch. 850, § 2(d), 52 Stat. 1251 (1938) ............ 9

Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213 .............. 10

Resolution of Sept. 1, 1775, *in* 1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New-York* 132 (1842) ....................................................................... 8

Resolution of Mar. 13, 1776, *in Journal of the Provincial Congress of South Carolina, 1776*, at 77 (1776) ......................................................................... 8

Resolution of July 25-26, 1776, *in* 1 *American Archives: Fifth Series* 587 (Peter Force ed., 1843) ............................................................................... 8

## Other Authorities

Stuart Banner, *The Death Penalty: An American History* (2002) ........................ 19

Bureau of Justice Statistics, Recidivism of Prisoners Released in 24 States in 2008: A 10-Year Follow-Up Period (2008-2018) ......................... 23

6 Nathan Dane, *Digest of American Law* (1823) ................................................ 7

**INTRODUCTION AND SUMMARY OF ARGUMENT**

A panel of this Court held that 18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to Steven Duarte, a five-time felon, who forfeited his constitutional challenge below.  After granting rehearing en banc, the Court requested supplemental briefing addressing (1) the impact of *United States v. Rahimi*, 144 S. Ct. 1889 (2024), on this case and (2) whether this case should be remanded to the district court for further proceedings.

1. *Rahimi* supports the government's contention that § 922(g)(1) is constitutional as applied to Duarte.  *Rahimi* explained that the Court's recent Second Amendment decisions "were not meant to suggest a law trapped in amber," and it emphasized that a modern regulation "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'"  *Rahimi*, 144 S. Ct. at 1897-98.  Although *Rahimi* addressed a statute that prohibited firearm possession by those judicially found to threaten others, the Court made clear that its opinion does "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse."  *Id.* at 1901.  And the Court reiterated that laws prohibiting possession of firearms by felons are "presumptively lawful."  *Id.* at 1901-02.  In short, *Rahimi* indicates that this Court's pre-*Bruen* precedent

upholding § 922(g)(1) is still good law, and it shows that § 922(g)(1) is constitutional—and at the very least not clearly or obviously *un*constitutional—as applied to Duarte.

2. This Court should not remand this case for further proceedings before reaching the merits.  This Court can decide the case based on the legal and historical authorities adduced by the parties.  And because Duarte failed to preserve his Second Amendment claim in the district court, his claim is subject to plain-error review under Federal Rule of Criminal Procedure 52(b).  Remanding for Duarte to develop additional facts or arguments would improperly circumvent Rule 52(b)'s plain-error rule.

## ARGUMENT

## I.    *Rahimi* Supports the Government's Argument that § 922(g)(1) Is Constitutional As Applied to Duarte.

Although *Rahimi* addressed a different provision, several aspects of its analysis support the government's view that § 922(g)(1) is constitutional in all its applications, including as applied to Duarte.  At the very least, *Rahimi* demonstrates that Duarte cannot establish any "clear or obvious" constitutional error, as he must to prevail on plain-error review.  *Puckett v. United States*, 556 U.S. 129, 135 (2009).

**A.** **In upholding 18 U.S.C. § 922(g)(8), *Rahimi* clarified the analytical framework governing Second Amendment challenges.**

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects an individual right to possess firearms. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022), the Court clarified that when a firearm regulation is challenged under the Second Amendment, courts must rely on "the Second Amendment's text, as informed by history." If the "plain text" of the Amendment "covers an individual's conduct," the regulation must be "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

In *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Supreme Court applied this historical-tradition test to uphold 18 U.S.C. § 922(g)(8), which prohibits the possession of firearms by individuals subject to certain domestic violence restraining orders. The Court explained that, since *Bruen*, "some courts have misunderstood the methodology of our recent Second Amendment cases," which "were not meant to suggest a law trapped in amber." *Id.* at 1897. The Court emphasized that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," *id.* at 1898, and that those principles "permit[] more than just those regulations identical to ones that could be found in 1791," *id.* at 1897-98. Section 922(g)(8), the Court held, is consistent with

the following historical principle: "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901.

As evidence of that historical principle, the Court relied upon "two distinct legal regimes," "[t]aken together": surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond," and "going armed" laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Rahimi*, 144 S. Ct. at 1899-1901. The Court recognized that § 922(g)(8) is "by no means identical to these founding era regimes" but held that "it does not need to be." *Id.* at 1901. Instead, it was sufficient that the prohibition "is 'relevantly similar'" to historical laws "in both why and how it burdens the Second Amendment right." *Id.* (quoting *Bruen*, 597 U.S. at 29). As to why, both the modern law and its historical antecedents regulate "individuals found to threaten the physical safety of another." *Id.* As to how, surety and going armed laws, like Section 922(g)(8), "involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 1902.

**B.    Section 922(g)(1) is constitutional under the analysis required by *Rahimi*.**

As explained in the government's answering brief, § 922(g)(1) is consistent with the Second Amendment as a matter of precedent, text, and history.

***Precedent.*** This Court's decision in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), correctly held that *Heller*'s statements that it was not calling into question "presumptively lawful" firearms laws such as "longstanding prohibitions on the possession of firearms by felons" were not "dicta" but were "integral" to *Heller*'s holding, *id.* at 1115 (quotation omitted). Nothing in *Bruen* or *Rahimi* calls *Vongxay*'s analysis into question.  To the contrary, *Rahimi* reiterated that "many" prohibitions on in-home firearm possession, "like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'"  *Rahimi*, 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626-27 & n.26).  Thus, the panel erred in reevaluating Section 922(g)(1)'s constitutionality rather than applying *Vongxay*.

Although the en banc Court is not bound by *Vongxay*, that decision remains persuasive.  And even if this Court determines that *Heller*'s statements about felon-dispossession laws were dicta, this Court does "not treat considered dicta from the Supreme Court lightly," but "accord[s] it appropriate

deference." *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc). That is especially true where, as here, that considered dicta has appeared in multiple Supreme Court opinions over the course of two decades. *See Rahimi*, 144 S. Ct. at 1902; *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion). Appropriate deference means rejecting Duarte's plain-error challenge to § 922(g)(1)'s presumptively lawful prohibition.

*Text.* As a textual matter, felons are not part of "the people" because they are not "members of the political community" who possess Second Amendment rights. *Heller*, 554 U.S. at 580. *Rahimi* did not address this question, but the government maintains that felons are not part of the political community, as they have long been excluded from exercising important civic rights such as voting and holding elective office. *See* Gov't Answering Br. 29-31.

*History.* Section 922(g)(1) is also consistent with America's historical tradition, which reflects two at least relevant principles: (1) legislatures may disarm persons who have been convicted of serious crimes and (2) legislatures may disarm "categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 144 S. Ct. at 1901. Several types of historical evidence, "[t]aken together," support these principles. *Id.*

*First,* "death was the standard penalty for all serious crimes at the time of the founding," *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (quotation omitted), and estate forfeiture was likewise a common felony punishment, *see* Gov't Answering Br. 34-39. Duarte and the panel decision question that proposition, relying on an 1823 treatise that discussed the available punishments (under federal law) more than three decades after the founding. *See* Supp. Br. 25; *United States v. Duarte*, 101 F.4th 657, 689 (9th Cir. 2024) (quoting 6 Nathan Dane, *Digest of American Law* 715 (1823)). That treatise does not address the many laws from the 1780s and 1790s cited by the government. Nor does it matter that, as the panel pointed out, states began to move away from capital punishment for many felonies in the decades after the founding. *See Duarte*, 101 F.4th at 689 n.15. The drafters and ratifiers of the Second Amendment understood that felonies *could be* punished by death, regardless of whether they were *always* so punished.

*Rahimi* supports the view that modern felons can be disarmed because felons historically were subject to the even greater penalties of death and estate forfeiture. *See* Gov't Answering Br. 38-39. In analogizing § 922(g)(8) to historical "going armed" laws, *Rahimi* reasoned: "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section

922(g)(8) imposes is also permissible." *Rahimi*, 144 S. Ct. at 1902. Likewise, the greater founding-era penalties of death or estate forfeiture justify the lesser modern restriction of a ban on firearm possession.

*Second*, some founding-era laws specifically disarmed those convicted of non-capital crimes. Because death was a standard penalty, founding-era legislatures had little occasion to consider disarming convicted criminals who were not executed. But the legislative power to do so was understood, as evidenced by laws from several colonies providing that a person would "be disarmed" upon conviction for offenses such as furnishing provisions to the British army, bearing arms against the colonies, opposing the Continental Congress's authority, or seditious libel.[1]

The principle that legislatures could disarm convicted criminals persisted during the ratification debates, during which Anti-Federalists in Pennsylvania proposed a bill of rights that would have prohibited "disarming the people, or any of them, *unless for crimes committed*, or real danger of public injury from

---

[1] *See* Resolution of Sept. 1, 1775, *in* 1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New-York* 132 (1842); Resolution of Mar. 13, 1776, *in Journal of the Provincial Congress of South Carolina, 1776,* at 77 (1776); Resolution of July 25-26, 1776, *in* 1 *American Archives: Fifth Series* 587 (Peter Force ed., 1843); Act of Dec. 1775, *in The Public Records of the Colony of Connecticut From May, 1775 to June 1776, inclusive* 193 (Charles J. Hoadly ed., 1890).

individuals." 2 *The Documentary History of the Ratification of the Constitution* 598 (Merrill Jensen ed., 1976) (emphasis added). Although not ultimately adopted in the Bill of Rights, this minority proposal was "highly influential," *Heller*, 554 U.S. at 604, and it reflects a shared understanding that disarming those convicted of crimes was consistent with the "pre-existing right" codified in the Second Amendment, *id.* at 592 (emphasis omitted).

*Third,* consistent with the historical understanding, legislatures in the 1920s began prohibiting the possession or purchase of handguns by all felons[2] or by felons convicted of crimes against a person or property.[3] Congress followed suit, enacting in 1938 a nationwide prohibition on firearm receipt by any person with a conviction for a crime of violence, Federal Firearms Act, ch. 850, § 2(d), 52 Stat. 1251, and enacting in the 1960s the current prohibition on possession of a firearm by anyone convicted of a crime punishable by

---

[2] *See* Act of Mar. 5, 1925, ch. 47, § 2, 1925 Nev. Laws 54; Act of Apr. 29, 1925, ch. 284, § 4, 1925 Mass. Acts 323; Act of June 5, 1925, 1925 W.V. Acts 25-26; Act of June 2, 1927, No. 373, § 2, 1927 Mich. Acts 887-888; Act of June 19, 1931, ch. 1098, § 2, 1931 Cal. Stat. 2316; Act of Jan. 9, 1934, No. 26, § 8, 1933-1934 Haw. Terr. Sess. Laws 39; Act of July 8, 1936, §§ 2-3, 1932 P.R. Laws 128.

[3] *See* Act of March 7, 1923, ch. 266, § 5, 1923 N.D. Laws 380; Act of May 4, 1923, ch. 119, § 3, 1923 N.H. Laws 138; Act of June 13, 1923, ch. 339, § 2, 1923 Cal. Stat. 696; Act of Feb. 26, 1925, ch. 260, § 2, 1925 Or. Gen. Laws 468; Act of Mar. 12, 1925, ch. 207, § 4, 1925 Ind. Laws 495-496.

imprisonment for a term exceeding one year, *see* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, § 2, 75 Stat. 757 (1961); Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220. These 20th-century laws are both "longstanding" and consistent with founding-era tradition. *Heller*, 554 U.S. at 626.

The century-old, nationwide tradition of disarming convicted felons (including non-violent felons) confirms the correct result in this case. Although post-ratification evidence cannot overcome clear constitutional text, "the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text." *Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring); *see also id.* at 1924 (Barrett, J., concurring) (recognizing that post-ratification history can be "an important tool"). And the Supreme Court has often relied on post-ratification history, including history from long after the Founding, in resolving constitutional ambiguities. *See, e.g.*, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 75 (2022); *see also Rahimi*, 144 S. Ct. at 1918-19 (Kavanaugh, J., concurring) (collecting numerous additional examples).

*Fourth*, the United States has a long tradition of disarming persons whose possession of firearms poses a danger to themselves or others. *See United States v. Perez-Garcia*, 96 F.4th 1166, 1185-89 (9th Cir. 2024). *Rahimi* involved one

aspect of that tradition: disarming "individual[s] found by a court to pose a credible threat to the physical safety of another." *Rahimi*, 144 S. Ct. at 1903. Section 922(g)(1) involves another aspect of that tradition: disarmament of "categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 1901.

Beyond the Founding-era disarmament laws discussed above, American legislatures in the 19th century disarmed classes of individuals who posed a danger of misusing firearms. At least 29 jurisdictions banned or restricted the sale of firearms to, or the possession of firearms by, individuals below specified ages. *See* Brief for the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 5322645, at *24 & n.16 (collecting citations). Several States banned the sale of firearms to persons of unsound mind. *Id.* at *24-25 & n.17. At least a dozen States disarmed "tramps"—that is, vagrants. *Id.* at *25 & n.18. And some States forbade intoxicated persons from buying or carrying firearms. *Id.* at *25-26 & n.19.

State courts upheld those laws, even though the laws did not require an individualized assessment of danger. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468,

11

469 (1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (1900).

Section 922(g)(1) is consistent with that tradition of imposing categorical limits on the right to keep and bear arms. The Supreme Court has recognized that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms. *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983). And "numerous studies" show a "link between past criminal conduct and future crime, including gun violence." *Binderup v. Attorney General*, 836 F.3d 336, 400 (3d Cir. 2016) (Fuentes, J., concurring in part and dissenting in part); *see id.* at 400 n.160 (collecting studies). Thus, § 922(g)(1) comports with the historical practice of legislatures that "prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024).

## C. *Rahimi* underscores several methodological errors in the panel's opinion and Duarte's arguments.

The Supreme Court's analysis in *Rahimi* corrects several misconceptions in the panel's decision, but Duarte's supplemental brief nonetheless repeats those errors.

### 1. *Rahimi* confirms that the proper focus is on historical principles, not historical twins.

*Rahimi* confirms that the Second Amendment analysis does not require a "granular" comparison of historical analogues, Supp. Br. 14, but instead focuses on the broader "principles underlying the Second Amendment," *Rahimi*, 144 S. Ct. at 1898. As Justice Barrett explained in concurrence, "[h]istorical regulations reveal a principle" that can then be applied to modern regulations. *Id.* at 1925 (Barrett, J., concurring). One of those "principles underlying the Second Amendment," *Rahimi* determined, is that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1898, 1901 (majority opinion). Of course, "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at 1926 (Barrett, J., concurring). But the appropriate analysis still focuses on broader principles, rather than an exacting one-to-one comparison.

*Rahimi* also cautions against placing undue weight on the absence of historical firearms regulations on a particular topic. The Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897-98. As Justice Barrett emphasized, "[t]o be *consistent* with historical limits, a challenged regulation need not be an

13

updated model of a historical counterpart." *Id.* at 1925 (Barrett, J., concurring). "[A] test that demands overly specific analogues" would result in a "'law trapped in amber'" by "forc[ing] 21st-century regulations to follow late-18th-century policy choices." *Id.* Such a test would also wrongly "assume[] that founding-era legislatures maximally exercised their power to regulate." *Id.* The *Rahimi* majority rejected that incorrect view of legislative authority, holding that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1898 (majority opinion).

Duarte fails to heed this aspect of *Rahimi*. He points out, for example, that "[t]here are no founding-era felon-in-possession laws." Supp. Br. 31; *see Duarte*, 101 F.4th at 691 (observing that Duarte's underlying felon-in-possession offense was a "nonexistent crime" before the 20th century). In *Rahimi*, the defendant and the dissent likewise pointed out that founding-era legislatures did not address domestic violence through laws prohibiting firearm possession. *Rahimi*, 144 S. Ct. at 1939 (Thomas, J., dissenting); Brief for Respondent, *United States v. Rahimi*, No. 22-915, 2023 WL 6391053, at *13. But the Supreme Court held that § 922(g)(8) was constitutional based on historical surety and "going armed" laws, even though § 922(g)(8) was "by no means identical to these founding era regimes." *Rahimi*, 144 S. Ct. at 1901.

## 2. *Rahimi* undermines Duarte's "how" and "why" analysis.

Duarte's attempts to distinguish the "how" and "why" of historical laws from § 922(g)(1) are irreconcilable with *Rahimi*. For example, he distinguishes laws disarming Loyalists on the basis that they were allegedly aimed at "political threats" and "insurrectionists," Supp. Br. 11, 19 (quotation omitted), and allowed dissidents to regain their arms by swearing an oath of allegiance, Supp. Br. 12-13. And he distinguishes laws punishing felonies with estate forfeiture and death on the basis that their purpose was "retribution" or "deterr[ence]" rather than "reducing the generalized risk of firearm violence." Supp. Br. 28-29.

Duarte's reliance on these distinctions echoes the dissent's approach in *Rahimi*—which eight justices rejected. The *Rahimi* dissent reasoned that "affray" (or "going armed") laws had a different purpose than Section 922(g)(8) because they "captured only conduct affecting the broader public" instead of seeking to prevent "interpersonal violence in the home." *Rahimi*, 144 S. Ct. at 1942 (Thomas, J. dissenting). And it argued that laws targeting "dangerous" persons "were driven by a justification distinct from that of § 922(g)(8)" because the historical laws were concerned with "quashing treason and rebellion" whereas Section 922(g)(8) is "concerned with preventing interpersonal violence." *Id.* at 1934-35.

15

The *Rahimi* majority rejected the dissent's conclusion that "the historical analogues for Section 922(g)(8) are not sufficiently similar to place that provision in our historical tradition." *Rahimi*, 144 S. Ct. at 1902-03. The Court said that both the dissent and the Fifth Circuit improperly "read *Bruen* to require a 'historical twin' rather than a 'historical analogue.'" *Id.* at 1903. Duarte commits the same error. It does not matter that some historical laws targeted danger from political dissidents, as opposed to danger from armed felons, or that they might have punished felons for retribution and deterrence, rather than solely based on generalized safety concerns. What matters is that historical laws punished felons with severe penalties and disarmed groups that presented a special danger of misuse.

Duarte also argues that § 922(g)(1) imposes a different burden than historical laws because it "permanently disarm[s] nonviolent offenders." Supp. Br. 31-32. He contends that "most or all founding-era disarmament laws . . . contained self-defense or necessity exceptions or other means of restoring the right." Supp. Br. 32. But under current law, a felon may regain his right to bear arms if his conviction "has been expunged[] or set aside" or he has "been pardoned or has had civil rights restored," 18 U.S.C. § 921(a)(20)—a feature of the statute that the panel appears to have overlooked, *see Duarte*, 101 F.4th at 662 (characterizing § 922(g)(1) as a "no-exception, lifelong ban"). And *Rahimi*

makes clear that the government need not point to historical laws imposing an identical burden on firearm possession. *Rahimi*, 144 S. Ct. at 1901-02. Historical laws that disarmed people for various crimes, "[t]aken together" with the often lifelong (or life-ending) consequences of a felony conviction, *id.* at 1901, adequately demonstrate that § 922(g)(1)'s lifetime ban is consistent with the Second Amendment's historical understanding.

### 3. *Rahimi* does not call into question legislative determinations of dangerousness.

Duarte contends that "*Rahimi* rejected the government's attempt to broadly define legislative authority to regulate firearms," and established that "courts cannot simply defer to modern legislatures when Second Amendment rights are [at] stake." Supp. Br. 3, 18 (boldface omitted). Duarte is correct that courts should not blindly defer to legislatures and may properly review a disqualification's breadth. *See* Reply Brief for the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 7106695, at *13-14. But *Rahimi* said it was "not suggest[ing] that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 144 S. Ct. at 1901. Indeed, "[t]hat *some* categorical limits are proper is part of the original meaning" of the Second Amendment. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). When 18th- and 19th-century legislatures

17

enacted laws categorically disarming loyalists, underage individuals, and vagrants, they did not require case-by-case findings of dangerousness. Thus, § 922(g)(1)'s categorical prohibition on those whose possession "present[s] a special danger of misuse" is consistent with the historical leeway given to legislatures. *Rahimi*, 144 S. Ct. at 1901.

Moreover, in interpreting other provisions of the Bill of Rights, the Supreme Court has routinely considered the "maximum authorized penalty" to "provide[ ] an 'objective indication of the seriousness with which society regards the offense.'" *Lewis v. United States*, 518 U.S. 322, 328 (1996) (brackets omitted). For example, the Grand Jury Clause applies only to "capital" or "infamous" crimes, U.S. Const. amend. V, and a crime is "infamous" if it is punishable by "imprisonment for more than a year," *Branzburg v. Hayes*, 408 U.S. 665, 687 n.24 (1972). The Sixth Amendment right to a jury trial similarly does not extend to petty offenses, and an offense is petty if it is punishable by a prison term of six months or less. *See Blanton v. City of North Las Vegas*, 489 U.S. 538, 541-45 (1989). Courts can likewise look to the prescribed punishment when interpreting the Second Amendment.

Duarte contends that "a 'felony' today is simply not the same thing as a founding-era 'felony.'" Supp. Br. 25. To be sure, the standard definition of a felony has changed, in large part because of the movement toward

incarceration and away from the death penalty that began in the decades after the founding. *See Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020); Stuart Banner, *The Death Penalty: An American History* 98-100 (2002). But "even as the term evolved and expanded, felonies continued to reflect the category of serious crimes." *Folajtar*, 980 F.3d at 905. Accordingly, "felonies were—and remain—the most serious category of crime." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).

Duarte argues that the government fails to identify "any meaningful limiting principle for what a modern legislature may designate as a 'felony.'" Supp. Br. 25-26. But that is not necessary. Although a legislature could, in theory, make a minor infraction like jaywalking a felony (Supp. Br. 26), there are strong systemic and political disincentives to making such minor crimes felonies. Beyond potentially subjecting jaywalkers to the full statutory maximum, such a law would, in many states, impact the jaywalker's rights to vote, hold public office, and serve on a jury.

Duarte contends that felons are "not a well-defined group representing unique or immediate risks of physical harm to others" because approximately 19 million Americans, or 8% of American adults, have been convicted of a crime punishable by imprisonment for more than one year. Supp. Br. 20. A prohibition's breadth is undoubtedly relevant to its constitutionality. *See Heller*,

19

554 U.S. at 593 (founders rejected abuses such as the Stuart Kings' "general disarmaments" of whole "regions"). But the primary question is not the bare number of people affected by a prohibition. Instead, the question is whether the prohibition is consistent with historical principles—here, whether it targets a category of people who committed serious crimes or who "present a special danger of misuse" of firearms. *Rahimi*, 144 S. Ct. at 1898, 1901. Thus, for example, prohibitions on firearm possession by the mentally ill, drug addicts, or underage individuals would not become unconstitutional should those groups swell in relation to the overall population. As *Rahimi* emphasized, "focused regulations" do not implicate the same constitutional concerns raised by "a broad prohibitory regime" that "severely" restricts arms-bearing by all citizens. *Id.* at 1902.

Duarte also contends that § 922(g)(1) has a particular impact on adult Black men. Supp. Br. 20. But he has not raised a challenge under the Equal Protection Clause. And he does not demonstrate how his proposed rule— limiting § 922(g)(1)'s application to those convicted of "violent" felonies— would reduce racial or gender disparities. Further, Duarte ignores that "the consequences of gun violence are borne disproportionately by communities of color, and Black communities in particular." *Bruen*, 597 U.S. at 86 (Breyer, J.,

dissenting) (citing statistics).  As a result, § 922(g)(1) serves to protect members of those communities.

Duarte further contends that § 922(g)(1) is "arbitrary" because it is underinclusive—failing to sweep in some misdemeanors "that appear more suggestive of potential future violence than most felonies."  Supp. Br. 22.  He points out that some jurisdictions punish some forms of assault as misdemeanors.  Supp. Br. 22 & nn.13-14.  But those same statutory schemes show that *most* assaults are felonies, *see, e.g.*, Or. Rev. Stat. §§ 163.165, 163.175, 163.185; Alaska Stat. §§ 11.41.200, 11.41.210, 11.41.220.  And the fact that Congress does not disarm *all* arguably dangerous misdemeanants, *but see* 18 U.S.C. § 922(g)(9), does not mean Congress lacks the power to do so.  Indeed, the argument that § 922(g)(1) is underinclusive sounds more like an argument that the statute fails under means-end scrutiny than that it is inconsistent with the historical tradition.

### 4.   *Rahimi* indicates that the proper focus is not on whether the prior felony offense was "violent."

Echoing the panel decision, Duarte contends that § 922(g)(1) cannot constitutionally be applied to "nonviolent" offenders.  Supp. Br. 1-2, 31-32; *see Duarte*, 101 F.4th at 661, 676, 679, 683.  But there is no basis for limiting the statute's application to those whose prior felonies were violent.  That limitation

finds no support in *Rahimi*, which relied on historical schemes that sought to "prevent[] violence before it occurred." *Rahimi*, 144 S. Ct. at 1900.

It finds no support in the historical record either. In 1791, various "nonviolent crimes such as forgery and horse theft were capital offenses." *Perez-Garcia*, 96 F.4th at 1183; *see* Gov't Answering Br. 35-39 (counterfeiting and forgery laws). Similarly, Revolutionary-War era statutes disarmed dissidents who had not yet engaged in violence. *See supra* nn.1-2.

Moreover, many people convicted of nonviolent felonies nevertheless "present a special danger of misuse" if armed. *Rahimi*, 144 S. Ct. at 1901. Many crimes such as "residential burglary and drug dealing are not necessarily violent" but are nevertheless "dangerous because they often lead to violence." *Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting). And even crimes not usually associated with violence can potentially demonstrate "a propensity for dangerous behavior." *Kanter v. Barr*, 919 F.3d 437, 469 (7th Cir. 2019) (Barrett, J., dissenting).

Duarte wrongly contends that "numerous nonviolent felonies . . . suggest no proclivity towards violent misuse of firearms." Supp. Br. 21. In fact, even nonviolent felonies can be indicative of dangerousness. For example, a 2021 study found that 82.2% of state prisoners whose most serious commitment offense was fraud or forgery were re-arrested within ten years of

22

release.  Bureau of Justice Statistics, Recidivism of Prisoners Released in 24 States in 2008: A 10-Year Follow-Up Period (2008-2018), at 10 (Table 11), https://bjs.ojp.gov/BJS_PUB/rpr24s0810yfup0818/Web%20content/508%20 compliant%20PDFs.  And nearly one third of those prisoners (31.7%) were re-arrested for a *violent* offense.  *Id.*

Duarte himself is poorly placed to contend that his "nonviolent" felonies do not suggest future violence.  His prior convictions include possession of cocaine base for sale,[4] in violation of Cal. Health & Safety Code § 11351.5; possession of a firearm by a felon, in violation of Cal. Penal Code § 29800(a)(1); and two counts of evading a police officer, in violation of Cal. Veh. Code § 2800.2.  *See* PSR ¶¶ 34-36.  As other circuits have observed, "offenses relating to drug trafficking . . . are closely related to violent crime." *United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011); *see United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011); *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir. 1988).  And offenses such as unlawful possession of a firearm and evading police can similarly be indicative of dangerousness.  *See United States v. Williams*, 113 F.4th 637, 662 (6th Cir. 2024) (observing that the

---

[4] The panel decision treated this as a mere "drug possession" offense, *Duarte*, 101 F.4th at 691, but the statute requires specific intent to sell drugs or intent that someone else will sell them, *People v. Parra*, 70 Cal. App. 4th 222, 227 (Cal. Ct. App. 1999).

government could "point[] to" a felon-in-possession conviction "to demonstrate [the defendant's] dangerousness"). So Duarte cannot show that his prior convictions "suggest no proclivity toward violent misuse of firearms." Supp. Br. 21.

### 5. *Rahimi* clarifies that the appropriate standard is "relevantly similar," not "distinctly similar."

*Rahimi* undermines the panel's (and Duarte's) view that, because § 922(g)(1) addresses a societal problem that has existed since the founding, the government must point to "distinctly similar" historical regulations. *See Duarte*, 101 F.4th at 677, 680, 690; Reply Br. 15-16. The *Rahimi* majority applied a "relevantly similar" test, *see Rahimi*, 144 S. Ct. 1898, 1901, without first determining whether § 922(g)(8) targets a societal problem that existed at the founding. And the Court was unpersuaded by the dissent's assertion, which Duarte echoes here, that a statute violates the Second Amendment if it "addresses a societal problem . . . that has persisted since the 18th century" through "materially different means." *Id.* at 1941 (Thomas, J., dissenting) (quotation omitted).

### 6. *Rahimi*'s rejection of a "responsible" standard does not cast doubt on § 922(g)(1).

Duarte contends that *Rahimi* "contradicts" the government's arguments because *Rahimi* "expressly rejected" the view that Congress can disarm those

who are not "law-abiding" and "responsible." Supp. Br. 7 (boldface omitted). In *Rahimi*, the government relied on statements in *Heller* and *Bruen* to argue that Congress may disarm those who are not "responsible" or "law-abiding." Brief for the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 5322645, at *11-13. The Supreme Court rejected the "contention that Rahimi may be disarmed simply because he is not 'responsible,'" which the Court considered a "vague term." *Rahimi*, 144 S. Ct. at 1903. The Court explained that *Heller* and *Bruen* "used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right" but "said nothing about the status of citizens who were not 'responsible'" because "[t]he question was simply not presented." *Id.*

Contrary to Duarte's contention, Supp. Br. 7-8, 10, *Rahimi* does not undermine the government's arguments in support of § 922(g)(1). Indeed, after surveying the historical record, *Rahimi* held that "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Rahimi*, 144 S. Ct. at 1898. And the Court said it was not casting doubt on the constitutionality of "laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," *id.* at 1901, citing *Heller*'s statements that laws dispossessing felons and the mentally ill are "presumptively lawful," *Heller*, 554 U.S. at 626

25

& n.26.  Thus, far from contradicting the government's approach, *Rahimi*

recognized historically grounded principles quite similar to those the

government advocated.

**D.  At the very least, *Rahimi* shows that any error was not plain.**

Because Duarte failed to raise a Second Amendment challenge in the

district court, he can obtain relief only by satisfying the plain-error standard.

Fed. R. Crim. P. 52(b).  And he cannot show that any constitutional error is

"clear or obvious," *Puckett*, 556 U.S. at 135, particularly considering *Rahimi*'s

reaffirmation that felon-possession prohibitions are "presumptively lawful,"

*Rahimi*, 144 S. Ct. at 1902, and its statement that the Court was "not

suggest[ing] that the Second Amendment prohibits the enactment of laws

banning the possession of guns by categories of persons thought by a

legislature to present a special danger of misuse," *id.* at 1901.

The Eighth and Eleventh Circuits have held that § 922(g)(1) is

constitutional in all its applications. *Jackson*, 110 F.4th at 1125; *United States v.*

*Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024).  Other courts of appeals have left

the door open for as-applied challenges to § 922(g)(1) but have nevertheless

upheld § 922(g)(1) as applied to a variety of defendants.  *See United States v.*

*Diaz*, 116 F.4th 458, 467 (5th Cir. 2024); *Williams*, 113 F.4th at 662; *United*

*States v. Moore*, 111 F.4th 266, 272 (3d Cir. 2024); *United States v. Gay*, 98 F.4th

843, 847 (7th Cir. 2024).  The only decision striking down § 922(g)(1) in any application—as applied to a civil plaintiff with a 25-year-old conviction for food stamp fraud—was vacated after *Rahimi*.  *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc), *vacated*, 144 S. Ct. 2706 (2024).  Given this landscape, Duarte cannot show plain error.  *See United States v. Jones*, 88 F.4th 571, 574 (5th Cir. 2023) (per curiam) (concluding, even before *Range* was vacated, that the "different conclusions" reached by various circuits "support the conclusion that this unsettled question is not clear or obvious error").

## II.   This Court Should Not Remand for Further Proceedings.

The Court should not remand this case for the district court to consider Duarte's Second Amendment challenge.  It should instead affirm Duarte's conviction based on the current factual record.  Providing Duarte the benefit of a remand would be inconsistent with Rule 52(b)'s plain-error standard.

### A.   Because § 922(g)(1) can constitutionally be applied to Duarte without further factual development, a remand is unnecessary.

As explained above, § 922(g)(1) is constitutional in all its applications, even as applied to nonviolent felons.  There is therefore no need for a remand to inquire into whether Duarte's prior felony offenses or his firearm possession in this case were violent.  This Court can, and should, affirm on the current factual record.

27

Nor is there any need for the district court to take a first look at any historical questions relevant to this case. As explained in a since-vacated decision, "the historical research required under *Bruen* involves issues of so-called 'legislative facts'—those 'which have relevance to legal reasoning and the lawmaking process' . . . —rather than adjudicative facts, which 'are simply the facts of the particular case.'" *Teter v. Lopez*, 76 F.4th 938, 946-47 (9th Cir. 2023) (quoting Fed. R. Evid. 201, advis. Comm. Note (1972)), *vacated on grant of reh'g en banc*, 93 F.4th 1150 (9th Cir. 2024). This Court is well equipped to resolve § 922(g)(1)'s constitutionality based on the historical sources cited by the parties.

**B.    A remand would be inconsistent with Rule 52(b)'s plain-error standard.**

Contrary to Duarte's suggestion, Supp. Br. 35, this Court should not remand to the district court based on an intervening change of law. Although that might be appropriate for a preserved challenge, it would not be appropriate for Duarte's unpreserved challenge, which is subject to Rule 52(b)'s plain-error standard.

**1.    Appellate courts must apply the plain-error standard to unpreserved claims rather than remanding such claims.**

A party's failure to object "when the court ruling or order is made or sought," Fed. R. Crim. P. 51(b), "ordinarily precludes the raising on appeal of

the unpreserved claim of trial error," *Puckett*, 556 U.S. at 135.  Rule 52(b) "recognizes a limited exception," *id.*, providing that a court may correct "[a] plain error that affects substantial rights," Fed. R. Crim. P. 52(b).  The Supreme Court's decisions make clear that both "error" and "plainness" are assessed at the time of appellate review.  *Johnson v. United States*, 520 U.S. 461, 467 (1997); *Henderson v. United States*, 568 U.S. 266, 271, 277 (2013).  Thus, when faced with an unpreserved error, an appellate court must consider (among other things) whether, under the law at the time of review, the appellant can show (1) error that is (2) clear or obvious, *see Henderson*, 568 U.S. at 277; and whether, based on "the entire record," the appellant has established the requisite effect on substantial rights, *Greer v. United States*, 593 U.S. 503, 511 (2021).

Remanding an unpreserved claim for a district court to assess those questions would be inconsistent with Rule 52(b), as it would allow the defendant to rely on *additional* changes in law after appellate review.  It would also allow a party (here the defendant, but potentially the government in some cases) to develop new factual or legal arguments—without shouldering its "burden of establishing each of the four requirements for plain-error relief." *Greer*, 593 U.S. at 508.

To be sure, a remand may be permissible in limited circumstances for the district court to address the prejudice prong of plain-error review. In the wake of *United States v. Booker*, 543 U.S. 220 (2005), this Court concluded that, where the first two prongs of plain-error review were satisfied, it was appropriate to "remand to the district court to answer the question whether the sentence would have been different had the court known that the [Sentencing] Guidelines were advisory." *United States v. Ameline*, 409 F.3d 1073, 1079 (9th Cir. 2005) (en banc); *see also Molina-Martinez v. United States*, 578 U.S. 189, 204 (2016) (observing that appellate courts have "developed mechanisms short of a full remand to determine whether a district court in fact would have imposed a different sentence absent the error"). But to the extent this narrow exception exists, it applies to the impact of a district court's sentencing discretion on the prejudice prong, not to the first two plain-error prongs. The Supreme Court's plain-error decisions make clear that an appellate court ordinarily may not abdicate its responsibility under Rule 52(b) by remanding for the district court to consider a forfeited error in the first instance.

### 2. No valid exception to Rule 52(b)'s plain-error standard would permit a remand here.

A remand might be within this Court's discretion if Duarte's claim fit within a valid exception to Rule 52(b). But there is no permissible basis for excusing non-compliance with Rule 52(b) here.

30

### a. Rule 52(b)'s plain-error standard applies even when a defendant has satisfied Rule 12(c)(3)'s "good cause" standard for an untimely motion.

The panel wrongly excused compliance with Rule 52(b) based on a conclusion that Duarte's forfeited claim had been foreclosed by circuit precedent before *Bruen*. The panel reasoned that "when the untimely issue is a Rule 12(b)(3) 'defense[]' or 'objection[]' to a criminal indictment, 'Rule 12's good-cause standard . . . displac[es] the plain-error standard' under Rule 52(b)." *Duarte*, 101 F.4th at 663 (quoting *United States v. Guerrero*, 921 F.3d 895, 897 (9th Cir. 2019) (per curiam)). The panel reasoned that, where a defendant demonstrates good cause, the appellate court may consider the issue under "whatever default standard of review would normally govern the merits, which in this case is de novo review." *Id.* The panel next concluded that Duarte "demonstrated good cause" for his forfeiture because, at the time of trial and sentencing, *Vongxay* "foreclosed the argument Duarte now makes." *Id.* (brackets and quotation omitted).

The panel's reasoning is wrong on multiple levels. First, the panel misread *Guerrero*, which held that where a defendant *fails* to show good cause, the claim is waived entirely and cannot be reviewed at all—not even for plain error. *Guerrero*, 921 F.3d at 897-98. *Guerrero* did not suggest that where a

31

defendant *shows* good cause, Rule 12 entirely displaces Rule 52(b) and allows review of the unpreserved claim under a more forgiving standard.

Second, the panel decision is wrong as a matter of textual interpretation because it fails to give effect to both Rule 12 and Rule 52. "When confronted with two Acts of Congress allegedly touching on the same topic, [a court] is not at liberty to pick and choose among [them] and must instead strive to give effect to both." *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quotation omitted). That well-worn principle of statutory interpretation applies with equal force when interpreting the Federal Rules of Criminal Procedure. *Cf. Kemp v. United States*, 596 U.S. 528, 537 (2022) (applying "ordinary rules of statutory construction" when interpreting the Federal Rules of Civil Procedure). And Rule 12 and Rule 52(b) are readily susceptible to a harmonious reading.

Rule 12 states that a court (including an appellate court) "may consider" an untimely objection "if the party shows good cause." Fed. R. Crim. P. 12(c)(3). That instruction is entirely consistent with "consider[ing]" the objection under Rule 52(b)'s plain-error standard. Other circuits have correctly read these provisions harmoniously, holding that, where a defendant shows good cause, Rule 52(b)'s plain-error standard still applies to the forfeited claim. *See United States v. Mung*, 989 F.3d 639, 642 (8th Cir. 2021); *United States v.*

*Maez*, 960 F.3d 949, 957 (7th Cir. 2020); *see also United States v. Herrera*, 51 F.4th 1226, 1271 (10th Cir. 2022). No other court has held, as the panel did here, that a showing of good cause under Rule 12(c)(3) allows a defendant to evade Rule 52(b)'s plain-error standard altogether.

In *United States v. Vonn*, 535 U.S. 55 (2002), the Supreme Court rejected a similar misreading of the Criminal Rules. The defendant there argued that Rule 11(h)'s express inclusion of a harmless-error provision for preserved claims that duplicates Rule 52(a) excluded by negative implication the application of Rule 52(b)'s standard for unpreserved claims. *Id.* at 64. The Court rejected that reading, observing that Rule 52 has "apparently equal dignity with Rule 11(h)" and "appl[ies] by its terms to error in the application of any other Rule of criminal procedure." *Id.* at 65. Accepting the defendant's argument would "consequently amount to finding a partial repeal of Rule 52(b) by implication," which is a disfavored result. *Id.* There is even less reason to find a partial repeal of Rule 52(b) here because, unlike in *Vonn*, there is no plausible argument that Rule 12(c)(3) excludes application of Rule 52(b) under the express-inclusion canon.

Third, the panel's conclusion that Duarte was excused from satisfying Rule 52(b) because his challenge was previously foreclosed by *Vongxay* is irreconcilable with *Greer*. The defendant in *Greer* requested a "narrow 'futility'

33

exception to Rule 52(b)," arguing that, because every circuit had rejected his interpretation of § 922(g)(1), "it would have been futile for him to contemporaneously object" at the time of his plea. *Greer*, 593 U.S. at 511. The Supreme Court disagreed, observing that this "proposed futility exception lacks any support in the text of the Federal Rules of Criminal Procedure or in this Court's precedents." *Id.* at 512. The Court further observed that "Rule 51's focus on a party's *opportunity* to object—rather than a party's likelihood of *prevailing* on the objection—also undercuts [the defendant's] proposed futility exception." *Id.*

Here, the panel fashioned a futility exception that is nearly identical to the one proposed in *Greer*, with the only difference being the panel's use of Rule 12(c)(3)'s "good cause" standard. There is no textual or logical reason why Rule 12(c)(3) should lead to a different result. In fact, untimely motions that "must be raised by pretrial motion" under Rule 12(b)(3) are generally treated *more* harshly than other claims, such as the plea-colloquy claim in *Greer*. Whereas the latter types of claims will always be subject to plain-error review when forfeited, claims subject to Rule 12(b)(3) often get no review at all because they are treated as waived. *Guerrero*, 921 F.3d at 897-98. Rule 12(c)(3) recognizes a narrow exception to that harsh rule and allows (but does not require) a court to "consider" the claim "if the party shows good cause."

34

But under the panel's reasoning, claims that ordinarily "must be raised by pretrial motion" can, if foreclosed by circuit precedent, receive *better* treatment than foreclosed claims that are not subject to Rule 12(b)(3)'s strictures. *Compare United States v. Keys*, 133 F.3d 1282, 1284-87 (9th Cir. 1998) (en banc) (failure to object to a jury instruction, even where an objection would be foreclosed by circuit precedent, results in plain-error review). This Court should not endorse such an inconsistent approach.

Finally, the panel's holding ignores the Supreme Court's repeated warnings that "[a]ny unwarranted extension of [Rule 52(b)'s] exacting definition of plain error" would be inappropriate, *United States v. Young*, 470 U.S. 1, 15 (1985), and that "even less appropriate . . . would be the creation out of whole cloth of an exception to" the rule, *Johnson*, 520 U.S. at 466. Accordingly, the Supreme Court has repeatedly rejected courts of appeals' attempts to create exceptions to Rule 52(b), whether for omissions from a plea colloquy, *Vonn*, 535 U.S. at 63-66; factual claims, *Davis v. United States*, 589 U.S. 345, 346-47 (2020) (per curiam); or claims that were foreclosed by precedent, *Greer*, 593 U.S. at 511. This Court should reject the panel's attempt to create another unsupported exception.

**b.** **This Court's exception to the plain-error standard for "pure questions of law" is erroneous.**

Quite apart from the atextual exception to Rule 52(b) created by the panel, this Court has sometimes applied de novo review to forfeited claims that raise "a question that is purely one of law." *United States v. McAdory*, 935 F.3d 838, 841-42 (9th Cir. 2019). But that exception provides no basis to excuse compliance with the plain-error standard. As Judge Graber has explained, that exception has no basis in Rule 52's text or Supreme Court precedent, and the case that first recognized the exception erroneously relied on civil cases. *United States v. Zhou*, 838 F.3d 1007, 1015-16 (9th Cir. 2016) (Graber, J., concurring). The Supreme Court itself has repeatedly applied plain-error review to pure legal questions. *See Musacchio v. United States*, 577 U.S. 237, 248 (2016); *Henderson*, 568 U.S. at 269-70. This Court's rule is inconsistent with those opinions.

Although a panel of this Court recently concluded that the "pure question of law" exception is not clearly irreconcilable with Supreme Court precedent, *United States v. Gomez*, 115 F.4th 987, 991-92 (9th Cir. 2024), the en banc Court is not bound by the "clearly irreconcilable" standard and should definitively reject its "pure question of law" exception. At the very least, the Court should decline to apply that discretionary exception here, *see United States v. Gonzalez-Aparicio*, 663 F.3d 419, 426-27 (9th Cir. 2011), and should

36

hold Duarte to his burden of showing plain error, as other appellate courts have done when considering unpreserved Second Amendment challenges to § 922(g)(1). *See, e.g.*, *Jones*, 88 F.4th at 572; *United States v. Langston*, 110 F.4th 408, 419 (1st Cir. 2024); *United States v. Dorsey*, 105 F.4th 526, 528 (3d Cir. 2024); *United States v. Johnson*, 95 F.4th 404, 415 (6th Cir. 2024); *United States v. Miles*, 86 F.4th 734, 740 (7th Cir. 2023).

      **c.    This Court's exception to the plain-error standard for "change[s] in the law" is erroneous.**

This Court has at times suggested "an exception to the plain error rule where the new issue arises while the appeal is pending because of a change in the law." *United States v. Valdivias-Soto*, 112 F.4th 713, 721 n.5 (9th Cir. 2024) (quotation omitted); *see United States v. Grovo*, 826 F.3d 1207, 1221 n.8 (9th Cir. 2016). This "change of law" exception is irreconcilable with multiple Supreme Court decisions, which have reviewed for plain error claims based on changes in law that occurred between judgment and appeal. *See Greer*, 593 U.S. at 506-07; *Henderson*, 568 U.S. at 270; *Johnson*, 520 U.S. at 464. Indeed, *Henderson*'s holding that the "plainness" of the error should be measured at "the time of review," *Henderson*, 568 U.S. at 271-73, would make no sense if a change in law relieves a defendant from the plain-error standard. As one panel of this Court correctly recognized, "[p]lain error review applies on direct appeal even where an intervening change in the law is the source of the error." *United*

*States v. Christensen*, 828 F.3d 763, 779 (9th Cir. 2015) (citing *Johnson*, 520 U.S. at 467-68). This Court should reaffirm that correct conclusion and apply plain-error review to Duarte's forfeited claim, without remanding to the district court.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Chief, Criminal Division

DAVID R. FRIEDMAN
Chief, Criminal Appeals Section
Central District of California

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney
General

LISA H. MILLER
Deputy Assistant Attorney General

s/William A. Glaser
WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the 8,400-word type-volume limitation in this Court's August 2, 2024 order because it contains 8,393 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point type.

s/William A. Glaser
WILLIAM A. GLASER