**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-50048 |
| *Plaintiff-Appellee*, | D.C. No. 2:20-cr-00387-AB-1 |
| v. | |
| STEVEN DUARTE, AKA Shorty, | OPINION |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the Central District of California
André Birotte, Jr., District Judge, Presiding

Argued and Submitted En Banc December 11, 2024
Pasadena, California

Filed May 9, 2025

Before: Mary H. Murguia, Chief Judge, and Kim McLane
Wardlaw, Johnnie B. Rawlinson, Sandra S. Ikuta, John B.
Owens, Ryan D. Nelson, Daniel P. Collins, Lawrence
VanDyke, Holly A. Thomas, Salvador Mendoza, Jr. and
Roopali H. Desai, Circuit Judges.

Opinion by Judge Wardlaw;
Concurrence by Judge R. Nelson;
Concurrence by Judge Collins;
Partial Concurrence and Partial Dissent by Judge VanDyke

**SUMMARY**[*]

**Criminal Law**

The en banc court affirmed Steven Duarte's conviction for felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

During the pendency of this appeal, the Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), in which it clarified the standard for analyzing Second Amendment claims:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

Duarte argued that under *Bruen*'s framework, § 922(g)(1) is unconstitutional as applied to non-violent felons like him.

The parties disagreed as to the applicable standard of review. Because the outcome is the same under either de novo or plain error review, the en banc court assumed without deciding that de novo review applies, the standard for which Duarte advocated.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Aligning itself with the Fourth, Eighth, Tenth, and Eleventh Circuits, the en banc court held that § 922(g)(1) is not unconstitutional as applied to non-violent felons like Duarte.

Judge R. Nelson, joined by Judge Ikuta, concurred in the judgment. Judge Nelson wrote that because Duarte failed to raise his Second Amendment challenge before the district court, this court must apply plain error review. He wrote that there was no plain error by the district court, and would uphold the conviction; he would not reach the merits of Duarte's Second Amendment challenge under de novo review.

Judge Collins concurred in the judgment. He agreed with the majority's ultimate conclusion that Duarte's as-applied Second Amendment challenge to his conviction under § 922(g)(1) fails on the merits even under de novo review. He disagreed with the majority's conclusion that, *standing alone, either* of the two historical traditions proffered by the Government—*viz.*, (1) the recognized traditional power of legislatures with respect to felons, *i.e.*, those who have committed serious crimes; and (2) the limited historical power of legislatures, at the time of the founding, to disarm specified categories of persons—is sufficient to supply a basis for the categorical application of § 922(g)(1) to felons. In his view, § 922(g)(1) survives Second Amendment scrutiny only when these two historical traditions are taken together.

Judge VanDyke, joined by Judges Ikuta and R. Nelson as to Part I (Standard of Review), concurred in the judgment in part and dissented in part. As to the standard of review, he wrote (1) de novo review does not apply here under Fed. R. Crim. P. 12; (2) the plain error standard of review in Fed.

R. Crim. P. 52(b) applies, and the majority should have affirmed the conviction on that ground; and (3) the en banc court should have used this opportunity to correct erroneous exceptions to Rule 52(b)'s plain error standard. Regarding the majority's de novo review of the merits of Duarte's Second Amendment claim, he wrote that the majority errs (1) by concluding that *Bruen* did not affect the holding or analysis of this court's precedent rejecting Second Amendment challenges to § 922(g)(1); (2) by concluding that legislatures have unilateral discretion to disarm anyone by assigning the label "felon" to whatever conduct they desire; and (3) by reaching the broad conclusion that legislatures can disarm entire classes of individuals, even absent a specific showing of individual dangerousness or propensity to violence.

## COUNSEL

William A. Glaser (argued), Attorney, Appellate Section; Lisa H. Miller, Deputy Assistant Attorney General; Nicole M. Argentieri, Principal Deputy Assistant Attorney General; Criminal Division, United States Department of Justice, Washington, D.C.; Suria M. Bahadue and Juan M. Rodriguez, Assistant United States Attorneys; Kyle Kahan, Special Assistant United States Attorney; Bram M. Alden and David R. Friedman, Assistant United States Attorneys, Criminal Appeals Section Chiefs; Mack E. Jenkins, Assistant United States Attorney, Criminal Division Chief; E. Martin Estrada, United States Attorney; Office of the United States Attorney, United States Department of Justice, Los Angeles, California; for Plaintiff-Appellee.

Sonam A. H. Henderson (argued), Deputy Federal Public Defender; Cuauhtemoc Ortega, Federal Public Defender; Federal Public Defender's Office, Los Angeles, California, for Defendant-Appellant.

Katherine M. Hurrelbrink, Appellate Attorney; Kasha Castillo, Executive Director, Southern District of California; Federal Defenders of San Diego Inc., San Diego, California; Carmen Smarandoiu, Appellate Chief; Jodi Linker, Federal Public Defender, Northern District of California; Federal Public Defender's Office, San Francisco, California; for Amici Curiae Ninth Circuit Federal Public and Community Defender Offices.

Matthew P. Cavedon and Clark M. Neily III, Cato Institute, Washington, D.C., for Amicus Curiae Cato Institute.

Joseph G.S. Greenlee and Erin M. Erhardt, National Rifle Association of America, Institute for Legislative Action, Fairfax, Virginia, for Amici Curiae National Rifle Association of America and Firearms Policy Coalition.

Neil K. Sawhney and Shilpi Agarwal, American Civil Liberties Union Foundation of Northern California, San Francisco, California; Cecillia D. Wang, American Civil Liberties Union Foundation, San Francisco, California; David D. Cole, American Civil Liberties Union Foundation, Washington, D.C.; Louise Melling, M. Yasmin Cader, Ria T. Mar, and Brandon Buskey, American Civil Liberties Union Foundation, New York, New York; Summer Lacey, American Civil Liberties Union Foundation of Southern California, Los Angeles, California for Amici Curiae American Civil Liberties Union, American Civil Liberties Union of Northern California, American Civil Liberties Union of Southern California, American Civil Liberties

Union of Nevada, American Civil Liberties Union of Arizona, and American Civil Liberties Union of Alaska.

Alex Hemmer and Sarah A. Hunger, Deputy Solicitors General; Samantha Sherman, Assistant Attorney General; Jane E. Notz, Solicitor General; Kwame Raoul, Illinois Attorney General; Office of the Illinois Attorney General, Chicago, Illinois; Rob Bonta, California Attorney General, Office of the California Attorney General, Sacramento, California; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Brian L. Schwalb, District of Columbia Attorney General, Office of the District of Columbia Attorney General, Washington, D.C.; Anne E. Lopez, Hawai'i Attorney General, Office of the Hawai'i Attorney General, Honolulu, Hawai'i; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, August, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Andrea J. Campbell, Commonwealth of Massachusetts Attorney General, Office of the Commonwealth of Massachusetts Attorney General, Boston, Massachusetts; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Raùl Torrez, New Mexico Attorney General, Office of the

New Mexico Attorney General, Albuquerque, New Mexico; Letitia James, New York Attorney General, Office of the New York Attorney General, New York, New York; Joshua H. Stein, North Carolina Attorney General, Office of the North Carolina Attorney General, Raleigh, North Carolina; Ellen F. Rosenblum, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; Michelle A. Henry, Commonwealth of Pennsylvania Attorney General, Office of the Commonwealth of Pennsylvania Attorney General, Harrisburg, Pennsylvania; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General, Providence, Rhode Island; Charity Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Robert W. Ferguson, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; for Amici Curie Illinois, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington.

**OPINION**

WARDLAW, Circuit Judge:

18 U.S.C. § 922(g)(1) prohibits those who have been "convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" from receiving or possessing a firearm. Today, § 922(g)(1) is one of the most significant gun laws in our modern regulatory framework. Section 922(g)(1) accounts for the highest percentage of convictions under § 922(g),[1] and is considered the "cornerstone" of the federal background check system for firearm purchases.[2] Following the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), every circuit to address the facial constitutionality of § 922(g)(1) upheld its categorical constitutionality. *Medina v. Whitaker*, 913 F.3d 152, 155 (D.C. Cir. 2019) (collecting cases). And no circuit, before the Supreme Court issued its decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), had held that the law was unconstitutional as applied to certain felons. *See id.*

---

[1] The United States Sentencing Commission estimates that 88.5% of convictions under § 922(g) are due to prior felony convictions. *See* U.S. Sent'g Comm'n, Quick Facts: 18 U.S.C. § 922(g) Firearms Offenses (2024), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Felon_In_Possession_FY23.pdf; *see also Rehaif v. United States*, 588 U.S. 225, 239 (2019) (Alito, J., dissenting) (noting that § 922(g) "probably does more to combat gun violence than any other federal law").

[2] Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1575 (2022); *id.* at 1594–98 (describing § 922(g)(1)'s impact on the federal background check system).

This was the state of Second Amendment affairs when Steven Duarte was indicted, tried, convicted, and sentenced as a felon in possession of a firearm in violation of § 922(g)(1). It was only after he filed his notice of appeal to our court, that the Supreme Court issued its decision in *Bruen*, which worked a sea change in the analytical framework that the federal courts had developed since *Heller* issued. The Court in *Bruen* rejected the "two-step framework" Courts of Appeals had "coalesced around" since *Heller* to evaluate whether gun regulations violate the Second Amendment. *Bruen*, 597 U.S. at 17. The Court clarified the standard for analyzing Second Amendment claims:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.* at 24.

*Bruen* was issued on June 23, 2022; Duarte filed his opening brief in our court on January 27, 2023, and for the first time challenged the constitutionality of § 922(g)(1) as applied to him.

Duarte argues that § 922(g)(1) is unconstitutional as applied to non-violent felons like him under *Bruen*'s analytical framework. While this is an issue of first impression for our court, we do not write on a blank slate, as Courts of Appeals across the nation have been wrestling with fresh challenges to the viability of § 922(g)(1) in the wake

of *Bruen*.    Four circuits have upheld the categorical application of § 922(g)(1) to all felons. *See United States v. Hunt*, 123 F.4th 697, 707–08 (4th Cir. 2024) (rejecting an as-applied challenge on a categorical basis); *United States v. Jackson*, 110 F.4th 1120, 1129 (8th Cir. 2024) (same); *Vincent v. Bondi*, 127 F.4th 1263, 1265–66 (10th Cir. 2025) (rejecting an as-applied challenge because neither *Bruen* nor *United States v. Rahimi*, 602 U.S. 680 (2024), abrogated circuit precedent foreclosing such a challenge); *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024), *cert. granted, judgment vacated*, No. 24-5744, 2025 WL 76413 (U.S. Jan. 13, 2025) (holding that *Bruen* did not abrogate circuit precedent foreclosing such challenges).

Other circuits have rejected as-applied challenges, but have left open the possibility that § 922(g)(1) might be unconstitutional as applied to at least *some* felons.  *See United States v. Diaz*, 116 F.4th 458, 471 (5th Cir. 2024) (rejecting an as-applied challenge because the defendant's underlying felony was sufficiently similar to a death-eligible felony at the founding); *United States v. Williams*, 113 F.4th 637, 661–62 (6th Cir. 2024) (rejecting an as-applied challenge because the defendant's criminal record sufficiently showed that he was dangerous enough to warrant disarmament).  By contrast, the Third Circuit has held that § 922(g)(1) is unconstitutional as applied to a felon who was convicted of making a false statement to secure food stamps. *See Range v. Att'y Gen.*, 124 F.4th 218, 222–23 (3d Cir. 2024) (en banc).  And, as of the date of this writing, the First and Second Circuits have declined to address constitutional challenges to § 922(g)(1) on the merits, while the Seventh Circuit has yet to definitively resolve an as-applied challenge.  *See United States v. Langston*, 110 F.4th 408, 419–20 (1st Cir. 2024) (rejecting an as-applied challenge

because there was no "plain" error); *United States v. Caves*, No. 23-6176-CR, 2024 WL 5220649, at \*1 (2d Cir. Dec. 26, 2024) (same); *United States v. Gay*, 98 F.4th 843, 846–47 (7th Cir. 2024) (assuming for the sake of argument that there is some room for an as-applied challenge, but rejecting the defendant's specific as-applied challenge because his prior felonies included aggravated battery of a peace officer and possession of a weapon while in prison).

Today, we align ourselves with the Fourth, Eighth, Tenth and Eleventh Circuits and hold that § 922(g)(1) is not unconstitutional as applied to non-violent felons like Steven Duarte.

## I.   Factual and Procedural History

On March 20, 2020, at approximately 9:30 p.m., Inglewood police officers observed a car drive through a stop sign.  Duarte was the only passenger in the vehicle.  As officers activated their car's lights and sirens, Duarte threw a pistol, without its magazine, out of the car's rear window. After asking the driver and Duarte to step out of the vehicle, officers searched the car and found a magazine loaded with six .380-caliber bullets stuffed between the center console and the front passenger seat, within reach from the passenger compartment.    The magazine fit "perfectly" into the discarded pistol.  In September 2020, a federal grand jury charged Duarte with a single count of violating § 922(g)(1).

The indictment charged Duarte with knowingly possessing a firearm with knowledge that he had previously been convicted of at least one of five felonies: (1) Vandalism, in violation of California Penal Code Section 594(a), in 2013; (2) Felon in Possession of a Firearm, in violation of California Penal Code Section 29800(a)(1), in 2016; (3) Evading a Peace Officer, in violation of California

Vehicle Code Section 2800.2, in 2016; (4) Possession of a Controlled Substance for Sale, in violation of California Health and Safety Code Section 11351.5, in 2016; and (5) Evading a Peace Officer, in violation of California Vehicle Code Section 2800.2, in 2019.

Following a jury verdict of guilty, the district court sentenced Duarte to a below-guidelines sentence of 51 months in prison. Duarte timely filed his notice of appeal on March 9, 2022. Duarte did not challenge his indictment or conviction as violating his Second Amendment rights before the district court.

On June 23, 2022, during the pendency of Duarte's appeal, the Supreme Court decided *Bruen*. Based on this new authority, Duarte argued in his opening brief to our court that because he has only non-violent prior felony convictions, § 922(g)(1) is unconstitutional as applied to him. He argued that our prior precedent upholding felon-in-possession laws as applied to non-violent felons is clearly irreconcilable with *Bruen*. He further argued that under Federal Rule of Criminal Procedure 12(c)(3) he demonstrated good cause to raise this defect in the indictment now, as it had been previously foreclosed by Ninth Circuit precedent.

A divided panel of our court accepted Duarte's Second Amendment argument. *See United States v. Duarte*, 101 F.4th 657, 661 (9th Cir. 2024), *reh'g en banc granted, opinion vacated*, 108 F.4th 786 (9th Cir. 2024). First, the panel majority found that Duarte demonstrated good cause for failing to raise his Second Amendment challenge to the district court as a Rule 12(b)(3) pre-trial motion because at the time our circuit precedent in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), foreclosed his Second

Amendment argument. *Duarte*, 101 F.4th at 663. Second, the panel found that de novo review applied because "[w]e normally review claims of constitutional violations *de novo*," *id.*, and once good cause is shown, permitting our consideration of the argument for the first time, we "apply whatever default standard of review would normally govern the merits," *id.* Third, the majority determined that *Vongxay* was "clearly irreconcilable" with *Bruen*, and thus, its holding that § 922(g)(1) applied to non-violent felons was no longer controlling under *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc). *Duarte*, 101 F.4th at 665.[3] Finally, applying the *Bruen* analytical framework, the panel majority held that the plain text of the Second Amendment covered Duarte's conduct and that the Government failed to meet its burden of showing that the application of § 922(g)(1) was consistent with the nation's historical tradition of firearm regulation. *Id.* at 671, 691.

A majority of the active judges of our court voted to rehear this appeal en banc. Having done so, although we agree that Duarte demonstrated good cause under Federal Rule of Criminal Procedure 12(c)(3), we now hold that § 922(g)(1) is not unconstitutional as applied to non-violent felons like Duarte.

## II. Standard of Review

The parties disagree as to whether the good cause standard in Federal Rule of Criminal Procedure 12(c)(3) or the plain error standard in Federal Rule of Criminal Procedure 52(b) governs our review of Duarte's

---

[3] Dissenting, Judge M. Smith contended that *Vongxay* was not clearly irreconcilable with *Bruen*, and thus, foreclosed Duarte's constitutional challenge. *Duarte*, 101 F.4th at 691–92 (M. Smith, J., dissenting).

constitutional challenge. The Government asserts that because Duarte did not raise his constitutional challenge before the district court, we must review his conviction for plain error. By contrast, Duarte contends that de novo review is appropriate, because under our precedent "Rule 12's good-cause standard . . . displac[es] the plain-error standard under [Rule] 52(b)." *United States v. Guerrero*, 921 F.3d 895, 897 (9th Cir. 2019). He argues further that once he demonstrates good cause, we should apply the default standard of review that would govern the merits; here, de novo review. *See United States v. Aguilera-Rios*, 769 F.3d 626, 629 (9th Cir. 2014); *United States v. Stackhouse*, 105 F.4th 1193, 1198 (9th Cir. 2024).

However, as the Government acknowledges, under either the good cause/de novo review standard or the plain error standard, we must address the merits of Duarte's constitutional claim. And, because under either standard, the outcome is the same—the district court did not err and § 922(g)(1) is constitutional as applied to non-violent felons—we need not decide which standard applies here. *See United States v. Begay*, 33 F.4th 1081, 1089–90 (9th Cir. 2022) (en banc); *see also Hunt*, 123 F.4th at 702 (assuming for the sake of argument that de novo review applies to a newly raised *Bruen* challenge to a § 922(g)(1) conviction). Therefore, "we assume without deciding that de novo review applies," the standard of review for which Duarte advocates. *Begay*, 33 F.4th at 1089.

## III. The Second Amendment

### A. *Bruen* Did Not Alter *Heller*'s Assurances as to Felon-In-Possession Laws.

Although *Heller* recognized "an individual right to keep and bear arms," 554 U.S. at 595, "[l]ike most rights, the right

secured by the Second Amendment is not unlimited," *id.* at 626. The Second Amendment does not provide an individual "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Rather, the Supreme Court in *Heller* clarified that:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, *nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons* and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27 (emphasis added). The Court further emphasized that such limitations on the right to bear arms were "presumptively lawful regulatory measures." *Id.* at 627 n.26.

Relying on this declaration, we have recognized that "[n]othing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)" and that "felons are categorically different from the individuals who have a fundamental right to bear arms." *Vongxay*, 594 F.3d at 1114, 1115. And we have continued to foreclose Second Amendment challenges to § 922(g)(1), regardless of whether an underlying felony is violent or not. *See United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016). Indeed, since *Heller*, the Supreme Court has repeated its "assurances" that *Heller* "did not cast doubt on such

longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (citation omitted).

*Bruen* did not change or alter this aspect of *Heller*. Rather, *Bruen* and *Rahimi* support *Vongxay*'s holding that § 922(g)(1) constitutionally prohibits the possession of firearms by felons. First, the *Bruen* Court largely derived its constitutional test from *Heller* and stated that its analysis was "consistent with *Heller* and *McDonald*." 597 U.S. at 10; *id.* at 17 ("In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."); *id.* at 26 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding"); *id.* at 31 ("Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement.").

Second, *Bruen* limited the scope of its opinion to "law-abiding citizens," evidenced by its use of the term fourteen times throughout the opinion. *See, e.g.*, *id.* at 8–9 ("In [*Heller* and *McDonald*], we recognized that the Second and Fourteenth Amendments protect the right of *an ordinary, law-abiding citizen* to possess a handgun in the home for self-defense." (emphasis added)); *id.* at 26 ("The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of *law-abiding, responsible citizens* to use arms' for self-defense." (citation omitted and emphasis added)); *id.* at 60 ("None of these historical limitations on the right to bear arms approach New York's proper-cause requirement

because none operated to prevent *law-abiding citizens* with ordinary self-defense needs from carrying arms in public for that purpose." (emphasis added)).[4]

Third, six justices, including three in the majority, emphasized that *Bruen* did not disturb the limiting principles in *Heller* and *McDonald*. 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun."); *id.* at 80–81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*'s language); *id.* at 129 (Breyer, J., dissenting, joined by Sotomayor and Kagan, JJ.) ("Like Justice Kavanaugh, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding.").

Finally, the *Bruen* majority clarified that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes."[5] *Id.* at 38 n.9 (majority opinion). Justifying this reservation, the Supreme Court explained that "shall issue" laws require background checks for the very purpose of ensuring that licenses are not issued to felons:

> Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding,

---

[4] *See also Bruen*, 597 U.S. at 15, 29–31, 33 n.8, 38 & n.9, 70–71.

[5] A "shall-issue" regime is "where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Bruen*, 597 U.S. at 13 (majority opinion).

> responsible citizens" from exercising their
> Second Amendment right to public carry. . . .
> Rather, it appears that these shall-issue
> regimes, which often require applicants to
> undergo a background check or pass a
> firearms safety course, are designed to ensure
> only that those bearing arms in the
> jurisdiction are, in fact, "law-abiding,
> responsible citizens."

*Id.* (citations omitted). This preservation of "'shall-issue'
regimes and related background checks . . . arguably
implie[s] that it [is] constitutional to deny firearm licenses to
individuals with felony convictions." *Vincent v. Garland*,
80 F.4th 1197, 1202 (10th Cir. 2023), *cert. granted,
judgment vacated*, 144 S. Ct. 2708 (2024); *Vincent*, 127
F.4th at 1264 (readopting prior analysis on remand); *see also
Range*, 124 F.4th at 283 (Krause, J., concurring) ("Prior
felony convictions are by far the most common reason
individuals fail NICS background checks.[] And the
Supreme Court in *Bruen* endorsed the use of background
checks, for violent and non-violent offenses alike, to ensure
individuals bearing firearms are 'law-abiding' citizens."
(footnote omitted)).

And most recently, in *Rahimi* the Supreme Court
reaffirmed *Heller*'s "assurances," *McDonald,* 561 U.S. at
786, noting that "many such prohibitions, like those on the
possession of firearms by 'felons and the mentally ill,' are
'presumptively lawful.'" 602 U.S. at 699 (citation omitted);
*see also id.* at 735 (Kavanaugh, J., concurring) (observing
that *Heller* "recognized a few categories of traditional
exceptions to the [Second Amendment] right," including the
"longstanding prohibitions on the possession of firearms by

felons" (quotation marks omitted)).  Indeed, the Supreme
Court was careful to note that "we do not suggest that the
Second Amendment prohibits the enactment of laws banning
the possession of guns by categories of persons thought by a
legislature to present a special danger of misuse." *Id.* at 698
(majority opinion) (citing *Heller*, 554 U.S. at 626.).

Together, these repeated and consistent "assurances"
make clear that felon-in-possession laws, like § 922(g)(1),
are presumptively constitutional, demonstrating that our
holding in *Vongxay* remains consistent with the Supreme
Court's articulation of Second Amendment rights.  Further,
these "assurances" recognize a historical tradition of firearm
regulation that supports the categorical application of
§ 922(g)(1) to felons like Duarte. *See Jackson*, 110 F.4th at
1125 ("Given these assurances by the Supreme Court, and
the history that supports them, we conclude that there is no
need for felony-by-felony litigation regarding the
constitutionality of § 922(g)(1).").   Our application of
*Bruen*'s constitutional test to Duarte's conduct confirms this
reading.

## B. *Bruen* Step One: Duarte's Conduct Is Covered by the Second Amendment.

Turning to the application of *Bruen*, "[w]e first consider
whether the Second Amendment's plain text covers an
individual's proposed course of conduct." *United States v.
Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024), *petition
for cert. filed*, --- U.S. ---- (U.S. Dec. 26, 2024) (Nos. 22-
50314, 22-50316).    "If so, the Second Amendment
presumptively protects that conduct[, and] [t]he Government
then bears the burden of justifying the challenged regulation
by showing that it is consistent with our nation's 'historical

tradition of firearm regulation.'"  *Id.* (quoting *Bruen*, 597
U.S. at 24).

We conclude that Duarte's proposed course of conduct
is covered under the plain text of the Second Amendment.
"The text of the Second Amendment refers to the right of
'the people' to keep and bear arms."  *Id.* at 1178 (citing U.S.
Const. amend. II).  As the Court in *Heller* observed, "'[t]he
people' seems to have been a term of art employed in select
parts of the Constitution[,] . . . refer[ring] to a class of
persons who are part of a national community or who have
otherwise developed sufficient connection with this country
to be considered part of that community."  *Id.* at 580.
Therefore, the *Heller* Court instructed that we start "with a
strong presumption that the Second Amendment right is
exercised individually and belongs to all Americans."  *Id.* at
581.  Accordingly, because Duarte is undoubtably a member
of the national community, he is part of "the people" and the
"Constitution presumptively protects" his right to possess a
firearm.  *Bruen*, 597 U.S. at 17.

Nonetheless, the Government contends that Duarte does
not fall within the scope of the Second Amendment because
of his status as a felon.  The Government first relies on a
"massively popular," *Heller*, 554 U.S. at 616, treatise by
Thomas Cooley, which states that "[c]ertain classes have
been almost universally excluded" from "the people,"
including "the idiot, the lunatic, and the felon, on obvious
grounds."     Thomas M. Cooley, A Treatise on the
Constitutional Limitations Which Rest upon the Legislative
Power of the States of the American Union 28–29 (Little,
Brown & Co., 1st ed. 1868).  And in line with this view, the
Government notes that historically felons could be excluded
from certain rights, such as the right to hold office and serve
on juries.  Thus, the Government reasons that felons are

constitutionally excludable from the scope of the Second
Amendment.

However, this passage from Cooley does not address the
scope of constitutionally protected individual rights, like the
one contained in the Second Amendment. Rather, Cooley's
description of certain groups excluded from "the people" is
derived from his discussion of "[w]ho are the *people* in
whom is vested the sovereignty of the State?" *Id.* at 28.
There, Cooley recognizes that "although all persons are
under the protection of the government, and obliged to
conform their action to its laws, there *are some who are
altogether excluded from participation in the government*."
*Id.* (emphasis added). In other words, Cooley's passage
refers to "elective franchise" and those who "should be
admitted to a voice in the government." *Id.* at 29; *see also
Williams*, 113 F.4th at 647 ("Cooley is discussing the right
to vote—the 'elective franchise' and 'a voice in [the]
government's] administration.'" (citation omitted)).

These collective rights are distinct from individual
rights, such as the rights set forth in the First, Second, and
Fourth Amendments. *See Kanter v. Barr*, 919 F.3d 437, 462
(7th Cir. 2019) (Barrett, J., dissenting) ("[T]he right to vote
is held by individuals, but they do not exercise it solely for
their own sake; rather, they cast votes as part of the collective
enterprise of self-governance."). Indeed, when discussing
the right to assemble and petition, Cooley takes a broader
view of "the people," explaining that:

> The first amendment to the Constitution
> further declares that Congress shall make no
> law abridging the right of the people
> peaceably to assemble and to petition the
> government for a redress of grievances. . . .

> When the term *the people* is made use of in
> constitutional law or discussions, it is often
> the case that those only are intended who
> have a share in the government through being
> clothed with the elective franchise. . . . *But in*
> *all the enumerations and guaranties of rights*
> *the whole people are intended . . . . In this*
> *case, therefore, the right to assemble is*
> *preserved to all the people, and not merely to*
> *the electors, or to any other class or classes*
> *of the people.*

Thomas M. Cooley, The General Principles of
Constitutional Law in the United States of America 267–68
(Little, Brown & Co. 1880) (second emphasis added). And
in describing the Second Amendment, Cooley observes that
its meaning "undoubtedly is, that the people, from whom the
militia must be taken, shall have the right to keep and bear
arms." *Id.* at 271.

This view comports with how other individual rights like
those of the First and Fourth Amendments—which are rights
held by "the people"—apply to felons.  *See Pell v.*
*Procunier*, 417 U.S. 817, 822 (1974) ("[A] prison inmate
retains those First Amendment rights that are not
inconsistent with his status as a prisoner or with the
legitimate penological objectives of the corrections
system."); *United States v. Lara*, 815 F.3d 605, 612 (9th Cir.
2016) (applying the Fourth Amendment to a defendant on
probation who was convicted under § 922(g)(1)).  Thus, "[a]
felon might lose the right to vote.  But that does not mean
the government can strip them of their right to speak freely,
practice the religion of their choice, or to a jury trial."
*Williams*, 113 F.4th at 647; *See Range*, 124 F.4th at 226

("We see no reason to adopt a reading of 'the people' that excludes Americans from the scope of the Second Amendment while they retain their constitutional rights in other contexts.").

Next, the Government relies on language in *Vongxay* where we observed:

> [M]ost scholars of the Second Amendment agree that the right to bear arms was "inextricably . . . tied to" the concept of a "virtuous citizen[ry]" that would protect society through "defensive use of arms against criminals, oppressive officials, and foreign enemies alike," and that "the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)."

594 F.3d at 1118 (alteration in original) (citation omitted). However, we are not convinced that this language places Duarte, and other felons, outside the ambit of the Second Amendment. As an initial matter, *Vongxay* recognized that this "historical question has not been definitively resolved." *Id.* And although some of our sister circuits have cited this aspect of *Vongxay* with approval,[6] other jurists have noted

---

[6] *See, e.g.*, *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" (citing *Vongxay*, 594 F.3d at 1118)); *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) ("[F]elons were excluded from the right to arms because they were deemed unvirtuous." (citation and quotation marks omitted)); *Binderup v. Att'y Gen.*, 836 F.3d 336, 348 (3d Cir.

that the "historical evidence is inconclusive at best." *United States v. Skoien*, 614 F.3d 638, 650 (7th Cir. 2010) (en banc) (Sykes, J., dissenting); *see also Folajtar v. Att'y Gen.*, 980 F.3d 897, 915–20 (3d Cir. 2020) (Bibas, J., dissenting) (criticizing the historical foundation for the theory that the right to keep and bear arms was limited to those who are virtuous). Indeed, then-Judge Barrett noted that "virtue exclusions are associated with civic rights[,]" which, as discussed above, are distinct from individual rights. *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). Thus, in the face of these conflicting interpretations of history, we adhere to the Supreme Court's definition of "the people," which does not exclude felons. *Heller*, 554 U.S. at 580.[7] Accordingly, we hold that Duarte's status as a felon does not remove him from the ambit of the Second Amendment; he is one of "the people" who enjoys Second Amendment rights.

---

2016) (en banc) (citing *Vongxay*, 594 F.3d at 1118, for the proposition that felons are excluded from the right to bear arms because they are "unvirtuous citizens").

[7] The Government also contends that the "people" need not have the same meaning in the Second Amendment as it does in the First and Fourth Amendments because of *Heller* and *Bruen*'s use of the language "law-abiding" citizens. Although we recognize that this language limits *Heller* and *Bruen*'s holdings, it does not follow that it also limits the scope of the Second Amendment. *See Rahimi*, 602 U.S. at 702 ("[T]hose decisions did not define the term and said nothing about the status of citizens who were not 'responsible.' The question was simply not presented."). Instead, we interpret the use of the phrase "law-abiding" as recognizing a historical tradition of disarming felons.

## C. *Bruen* Step Two: Section 922(g)(1) Is Consistent with Our Historical Tradition of Firearm Regulation.

Turning to the second step of the *Bruen* analysis, we hold that the Government has met its burden of showing that § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

Under *Bruen*, courts must engage in analogical reasoning to determine "whether the modern regulation is 'relevantly similar' to historical laws and traditions, . . . so as to 'evince[ ] a comparable tradition of regulation.'" *Perez-Garcia*, 96 F.4th at 1181 (citations omitted). Two metrics guide our analysis: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" (the "how"); and (2) "whether that burden is comparably justified" (the "why"). *Bruen*, 597 U.S. at 29 (citation omitted). "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30. Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* Ultimately, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (emphasis added).

Furthermore, not all historical evidence is entitled to equal weight. *See Bruen*, 597 U.S. at 34. Because our inquiry focuses on interpreting the Second Amendment as the founding generation would have understood it, we primarily look to historical regulations extant when the Second and Fourteenth Amendments were adopted in 1791

and 1868, respectively.[8] *See id.* However, we may consider pre- and post-ratification history to the extent that it does not contravene founding-era evidence. *See id.* at 35–36, 39. In sum, *Bruen*'s historical test requires that we attempt to place ourselves in the shoes of the founding generation, and to evaluate from this point of view whether the present regulation would be consistent with its understanding of the Second Amendment.

To support the application of § 922(g)(1) to Duarte, the Government proffers a variety of historical sources that evince two regulatory principles that: (1) legislatures may disarm those who have committed the most serious crimes; and (2) legislatures may categorically disarm those they deem dangerous, without an individualized determination of dangerousness. We address each in turn, and agree that either supplies a basis for the categorical application of § 922(g)(1) to felons.[9]

### 1. Historical Felony Punishments.

First, "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*,

---

[8] We recognize that there is "ongoing scholarly debate" regarding the appropriate time frame of our analysis—whether we must only look to 1791 and the surrounding period or whether we may also consider 1868 and the surrounding period. *See Rahimi*, 602 U.S. at 692 n.1 (quoting *Bruen*, 597 U.S. at 37). The Supreme Court has not resolved this issue, and we need not decide it here, as the historical evidence from both periods is consistent. *See id.*

[9] We do not disagree with Judge Collins's conclusion that "taken together" both historical principles—that legislatures may disarm those who have committed the most serious crimes, and that categorical disarmament was also within the legislative power—serves to bolster our conclusion that § 922(g)(1) is categorically constitutional. *See* Concurring Op., Collins, J., at 58–60; *see also Rahimi*, 602 U.S. at 698.

587 U.S. 119, 129 (2019) (citation omitted); *see also Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that, at common law, "virtually all felonies were punishable by death"). Likewise, "[c]olonies and states also routinely made use of estate forfeiture as punishment." *Diaz*, 116 F.4th at 468 (citing Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn.275 & 276 (2014) (collecting statutes)); *see also Range*, 124 F.4th at 267–71 (Krause, J., concurring) (collecting statutes). In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded." 4 William Blackstone, Commentaries on the Laws of England 95 (1st ed. 1769). And these punishments were not limited to violent felonies, as "nonviolent crimes such as forgery and horse theft were capital offenses." *Medina*, 913 F.3d at 158; *see* Stuart Banner, *The Death Penalty: An American History* 23 (2002) (describing the escape attempts of men condemned to die for forgery and horse theft in Georgia between 1790 and 1805); *Jackson*, 110 F.4th at 1127 (collecting laws that punished non-violent offenses with death and estate forfeiture). Indeed, in 1790, the First Congress made counterfeiting and forgery capital offenses. *See* Act of Apr.30, 1790, ch. 9, § 14, 1 Stat. 112, 115.[10]

---

[10] Colonies and states also authorized seizure of firearms from those who engaged in misdemeanor hunting offenses, such as hunting partridge or deer. *See, e.g.*, Act of Oct. 9, 1652, Laws and Ordinances of New Netherlands 138 (1868) (forbidding partridge and game hunting "on pain of forfeiting the gun"); Act of Apr. 20, ch. III (1745), 23 Acts of the North Carolina General Assembly 218, 219 (1805) (prohibiting nonresidents from hunting deer in "the King's Wast" and stating that any

Thus, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158. Certainly, if the greater punishment of death and estate forfeiture was permissible to punish felons, then the lesser restriction of permanent**[11]** disarmament is also permissible. *See Rahimi*, 602 U.S. at 699 ("[I]f imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible."); *see also Diaz*, 116 F.4th at 469 ("[I]f capital punishment was permissible to respond to theft, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible."); *Jackson*, 110 F.4th at 1127; *Hunt*, 123 F.4th at 705–06.

---

violator "shall forfeit his Gun" to the authorities). Although we recognize that these laws effected a temporary disarmament, we agree with our sister circuits that these laws support a historical tradition of disarming those who violated the law. *See Jackson*, 110 F.4th at 1127; *Hunt*, 123 F.4th at 706.

[11] We note that § 922(g)(1) does not necessarily affect permanent disarmament of all felons. Under § 921(a)(20), certain offenses are excluded from § 922(g)(1)'s ambit including "offenses relating to the regulation of business practices." 18 U.S.C. § 921(a)(20). Furthermore, "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter." *Id.* And under § 925(c), a felon may seek administrative relief and regain his right to bear arms. 18 U.S.C. § 925(c). However, this "relief provision has been rendered inoperative . . . for Congress has repeatedly barred the Attorney General from using appropriated funds 'to investigate or act upon [relief] applications.'" *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007) (citation omitted).

Indeed, pre- and post-ratification history support the view that legislatures could disarm those who committed the most serious crimes. The 1689 English Bill of Rights—"the 'predecessor to our Second Amendment'"—guaranteed that "Protestants . . . may have Arms for their Defence suitable to their Conditions, and *as allowed by Law*[.]" *Bruen*, 597 U.S. at 44 (emphasis added) (citations and quotation marks omitted). "The purpose of this clause, according to historians, was to leave no doubt that it was Parliament that had regulatory power over firearms, not the Crown." *Atkinson v. Garland*, 70 F.4th 1018, 1031 (7th Cir. 2023) (Wood, J., dissenting) (citing Carl T. Bogus, *The Hidden History of the Second Amendment*, 31 U.C. Davis L. Rev. 309, 379–84 (1998)). And "[i]n Pennsylvania, Anti-Federalist delegates—who were adamant supporters of a declaration of fundamental rights—proposed that the people should have a right to bear arms 'unless for crimes committed, or real danger of public injury from individuals.'" *Perez-Garcia*, 96 F.4th at 1188 (emphasis and citation omitted).

Furthermore, in 1820, one of the nation's "best known proponents of abolishing capital punishment, Edward Livingston," prepared a systematic code of criminal law for Louisiana, which replaced the death penalty for crimes such as forgery, perjury, and fraud with permanent forfeiture of certain rights, including the "right of bearing arms." *Range*, 124 F.4th at 271–72 (Krause, J., concurring); *See* Edward Livingston, *A System of Penal Law for the State of Louisiana* 377, 378 (Phila., J. Kay, Jun. & Bro., Pittsburgh, J.L. Kay & Co. 1833) (including the right to bear arms as a civil right that may be forfeited); *id.* at 393 (between three and seven years' imprisonment and permanent forfeiture of civil rights for perjury); *id.* at 409 (between seven and fifteen years'

imprisonment and permanent forfeiture of civil rights for forgery). Livingston's work won acclaim from founders such as Thomas Jefferson, James Madison, Justice Joseph Story, and Chief Justice John Marshall. *See Range*, 124 F.4th at 272 (Krause, J., concurring).**[12]** Though these codes were ultimately not adopted, the creation and reception of them serves as evidence of an unbroken understanding that the legislature could permanently disarm those who committed the most serious crimes consistent with the Second Amendment. *See id.*

The motivations for these historical punishments are relevantly similar to the justification for § 922(g)(1). "The purpose of capital punishment in colonial America was threefold: deterrence, retribution, and penitence." *Diaz*, 116 F.4th at 469. Likewise, "[t]he precursor to § 922(g)(1) . . . was enacted to 'bar possession of a firearm from persons whose prior behaviors have established their violent tendencies.'" *Id.* (quoting 114 Cong. Rec. 14773 (daily ed. May 23, 1968) (statement of Sen. Russell Long of Louisiana)). Thus, historical felony punishments are relevantly similar—sharing the "how" and "why"—to § 922(g)(1) and support its application to Duarte and all other felons.

In response, Duarte first challenges the frequency with which the punishments of death and estate forfeiture were imposed at the time of the founding. Specifically, he

---

[12] *See also* Letter from John Marshall, Chief Justice, Supreme Court of the United States, to Edward Livingston (Oct. 24, 1825), https://findingaids.princeton.edu/catalog/C0280_c3493 (last visited Feb. 7, 2025) (noting that he had "no marginal notes to make nor any alterations to suggest" and stating that "no former legislator has relied sufficiently on [provisions that deprived criminals of civil political rights]; and [that he had] strong hope of its efficacy").

contends that the notion that all felonies at the founding were actually punished by death or forfeiture is "shaky." *See Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) ("The premise of this argument—that the states permanently extinguished the rights of felons, either by death or operation of law, in the eighteenth and nineteenth centuries—is shaky.").

However, this argument misperceives our standard. To find Duarte's punishment consistent with the founding generation's understanding of the Second Amendment, history need not show that *every* felony was punished with death and estate forfeiture. It may be the case that by the time of the founding, legislatures made the policy choice to retreat from harsher punishments. But this does not mean that, as a matter of constitutional authority, legislatures lacked the ability to impose such punishments. Holding otherwise would "force[] 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber' . . . [a]nd it assumes that founding-era legislatures maximally exercised their power to regulate." *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring). Instead, the exposure to capital punishment and estate forfeiture is sufficient to demonstrate that the founding generation would view § 922(g)(1)'s permanent disarmament as consistent with the Second Amendment.

Duarte next contends that, even assuming that death and estate forfeiture were the standard punishments at the time of the founding, today's felonies do not correspond with felonies at the founding that were eligible for death and estate forfeiture. *See Lange v. California*, 594 U.S. 295, 311 (2021) ("The felony category then was a good deal narrower than now."). And he asserts that relying only on the modern

felony label would provide legislatures too much discretion to define away Second Amendment rights.

However, this discretion is consistent with our nation's history. Since the founding, legislatures have been permitted to identify conduct that they deem the most serious and to punish perpetrators with severe deprivations of liberty. *See Jackson*, 110 F.4th at 1127 ("This historical record suggests that legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms, not merely to address a person's demonstrated propensity for violence."); *Hunt*, 123 F.4th at 707 ("Just as early legislatures retained the discretion to disarm categories of people because they refused to adhere to legal norms in the pre-colonial and colonial era, today's legislatures may disarm people who have been convicted of conduct the legislature considers serious enough to render it a felony.").

To the extent that Duarte contends that we should limit the application of § 922(g)(1) to felonies that at the time of the founding were punished with death, a life sentence, or estate forfeiture, we reject such a narrow view of history. Indeed, under Duarte's and the now-vacated panel opinion's approach, modern felonies that have been considered closely related to gun violence and presenting a danger to the community such as drug trafficking offenses could not form the basis for a § 922(g)(1) conviction. *See Duarte*, 101 F.4th at 691 n.16 (noting that criminalizing drug possession did not gain momentum until the early 20th century, and modern "illicit drugs" were legal "for a long stretch of this country's history"); Dissenting Op. at 99–100 ("[T]here are no comparable analogues that allowed for disarmament based upon drug offenses."); *see also Williams*, 113 F.4th at 659 (noting that drug trafficking is a serious offense that poses a

danger to the community and often leads to violence). To adopt such a test would create "a law trapped in amber." *Rahimi*, 602 U.S. at 691.

### 2. Laws Categorically Disarming Dangerous Individuals.

Second, the Government points to a historical tradition of disarming "categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 602 U.S. at 698. The historical record reveals a host of regulations that disarmed those whom the legislature deemed dangerous on a categorical basis. *See Jackson*, 110 F.4th at 1126; *Atkinson*, 70 F.4th at 1035 n.2 (Wood, J., dissenting); *Range*, 124 F.4th at 255–72 (Krause, J., concurring).

"[I]n the late 1600s, . . . the government disarmed non-Anglican Protestants who refused to participate in the Church of England, . . . and those who were 'dangerous to the Peace of the Kingdom." *Jackson*, 110 F.4th at 1126 (citations omitted). The same Parliament that enacted the English Bill of Rights also disarmed Catholics who refused to take an oath renouncing their faith, except as necessary for self-defense. *See Range*, 124 F.4th at 256–57 (Krause, J., concurring). Likewise, the colonies enacted similar restrictions on Catholics, prohibited the transfer of weapons to Native Americans,[13] and banned slaves and free Black people from possessing firearms. *See id.* at 259, 264. And during the revolutionary period states disarmed those who

---

[13] Although they did not directly prohibit Native Americans from possessing firearms, "these laws still inform how early settlers of the colonies that became the United States thought about regulating firearms." *Williams*, 113 F.4th at 652 n.8. "Their key idea was to keep weapons out of the hands of the Native Americans, whom colonists believed were hostile and dangerous." *Id.*

refused to swear oaths of loyalty to the emerging nation. *See id.* at 259–63; *Jackson*, 110 F.4th at 1126–27; *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting).

Consistent with this tradition, through the late 1800s states continued to promulgate categorical restrictions on the possession of firearms by certain groups of people. These laws included restrictions on: (1) the sale of firearms to, or the possession of firearms by, individuals below specified ages;[14] (2) the sale of firearms to those of unsound mind;[15] (3) the possession of firearms by those who were

---

[14] At least ten state statutes restricted the possession or sale of firearms to those below certain ages: Act of July 13, 1892, ch. 159, § 5, 27 Stat. 116, 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1855 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716, 716; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112, 112; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13, 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556, 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468, 468; Act of June 10, 1881, No. 124, § 1, 1881 Pa. Laws 111, 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157, 157; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83, 83.

[15] Three state statutes restricted the sale of firearms to those of unsound mind: Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87, 87; Crimes and Punishments-Relating to Minors and Deadly Weapons or Toy Pistols, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 3.

intoxicated;[16] and (4) the possession of weapons by certain vagrants—known as "tramps."[17]

Indeed, laws disarming "tramps" illustrate the broad and imprecise nature of categorical disarmament. "Tramps" were typically defined as those who went "about from place to place begging and asking or subsisting upon charity." *See, e.g.*, Act of Aug. 1, 1878, ch. 38, § 1, 1878 N.H. Laws 170. Tramps were an "object of fear" and described by one legal scholar as "the chrysalis of every species of criminal." Lawrence Friedman, *Crime and Punishment in American History* 102 (1993) (quotation marks omitted). Indeed, the Ohio Supreme Court described tramps as follows:

> [T]he genus tramp, in this country, is a public enemy. He is numerous, and he is dangerous. He is a nomad, a wanderer on the face of the earth, with his hand against every honest

---

[16] Four other state statutes restricted the possession of firearms by those who were intoxicated: Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

[17] And thirteen more state statutes restricted the possession of firearms by those who were deemed "tramps": Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 393, 394; Act of Mar. 27, 1879, ch. 155, § 8, 1879 Del. Laws 223, 225; Arrest Trial and Punishment of Tramps, ch. 43, § 4, 1890 Iowa Acts 68, 68-69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 231, 232; Miss. Rev. Code § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170, 170; Act of May 5, 1880, ch. 176, § 4, 1 N.Y. Laws 296, 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355, 355; Act of June 12, 1879, § 2, 76 Ohio Laws 191, 192; Act of Apr. 30, 1879, No. 31, § 2, 1879 Pa. Laws 33, 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110, 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 29, 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 273, 274.

> man, woman, and child, in so far as they do
> not promptly and fully supply his demands.
> He is a thief, a robber, often a murderer, and
> always a nuisance. He does not belong to the
> working classes, but is an idler.

*State v. Hogan*, 63 Ohio St. 202, 215 (1900). In line with
this view, the Ohio Supreme Court held that a statute that
disarmed tramps was consistent with its state constitutional
right to bear arms,[18] writing that the state right to bear arms
"was never intended as a warrant for vicious persons to carry
weapons with which to terrorize others." *Id.* at 219.
Certainly not all "tramps" were "vicious" or "dangerous."
Yet, thirteen states passed laws categorically disarming them
on the belief that tramps, as a class, presented a danger to the
community if armed.

To be clear, these laws reflect overgeneralized and
abhorrent prejudices that would not survive legal challenges
today. And many of these laws would likely be
unconstitutional today under *other* parts of the Constitution.
But these laws are reflective of American history and
tradition. And our historical tradition reveals that
legislatures were permitted to categorically disarm those
they deemed dangerous without having to perform "an
individualized determination of dangerousness as to each

---

[18] *See Range*, 124 F.4th at 267 (Krause, J., concurring) (noting that "state
constitutional rights to bear arms . . . were understood to be coextensive
with the Second Amendment"); *see also* William Baude & Robert
Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev.
1467, 1472 (2024) (explaining that early American courts described the
right to arms codified in "the English Bill of Rights, the Second
Amendment to the U.S. Constitution, and various state constitutions as
codifying the *same* preexisting right").

person in a class of prohibited persons." *Jackson*, 110 F.4th at 1128; *see Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) ("[S]ince the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed."). "[F]our centuries of unbroken Anglo-American history shows that legislatures consistently disarmed entire categories of people who were presumed to pose a special risk of misusing firearms." *Range*, 124 F.4th at 273 (Krause, J., concurring). "Not all persons disarmed under historical precedents . . . were violent or dangerous persons." *Jackson*, 110 F.4th at 1128. Indeed, "every categorical disarmament law was overbroad—sweeping in law-abiding people who were not dangerous, violent, untrustworthy, or unstable—yet they comported with the Second Amendment." *Range*, 124 F.4th at 267 (Krause, J., concurring).

Section 922(g)(1) fits within this tradition. "Congress obviously determined that firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119 (1983). And this legislative judgment comports with our historical tradition of regulating firearm possession by those who commit the most serious crimes to protect the public. *Supra* at 26–33; *see Hunt*, 123 F.4th at 708.[19]   Accordingly, our historical

---

[19] We do not hold, as Judge Collins would, that every legislative judgment that a group of individuals presents a "special danger of misuse" must be rooted in history. *See* Concurring Op., Collins, J., at 50. However, we recognize that, in this case, Congress's well-founded determination that felons, as a class, present a special danger of firearm misuse is fully supported by our tradition of regulating those who have committed the most serious crimes.

tradition of categorically disarming those whom the legislature determines to represent a "special danger of misuse" also supports the application of § 922(g)(1) to felons, like Duarte, who assert that their felonies were non-violent. *Rahimi*, 602 U.S. at 698.

. . .

In sum, these laws demonstrate that § 922(g)(1)'s permanent and categorical disarmament of felons is consistent with this Nation's historical tradition of firearm regulations. Legislatures have historically retained the discretion to punish those who commit the most severe crimes with permanent deprivations of liberty, and legislatures could disarm on a categorical basis those who present a "special danger of misuse" of firearms. *Rahimi*, 602 U.S. at 698. We agree with the Fourth and Eighth Circuits that either historical tradition is sufficient to uphold the application of § 922(g)(1) to all felons. *See Jackson*, 110 F.4th at 1127–28; *Hunt*, 123 F.4th at 706.

Section 922(g)(1) "is by no means identical to these [historical laws], but it does not need to be." *Rahimi*, 602 U.S. at 698. History does not require "felony-by-felony litigation" to support the application of § 922(g)(1). *Jackson*, 110 F.4th at 1125; *Hunt*, 123 F.4th at 700. Instead, consistent with our historical tradition, the government is "empowered to regulate guns through categorical restrictions." *Atkinson*, 70 F.4th at 1038 (Wood, J., dissenting).[20]

---

[20] Echoing Justice Thomas's lone dissent in *Rahimi*, Judge VanDyke's granular historical analysis contends that historical analogues for § 922(g)(1) are not sufficiently similar to uphold the application of

Finally, we recognize that these historical principles "may allow greater regulation than would an approach that employs means-end scrutiny with respect to each individual person who is regulated." *Jackson*, 110 F.4th at 1129. However, these are the fruits of *Bruen*'s constitutional test. *See id.*; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1274 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("[G]overnments appear to have more flexibility and power to impose gun regulations under a test based on text, history, and tradition than they would under strict scrutiny." (emphasis omitted)).

## IV.  Conclusion

Accordingly, § 922(g)(1) is constitutional as applied to Duarte and other non-violent felons.  We **AFFIRM** Duarte's conviction.

---

R. NELSON, Circuit Judge, joined by IKUTA, Circuit Judge, concurring in the judgment:

Because Duarte failed to raise his Second Amendment argument before the district court, we must apply plain error review.  Applying that standard, there was no plain error by the district court, and I would uphold Duarte's conviction. Because I reach this conclusion, I would not reach the merits of Duarte's Second Amendment challenge under de novo review.

---

§ 922(g)(1) to non-violent felons.  *Compare Rahimi*, 602 U.S. at 752–775 (Thomas, J., dissenting), *with* Dissenting Op. at 85–113.  Our response is simple: "[a]s the [Supreme Court] said in *Bruen*, a 'historical *twin*' is not required."  *Rahimi*, 602 U.S. at 701 (quoting *Bruen*, 597 U.S. at 30).

COLLINS, Circuit Judge, concurring in the judgment:

I agree with the majority's ultimate conclusion that Steven Duarte's as-applied Second Amendment challenge to his conviction under 18 U.S.C. § 922(g)(1) fails on the merits even under *de novo* review.[1]  But I disagree with the majority's conclusion that, *standing alone*, *either* of the two historical traditions proffered by the Government—*viz*., (1) the recognized traditional power of legislatures with respect to felons, *i.e.*, those who have committed serious crimes; and (2) the limited historical power of legislatures, at the time of the founding, to disarm specified categories of persons—is sufficient to "suppl[y] a basis for the categorical application of § 922(g)(1) to felons." *See* Opin. at 26.  In my view, § 922(g)(1) survives Second Amendment scrutiny only when these two historical traditions are "[t]aken together." *United States v. Rahimi*, 602 U.S. 680, 698 (2024).  I therefore concur only in the judgment.

**I**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment "codified a pre-existing" "individual right to keep and bear arms" "for defensive purposes," even if "unconnected to militia service." *Id*. at 592, 595, 602, 612 (emphasis omitted).  The Court cautioned, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at

---

[1] Like the majority, I assume *arguendo* that Duarte's challenge should be reviewed *de novo*. *See* Opin. at 13–14.

626. Rather, the Second Amendment right was "enshrined with the scope [it] w[as] understood to have when the people adopted [it]." *Id.* at 634–35.

In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court set forth a basic framework based in "constitutional text and history" for "defining the character" and "outer limits" of the Second Amendment right and for "assessing the constitutionality of a particular regulation." *Id*. at 22. The Court instructed:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24 (citation omitted). In *Rahimi*, the Court clarified that the "appropriate" historically based analysis requires "considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." 602 U.S. at 692 (emphasis added). Thus, in evaluating a challenged regulation's consistency with our Nation's history of firearm regulation, "[a] court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Id.* (simplified). Accordingly, the Court explained, "the Second Amendment permits more than just

those regulations identical to ones that could be found in 1791," and even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* at 691–92 (quoting *Bruen*, 597 U.S. at 30).

In determining whether a challenged law is "relevantly similar" to particular historical examples of permissible firearm regulations and fits within the "principles that underpin [the] regulatory tradition" reflected in such examples, a court must consider "[w]hy and how the [challenged] regulation burdens the right." *Rahimi*, 602 U.S. at 692 (citation omitted).  Specifically, the court must consider "[1] whether modern and historical regulations impose a comparable burden on the right of armed self-defense" (*i.e.*, the "how"); and "[2] whether that burden is comparably justified" (*i.e.*, the "why").  *Bruen*, 597 U.S. at 29 (citations omitted).  The *Rahimi* Court further clarified that, under the requisite historically based approach, courts should not evaluate particular historical examples in isolation, but should consider whether, "[t]aken together," they reflect a general principle that helps to define the contours of the Second Amendment right. *Rahimi*, 602 U.S. at 698 (citing two particular historical examples and holding that, "[t]aken together," these examples confirm the general principle that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed" consistent with the Second Amendment).

## II

Applying this framework, I agree that § 922(g)(1)'s criminal prohibition of possession of firearms by convicted felons is consistent with the Second Amendment.   In reaching this conclusion, I think it is unnecessary to address,

or to rely on, the Government's argument that felons are not
included within the "people" whose rights are protected by
the "plain text" of the Second Amendment. *Bruen*, 597 U.S.
at 24.    Even assuming *arguendo* that felons are
presumptively covered by the literal text of the Second
Amendment, I agree that the Government has established
that § 922(g)(1) "is consistent with the Nation's historical
tradition of firearm regulation." *Id*.

**A**

I turn first to the Government's argument that the
historical tradition at the time of the Second Amendment's
adoption confirms that the right guaranteed by that
Amendment does not "prohibit[] the enactment of laws
banning the possession of guns by categories of persons
thought by a legislature to present a special danger of
misuse." *Rahimi*, 602 U.S. at 698 (stating that the Court did
"not suggest that the Second Amendment prohibits" such
laws and citing the page of *Heller* where the Court stated that
the Court did not "cast doubt on longstanding prohibitions
on the possession of firearms by felons and the mentally
ill"). As I shall explain, a review of that often unsavory
history reveals a tradition of categorical legislative
disarmament that survives only in a highly constrained form.

**1**

As *Rahimi* noted, English law over the centuries allowed
for the disarmament of certain categories of persons,
including "not only brigands and highwaymen but also
political opponents and disfavored religious groups."
*Rahimi*, 602 U.S. at 694. In response to the perceived
abusive disarmament practices of "the Stuart Kings Charles
II and James II," *Heller*, 554 U.S. at 592, Parliament in 1689
"adopted the English Bill of Rights, which guaranteed 'that

the Subjects which are Protestants, may have Arms for their
Defence suitable to their Conditions, and as allowed by
Law.'" *Rahimi*, 602 U.S. at 694 (quoting An Act Declaring
the Rights and Liberties of the Subject, and Settling the
Succession of the Crown, 1 Wm. & Mary, ch. 2, § 7, *in*
3 ENG. STAT. AT LARGE 441 (1689)). Because the English
Bill of Rights granted an individual right to "have Arms"
only to "Protestants" and only "as allowed by Law," this
right by its terms "was restricted to Protestants and held only
against the Crown, but not Parliament." *Bruen*, 597 U.S. at
44. Indeed, the same year that it enacted the Bill of Rights,
Parliament expressly disarmed Catholics (derisively referred
to as "Papists"), although it also permitted any Catholic men
"to retain those weapons that local justices . . . thought
necessary 'for the Defence of his House or Person.'" *See*
Joyce Lee Malcolm, *The Right of the People to Keep and
Bear Arms: The Common Law Tradition*, 10 HASTINGS
CONST. L.Q. 285, 308–09 (1983) (citation omitted).

Laws generally disarming Catholics also were enacted in
some of the American colonies after the French and Indian
War (1756–1763), which "was perceived by many in
[England] as a war between Protestantism and Catholicism."
Joseph G.S. Greenlee, *The Historical Justification for
Prohibiting Dangerous Persons From Possessing Arms*, 20
WYO. L. REV. 249, 263 (2020). In particular, the colonial
legislatures in Pennsylvania, Maryland, and Virginia
enacted laws generally barring Catholics from possessing
firearms and ammunition.[2]

---

[2] *See* 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801,
at 627 (James T. Mitchell & Henry Flanders eds., Wm. Stanley Ray
1898) (1759 statute providing "[t]hat all arms, military accoutrements,

Colonial American legislatures also adopted other laws that categorically prohibited, or severely limited, the sale of firearms and ammunition to specific classes of persons. These included Native Americans,**[3]** as well as, in southern

_____

gunpowder and ammunition of what kind soever, any papist or reputed papist within this province hath or shall have in his house or houses . . . , shall be taken from such papist or reputed papist by warrant"); 52 ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND 1755–1756, at 454 (Baltimore, J. Hall Pleasants ed., Md. Hist. Soc'y 1935) (1756 statute providing "that all Arms Gunpowder and Ammunition of what kind soever any Papist or reputed Papist within this Province hath or shall have in his House or Houses or elsewhere shall be taken from Such Papist or reputed Papist by Warrant"); 7 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 35–39 (Richmond, William Waller Hening ed., Franklin Press 1820) (1756 statute providing "[t]hat no Papist, or reputed Papist," who refuses to take an oath of allegiance, "shall, or may have, or keep in his house or elsewhere, or in the possession of any other person to his use, or at his disposition, any arms, weapons, gunpowder or ammunition").

[3] *See*, *e.g.*, ACTS OF ASSEMBLY OF THE PROVINCE OF MARYLAND, ch. 4, § 3 (Annapolis, Jonas Green 1763) (1763 statute providing that "it shall not be lawful for any Person or Persons within this Province, to sell or give to any Indian Woman or Child, any Gun-powder, Shot, or Lead, whatsoever, nor to any Indian Man within this Province, more than the Quantity of one Pound of Gun-powder, and Six Pounds of Shot or Lead, at any one Time"); 6 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 319–20 (James T. Mitchell & Henry Flanders eds., Wm. Stanley Ray 1899) (1763 statute providing for a fine, 39 lashes, and 12 months in the "common gaol of the county" "if any person or persons whatsoever shall directly or indirectly give to, sell, barter or exchange with any Indian or Indians whatsoever any guns, gunpowder, shot, bullets, lead or other warlike stores without license from" designated officials); ACTS AND LAWS OF HIS MAJESTY'S PROVINCE OF NEW-HAMPSHIRE IN NEW-ENGLAND 164 (Portsmouth, Daniel Fowle & Robert

States, slaves.[4]  Moreover, during the Revolutionary War, the Continental Congress in March 1776 "recommended to the several assemblies, conventions, and councils or committees of safety of the United Colonies, immediately to cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies." *See* 4 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 205 (Washington, D.C., Worthington Chauncey Ford ed., Library of Congress 1906).   Heeding the Continental Congress's call, several States enacted laws disarming

---

Fowle 1771) (1721 statute prohibiting anyone from supplying Indians "with any provision, cloathing, guns, powder shott, bullets, or any other goods"); *see generally* 1 FRANCIS PAUL PRUCHA, THE GREAT FATHER: THE UNITED STATES GOVERNMENT AND THE AMERICAN INDIANS 18–19 (Lincoln, Univ. of Neb. Press 1984).

[4] *See*, *e.g.*, 4 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 131 (New York, William Waller Hening ed., Franklin Press 1820) (1723 statute providing that "every gun, and all power and shot, and every such club or weapon . . . found or taken in the hands, custody, or possession of any such negro, mulatto, or Indian, shall be taken away"); A CODIFICATION OF THE STATUTE LAW OF GEORGIA 813 (Savannah, William A. Hotchkiss ed., John M. Cooper 1845) (1770 statute providing that, with certain exceptions, "[i]t shall not be lawful for any slave to carry and make use of firearms, or any offensive weapon whatsoever"); 7 THE STATUTES AT LARGE OF SOUTH CAROLINA 410 (Columbia, David J. McCord ed., A.S. Johnston 1840) (1740 statute providing that "it shall be lawful for all masters, overseers and other persons whomsoever, to apprehend and take up any . . . negro or other slave or slaves, met or found out of the plantation of his or their master or mistress, . . . if he or they be armed with such offensive weapons," and "him or them to disarm").

loyalists or those who refused to take loyalty oaths.**5** In fact, even before the Continental Congress issued its recommendation, at least one State had already prohibited

<hr>

[5] *See* 5 THE ACTS AND RESOLVES, PUBLIC AND PRIVATE, OF THE PROVINCE OF THE MASSACHUSETTS BAY 479–84 (Boston, Wright & Potter Printing Co. 1886) (1776 statute providing that "every male person above sixteen years of age . . . who shall neglect or refuse to subscribe a printed or written declaration . . . upon being required thereto . . . shall be disarmed, and have taken from him, in manner hereafter directed, all such arms, ammunition and warlike implements, as, by the strictest search, can be found in his possession or belonging to him"); 9 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 281–83 (Richmond, William Waller Hening ed., J. & G. Cochran 1821) (1777 statute providing that any male above the age of 16 who refuses to take a loyalty oath will be "disarmed"); 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 110–14 (James T. Mitchell & Henry Flanders eds., Wm. Stanley Ray 1903) (1777 statute providing "[t]hat every person above the age [of 18] refusing or neglecting to take and subscribe the said oath or affirmation shall during the time of such neglect or refusal . . . be disarmed"); 7 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS IN NEW ENGLAND 567–68 (Providence, John Russell Bartlett ed., A. Crawford Greene 1862) (1776 statute providing "that in case any such suspected [loyalist] shall refuse to subscribe [to an oath]," he will be "search[ed] for all arms, ammunition and warlike stores," which will be taken); THE ACTS OF ASSEMBLY OF THE STATE OF NORTH CAROLINA 42–44 (Newbern, James Davis 1778) (1777 statute providing "[t]hat all Persons failing or refusing to take the Oath of Allegiance, and permitted by the County Courts . . . to remain in the State, . . . shall not keep Guns or other Arms within his or their House"); JOURNAL OF THE PROVINCIAL CONGRESS OF SOUTH CAROLINA, 1776, at 77–79 (Charlestown 1776) (1776 resolution providing "[t]hat all persons who shall hereafter bear arms against, or shall be active in opposing the measures of the Continental or Colony Congress, and upon due conviction thereof before a majority of the Committee of the district or parish where such persons reside, be disarmed, and at the discretion of the said Committee taken into custody").

loyalists from bearing arms. *See* THE PUBLIC RECORDS OF
THE COLONY OF CONNECTICUT FROM MAY, 1775 TO JUNE,
1776, at 192–95 (Hartford, Charles J. Hoadly ed., Lockwood
& Brainard Co. 1890) (1775 statute pre-dating the
Continental Congress's recommendation and requiring that
any accused loyalist who failed to show he was "not
inimical" to the colonies be "disarmed").

**2**

The tradition that emerges from these historical
precedents is not particularly impressive. Today, *other*
constitutional provisions would independently prohibit
racially or religiously based discriminatory bans on gun
ownership by Catholics, Blacks, or Native Americans (who,
since at least 1924, have been recognized as full citizens).
*See* U.S. CONST., amends. I, V, XIV. And, of course, slavery
was abolished by the Thirteenth Amendment. Moreover, the
Supreme Court has recognized that, in light of the
"polemical reactions by Americans" to the British
government's efforts to "disarm the inhabitants of the most
rebellious areas" of the colonies, *Heller*, 554 U.S. at 594, the
Second Amendment was *itself* understood, at "the time of
the founding," as having "largely eliminated governmental
authority to disarm political opponents on this side of the
Atlantic," *Rahimi*, 602 U.S. at 694. Much of the actual
historical instances of legislative categorical exclusions
from firearms possession have thus either been vitiated by
other constitutional provisions or are inconsistent with what
the Second Amendment itself was understood to
accomplish. Given this shaky foundation, I cannot endorse
the majority's view that we should extract from this
historical tradition the sweeping principle that the Second
Amendment allows a legislature to "categorically disarm[]
those whom the legislature determines to represent a 'special

danger of misuse'" or to "categorically disarm those [it] deem[s] dangerous." *See* Opin. at 36–38. The majority's deference to Congress's judgments as to whom it "deem[s]" to be unworthy of Second Amendment rights sounds like rational basis review, *see Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012) (holding that "rational basis review requires deference to reasonable underlying legislative judgments"), but the *Heller* Court squarely rejected that standard as being inapplicable in the Second Amendment context, *see* 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment . . . would have no effect.").

The difficult question nonetheless remains as to what "principles" should be understood to "underpin" this particular "regulatory tradition," keeping in mind that a modern law need only be "*relevantly* similar to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (emphasis added) (simplified). In answering that question, I think we must keep two contrasting considerations in mind. On the one hand, as I have just noted, defining the principles that emerge from the tradition of legislative categorical disarmament at a very high level of generality—as the majority does—could allow legislatures to creatively fashion *new* categorical exclusions, thereby effectively gutting the Amendment's protections in a way that is at war with its original understanding. *See Rahimi*, 602 U.S. at 694 (emphasizing that the Second Amendment was understood to *limit* the sorts of broad disarmament measures the British had applied); *Heller*, 554 U.S. at 594–95 (similar); *see also Bruen*, 597 U.S. at 30 (stating that "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted" (simplified)). On the

other hand, the Supreme Court has made clear that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691–92.

The key to steering between these two extremes, in my view, is to remember that "history" must always remain the "guide" when it comes to recognizing and defining the scope of any asserted exclusions from the Second Amendment's reach. *Bruen*, 597 U.S. at 28. Therefore, to the extent that the historical tradition described above recognizes some measure of legislative discretion to impose disarmament on particular categories of persons who are thought to present a "special danger of misuse," *see Rahimi*, 602 U.S. at 698, the eligible categories of such persons must *themselves* be historically based. To hold otherwise would be to say that Second Amendment rights effectively exist only at the sufferance of the legislature, which is directly contrary to the Amendment's central purpose. Accordingly, in order for a legislature to validly disarm a given category of persons, that category must itself be rooted in an identifiable historical antecedent.

The Court, however, has also made clear that the historical antecedent only needs to be "relevantly" similar, and the *Rahimi* Court held, in particular, that a historical tradition allowing the imposition of other, *more severe* penalties than disarmament on a given class of persons may provide a sufficient analogue to support allowing such persons to be disarmed. *See Rahimi*, 602 U.S. at 698–99 (citation omitted). Thus, in rejecting a Second Amendment challenge to 18 U.S.C. § 922(g)(8)(C)(i), which forbids gun possession by any person who is subject to a restraining order that "includes a finding that he poses 'a credible threat to the physical safety' of a protected person," *Rahimi*, 602

U.S. at 693 (quoting 18 U.S.C. § 922(g)(8)(C)(i)), *Rahimi*
held that the so-called "going armed laws" provided,
together with other laws, a relevant historical analogy, *id.* at
699. The "going armed laws prohibited 'riding or going
armed, with dangerous or unusual weapons, [to] terrify[ ] the
good people of the land,'" and the penalty for violation of
such laws was "'forfeiture of the arms . . . and
imprisonment.'" *Id*. at 697 (alterations in original) (quoting
4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF
ENGLAND 149 (10th ed. 1787)).    The Court held that
§ 922(g)(8)(C)(i) shared the same objective (*i.e.*, the same
"why") as the "going armed laws, " because they both
"restrict[ed] gun use to mitigate demonstrated threats of
physical violence." *Id*. at 698. The manner in which the
going armed laws burdened gun possession was also
sufficiently analogous, because § 922(g)(8)(C)(i) effectively
imposes "temporary disarmament" when a restraining order
is in effect, which entails *a "lesser restriction" than
"imprisonment"* (which was the penalty imposed by the
"going armed laws"). *Id*. at 699 (emphasis added).**[6]**

As applicable here, *Rahimi* thus teaches that a historical
precedent establishing that, at the time of the founding, a
discrete group of persons could *categorically* be subjected to
legal disabilities and penalties that were equivalent to, or
more onerous than, disarmament would provide a
"relevantly similar" "historical analogue" that would suffice

---

[6] The dissent obviously does not like that, in determining when a given
historical analogue is "sufficiently similar," *Rahimi* applied a greater-
includes-the-lesser standard, *Rahimi*, 602 U.S. at 700, which the dissent
views as too indeterminate, *see* Dissent at 122–23 & n.26. We are, of
course, bound to follow and apply the Supreme Court's decision in
*Rahimi*. *See* U.S. CONST., art. III, § 1 (confirming that federal courts
created by Congress are "inferior Courts" to the "one supreme Court").

to support a legislative determination to categorically disarm such persons. *Rahimi*, 602 U.S. at 698–99 (citation omitted). By confining any legislative categorical disarmament power to only those historically based classes of persons who could be subjected to equivalent or greater disabilities, this approach avoids endorsing the sort of freewheeling legislative power to categorically disarm that the Second Amendment sought to eliminate. *See id*. at 694. And by counting, as relevantly similar, historical precedents that allowed categorical burdens greater than disarmament, this approach avoids limiting the range of permissible categorical disarmaments to only those particular categories of persons who were *specifically* subject to categorical *disarmament* in 1791. *See id*. at 691–92 (rejecting an approach to the Second Amendment that would entail "a law trapped in amber," such that the only permissible regulations would be those "*identical* to ones that could be found in 1791" (emphasis added)).[7] And, of course, notwithstanding the historical precedents, a legislature may not impose categorical disarmament on a given class of persons in a manner that would violate *other* provisions of the Constitution.

**B**

Against this backdrop, the question is whether there is a relevant historically based category of persons who, at the time of the founding, could be subjected to legal disabilities that were equivalent to, or more severe than, § 922(g)(1)'s lifetime prohibition on firearm possession. The answer to that question is yes. *See Heller*, 554 U.S. at 626–27 & n.26

---

[7] The dissent, therefore, is wrong in insisting on an *identical* tradition, *viz*., a showing that felons, "as a group, [were] categorically disarmed at the founding." *See* Dissent at 119.

(describing "longstanding prohibitions on the possession of firearms by felons and the mentally ill" as "presumptively lawful regulatory measures"); *Bruen*, 597 U.S. at 38–39 n.9 (affirming the presumptive constitutionality of shall-issue licensing regimes that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" (quoting *Heller*, 554 U.S. at 635)); *id.* at 80–81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating *Heller*'s statement regarding "prohibitions on the possession of firearms by felons and the mentally ill" (quoting *Heller*, 554 U.S. at 626–27)); *Rahimi*, 602 U.S. at 699 (same).

**1**

The category of serious criminal offenses known as "felonies" was well-recognized at the founding. As explained in several influential contemporary legal treatises, felonies were those crimes deemed to be sufficiently serious, either at common law or by legislative enactment, so as to warrant capital punishment and forfeiture of the convicted individual's estate. *See* 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 94–95 (Oxford, Clarendon Press 1st ed. 1769) (hereinafter "BLACKSTONE") ("Felony, in the general acceptance of our English law, compri[s]es every species of crime, which occasioned at common law the forfeiture of lands or goods" and "for which a capital punishment either is or was liable to be inflicted"); 1 MATTHEW HALE, THE HISTORY OF THE PLEAS OF THE CROWN 703 (E & R. Nutt & R. Gosling 1st ed. 1736) (hereinafter "HALE") ("Generally if an act of parliament be, that if a man commit such an act, he shall have judgment of life and member, this makes the offense [a] felony, and this was ordinarily the clause used in ancient statutes."); 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE

CROWN 107 (London, E. Richardson & C. Lintot 4th ed. 1762) (hereinafter "HAWKINS") (stating that "Felonies" included those offenses expressly denominated as such, as well as "also those which are decreed to have or undergo Judgment of Life and Member by any Statute").

The gravity of felonies was also understood as being in contrast to the category of less serious crimes known as misdemeanors. "In the English law[,] misdemeanour [was] generally used in contradistinction to *felony*," 5 HENRY ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE TO THE CONSTITUTION AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES; AND OF THE COMMONWEALTH OF VIRGINIA 5 n.1 (Philadelphia, William Young Birch & Abraham Small 1803) (hereinafter "ST. GEORGE TUCKER"), and referred to a crime that "may be punished, according to the degree of the . . . offense, by fine, or imprisonment, or both," RICHARD BURN & JOHN BURN, A NEW LAW DICTIONARY 472 (Dublin, Brett Smith 1792) (hereinafter "BURN & BURN"); *see*, *e.g.*, 4 BLACKSTONE, *supra*, at 99–100, 162–63 (distinguishing between misdemeanors and felonies).

Influential dictionaries at the time of the Second Amendment's ratification reflected a similar understanding that the term "felony" referred to the category of crime that was most serious and that was typically punishable by death. *See*, *e.g.*, SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (London, 10th ed. 1792) (defining a "felony" as "[a] crime denounced capital by the law"); THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (London, 2d ed. 1789) (same); 1 JOHN ASH, THE NEW AND COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (London, 2d ed. 1795) (defining a "felony" as a "capital crime, a very heinous offence"); WILLIAM PERRY,

THE ROYAL STANDARD ENGLISH DICTIONARY 239 (London, 5th ed. 1788) (defining a "felony" as a "capital or enormous crime"); BURN & BURN, *supra*, at 302 (explaining that "felony, as it is now become a technical term, signifies in a more restrained sense an offence of an high nature, yet it is not limited to *capital* offenses only, but still retains somewhat of this larger acceptance"); *see also* 1 NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE 115 (New-Haven, Sidney's Press 1806) (following the definition in Ash's dictionary).

Accordingly, it was commonly understood that "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (quoting STUART BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 23 (Cambridge, Harvard Univ. Press 2002) (hereinafter "BANNER")). Justice James Wilson thus observed in a law lecture he delivered in Philadelphia in the period of 1790–91 that "the idea of felony is now very generally and very strongly connected with capital punishment; so generally and so strongly, that if an act of parliament denominates any new offence a felony, the legal inference drawn from it is, that the offender shall be punished for it capitally." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON, L.L.D., 16 (Philadelphia, Bird Wilson ed., Lorenzo Press 1804) (hereinafter "WILSON").[8]

---

[8] The vacated panel opinion in this case ascribed to Justice Wilson the view that the widespread, common understanding of "felony" was incorrect as a technical and historical matter. *See United States v. Duarte*, 101 F.4th 657, 689, *vacated and reh'g en banc granted,* 108 F.4th 786 (9th Cir. 2024); *see also* Dissent at 91–92 (similar). But Justice

The same treatises noted above also recognized the important point that the legislature had the authority to expand the category of "felony" to include additional serious crimes and that the legislature could, if it wished, subject such newly defined offenses to the punishment of death that was typically allowed for felonies. *See* 4 BLACKSTONE, *supra*, at 98 ("And therefore if a statute makes any *new* offence felony, the law implies that it shall be punished with death . . . , as well as with forfeiture" (emphasis added)); 1 HALE, *supra*, at 703–04 (recognizing the legislature's authority to enact "new felonies"); 1 HAWKINS, *supra*, at 107 (similar). And that power to expand the category of felonies was not limited to only those offenses involving violent acts. Thus, for example, "[s]hortly after proposing the Bill of Rights, the First Congress . . . punished forgery of United States securities, 'running away with a ship or vessel, or any goods or merchandise to the value of fifty dollars,' treason, and murder on the high seas with the same penalty: death by hanging." *Harmelin v. Michigan*, 501 U.S. 957, 980–81 (1991) (opinion of Scalia, J.) (original brackets omitted) (quoting Crimes Act of 1790, 1 Stat. 112, 114–15 (1790)); *see also United States v. Tully*, 28 F. Cas. 226, 228 (C.C.D. Mass. 1812) (No. 16,545) (Story, Circuit Justice) (explaining that "run[ning] away with [a] ship or vessel, or any goods or merchandi[s]e to the value of fifty dollars" did not require "personal force or violence"). Blackstone

---

Wilson's challenge to the traditional conception of felony reflected his personal belief that "[p]unishments ought unquestionably to be moderate and mild," 3 WILSON, *supra*, at 32, and as the quote above shows, "he recognized that the prevailing view was to the contrary," *Heller*, 554 U.S. at 610. Given that the purpose of originalism is "to determine *the public understanding* of a legal text," *id.* at 605, Justice Wilson's personal disagreement with the prevailing view is less relevant to the historical inquiry under *Bruen* and *Rahimi*.

USA V. DUARTE                    57

similarly observed that acts such as, *inter alia*, robbery, certain thefts, fraudulent bankruptcy, forgery of coin, and forgery of a marriage license were felonies that could warrant death and forfeiture. 4 BLACKSTONE, *supra*, at 6, 156, 162–65, 238–39, 246–47. Colonial laws in the decades directly preceding, or during, the Revolutionary War prescribed the death penalty for a variety of felonies, including certain instances of counterfeiting, fraud, theft, and perjury. *See* BANNER, *supra*, at 7–8 (describing pre-Revolution laws in New Hampshire, Connecticut, Pennsylvania, New York, Virginia, Delaware, and South Carolina that imposed capital punishment for non-violent crimes such as counterfeiting, perjury, theft, embezzlement, and burning timber).[9] And the same is true of state laws at the time of the founding.[10]

---

[9] *See also*, *e.g.*, ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW-JERSEY 121 (Burlington, Samuel Allinson ed., Isaac Collins 1776) (1741 statute imposing "the Pains of Death" for "Felons" convicted of impersonating another during bail proceedings); THE HISTORY OF THE PROVINCE OF NEW-YORK FROM THE FIRST DISCOVERY TO THE YEAR 1732, at 216 (London, William Smith ed. 1757) (stating that "[t]o counterfeit . . . is Felony without Benefit of Clergy"); A DIGEST OF THE LAWS OF MARYLAND 255–56 (Baltimore, Thomas Herty ed. 1799) (1776–78 statutes imposing "death as a felon" for forgery and counterfeiting); A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 181 (Philadelphia, Robert Watkins & George Watkins eds. 1800) (hereinafter "GA. DIGEST") (1773 statute providing that a counterfeiter of "paper money . . . shall be adjudged a felon, and shall suffer death without benefit of clergy").

[10] *See*, *e.g.*, 1 A MANUAL OF THE LAWS OF NORTH-CAROLINA 199 (Raleigh, John Haywood ed., 2d ed. 1808) (1790 law imposing felon status and death for horse theft); GA. DIGEST, *supra*, at 467–68 (1792 law imposing felon status and death for forgery); *id.* at 341–43 (1786 law

Thus, at the time of the adoption of the Second Amendment, it was well understood that legislatures had the authority to define and expand a category of serious crimes and, if it chose, to subject those convicted of such crimes to the death penalty. Inflicting death, of course, is the most severe exercise of state power against an individual, and disarmament—even permanent disarmament—is a "lesser restriction" than execution. *See Rahimi*, 602 U.S. at 699. Because, at the time of the founding, legislatures had a recognized power to define serious crimes as felonies, and to attach the penalty of death and forfeiture of estate to them, the category of convicted "felons" is one that then could categorically be subjected to legal disabilities that equaled or exceeded lifetime disarmament. These two historical traditions (of legislative categorical disarmament and legislative power to define felonies eligible for severe

---

imposing felon status and death for counterfeiting); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC OR PERMANENT NATURE, AS ARE NOW IN FORCE 260–61 (Richmond, Augustine Davis 1794) (1792 law imposing death and felon status for certain instances of theft, forgery, and counterfeiting); 2 LAWS OF THE STATE OF NEW-YORK 41–42 (New-York, Thomas Greenleaf 1792) (1788 law imposing "death as a felon" for certain instances of forgery and counterfeiting); *id.* at 73–75 (1788 law imposing capital punishment for certain thefts); 1 THE PUBLIC ACTS OF THE GENERAL ASSEMBLY OF NORTH-CAROLINA 242 (Newbern, James Iredell & Francois-Xavier Martin eds., Martin & Ogden 1804) (1784 law stating that those convicted of committing forgery, counterfeiting, or fraud with respect to tobacco shipments "shall be adjudged a felon, and suffer as in cases of felony"); *Commonwealth v. Hope*, 39 Mass. 1, 9–10 (1839) (Shaw, C.J.) (discussing a 1784 law that "made burglary in the night time punishable with death"); ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 66 (New-London, Timothy Green 1784) (statute providing that "if any Person rise up by false Witness, wil[l]fully, and of Purpose to take away any Man's Life, such Offender shall be put to Death").

punishment), *taken together*, therefore provide a sufficient historical analogy to satisfy the "how" requirement of *Bruen*.[11]  And because the death penalty, like disarmament, is in part aimed at addressing the problem of potential future lawlessness by demonstrated lawbreakers, *see* 4 BLACKSTONE, *supra*, at 11–12 (explaining that among the aims of criminal punishment were to "depriv[e] the party injuring of the power to do future mischief" and to "deter[] others"); *Joseph Story on Capital Punishment*, 43 CAL. L. REV. 76, 80 (John C. Hogan ed. 1955) (1830 essay by Justice Story explaining that capital punishment is premised on "cutting [a convict] off from the power of doing further mischief" and "the deterring of others from committing like crimes"), the "why" requirement is satisfied as well.

For the foregoing reasons, the historical traditions concerning legislative treatment of felons and concerning legislative categorical disarmament, taken together, provide a "relevantly similar" historical analogue that justifies, as

---

[11] I therefore disagree with the majority's suggestion that the two traditions, considered separately, provide *alternative* grounds for rejecting Duarte's Second Amendment challenge here.  Considered separately, neither is sufficient.  As I have explained, positing a free-floating legislative power to categorically disarm *any* group deemed to be unreliable, *see* Opin. at 36–38 & n.19, seems at war with the original understanding of the Second Amendment.  *See supra* at 48–49.  And the greater-includes-the-lesser argument that disarmament is a lesser burden than execution is also inadequate, standing alone, to uphold felon disarmament.  Stripping convicted felons of their First Amendment rights is also less severe a consequence than death, but no one could seriously contend that such a statute would be consistent with the First Amendment.  The crucial difference is that, in the context of the Second Amendment (in contrast to the First Amendment), there was, at the time of the founding, a well-recognized (if limited) legislative power to strip specified *categories of persons* of their right to bear arms.

consistent with the Second Amendment, legislation permanently disarming the category of persons who are convicted felons. *Rahimi*, 602 U.S. at 698 (citation omitted). And because no other provision of the federal Constitution precludes discriminating, on a categorical basis, against convicted felons, Duarte's constitutional challenge to § 922(g)(1) must be rejected.

**2**

In my view, none of the contrary arguments presented by Duarte and others on this point is persuasive. In particular, the fact that capital punishment was in practice only "sparingly" applied in the colonies and that many felonies were not eligible for the death penalty, *see Kanter v. Barr*, 919 F.3d 437, 459 (7th Cir. 2019) (Barrett, J., dissenting) (citation omitted), does not require a different conclusion. As I have explained, the relevant question in assessing the scope of a historically based legislative power to disarm particular categories of persons is whether it was understood, at the time of the founding, that the legislature had the *discretion* to impose on a particular group, categorically, legal burdens that were equivalent to or more onerous than permanent disarmament.[12] That was clearly the case with

---

[12] Thus, while Congress and the States shifted away from capital punishment in the decades after the founding, *see* BANNER, *supra*, at 112–43, this evolution in thought did "not alter the nature of felony" as a serious crime worthy of harsh punishment, as St. George Tucker recognized specifically with respect to Virginia's decision to abolish forfeiture and narrow the applicability of capital punishment. *See* 5 ST. GEORGE TUCKER, *supra*, at 95 n.1. And writing in 1868, the year of the Fourteenth Amendment's ratification, Francis Wharton explained that at common law, "it was held, that whenever judgment of life or member was affixed by statute, the offence to which it was attached became

respect to the category of persons who committed serious
crimes that the legislature chose to define as felonies, and the
Second Amendment is therefore not violated if a legislature
decides to impose permanent disarmament on persons who
have previously been convicted of what it deems to be a
sufficiently serious crime.

Likewise, it does not matter that, under current Eighth
Amendment doctrine, the vast majority of felonies are not
constitutionally eligible for the death penalty.  In assessing
whether a legislature at the time of the founding had the
discretion to impose burdens that exceeded disarmament in
severity on a particular category of persons, what matters is
the scope of such power as then understood, and not 21st
century notions of what is consistent with "evolving
standards of decency." *Kennedy v. Louisiana*, 554 U.S. 407,
419–21 (2008) (citation omitted).    With respect to the
question presented by this case, what matters is that (1) "to
ordinary citizens in the founding generation" it was widely
understood that legislatures could define an offense to be a
felony and impose the death penalty for it, *see Heller*, 554
U.S. at 577; and (2) § 922(g)(1)'s categorical disarmament
of felons does not violate any other provision of the
Constitution.

---

felonious by implication, though the word felony was not used in the
statute," and that "[i]n this country, with a few exceptions, the common
law classification has obtained; the principal felonies being received as
they originally existed, and their number being increased as the
exigencies of society prompted." 1 FRANCIS WHARTON, A TREATISE ON
THE CRIMINAL LAW OF THE UNITED STATES § 2, at 2 (Philadelphia, Kay
& Brother 6th ed. 1868).

### III

For the foregoing reasons, I conclude that § 922(g)(1)'s lifetime ban on possession of a firearm or ammunition by a convicted felon does not violate the Second Amendment and that Duarte's as-applied challenge fails. I therefore respectfully concur in the judgment.

---

VANDYKE, Circuit Judge, with whom IKUTA and R. NELSON, Circuit Judges, join as to Part I, concurring in the judgment in part and dissenting in part:

Steven Duarte was indicted for possessing a firearm while knowing he had been previously convicted of "a crime punishable by imprisonment for a term exceeding one year," in violation of 18 U.S.C. § 922(g)(1). Duarte was previously convicted of five non-violent criminal offenses in California, each of which carried a sentence of one year or more in prison: vandalism, Cal. Penal Code § 594(a); felon in possession of a firearm, *id.* § 29800(a)(1); possession of a controlled substance, Cal. Health & Safety Code § 11351.5; and two convictions for evading a peace officer, Cal. Veh. Code § 2800.2. The government conceded in pre-trial proceedings below that "none of [Duarte's] prior convictions are violent or involve fraud." Duarte did not challenge his indictment on Second Amendment grounds, as such an argument was foreclosed by our court's precedent in *United States v. Vongxay*, 594 F.3d 1111, 1114–18 (9th Cir. 2010).

After a jury trial, Duarte was convicted of violating § 922(g)(1). The Supreme Court then issued *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), which represented a dramatic shift from our court's approach to the

Second Amendment and upended our court's precedent, *see id.* at 15 (abrogating *Young v. Hawaii*, 992 F.3d 765, 773 (9th Cir. 2021) (en banc)). *Bruen* thus called into question our court's precedents holding that § 922(g)(1)'s felon-in-possession ban is constitutional in all applications. *See Vongxay*, 594 F.3d at 1118; *United States v. Phillips*, 827 F.3d 1171, 1174–76 (9th Cir. 2016). So on appeal Duarte brought an as-applied challenge to his conviction under the Second Amendment, arguing that the indictment failed to state an offense, and should thus be dismissed pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v).

A three judge-panel of our court reversed the district court, concluding that our precedent in *Vongxay* was "clearly irreconcilable" with *Bruen*, that Duarte was a part of "the people" protected by the Second Amendment, and that the government had not proved that § 922(g)(1)'s categorical prohibition, as applied to a nonviolent felon like Duarte, "'is part of the historical tradition that delimits the outer bounds of the' Second Amendment right." *United States v. Duarte*, 101 F.4th 657, 661–62 (9th Cir. 2024), *reh'g en banc granted, opinion vacated*, 108 F.4th 786 (9th Cir. 2024) (quoting *Bruen*, 597 U.S. at 19). Then a majority of our court voted to take this case en banc, vacating the panel opinion. *See Duarte*, 108 F.4th at 786; *see also id.* (VanDyke, J., disgrantle).

The majority of our en banc court now holds that under a de novo standard of review, applying § 922(g)(1) to Duarte does not violate the Second Amendment. In so holding, the majority makes a cavalcade of errors. First, the majority assumes that de novo review applies to Duarte's claims. The court should have instead disposed of this case under plain error review. Second, the majority concludes that our court's pre-*Bruen* precedent upholding § 922(g)(1) against

Second Amendment challenges is not inconsistent with intervening Supreme Court authority.  But given the paradigm change in Second Amendment jurisprudence that *Bruen* effected, the majority's conclusion is incorrect. Third, the majority concludes that legislatures have unilateral discretion to disarm anyone by assigning the label "felon" to whatever conduct they desire.  And fourth, the majority reaches the broad conclusion that legislatures can disarm entire classes of individuals, even absent a specific showing of individual dangerousness or propensity to violence.

## I. Standard of Review

The majority needed to go no further than the standard of review to decide this case.  Rather than "assum[ing] without deciding that de novo review applies," the majority should have applied plain error review and affirmed Duarte's conviction on that ground.  De novo review does not apply here under Federal Rule of Criminal Procedure 12, as Duarte contends.  Rather, Rule 52(b)'s plain error standard of review applies, and we should have used this opportunity while sitting as an en banc court to correct our erroneous exceptions to that standard.

Duarte's argument that de novo review should apply is wrong.  Rule 12(b) provides that certain defenses— including certain defects in the indictment—must be raised by motion before trial.  Fed. R. Crim. P. 12(b)(3)(B).  If a defendant fails to timely make such a motion, then the defense can later be considered only "for good cause."  *Id.* 12(c)(3).  And Rule 52(b) provides that on appeal a court may only consider an issue that "was not brought to the court's attention" below if that issue represents "[a] plain error that affects substantial rights."  We apply the familiar

four-part *Olano* test to determine whether an issue was "plain error." *United States v. Olano*, 507 U.S. 725, 732–35 (1993).

Against this backdrop, Duarte contends "that de novo review applies once a defendant-appellant shows Rule 12 good cause." The text of Rule 12 and Supreme Court precedent foreclose this argument. Rule 12 doesn't address appellate standards of review or "explicitly announce an exception to plain-error review." *Jones v. United States*, 527 U.S. 373, 388–89 (1999). So any argument that Rule 12 sets aside plain error upon a showing of good cause relies on an inference from silence. And on at least four occasions, the Supreme Court has refused to find exceptions to plain error based on inferences from silence. *See Johnson v. United States*, 520 U.S. 461, 466 (1997); *Jones*, 527 U.S. at 388–89; *United States v. Vonn*, 535 U.S. 55, 64 (2002); *Greer v. United States*, 593 U.S. 503, 511–12 (2021). The fact that Rule 12 is silent about appellate standards of review isn't a good reason to buck that trend. Especially because Rule 12 is focused entirely on trial-court proceedings.

Arguing otherwise, Duarte cites *United States v. Guerrero*, 921 F.3d 895, 897 (9th Cir. 2019) (per curiam), which described "Rule 12's good-cause standard as displacing the plain-error standard under [Rule] 52(b)." There, our court correctly observed that plain error review is "the default standard" for reviewing claims on appeal that were not raised below. *Id.* But the court nevertheless concluded that if a defendant can't show good cause for an untimely defense, his defense is "waived" entirely and can't be reviewed at all—not even for plain error. *Id.* Indeed, that was the case in *Guerrero*—the panel concluded that the defendant had not shown good cause, and

therefore the court did not review the merits of defendant's
arguments *at all*. *Id.* at 898.

*Guerrero* did not directly address the question posed to
us here. In *Guerrero*, the court decided whether a defendant
who fails to show good cause when required by Rule 12 can
get any review at all. In answering that question, *Guerrero*
said "no": if a defendant has not shown good cause he can
get no review at all. In that sense, Rule 12 "displaces" Rule
52(b)'s "plain error" standard. When a defendant fails to
satisfy Rule 12's requirement to raise a pre-trial defense—or
fails to show "good cause"—then the court's inquiry stops
at the Rule 12 analysis, and the court never even turns to the
Rule 52(b) analysis.

The question Duarte poses is different: whether a
defendant who *has* shown good cause for not raising a
required Rule 12 defense should obtain de novo or plain
error review when raising the required Rule 12 defense for
the first time on appeal. *Guerrero* did not directly address
that. In that instance, plain error review remains "the default
standard" for reviewing new claims on appeal that were not
raised at any time below, *id.* at 897, and thus the appellate
court must apply the plain error standard.

To put it another way, Rule 12's good cause standard is
not an alternative to Rule 52(b)'s plain error standard.
Instead, the good cause standard is an additional
"antecedent" requirement to be applied in tandem with Rule
52(b)'s plain error standard. *United States v. McMillian*, 786
F.3d 630, 636 (7th Cir. 2015). So when a defendant wants
to raise a Rule 12(b)(3) defense for the first time *on appeal*,
as Duarte seeks to do here, he must show both good cause
and plain error. Fed. R. Crim. P. 12(c)(3), 52(b). This is
how other circuits have interpreted the interaction between

the two rules. *See, e.g.*, *McMillian*, 786 F.3d at 636; *United States v. Mung*, 989 F.3d 639, 642 (8th Cir. 2021) ("[E]ven if he could show good cause, we would review his argument under the same plain error standard."); *United States v. Vance*, 893 F.3d 763, 770 (10th Cir. 2018) (applying good cause and plain error).

The upshot is that applying Rule 12 doesn't make it easier for Duarte to raise his Second Amendment arguments for the first time on appeal. It makes it harder. Rule 12 limits Duarte's ability to get even plain error review—if he can't show good cause, he's not entitled to any review at all. *Guerrero*, 921 F.3d at 898; *United States v. Wright*, 215 F.3d 1020, 1026–27 (9th Cir. 2000). That is why our court has made clear that "[p]lain error review applies on direct appeal even where an intervening change in the law is the source of the error." *United States v. Christensen*, 828 F.3d 763, 779 (9th Cir. 2015) (citing *Johnson*, 520 U.S. at 467–68).

The government does not meaningfully dispute that Duarte has good cause under Rule 12. Under our court's precedents, an intervening change in law satisfies Rule 12's good cause standard. *See United States v. Aguilera-Rios*, 769 F.3d 626, 629 (9th Cir. 2014). In *Aguilera-Rios*, our court held that there was "good cause" to consider a defendant's argument that had not been raised prior to trial pursuant to Rule 12(b)(3)(B) because the defendant "would have had no reason to challenge" the indictment at the district court as "this Court's caselaw … foreclosed the argument he now makes." *Id.* at 630–31. Similarly here, Duarte did not challenge his indictment because our precedent in *Vongxay* foreclosed his argument that § 922(g)(1) was unconstitutional. 594 F.3d at 1114–18; *see also Phillips*, 827 F.3d at 1175 ("[A]ssuming the propriety of felon firearm bans—as we must under Supreme Court

precedent and our own—there is little question that
Phillips's predicate conviction … can constitutionally serve
as the basis for a felon ban."). So Duarte has satisfied Rule
12's good cause requirement, and he is not barred entirely
from raising his Second Amendment challenge in this
appeal.

But because Duarte did not raise his Second Amendment
argument at any point below—either in a Rule 12(b) motion
or through another motion—under a plain reading of Rule
52(b) we must apply plain error review. *See, e.g.*, *United
States v. Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012)
("[C]onstitutional issues not originally raised at trial are
reviewed for plain error.").

But that is not the end of the matter, because the Ninth
Circuit has already muddied this otherwise clear rule by
crafting atextual exceptions to the plain error standard. For
example, our court has created an exception to Rule 52(b)'s
plain error standard when a "new issue arises while the
appeal is pending because of a change in the law." *United
States v. Valdivias-Soto*, 112 F.4th 713, 721 n.5 (9th Cir.
2024) (quoting *United States v. Grovo*, 826 F.3d 1207, 1221
n.8 (9th Cir. 2016)); *see also United States v. Flores-Payon*,
942 F.2d 556, 558 (9th Cir. 1991); *United States v. Carlson*,
900 F.2d 1346, 1349 (9th Cir. 1990). If this exception is
satisfied, we apply de novo review. *Valdivias-Soto*, 112
F.4th at 721 n.5.

This change-in-law exception would apply to Duarte's
claim. Just as *Bruen* was a change in law satisfying Rule
12's "good cause" requirement, *Bruen* was a sufficient
change to warrant application of our "change in the law"
exception to Rule 52(b), thus leading us to apply de novo

review. *See, e.g.*, *Grovo*, 826 F.3d at 1221 n.8; *Aguilera-Rios*, 769 F.3d at 629.

But this exception should never have been created, and the government has asked us to take advantage of the en banc posture of this case to jettison it. *Cf. United States v. Begay*, 33 F.4th 1081, 1090 n.3 (9th Cir. 2022) (en banc) ("The government did not ask us to revisit our precedent allowing the application of de novo review" under Rule 52(b).). I would accept that invitation. The exception is divorced from the text of Rule 52(b) and contradicts the Supreme Court's repeated rejection of exceptions to Rule 52(b).[1]

Rule 52(b) is mercifully short. It states: "[a] plain error that affects substantial rights may be considered even though

---

[1] Our court has also crafted another exception to Rule 52(b)'s plain error review in cases where the court is "presented with [1] a question that is purely one of law and [2] where the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court." *United States v. McAdory*, 935 F.3d 838, 841–42 (9th Cir. 2019) (alterations in original) (quoting *United States v. Garcia-Lopez*, 903 F.3d 887, 892 (9th Cir. 2018)). Both prongs of this exception would also appear to be met in this case, again leading to de novo review. Under the majority's chosen approach—upholding categorical bans on all felons—Duarte's claim raises a purely legal determination. *See United States v. Eckford*, 77 F.4th 1228, 1231 (9th Cir. 2023) (noting that application of the categorical approach is a "purely legal question"); *McAdory*, 935 F.3d at 842 ("[W]hether McAdory's prior convictions qualify as predicate felonies under § 922(g)(1) is a purely legal question."). And "[t]he Government suffers no prejudice because of [Duarte's] failure to raise the issue to the district court—at the time, under then-current law, the answer would have been obvious and in the Government's favor. On appeal, the effect of intervening law was the subject of supplemental briefing and the main focus of oral argument so the Government has had a full opportunity to present its views." *McAdory*, 935 F.3d at 842. This exception is also unwarranted, and we should overrule it.

it was not brought to the court's attention." Fed. R. Crim. P. 52(b). "Except in unusual circumstances, that is all there is to it: we must review new, unpreserved arguments for plain error." *United States v. Yijun Zhou*, 838 F.3d 1007, 1015 (9th Cir. 2016) (Graber, J., concurring). Our exception has no grounding in Rule's 52(b)'s plain text, the sine qua non for interpreting the Federal Rules of Criminal Procedure. *See In re Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1055 (9th Cir. 2018) (The Federal Rules of Criminal Procedure are "in every pertinent respect, as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard [a] Rule's mandate than they do to disregard constitutional or statutory provisions." (alteration in original) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988))).

A quick look at how this exception came about shows that it is not grounded in the text of Rule 52(b). The Ninth Circuit's exception materialized through an errant line in *United States v. Whitten*, where our court stated that "where a new theory or issue arises while an appeal is pending because of a change in the law," our court will review that issue in the first instance. 706 F.2d 1000, 1012 (9th Cir. 1983) (first citing *Hormel v. Helvering*, 312 U.S. 552, 557–58 (1941), then citing *Singleton v. Wulff*, 428 U.S. 106, 120–21 (1976)). The court's statement was entirely unnecessary to its opinion, as the appellant's argument was not based on new law, and so the exception did not apply. *Id.* And the two cases that *Whitten* relied upon when announcing this rule were not relevant to the proper interpretation of Rule 52. Neither was a criminal case, and thus neither had occasion to apply the Federal Rules of Criminal Procedure. *Hormel* was a civil taxation case, in which the Supreme Court held that a circuit court was correct to consider intervening

Supreme Court precedent in rendering its decision on an appeal from the Board of Tax Appeals. 312 U.S. at 557–58. *Hormel* did not discuss, and arguably has no bearing on, the proper interpretation of Rule 52 of the Federal Rules of Criminal Procedure. (Nor could it have discussed Rule 52, as the Federal Rules of Criminal Procedure were not adopted until several years later. *See* Order Adopting Federal Rules of Criminal Procedure, 327 U.S. 821 (1945).). And *Singleton* was a civil challenge to a state statute, again without opportunity to discuss the rules of criminal procedure. 428 U.S. at 120. It did not discuss a new law exception—it simply stated that "there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt or where 'injustice might otherwise result.'" *Id.* at 120–21 (citations omitted). In short, in *Whitten* our court conjured out of thin air an exception to Rule 52(b)'s plain error standard that was irrelevant to that case in any event.

In sharp contrast to what our court did in *Whitten*, the Supreme Court has repeatedly rebuffed litigants' and lower courts' efforts to create such exceptions. *See, e.g.*, *United States v. Young*, 470 U.S. 1, 15 (1985). In *Johnson*, the Court explained that courts have "no authority to make" exceptions to Rule 52(b) "out of whole cloth." 520 U.S. at 466; *see also Puckett v. United States*, 556 U.S. 129, 135–36 (2009) (criticizing judicially crafted exceptions to Rule 52(b)); *Davis v. United States*, 589 U.S. 345, 347 (2020) (per curiam) (noting that courts should not "shield any category of errors from plain-error review"). And the Supreme Court frequently considers claims based upon changes in law under a plain error standard. *See, e.g.*, *Greer*, 593 U.S. at 511–12; *Henderson v. United States*, 568 U.S. 266, 270–71 (2013);

*Johnson*, 520 U.S. at 464.  For example, in *Henderson*, the Court explained that the "plainness" of an error should be measured at "the time of review."  568 U.S. at 271.  That is, a change in law must be considered when determining whether the district court plainly erred.  But if a change in the law means that plain error does not apply (as our court says), then how could a change in law ever be considered when deciding the plainness of an error (as the Supreme Court commands)?  It can't.  The Court's statements flatly contradict our exception.

Our change-in-law exception also makes us an outlier among the circuits.  Other circuits have made clear they "review for plain error even if the objection would have lacked merit at the time of trial, before an intervening change in the law."  *United States v. Maez*, 960 F.3d 949, 956 (7th Cir. 2020); *see also United States v. Jobe*, 101 F.3d 1046, 1062 (5th Cir. 1996) ("permit[ting] defendants to assert plain error based on intervening changes in the law"); *United States v. David*, 83 F.3d 638, 644–45 (4th Cir. 1996) (applying plain error review to claim based upon change in law); *United States v. Kramer*, 73 F.3d 1067, 1074 & n.16 (11th Cir. 1996) (same); *United States v. Retos*, 25 F.3d 1220, 1230 (3d Cir. 1994) (same); *United States v. Viola*, 35 F.3d 37, 42 (2d Cir. 1994) (same); *United States v. Jones*, 21 F.3d 165, 172–73 (7th Cir. 1994) (same); *United States v. Pervez*, 871 F.2d 310, 314 (3d Cir. 1989) (same).[2]

---

[2] Other members of our court have raised the questionable provenance of the "pure questions of law" exception and stated that the exception should be reconsidered.  *See, e.g.*, *Zhou*, 838 F.3d at 1017 (Graber, J., concurring) ("[O]ur line of the cases permitting an exception for 'pure questions of law' is contrary to Rule 52(b), Supreme Court precedent,

Because our exception has no grounding in the text of Rule 52(b), contradicts Supreme Court holdings, and conflicts with our sister circuits, I would overrule it here. Then freed from following our erroneous precedent, we should apply plain error review to Duarte's Second Amendment challenge.

Applying plain error review, this is an easy case. "Plain error" requires an error that is "clear" or "obvious," *Olano*, 507 U.S. at 731. The error must be so "clear-cut, so obvious, a competent district judge should be able to avoid it without benefit of objection." *United States v. Bain*, 925 F.3d 1172, 1178 (9th Cir. 2019) (citation omitted). "An error cannot be plain where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results." *United States v. Wijegoonaratna*, 922 F.3d 983, 991 (9th Cir. 2019) (citation omitted).

There was no plain error by the district court. Given the split among the circuit courts over the constitutionality of § 922(g)(1) as applied to felons convicted of non-violent offenses, and our pre-*Bruen* precedent upholding the constitutionality of the statute, I cannot say that the district court's error was "clear" and "obvious." *Olano*, 507 U.S. at 731; *Bain*, 925 F.3d at 1178. Our sister circuits have reached the same conclusion, finding no plain error when presented with similar challenges to § 922(g)(1) after *Bruen*. *See, e.g.*, *United States v. Langston*, 110 F.4th 408, 420 (1st Cir. 2024); *United States v. Caves*, No. 23-6176-CR, 2024 WL 5220649, at *1 (2d Cir. Dec. 26, 2024); *United States v.*

---

and the practice of our sister circuits …. We ought to reconsider our errant line of cases en banc, either now or in a future appropriate case."); *United States v. Castillo*, 69 F.4th 648, 658 (9th Cir. 2023) (opinion of Wardlaw, J.).

*Dorsey*, 105 F.4th 526, 532 (3d Cir. 2024); *United States v. Johnson*, 95 F.4th 404, 416–17 (6th Cir. 2024); *United States v. Jones*, 88 F.4th 571, 574 (5th Cir. 2023) (per curiam); *United States v. Miles*, 86 F.4th 734, 740–41 (7th Cir. 2023). As a member of the en banc court—and after overruling our atextual exceptions to plain error review—I would have taken the same approach here and upheld Duarte's conviction for his failure to show any plain error.

## II. Merits of the Second Amendment Challenge

Although the majority could resolve this case under plain error review, it declines to do so. Instead, the majority addresses the merits of Duarte's Second Amendment challenge under de novo review, resolving conclusively for our circuit that § 922(g)(1) is constitutional in all of its applications. In doing so, the majority deepens a circuit split, intentionally taking the broadest possible path to uphold § 922(g)(1).**3** Because the majority refuses to

---

**3** *Compare United States v. Hunt*, 123 F.4th 697, 705, 707–08 (4th Cir. 2024) (concluding that "the possession of firearms by felons … fall[s] outside the scope of the [Second Amendment] right as originally understood" and that legislatures can categorically disarm classes of people (cleaned up) (citations omitted)), *United States v. Jackson*, 110 F.4th 1120, 1129 (8th Cir. 2024) (concluding "that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms" and "Congress acted within the historical tradition when it enacted § 922(g)(1)"), *Vincent v. Bondi*, 127 F.4th 1263, 1266 (10th Cir. 2025) (upholding the constitutionality of § 922(g)(1) "for all individuals convicted of felonies" including the "application of § 922(g)(1) to nonviolent offenders"), and *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024), *cert. granted, judgment vacated,* No. 24-5744, 2025 WL 76413 (U.S. Jan. 13, 2025) (concluding that *Bruen* did not abrogate the court's prior precedent upholding § 922(g)(1) against a Second Amendment challenge), *with Range v. Att'y*

overrule our court's exceptions to the plain error standard, I
would begrudgingly apply them here and reach the merits of
Duarte's Second Amendment challenge under a de novo
review. And under de novo review the majority is wrong on
the merits of Duarte's Second Amendment claim, so I
dissent from that portion of the majority's opinion.

### A.  The Second Amendment Historical Analysis

Before turning to the merits of Duarte's Second
Amendment challenge, I provide a brief description of the
historical analysis the Supreme Court has directed us to
follow when evaluating the scope of the individual right to
"keep and bear" firearms. U.S. Const. amend. II. *Bruen*
clarified "that the Second Amendment's text, history, and
tradition are the '[o]nly' avenues to justify a firearm
regulation." *United States v. Perez-Garcia*, 96 F.4th 1166,
1175 (9th Cir. 2024) (alteration in original) (quoting *Bruen*,
597 U.S. at 17). This involves a two-step inquiry in the face
of Second Amendment challenges. *Bruen*, 597 U.S. at 17.
First, we look at whether "the Second Amendment's plain
text covers an individual's conduct." *Id.* If so, "the
Constitution presumptively protects that conduct." *Id.* But
because, "'[l]ike most rights, … 'the right secured by the
Second Amendment is not unlimited,'" we must look to our
nation's "'historical tradition of firearm regulation' to help
delineate the contours of the right." *United States v. Rahimi*,

---

*Gen. United States*, 124 F.4th 218, 222 (3d Cir. 2024) (en banc) (holding
that § 922(g)(1) was unconstitutional as applied to a non-violent felon),
*United States v. Diaz*, 116 F.4th 458, 471 (5th Cir. 2024) (rejecting an
as-applied challenge because the defendant's underlying felony was
sufficiently similar to a death-eligible felony at the founding), *and
United States v. Williams*, 113 F.4th 637, 662 (6th Cir. 2024) (rejecting
an as-applied challenge because the defendant's criminal record showed
that he was sufficiently dangerous to warrant disarmament).

602 U.S. 680, 691 (2024) (first quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), then quoting *Bruen*, 597 U.S. at 17).

It is the government's burden to show that a challenged regulation is consistent with our historical traditions, and it must do so by showing that the "challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692 (citing *Bruen*, 597 U.S. at 26–31). In doing so, we consider whether the government has shown that "the new law is 'relevantly similar' to laws that our tradition is understood to permit.'" *Id.* (quoting *Bruen*, 597 U.S. at 29). The government does so by identifying "historical precursors" supporting the challenged law's constitutionality. *Id.* "Why and how the regulation burdens the right are central to this inquiry." *Id.* (citing *Bruen*, 597 U.S. at 29). The challenged and historical laws are "relevantly similar" only if they share a common "why" *and* "how": they must both (1) address a comparable problem (the "why") and (2) place a comparable burden on the right holder (the "how"). *Id.*; *Bruen*, 597 U.S. at 27–30. While the government "need not [present] a 'dead ringer' or a 'historical twin'" to be successful, it must present at least an analogous historical regulation with a sufficiently similar "why" and "how." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30).

With that background in place, I turn to responding to the majority's analysis of Duarte's Second Amendment claims.[4]

---

[4] I do not address the majority's conclusions at *Bruen*'s first step, *see* 597 U.S. at 17, because I agree that Duarte's challenged conduct is covered by the text of the Second Amendment, and that Duarte is a part of "the People" protected by the Second Amendment's guarantees.

## B.  The Status of our Pre-*Bruen* Precedent

At the outset, the majority incorrectly concludes that *Bruen* did not affect the holding or analysis of our court's precedent rejecting Second Amendment challenges to § 922(g)(1). *See Vongxay*, 594 F.3d at 1114–18.  *Bruen* abrogated that precedent. *See* 597 U.S. at 15.  While sitting as an en banc court, we are not bound by our prior circuit precedent, nor are three-judge panels bound by our circuit precedent when the holding or reasoning of an intervening Supreme Court or en banc case is "clearly irreconcilable" with our prior decision. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).  When the "Supreme Court decisions have taken an approach that is fundamentally inconsistent with the reasoning of our earlier circuit authority," *id.* at 892, that alone "[i]s enough to render them 'clearly irreconcilable'" with one another, *Langere v. Verizon Wireless Servs., LLC*, 983 F.3d 1115, 1121 (9th Cir. 2020) (citation omitted).

The Second Amendment regime courts are now supposed to operate under is very different than the law we applied when our court upheld § 922(g)(1) in *Vongxay*. *Bruen* explicitly rejected the analytical framework that our court, and many others, had applied when addressing Second Amendment challenges, *see* 597 U.S. at 19 (rejecting our court's former "two-step approach" as "one step too many," and rejecting "applying means-end scrutiny in the Second Amendment context").

Our old test bears no relationship to *Bruen*'s test, which looks for "consisten[cy] with the principles that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 692, and compares the "how and why" of the founding generation's regulations

to the "how and why" of the modern regulation, *Bruen*, 597 U.S. at 29.

*Vongxay*, and the cases it relied upon, did not follow anything resembling *Bruen*'s text-history-and-tradition "mode of analysis." *Miller*, 335 F.3d at 900 ("[L]ower courts a[re] bound not only by the holdings of higher courts' decisions but also by their 'mode of analysis.'" (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989))). Rather, *Vongxay* relied on a handful of prior circuit court decisions, then turned to *Heller*'s passing footnote referring to "longstanding" felon firearm bans as "presumptively lawful." *See Phillips*, 827 F.3d at 1174 ("[W]e held in *United States v. Vongxay*, that 'felons are categorically different from the individuals who have a fundamental right to bear arms,'" "based on th[e] language" in *Heller* that "'longstanding prohibitions on the possession of firearms by felons' … were 'presumptively lawful'" (citations omitted)). In short, *Vongxay* wholly omitted *Bruen*'s two-step methodology, and thus its reasoning is "clearly irreconcilable" with *Bruen*'s "mode of analysis" for analyzing Second Amendment challenges. *Miller*, 335 F.3d at 893, 900.

To be sure, our sister circuits are split on the question of whether *Bruen* abrogated their pre-*Bruen* precedent regarding § 922(g)(1). *Compare Dubois*, 94 F.4th at 1293 (concluding *Bruen* did not abrogate circuit prior precedent upholding § 922(g)(1)), and *Vincent v. Garland*, 80 F.4th 1197, 1200–02 (10th Cir. 2023) (same), *with Range*, 124 F.4th at 225 (concluding that *Bruen* abrogated circuit precedent), *Diaz*, 116 F.4th at 471 (same), *Williams*, 113 F.4th at 645–46 (same), and *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) ("We must undertake the text-and-history inquiry the Court so plainly announced and

expounded upon at great length."). But our court applies a more "flexible approach" than other circuits when determining whether circuit precedent has been abrogated by intervening authority. *Miller*, 335 F.3d at 899. In contrast with the more restrictive standards our sister circuits require, to abrogate a prior decision of ours the intervening authority need only be "closely related" to the prior circuit precedent and need not "expressly overrule" its holding. *Id.*[5]

Our en banc court here should have made clear that our pre-*Bruen* decisions applying a mode of analysis other than *Bruen*'s text-history-and-tradition approach are no longer binding upon future panels of our court. Instead, the majority further bakes in our outdated and erroneous precedent.

### C. Reliance on *Heller*'s "Presumptively Lawful" Footnote

The majority's continued reliance on *Vongxay*'s analytical approach is emblematic of another problem with Second Amendment jurisprudence in this Circuit: using "cherrypicked language" that is "mis- and over-applied from the Court's prior precedents" to uphold any firearms regulation that comes before it. *Duarte*, 108 F.4th at 788 (VanDyke, J., disgrantle). "[J]udges who are more

---

[5] *Compare, e.g.*, *Dubois*, 94 F.4th at 1293 ("An intervening Supreme Court decision abrogates our precedent only if the intervening decision is both 'clearly on point' and 'clearly contrary to' our earlier decision…. To abrogate a prior-panel precedent, 'the later Supreme Court decision must "demolish" and "eviscerate" each of its "fundamental props."'" (citations omitted)); *Vincent*, 80 F.4th at 1201 ("[W]e can't jettison [our precedent] just because it might have been undermined in *Bruen*. We must instead determine whether *Bruen* indisputably and pellucidly abrogated [our precedent]." (citations omitted)).

interested in sidestepping than following the Court's Second Amendment precedent will latch onto phrases like 'presumptively lawful' … while conveniently overlooking such bothersome details like the government's burden of supplying relevantly similar historical analogues." *Id.* That is exactly what *Vongxay* did, and what the majority here continues to do.

The majority extracts from *Heller*'s footnoted statement that felon-in-possession laws are "presumptively lawful" the apparent per se rule that *all* felon-in-possession laws are constitutional, warranting "the categorical application of § 922(g)(1) to felons." "[A]pplying *Heller*'s dicta uncritically," as our court continues to do, is "at odds with *Heller* itself, which stated courts would need to 'expound upon the historical justifications' for firearm-possession restrictions when the need arose." *Williams*, 113 F.4th at 648 (quoting *Heller*, 554 U.S. at 635). Nevertheless, the majority doubles-down on our pre-*Bruen* precedent "to foreclose Second Amendment challenges to § 922(g)(1), regardless of whether an underlying felony is violent or not." But "[m]aking the leap from *presumptively* constitutional to *always* constitutional … is too much for that overused line to bear, no matter how you read it." *United States v. Jackson*, 121 F.4th 656, 658 (8th Cir. 2024) (Stras, J., dissental).

*Heller* speaks only in terms of a presumption. A presumption must be defeasible. *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("'[P]resumptively lawful' ... by implication[] means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge."). So the Court's statement that felon-in-possession laws are only *presumptively* lawful implies that felon-in-possession laws must be unlawful in at

least *some* instances. *See Jackson*, 121 F.4th at 658 (Stras, J., dissental). And it is especially unusual to put such weight on *Heller*'s dicta that felon-in-possession laws are presumptively constitutional, because it is black-letter law that *all* legislation is entitled to a presumption of constitutionality. *See, e.g.*, *Davis v. Dep't of Lab. & Indus. of Washington*, 317 U.S. 249, 257 (1942); *O'Gorman & Young, Inc. v. Hartford Fire Ins. Co.*, 282 U.S. 251, 257–58 (1931). But no one thinks that *that* longstanding presumption gives statutes passed by Congress blanket immunity from searching constitutional scrutiny.

Stretching the language of *Heller*'s "presumption" beyond what it can bear is par for the course on our court. The majority's holding continues a trend in our court's cases relying on *Heller*'s "presumptively lawful" footnote to sidestep the otherwise governing standard. 554 U.S. at 627 & n.26. You might call it our court's Second Amendment fiat-by-footnote. In *Heller*, the court identified at least four types of regulations that are presumptively lawful:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on [1] the possession of firearms by felons and [2] the mentally ill, or [3] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or [4] laws imposing conditions and

> qualifications on the commercial sale of arms.

*Id.* at 626–27.     Our court has taken each of these "presumptively lawful" regulations outside of the "heavy burden" that *Bruen* imposes on the government to justify its regulations.  *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024).

Consider "sensitive places" prohibitions.  *Heller*, 554 U.S. at 626; *see generally* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 203 (2018).  Our court recently upheld certain "sensitive places" prohibitions that Hawaii and California enacted.  *See Wolford v. Lopez*, 116 F.4th 959, 1002–04 (9th Cir. 2024); *see also Wolford v. Lopez*, 125 F.4th 1230, 1232 (9th Cir. 2025) (VanDyke, J., dissental) (detailing errors in the panel opinion).     Relying in part on *Heller*'s "presumptively lawful" footnote, the *Wolford* panel concluded that it could apply a "more lenient standard … when analyzing the regulation of firearms at 'sensitive places.'"  *Wolford*, 116 F.4th at 978–79.    In other words, our court held the government to a lower standard—let's call it *Bruen*-lite— when identifying "relevantly similar" historical analogues for sensitive places laws.

Or look at the way that our court has treated laws that impose "conditions and qualifications on the commercial sale of arms," another of *Heller*'s "presumptively lawful" categories.     554 U.S. at 626–27 & n.26.  In *B & L Productions, Inc. v. Newsom*, our court held that commercial restrictions presumptively fall outside the plain text of the Second Amendment altogether.  104 F.4th 108, 119 (9th Cir. 2024).     Notwithstanding the paradigm shift in Second

Amendment law that *Bruen* announced, the *B & L Productions* panel adopted the exact same approach our court had taken years before, which concluded that "*Heller*'s assurance that laws imposing conditions and qualifications on the commercial sale of firearms are presumptively lawful makes us skeptical … that retail establishments can assert an independent, freestanding right to sell firearms under the Second Amendment." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc); *B & L Prods.*, 104 F.4th at 119 ("the approach we took in *Teixeira* ... remains appropriate").

And our court upheld § 922(g)(4)'s prohibition on the possession of firearms by those who are mentally ill in *Mai v. United States*, 952 F.3d 1106, 1121 (9th Cir. 2020). There, the court all but held that § 922(g)(4) did not burden Second Amendment rights based upon *Heller*'s presumptively lawful language. *See id.* at 1114 (reiterating the government's argument that "§ 922(g)(4) does not burden Second Amendment rights" because "[t]he Supreme Court identified as presumptively lawful" the prohibitions on the possession of firearms by the mentally ill) (citation omitted); *Mai v. United States*, 974 F.3d 1082, 1098 (9th Cir. 2020) (VanDyke, J., dissental) (disagreeing with the panel's conclusion that "Mr. Mai's long-ago mental illness forever excludes him from the community of 'law-abiding, responsible citizens' under the Second Amendment (i.e., once mentally ill, always so)"); *id.* at 1090 (Bumatay, J., dissental) ("*Heller*'s observations about 'presumptively lawful regulatory measures' does not change this analysis. *Heller*'s reference to firearm prohibitions for the 'mentally ill' as being 'presumptively lawful,' appl[ies] to those who are *presently* mentally ill." (citations omitted)).

Finally, the majority here relies on *Heller*'s "presumptively lawful" language once more to adopt a per se rule upholding felon-in-possession bans. That is just as wrong as each of our court's earlier decisions relying on *Heller*'s "presumption" footnote to sidestep *Bruen*'s text-history-and-tradition test.

The Supreme Court has provided one test for assessing the constitutionality of regulations on the right to bear arms. "[T]he Second Amendment's text, history, and tradition are the '[o]nly' avenues to justify a firearm regulation." *Perez-Garcia*, 96 F.4th at 1175 (alteration in original) (quoting *Bruen*, 597 U.S. at 17)). Our court makes a "category error in its analysis" when it concludes that such regulations are not "subject to [the full scope of] *Bruen*'s test." *Reese v. A.T.F.*, 127 F.4th 583, 590 n.2 (5th Cir. 2025). By watering down this test, or sidestepping it completely, our court "place[s] more weight on these passing references than the Court itself did." *Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019) (citation omitted). "Nothing allows us to sidestep *Bruen* in the way" the majority proposes. *Atkinson*, 70 F.4th at 1022; *see also id.* ("We must undertake the text-and-history inquiry the Court so plainly announced and expounded upon at great length.").

The majority's approach here confirms once more that Second Amendment jurisprudence in our circuit is not principally one of reason or logic. It does not actually rely on general historical "principles," distilled from history and tradition, or the holdings and reasoning of Supreme Court precedent. Rather, ours is a jurisprudence built on throwaway lines and footnotes. *See United States v. Perez-Garcia*, 115 F.4th 1002, 1008 (9th Cir. 2024) (VanDyke, J., dissental); *Duarte*, 108 F.4th at 788 (VanDyke, J., disgrantle). We disregard holdings to

embrace dictum. And we set aside a coherent
methodological approach for ad hoc exceptions justifying
our court majority's policy preferences. The Supreme Court
has demanded better of us—as does the Constitution—for
"the right to keep and bear arms is among the 'fundamental
rights necessary to our system of ordered liberty.'" *Rahimi*,
602 U.S. at 690 (quoting *McDonald*, 561 U.S. at 778); *see
also id.* ("As a leading and early proponent of emancipation
observed, 'Disarm a community and you rob them of the
means of defending life. Take away their weapons of
defense and you take away the inalienable right of defending
liberty.'" (quoting Cong. Globe, 40th Cong., 2d Sess., 1967
(1868) (statement of Rep. Stevens))).

### D. The Greater Includes the Lesser Rationale

The majority purports to derive from the historical record
the "regulatory principle" that "legislatures may disarm
those who have committed the most serious crimes." In
doing so, the majority endorses the government's argument
that because, in 1791, "the greater punishment of death and
estate forfeiture was permissible to punish felons, [the]
lesser restriction of permanent disarmament is also
permissible." The majority's argument breaks down in at
least three respects. First, the three historical sources the
majority cites are insufficient to show an "unbroken
understanding that the legislature could permanently disarm
those who committed the most serious crimes consistent
with the Second Amendment." Second, capital punishment
and estate forfeiture were imposed as punishment for only a
few felonies. The death penalty was not, as the majority
contends, "'the standard penalty for all serious crimes' at the
time of the founding." And third, the majority's argument
presupposes that the felonies at the founding were equivalent

to felonies today.  But that's obviously false; many felonies today bear little resemblance to felonies at the founding.

### 1. Historical Disarmaments

The majority's evidence of the "unbroken understanding that the legislature could permanently disarm those who committed the most serious crimes" is just one Colonial-era English enactment and two *draft* proposals from the Founding-era and succeeding decades.  The paucity of that historical record speaks for itself.  *Bruen* doubted that three Colonial-era laws were enough to show a historical tradition.  597 U.S. at 46 ("For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.").  The historical evidence the majority musters is even sparser than that which *Bruen* found inadequate.  But even beyond that, each of the historical analogues the majority points to also fails as a historical analogue on its own terms.

First, the majority points to the 1689 English Bill of Rights, characterized as the "predecessor to our Second Amendment."  This Bill of Rights provided "[t]hat the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by law."  Bill of Rights 1688, 1 W. & M. Sess. 2 c. 2, sch. 1. (Eng.); *see also* 6 William Searle Holdsworth, *A History of English Law* 241 (1924) (explaining that Parliament added this provision to the Bill of Rights in response to James II's refusal to allow Protestants the right to carry arms).  But notwithstanding the ostensible limitation of this right "as allowed by law," "[t]here is no evidence that any Protestants were excluded from the 1689 arms right for being insufficiently loyal or law-abiding."  *See* Joseph G.S. Greenlee, *Disarming the Dangerous: The American*

*Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 23 (2024) [hereinafter Greenlee, *Disarming the Dangerous*]; *see also* 5 William Blackstone, *Commentaries* 57 (St. George Tucker ed. 1803) [hereinafter Blackstone, *Commentaries*] ("[T]hese laws are seldom exerted to their utmost rigour" and "if they were, it would be very difficult to excuse them."). And there were multiple "statements made during debates in Parliament that suggest all Protestants were protected by the right, regardless of their condition." Greenlee, *Disarming the Dangerous* at 23; *see also* 5 *Cobbett's Parliamentary History of England* 183 (London, T.C. Hansard 1809) ("If you find not a way to convict them [for being Catholic], you cannot disarm them." (statement of W. Wogan)); 9 *Debates of the House of Commons, From the Year 1667 To the Year 1694*, at 170 (London, D. Henry, R. Cave & J. Emonson 1763) ("[B]eing not convicted [for being Catholic] they will say they are not concerned ... and not one man will ... deliver their arms." (statement of Speaker H. Powle)).

The founders also rejected the limitations on the right to bear arms set out in the 1689 English Bill of Rights. Greenlee, *Disarming the Dangerous* at 25; *see also Bridges v. California*, 314 U.S. 252, 264 (1941) ("[T]o assume that English common law in this field became ours is to deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law….'" (citations omitted)). The right codified in the 1689 English Bill of Rights had "matured" and expanded by the founding, *Bruen*, 597 U.S. at 45, with Americans "swe[eping] aside" England's "as allowed by law" limitation. Joyce Lee Malcolm, *To Keep and Bear Arms* 136–37, 162 (1994). When James Madison introduced the Second Amendment in Congress, he criticized the

limitations on the right to bear arms in the English Bill of
Rights, including that it only protected the right of
Protestants. *See* James Madison, *Notes for speech in
Congress supporting Amendments* (June 8, 1789) (reprinted
in 12 *The Papers of James Madison* 193–94 (Charles F.
Hobson et al. eds., 1979))*.* Thomas Cooley explained how
the Second Amendment "was adopted with some
modification and enlargement from the English Bill of
Rights of 1688." Thomas M. Cooley, *The General
Principles of Constitutional Law in the United States of
America* 270 (Boston, Little, Brown & Co. 1880). And
William Rawle's "influential treatise" on the Constitution,
*Heller*, 554 U.S. at 607, contrasted the "cautiously
described" English Bill of Rights—as it was "secured to
protestant subjects only" and only protected "bearing arms
for their defence, 'suitable to their conditions, and as allowed
by law'"—with the more expansive American right, William
Rawle, *A View of The Constitution of The United States of
America* 126 (Philadelphia, Philip H. Nicklin ed. 1829). In
sum, the 1689 English Bill of Rights does not support the
majority's purported principle because it was not actually
used to disarm those who had committed crimes and the
founders explicitly departed from its limitations on the right
to bear arms found in *our* Bill of Rights. *See also Bruen*,
597 U.S. at 35 ("[C]ourts must be careful when assessing
evidence concerning English common-law rights.... English
common-law practices ... cannot be indiscriminately
attributed to the Framers of our own Constitution.").

Second, the majority emphasizes that "[i]n
Pennsylvania, Anti-Federalist delegates—who were
adamant supporters of a declaration of fundamental rights—
proposed that the people should have a right to bear arms
'unless for crimes committed, or real danger of public injury

from individuals.'" But that proposal was just that: a proposal. It went nowhere. "[N]one of the relevant limiting language made its way into the Second Amendment" from this convention, nor from any of the other state ratifying conventions that the government points to. *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting); *see also* 1 Jonathan Elliot, *The Debates in The Several State Conventions on The Adoption of The Federal Constitution* 326 (Washington, Jonathan Elliot 1836) (New Hampshire proposal); 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971) (Massachusetts proposal). The Pennsylvania minority proposal failed to even obtain a majority of its own convention. *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). This failed proposal is not enough to support the permanent disarmament of all felons. And this proposal was not "about felons in particular or even criminals in general," but rather those whose conduct "threatened violence and the risk of public injury." *Id.* at 456. "If 'crimes committed' refers only to a subset of crimes, that subset must be defined; using 'real danger of public injury' to draw the line is both internally coherent and consistent with founding-era practice." *Id.*

Third and finally, the majority cites a draft criminal code that Edward Livingston proposed for the state of Louisiana. As the majority describes it, this code would have abolished the death penalty for certain crimes, replacing it instead with "permanent forfeiture of certain rights, including the 'right of bearing arms.'" It bears repeating that this too was a *draft* criminal code—as with Pennsylvania's convention proposal, the code was never adopted. Given the minimal probative value of such a draft code, it is no surprise that the government never raised it in its briefing to this court. Instead, the majority errs by bringing in historical evidence of its own volition. *See Baird v. Bonta*, 81 F.4th 1036, 1041

(9th Cir. 2023) ("A district court should not try to help the government carry its burden by sifting historical materials to find an analogue." (internal alterations and citation omitted)). As the Supreme Court has made clear, it is the government's burden to identify historical analogues supporting the government's regulations, not the court's. *See Rahimi*, 602 U.S. at 691 ("[W]hen the Government regulates arms-bearing conduct, ... it bears the burden to 'justify its regulation.'" (citation omitted)); *Bruen*, 597 U.S. at 24 ("The government must ... justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.").

In sum, the majority fails to point to any historical evidence that actually supports its supposed "unbroken understanding" of permanently disarming felons. The government and the majority thus fail to situate § 922(g)(1) in a "historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. It is perhaps unsurprising, then, that the majority attempts to compensate by pointing to a different analog— the purported practice of consistently executing felons at the founding.

## 2. The Majority's Cold, Dead Fingers Rationale

The majority's death-equals-disarmament argument is no more persuasive than its historical evidence for disarming felons. The majority contends that dead people can't keep or bear arms, and "death was 'the standard penalty for all serious crimes' at the time of the founding.'" But the historical support for that statement is "shaky." *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting). During the colonial era, through the founding, and in the succeeding years, the death penalty was steadily divorced from serious crimes.

"[E]ven before the Founding, the link between felonies and capital punishment was frayed." *Folajtar v. Attorney General*, 980 F.3d 897, 920 (3d Cir. 2020) (Bibas, J., dissenting). In Blackstone's telling, at common law not all felonies faced capital punishment; it was only certain felonies "according to the degree of guilt," "to which capital or other punishment may be superadded." 5 Blackstone, *Commentaries*, 95; *see also id.* at 97 ("Felony may be without inflicting capital punishment … and it is possible that capital punishments may be inflicted, and yet the offence be no felony …."). The American colonies further limited the scope of crimes eligible for the death penalty relative to the English Common Law. *Folajtar*, 980 F.3d at 920 (Bibas, J., dissenting).

And even for those crimes that were capital, "[t]he colonies carried out the death penalty 'pretty sparingly,' and '[p]roperty crimes were, on the whole, not capital.'" *Id.* (quoting Lawrence M. Friedman, *Crime and Punishment in American History* 42 (1993)). "Colonial Pennsylvania, for instance, on average sentenced fewer than two people per year to die and executed only one of those two per year." *Id.* (citation omitted). And in 1682, Pennsylvania "limited imposition of the death penalty to 'willful murder.'" June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517, 531 (1983) [hereinafter Carbone, *Principles in Bail*] (quoting 2 Charles P. Keith, *Chronicles of Pennsylvania 1688–1748*, at 586 (1917)). In short, "[a]t the common law, few felonies, indeed, were punished with death." James Wilson, *Lectures on Law*, *in* 2 *Collected Works of James Wilson* 242 (Kermit L. Hall & Mark David Hall eds., 2007) [hereinafter, Wilson, *Lectures*]; *see also* 1 Wilson, *Lectures on Law* 343 ("How few are the

crimes—how few are the capital crimes, known to the laws
of the United States, compared with those known to the laws
of England!").

The relationship between the death penalty and felonies
continued to diverge at the founding. "[M]any states were
moving away from making felonies … punishable by death
in America." *Range*, 124 F.4th at 227. Founder James
Wilson explained that while, in theory, "the idea of [a]
felony [wa]s very generally ... connected with capital
punishment," in practice, this "inference[] ... [wa]s by no
means entitled the merit of critical accuracy." 2 Wilson,
*Lectures* 242. And James Madison explained in The
Federalist that the term "felony is a term of loose
signification, even in the common law of England." *The
Federalist No. 42*, at 234 (Clinton Rossiter ed., 1961) (James
Madison). What defined a felony "is not precisely the same
in any two of the States; and varies in each with every
revision of its criminal laws." *Id.* As a result, there were
"many felonies, not one punished with forfeiture of estate,
and but a very few with death."[6] 6 Nathan Dane, *A General*

---

[6] *See, e.g.*, Act for the Punishment of Diverse Capital and Other Felonies,
*in Acts and Laws of the State of Connecticut in America* 182–83
(Hartford, Hudson & Goodwin 1796) (listing various "felonies" but
punishing only some capitally (*e.g.*, bestiality, arson, bearing false
witness); Act for the Punishment of Certain Atrocious Crimes and
Felonies, *in Acts and Laws of the State of Connecticut in America, supra*,
at 183–86 (listing various "felonies" that were punished with a term of
imprisonment (*e.g.*, forgery, counterfeiting, attempted rape, horse theft,
robbery)); *General Laws of Pennsylvania, from the Year 1700 to April
22, 1846*, at 155 (Philadelphia, T. & J.W. Johnson 1847) (abolishing
capital punishment for *all* crimes except first-degree murder); An Act to
Prevent the Stealing and Taking away of Boats and Canoes, *in* 1 *The
Laws of the Province of South Carolina* 49 (Nicholas Trott, ed. 1736)

*Abridgment and Digest of American Law* 715 (Boston, Cummings, Hilliard & Co. 1824).

In the years immediately after the Founding, the relationship became even more attenuated. *See Perez-Garcia*, 1115 F.4th at 1018–19 (VanDyke, J., dissental) (detailing this relationship). For example, of more than twenty crimes the first Congress defined in The Crimes Act of 1790, only seven were punishable by death. *See* Act for the Punishment of Certain Crimes Against the United States, ch. 9, §§ 1–28, 1 Stat. 112, 112–18 (1790). Manslaughter, perjury, mayhem (the intentional maiming of another person), and larceny were all non-capital offenses, punished with imprisonment for a term of years. *Id.* §§ 7, 13, 16, 18. And even for the "nonviolent crimes such as forgery and horse theft" that the majority points to, "by the early Republic, many states assigned lesser punishments." *Range*, 124 F.4th at 231.

After the founding, a movement also began to narrow the list of capital crimes to "murder alone, or murder and rape in some states." Carbone, *Principles in Bail* at 535. "By 1798,

_____

(punishing boat theft with "corporal punishment" and a fine "if the Matter of Fact be a Felony"); 1793 Act Respecting the Punishment of Criminals, *in* 2 *The Laws of Maryland* chap. LVII, § 10 (William Kilty ed. 1800) (empowering justices of the court to, "in their discretion," sentence males convicted of "[a]ny felony" "to serve and labour for any time[] ... not exceeding seven years"); 1801 Act Declaring the Crimes Punishable with Death or with Imprisonment in the State Prison, *in* 1 *The Laws of the State of New York* 254 (Albany, Charles R. & George Webster 1802) (committing any person "duly convicted ... of any felony," with certain enumerated exceptions, to a "term [of imprisonment] not more than fourteen years"); *see also* 2 Timothy Cunningham, *A New and Complete Law Dictionary*, Felony (2d ed. 1771) (describing punishments for various felonies as ranging from death and estate forfeiture to imprisonment and hard labor).

five states had abolished it for all crimes besides murder."
Mugambi Jouet, *Death Penalty Abolitionism from the
Enlightenment to Modernity*, 71 Am. J. Comp. L. 46, 69
(2023). "Within two decades of gaining independence from
England, the states of the Union had replaced execution with
incarceration as the punishment for all but a few crimes."
Will Tress, *Unintended Collateral Consequences: Defining
Felony in the Early American Republic*, 57 Clev. St. L. Rev.
461, 468 (2009). Michigan abolished the death penalty for
all crimes but treason in 1846, and Rhode Island and
Wisconsin each abolished the death penalty entirely between
1852 and 1853. *See* John D. Bessler, *The Death Penalty in
Decline: From Colonial America to the Present*, 50 Crim. L.
Bull. 245, 258 (2014); Franklin E. Zimring & Gordon
Hawkins, *Capital Punishment and the American Agenda* 28
(1986). Indeed, Edward Livingston's proposed criminal
code for Louisiana, on which the majority stakes much of its
historical argument, was part of this movement to eliminate
the death penalty as part of the criminal law. So the
historical evidence belies the majority's claim that "death
was 'the standard penalty for all serious crimes' at the time
of the founding."

Absent the relationship at the founding between the
historical punishments for felonies and § 922(g)(1), the
majority's rationale crumbles. To get around the absence of
historical support, the majority contends that "history need
not show that *every* felony was punished with death and
estate forfeiture.... Instead, the exposure to capital
punishment and estate forfeiture is sufficient to demonstrate
that the founding generation would view § 922(g)(1)'s
permanent disarmament as consistent with the Second
Amendment." But "[t]he Founding-era practice of
punishing some nonviolent crimes with death does not

suggest that the *particular* (and distinct) punishment at issue here—de facto lifetime disarmament for all felonies and felony-equivalent misdemeanors—is rooted in our Nation's history and tradition." *Range*, 124 F.4th at 231. So "the historical evidence belies the [majority's] necessary link in its analysis." *Perez-Garcia*, 1115 F.4th at 1018 (VanDyke, J., dissental). The "history confirms that the basis for the permanent and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon or to the uniform severity of punishment that befell the class." *Kanter*, 919 F.3d at 461 (Barrett, J., dissenting).

Moreover, even putting aside the ahistorical foundation for the majority's attempted analogy, its death-equals-disarmament equivalence still fails. "The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society." *Id.* at 462 (Barrett, J., dissenting). "No one suggests that [someone with a felony conviction] has no right to a jury trial or [to] be free from unreasonable searches and seizures." *Williams*, 113 F.4th at 658. "Dead men do not speak, assemble, or require protection from unreasonable searches and seizures …." *United States v. Jackson*, 85 F.4th 468, 474 (8th Cir. 2023) (Stras, J., dissental). But "we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding." *Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting).

How can the "greater include the lesser" rationale work when the claimed "greater" (capital punishment of all, or even most, felonies) was in fact a historical fiction? It can't. And what can the founders' greater willingness to apply capital punishment tell us about whether they would disarm

those *not* sentenced to death? Nothing. But those aren't the only flaws with the majority's historical analysis. The majority is also wrong to uncritically equate modern-day felonies with those at the founding, the point I turn to next.

### 3. The Difference Between Modern and Founding-era Felonies

The majority cannot dispute that "today's felonies do not correspond with felonies at the founding that were eligible for death and estate forfeiture." And the majority rightly concedes that "[t]he felony category then was a good deal narrower than now." "Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies." *Tennessee v. Garner*, 471 U.S. 1, 14 (1985). For example, the crime of vandalism—one of Duarte's prior convictions—would have been a misdemeanor at the founding. *United States v. Collins*, 854 F.3d 1324, 1333 (11th Cir. 2017) (describing "malicious mischief" as "the closest common-law offense for damaging another's property"); *see, e.g.*, Act of 1772, in *An Abridgment of the Laws of Pennsylvania* 357 (Philadelphia, Farrand, Hopkins, Santzinger & Co. 1811) (setting forth the penalty for "malicious mischief" as a payment of "the sum of twenty-five pounds"). And "possessing a firearm as a felon"—another of Duarte's prior convictions—"was not considered a crime until 1938 at the earliest." *Diaz*, 116 F.4th at 468 (citing Federal Firearms Act, ch. 850, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938)). As a result of this expansion of what constitutes a felony, § 922(g)(1) now covers an "immense and diverse category" of criminal offenses—"everything from ... mail fraud, to selling pigs without a license in Massachusetts, redeeming large quantities of out-of-state bottle deposits in Michigan, and

countless other state and federal offenses." *Kanter*, 919 F.3d at 466 (Barrett, J., dissenting).[7]

The majority acknowledges this glaring problem but then bulldozes right over it. It concludes that legislatures have "discretion [] consistent with our nation's history.… to identify conduct that they deem the most serious and to punish perpetrators with severe deprivations of liberty." The majority doesn't point to any limits on that discretion. It is true that "judges [normally] have little authority to question a legislature's decision to criminalize or punish certain conduct; a felony sentence is 'purely a matter of legislative prerogative.'" *Williams*, 113 F.4th at 660–61 (quoting *Rummel v. Estelle*, 445 U.S. 263, 274 (1980)). "But when that decision implicates a fundamental, individual right, judicial deference is simply not an option." *Id.* at 661.

Under the majority's approach, the Second Amendment is a paper tiger with no fixed boundaries. "Congress may decide to change [the definition of what a felony is] in the future." *Diaz*, 116 F.4th at 469. "Such a shifting benchmark should not define the limits of the Second Amendment, without further consideration of how that right was understood when it was first recognized." *Id.*; *see also Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting) ("The

---

[7] *See also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 269 (2020) [hereinafter Greenlee, *Historical Justification*] ("[I]n West Virginia, someone who shoplifts three times in seven years, 'regardless of the value of the merchandise,' is forever prohibited from possessing a firearm. In Utah, someone who twice operates a recording device in a movie theater is forever prohibited from possessing a firearm. And in Florida, a man committed a felony when he released a dozen heart-shaped balloons in a romantic gesture …." (footnotes and citations omitted)).

majority's extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label.").

"Simply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny." *Diaz*, 116 F.4th at 469. "Put simply, there is no historical basis," for Congress "to effectively declare" that committing a crime punishable by imprisonment for a term exceeding one year, will result in permanent loss of one's Second Amendment right "simply because" that is how Congress defined a felony in § 922(g)(1). *Bruen*, 597 U.S. at 31.

Rather, applying *Bruen* requires the government to proffer Founding-era felony analogues that are "distinctly similar" to Duarte's underlying offenses and would have been punishable either with execution, with life in prison, or permanent disarmament. *See id.* at 26. This is the approach taken by several of our sister circuits, including in cases where courts have found "distinctly similar" Founding-era felonies. *See Range*, 124 F.4th at 232 (concluding that the government had not shown a "longstanding history and tradition of depriving people like Range," who was convicted of mail fraud, "of their firearms"); *Diaz*, 116 F.4th at 472 (concluding that disarmament was appropriate because "[a]t the time of the Second Amendment's ratification, those—like Diaz—guilty of certain crimes—like theft—were punished permanently and severely").

The proper approach in a case like this would be for the government, instead of simply relying on the "felony" label, to instead present analogies between "distinctly modern" felonies and any Founding-era analogues, just as it must do with other firearm regulations. *Bruen*, 597 U.S. at 28–29. But in evaluating such analogies to Founding-era crimes,

courts must consider what the modern crime at issue is most similar to: a relevant capital offense that could subject an individual to life imprisonment or permanent disarmament? Or a crime subject to lesser penalties—like a term of years or temporary disarmament—or perhaps activity that was left entirely unregulated?**[8]** *Compare Connelly*, 117 F.4th at 279 ("[W]e must ask: Which are marijuana users more like: British Loyalists during the Revolution? Or repeat alcohol users?").**[9]**

Analogizing properly, the government has not shown that § 922(g)(1)'s permanent firearm ban can be constitutionally applied to Duarte. As already noted, Duarte's prior vandalism and felon-in-possession convictions were not felonies at the founding. And there are

---

[8] As the above discussion should make clear enough, contrary to Judge Collins's caricature of my position I would not require an "*identical* tradition." I would simply require a historical analogue that has a closer fit to the modern law and thus has a "comparable burden" and is "comparably justified" in its restriction on the right of armed self defense. *Bruen*, 597 U.S. at 29.

[9] To justify avoiding this approach required by *Bruen*, the majority turns to a new favorite talismanic Supreme Court line—stating that this would lead to looking for "a law trapped in amber." The majority's fear is unwarranted.    Just as it must do when considering other Second Amendment challenges, the court here too is perfectly capable of looking to analogies and other "relevantly similar" Founding-era regulations. This is not the first cherrypicked line from a Supreme Court Second Amendment opinion that our court has weaponized to dodge the standard the Supreme Court has directed us to apply. *See, e.g.*, *McDougall v. Cnty. of Ventura*, 23 F.4th 1095, 1124 n.1 (9th Cir.), *reh'g en banc granted, opinion vacated*, 26 F.4th 1016 (9th Cir. 2022), and *on reh'g en banc*, 38 F.4th 1162 (9th Cir. 2022) (VanDyke, J., concurring); *Perez-Garcia*, 1115 F.4th at 1008 (VanDyke, J., dissental). Perhaps the Supreme Court should consider trimming some of that low-hanging fruit out of its dicta. *See Duarte*, 108 F.4th at 788 (VanDyke, J., disgrantle).

no comparable analogues that allowed for disarmament based upon drug offenses. *Connelly*, 117 F.4th at 278 ("The government identifies no class of persons at the Founding who were 'dangerous' for reasons comparable to marijuana users."); *see also Duarte*, 101 F.4th at 691 & n.16. The government has not adduced any evidence showing whether Duarte's remaining conviction for evading a peace officer fits within any "longstanding" tradition of "prohibit[ing] ... the possession of firearms by felons." *Heller*, 554 U.S. at 626. So the government has altogether failed to show that applying § 922(g)(1) to Duarte "is 'relevantly similar' to laws that" provided for similar punishments at the founding. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29).

## E. Designating Categories of Dangerous Persons

As if the blanket discretion the majority bestows upon legislatures to disarm anyone they label as a felon was not concerning enough, the majority also identifies a second— and even broader—"regulatory principle" supporting § 922(g)(1)'s constitutionality: "legislatures may categorically disarm those they deem dangerous, without an individualized determination of dangerousness."

There is no such principle grounded in our nation's historical tradition. The historical analogues on which the majority and the government rely satisfy neither the "how" nor the "why" of *Bruen*'s test. The majority relies first on certain Founding-era laws that disarmed British Loyalists, Catholics, Native Americans, and Blacks. The majority then relies upon a series of laws that effectuated temporary disarmaments—of minors, those of unsound mind, the actively intoxicated, and "tramps." But the former set of laws were all united by one historical principle: they

"permitted disarmament if one was a member of a group that was expected to take up arms against the government." *Perez-Garcia*, 115 F.4th at 1031 (VanDyke, J., dissental). And the second set of laws effectuated mere temporary dispossessions of firearms—not permanent bans like § 922(g)(1). Because the historical analogues fail to match either the "how" or the "why" of *Bruen*'s test, they are not "relevantly similar" to § 922(g)(1). *Rahimi*, 602 U.S. at 692.

## 1. Categorical Disarmament Laws

The first set of laws the majority relies upon are those it characterizes as "regulations that disarmed those whom the legislature deemed dangerous on a categorical basis." These colonial- and Founding-era laws disarmed or otherwise limited the ability to own firearms by British Loyalists, Catholics, Native Americans, Blacks, and slaves. But the majority is wrong in its historical analysis. The laws did disarm groups that were deemed to be "dangerous" in the sense that they were "judged to be a threat to the public safety." *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). But this "history and tradition of disarming 'dangerous' persons does not include non-violent [felons like Duarte]. Indeed, not one piece of historical evidence suggests that, at the time they ratified the Second Amendment, the Founders authorized Congress to disarm *anyone* it deemed dangerous." *Connelly*, 117 F.4th at 277.

In *Bruen*'s parlance, these sets of categorical disarmament laws are not analogues because they were motivated by a different "why." Their motivation was "one particular type of perceived danger: that the group would take up arms against the government during war or in revolt." *Perez-Garcia*, 115 F.4th at 1012 (VanDyke, J., dissental); *see also Range*, 124 F.4th at 245 (Matey, J.,

concurring) ("Laws imposing class wide disarmament were enacted during times of war or civil strife where separate sovereigns competed for loyalty."); *Jackson*, 85 F.4th at 472 (Stras, J., dissental) ("[T]he decades surrounding the ratification of the Second Amendment showed a steady and consistent practice.  People considered dangerous lost their arms.  But being a criminal had little to do with it.").

By contrast, § 922(g)(1)'s broader prohibition serves to—in the majority's telling, and in Congress's judgment—prevent the general danger of gun violence and misuse of firearms.  *See Kanter*, 919 F.3d at 448 (describing the government's interest in § 922(g)(1) "as preventing gun violence"); *id.* at 451 (Barrett, J., dissenting) (same).  "Section 922(g)(1) … takes aim at 'gun violence' generally, which is a 'problem that has persisted in this country since the 18th century.'  And § 922(g)(1) 'confront[s] that problem' with 'a flat ban on the possession of guns.'" *Duarte*, 101 F.4th at 677 (alterations omitted) (quoting *Bruen*, 597 U.S. at 26, 27).  Because these laws did not address a comparable problem, they are not "relevantly similar." *Bruen*, 597 U.S. at 27–30.

Given the extent to which the government has relied upon these alleged categorical disarmament laws, a further explanation of each of the four categories is in order.  During the Revolutionary War, former colonies enacted laws to disarm the Loyalists and others who did not take an oath to the union.  *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 711 (2009) [hereinafter Marshall, *Martha Stewart*].  The Continental Congress recommended that legislatures "disarm persons 'who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United

Colonies.'"    Greenlee, *Historical Justification* at 264
(quoting 4 *Journals of the Continental Congress, 1774–1789*, at 205 (Worthington Chauncey Ford ed. 1906)).  At
least six states enacted such laws, disarming those who
refused to "renounc[e] all allegiance to the now-foreign
sovereign George III in addition to swearing allegiance to
one's State."[10] Marshall, *Martha Stewart* at 724–25.

These Loyalist laws were temporary measures—both in
the timing for their enactments and in the extent to which

---

[10] *E.g.*, Act of Oct. 10, 1779, *in* 9 *Statutes at Large of Pennsylvania* 347–48 (James T. Mitchell & Henry Flanders eds. 1903) [hereinafter, Pa. Statutes at Large]; Act of May 1, 1776, *in* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479–482 (Boston, Wright & Potter Printing Co. 1886); Act of May 1777, in 9 *Statutes at Large* 281–82 (Hening ed. 1821) [hereinafter, *Va. Statutes at Large*]; Act of 1776, *in* 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (Bartlett ed. 1862); Act of 1777, *in* 24 *The State Records of North Carolina* 86–89 (Clark ed. 1905); Act of 1778, *in* 203 *Hanson's Laws of Maryland 1763–1784*, at 193, 278 (Annapolis, Frederick Green 1801); Act of 1775, *in* 15 *The Public Records of the Colony of Connecticut, From May, 1775, to June 1776*, at 193 (Hartford, Case, Lockwood & Brainard Co. 1890) (disarming those who "libel[ed] or defame[d] any of the resolves of the Honorable Congress of the United Colonies" or, upon "complaint being made to the civil authority," were found to be "inimical to the liberties of this Colony and the other United Colonies in America"); Order of May 21, 1776, *in* 15 *Documents Relating to the Colonial History of the State of New York* 103 (Albany, Weed, Parsons & Co. 1887) (ordering the supplying of its militias with "such good Arms fit for soldiers use as they may have collected by disarming disaffected persons"); Act of April 14, 1778, *in* *Acts of the General Assembly of the State of New Jersey* 90 (Burlington, Isaac Collins 1777) (granting authority to Council of Safety "to deprive and take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements, and Ammunition which they own or possess").

they disarmed individuals.[11] They were "merely temporary," 2 Blackstone, *Commentaries* 368 n.2, as they were enacted in the midst of the war, and did not "survive[] through the Founding in anything like their original form," Marshall, *Martha Stewart* at 726.[12] They were also temporary in the sense that individuals could regain their right to bear arms upon swearing an oath of allegiance to the Union or disavowing the Crown. *See, e.g.*, Act of Dec. 1775, *in* 15 *The Public Records of the Colony of Connecticut*, *supra*, at 193 (stating that individuals who were "inimical" to the States would be disarmed only "until they shall satisfy" the authorities that they "are friendly to this and the other United Colonies"); *see also* June 13, 1777, Journal of the Council of Safety, *in* 1 *The Public Records of the State of Connecticut* 327–29 (Hartford, Cask, Lockwood & Brainard 1894) (releasing "John Wilcocks and James Ward," and "George Folliot," from custody after each took an oath of loyalty).

Given the temporary nature of these laws disarming Loyalists, they fail both the "why" and "how" of *Bruen*'s second step. The motivation for these regulations (wartime

---

[11] *See, e.g.*, Act of 1778, in 10 Va. *Statutes at Large* 309–10 (calling for the confinement of disaffected persons "in this time of public[] danger, when a powerful and vindictive enemy are ravaging our southern sister states … it has become highly expedient … to vest the executive with extraordinary powers for a limited time"); Act of 1779, *in* 9 *Pa. Statutes at Large* 441 (calling for the "temporary suspension of law" in the "time[] of public danger" and confining suspected Loyalists).

[12] After the Revolutionary War, some states did continue to disarm Loyalists. Greenlee, *Disarming the Dangerous* at 53. But these laws too were temporary—both in the time for which they were enacted, and the timeframe within which individuals could get their right to bear arms back upon taking an oath.

USA v. DUARTE    105

measures) was also different than the motivation behind
§ 922(g)(1) (limiting gun crimes). And the manner in which
these laws effectuated that purpose—a temporary
disarmament—does not match § 922(g)(1)'s lifetime ban.
So these laws are not "relevantly similar" to § 922(g)(1).
*Bruen*, 597 U.S. at 29.

The colonial laws disarming Catholics fare no better
under *Bruen*'s test. The government points to only three
such colonial laws.**[13]** But again, it is "doubt[ful] that *three*
colonial regulations" prove that disarming Catholics as a
class ever became a "well-established" national tradition.
*See Bruen*, 597 U.S. at 46. These laws too were temporary
measures; passed at the height of the French and Indian War,
during which "American Protestants worried that their
Catholic neighbors were plotting with Catholic France to
impose Catholic rule throughout America." Greenlee,
*Disarming the Dangerous* at 35–36. And just as with
disarming Loyalists amidst the Revolutionary War, these
laws were limited in time and bore virtually "the same
rationale." Marshall, *Martha Stewart* at 723. So again, the
"why" and "how" break down under *Bruen*'s test.

---

[13] *See* Act of 1757 for Forming and Regulating the Militia, *in* 3
*Pennsylvania Archives* 131–32 (Harrisburg, Joseph Severns & Co. 1853)
(seizing arms belonging to any "Papist or reputed Papist"); Act of 1756,
for Regulating the Militia of the Province of Maryland, *in* 52
*Proceedings and Acts of the General Assembly, 1755–1756*, at 454
(Raphael Semmes ed. 1946) (same); Act of 1756 for Disarming Papists,
and Reputed Papists, Refusing To Take the Oaths To the Government,
*in* 7 *Va. Statutes at Large* 35–36 ("[N]o Papist, or reputed Papist
[refusing to take an oath], shall, or may have, or keep in his house or
elsewhere, or in the possession of any other person to his use, or at his
disposition, any arms, weapons, gunpowder or ammunition ….").

The colonial laws barring the sale of arms to Native Americans are even less relevant. At least eight colonies enacted such laws that barred the sale of firearms to Native Americans.[14] The colonies justified these laws as measures in an ongoing military conflict. Greenlee, *Disarming the Dangerous* at 29–30; *Perez-Garcia*, 115 F.4th at 1026 (VanDyke, J., dissental). Their aim was to limit the danger of armed encounters with hostile Native Americans. *See* Greenlee, *Disarming the Dangerous* at 29.[15] So these laws

---

[14] *See* 1 *Journals of the House of Burgesses of Virginia, 1619–1658/59*, at 13 (H.R. McIlwaine ed. 1915) (making it a crime to "sell or give any Indians any piece shott, or poulder, or any other armes offensive or defensive"); Act of 1633 Respecting the Indians, *in The Charters and General Laws of the Colony and Province of Massachusetts Bay* 133 (T.B. Wait & Co., 1814) (banning the selling or bartering of "any gun or guns, powder, bullets, shot, [or] lead, to any Indian whatsoever"); Ordinance of March 31, 1639, *in Laws and Ordinances of New Netherland, 1638–1674*, at 19 (Albany, Weed, Parsons & Co. 1868) ("every Inhabitant of *New Netherland* … is most expressly forbidden to sell any Guns, Powder or Lead to the Indians, on pain of being punished by Death"); *The Public Records of the Colony of Connecticut, Prior to the Union With New Haven Colony, May 1665*, at 529–30 (Hartford, Brown & Parsons 1850) (barring repairing an Indian's gun or selling one to an Indian); Act of 1763 to Prohibit the Selling of Guns, Gunpowder, or other Warlike Stores to the Indians, *in* 6 *Pa. Statutes at Large* 319–20 (banning giving, selling, bartering, or exchanging with any Indian "any guns, gunpowder, shot, bullets, lead or other warlike stores without license"); Act of 1763 for Prohibiting All Trade With the Indians, *in Acts of Assembly of the Province of Maryland*, ch. IV, § 3 (Jonas Green, 1764) (prohibiting selling or giving "Gun-powder, Shot, or Lead" to Indians over a certain quantity).

[15] *See also, e.g.*, 1675 Act for the Safeguard and Defence of the Country Against the Indians, *in* 2 Va. *Statutes at Large*, *supra*, at 326–27, 336 (condemning "the sundry mur[d]ers, rapines and many depredations lately committed and done by Indians on the inhabitants of this country,"

too fail to serve as a distinctly similar historical analogue, as they had a distinct purpose (the "why")—not arming the enemy. The laws also imposed a different type of burden (the "how"). They did not ban Native Americans from *possessing* firearms but simply prohibited colonists from *selling* them arms. Greenlee, *Disarming the Dangerous* at 29.

Finally, colonial laws disarming slaves and Blacks reflected similar concerns. Just as the colonists feared the "danger of Indian attack[s]," they felt the "equivalent fear" of "indentured servants and slaves as a class." Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607–1794*, 16 L. & Hist. Rev. 567, 581 (1998). The colonies justified disarming Blacks based on the threat of violence they posed as a collective group.[16]

---

directing that "a war[] be declared ... against all such Indians," and ordering that "any person ... within this colony ... presum[ing] to trade ... with any Indian any powder, shot[] or arm[s] ... shall suffer death without benefit[] of clergy").

[16] *See, e.g.*, Act of 1752, *in 2 Va. Statutes at Large* 481–82 ("Whereas the frequent meeting of considerable numbers of negroe slaves ... is judged of dangerous consequence ... it shall not be lawful[] for any negroe or other slave to carry or arm[] himself[] with any club, staff[], gun[] ... or any other weapon."); Act of 1770, *in A Codification of the Statute Law of Georgia* 813 (Augusta, Charles E. Greville 1848) ("[A]s it is absolutely necessary to the safety of this province[] ... to restrain the wandering and meeting of ... slaves ... it shall be lawful for any person ... to apprehend any ... slave ... found out of the plantation ... [and] if he ... be armed ... to disarm [him]."); Act of 1740, *in 7 Statutes at Large of South Carolina* 410 (Columbia, A.S. Johnston 1840) (same); *see also* 1790 Act of N.C., in *A Manual of the Laws of North-Carolina* 172 (Raleigh, J. Gales 1814) ("When any number of negroes, or other slaves, or free people of color, shall collect together

*See Heller*, 554 U.S. at 611–12 (citing *Waters v. State*, 1 Gill 302, 309 (Md. 1843) for the proposition that "free blacks were treated as a 'dangerous population,'" prompting "'laws ... to make it unlawful for them to bear arms'"). Many colonies prohibited slaves and free Blacks from possessing arms for this reason.**[17]** *See* Jamie G. McWilliam,

---

in arms, and be going about the country, committing thefts and alarming the inhabitants of any county, it shall be the duty of the commanding officer of such county to suppress[] such depredations or insurrections."); 12 The *Colonial Records of the State of Georgia* 451–52 (Candler ed. 1907) (petitioning the Governor for relief from "a Number of Slaves appear[ing] in Arms ... [and] commit[ting] great Outrages and plunder in and about the Town" so that "all Slaves ... be immediately disarmed").

[17] *See* Act of 1664, *in* 2 *The Colonial Laws of New York From the Year 1664 to the Revolution* 687 (Albany, James B. Lyon 1894) (making it unlawful "for any Slave or Slaves to have or use any gun Pistoll sword Club or any other Kind of Weapon whatsoever" unless in the presence of their master); Act for the Trial of Negroes, *in* 1 *Laws of the State of Delaware* 104 (Newcastle, Samuel & John Adams 1797) (regulating the possession of weapons by "any Negro or Mulatto slave"); Act of 1704 Relating to Servants and Slaves, *in Proceedings and Acts of the General Assembly of Maryland, September, 1704–April, 1706*, at 261 (Browne ed. 1906) ("[N]o Negro or other Slave within this Province shall be permitted to carry any Gunn or any other Offensive Weapon ...."); *Acts of Assembly, Passed in the Province of New York, From 1691, to 1718*, at 144 (London, John Baskett 1719) ("[I]t shall not be Lawful for any Negro, Indian, or Mulatto Slave, to have or use any Gun or Pistol, but in his Master's ... Presence ...."); Act of 1770, *in A Codification of the Statute Law of Georgia*, *supra*, at 812 ("It shall not be lawful for any slave, unless in the presence of some white person, to carry and make use of firearms, or any offensive weapon whatsoever ...."); Act of 1740, *in* 7 *Statutes at Large of South Carolina*, *supra*, at 404 (same); Act of 1755, *in* 18 *The Colonial Records of the State of Georgia* 117–18 (Candler ed. 1910) ("[I]t shall not be Lawfull for any Slave ... to Carry and make use of Fire Arms" except with a ticket that must be renewed each month).

*Refining the Dangerousness Standard in Felon Disarmament*, 108 Minn. L. Rev. Headnotes 315, 319–20 (2024) [hereinafter, McWilliam, *Refining the Dangerous Standard*].

In sum, this history reveals that even while there was a tradition of disarming groups deemed to be "dangerous," *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting), the danger motivating their disarmament was always a very particular one: "a violent attack against the community by a group opposed to the current regime." *Perez-Garcia*, 115 F.4th at 1028 (VanDyke, J., dissental); *id.* ("In each historical scenario, danger meant one thing: a violent attack." (quoting McWilliam, *Refining the Dangerousness Standard* at 324–25)); *see also Range*, 124 F.4th at 244–45 (Matey, J., concurring) (describing the "hallmark [principle] of our Nation's firearm regulations" that "an individual cannot exercise [the right to bear arms] to rebel against a just government").

It should be clear enough that § 922(g)(1) does not fit within that tradition.  The burdens and justifications (*Bruen*'s "how" and "why") for laws disarming disfavored groups at the founding are not "relevantly similar" to § 922(g)(1)'s blanket ban on non-violent felons possessing firearms.  *Bruen*, 597 U.S. at 29.  While § 922(g)(1) was "originally intended to keep firearms out of the hands of violent persons," Greenlee, *Historical Justification* at 274, the law now "encompasses those who have committed *any* nonviolent felony or qualifying state-law misdemeanor"— an "immense and diverse category." *Kanter*, 919 F.3d at 466 (Barrett, J., dissenting); *see also United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011) (noting that "the earliest incarnation" of § 922(g)(1) codified "as the Federal Firearms Act of 1938 … initially covered those convicted of a limited

set of violent crimes such as murder, rape, kidnapping, and
burglary").

The majority thus fails to show support for its proposed
"regulatory principle" from the 17th- and 18th-century
categorical disarmament laws it addresses.  As we'll see, its
second set of 19th-century laws fare no better.

### 2.  Temporary Disarmaments

The majority points to four sets of laws that it describes
as "categorical restrictions on the possession of firearms by
certain groups of people."  These laws restricted the ability
to possess firearms by minors, the unsound of mind, the
intoxicated, and "tramps."  At the outset, given the absence
of such regulations in the Founding-era, the majority only
cites law from the Reconstruction-era (or later).  This
approach "inverts historical analysis by relying principally
on mid-to-late-19th century statutes (most enacted after
Reconstruction)" then "work[ing] backward to assert that
these laws are consistent with founding-era analogues."
*Reese*, 127 F.4th at 596.  But none of these laws is a
"relevantly similar" analogue in any event, as they were
merely temporary disarmaments, in contrast to § 922(g)(1)'s
permanent disarmament.

The first set involves laws that prohibited minors from
purchasing or possessing firearms.  Of course, a limitation
on a minor's right is necessarily a temporary limitation,
given that the limitation falls away once the minor passes the
age of majority.  Moreover, the idea that historical
limitations on the scope of a *minor's* constitutional rights can
justify even greater restrictions on an *adult's* rights
contradicts the Supreme Court's repeated conclusions that
other fundamental constitutional rights apply differently to
minors.  *See, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 325, 337–

38 (1985) (Fourth Amendment); *McKeiver v. Pennsylvania*, 403 U.S. 528, 545, 550–51 (1971) (Sixth Amendment); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (free speech); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (free exercise); U.S. Const. amend. XXVI (voting); *see also Reese*, 127 F.4th at 591 (noting that constitutional rights are applied to minors "with modifications"). In short, these late-19th century laws authorizing the temporary disarmament of minors are not relevantly similar to § 922(g)(1)'s lifetime disarmament.

The same is true of the laws that prohibited the sale of firearms to those of unsound mind. These historical laws only provide support for disarming those who are *presently* ill. *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 705–06 (6th Cir. 2016) (en banc) (Batchelder, J., concurring in most of the judgment). "Our common law heritage has long recognized that mental illness is not a permanent condition." *Tyler*, 837 F.3d at 710 (Sutton, J., concurring in most of the judgment); *see also* Anthony Highmore, *A Treatise on The Law of Idiocy and Lunacy* 73 (Exeter, George Lamson 1822) ("A lunatic is never to be looked upon as irrecoverable."). "At the time of the Founding" "mental illness was considered a *temporary* ailment that only justified a *temporary* deprivation of rights." *Mai v. United States*, 974 F.3d 1082, 1090 (9th Cir. 2020) (Bumatay, J., dissental); *see also id.* at 1089 ("[T]he evidence is clear: temporary mental illness didn't lead to a permanent deprivation of rights."). The laws the majority relies on did not effectuate the *permanent* disarmament of those who were deemed to be of unsound mind. So they too are not "relevantly similar."

The majority next proffers four state laws that restricted the possession of firearms by those who were intoxicated, or

the sale of firearms to them. But offering just four Reconstruction-era laws "passed scores of years post-Ratification … misses the mark by a wide margin." *Connelly*, 117 F.4th at 281. At best, these "statutes provide support for banning the *carry* of firearms *while actively intoxicated.*" *Id.* (discussing the same laws the majority relies upon). They did not ban the wholesale possession of firearms by those who used intoxicating substances, nor did they ban carry by those who were not actively under the influence. *Id.*; *see also* Act of Feb. 28, 1878, *in Laws of the State of Mississippi* 175 (Jackson, Power & Barksdale) (simply prohibiting the "s[ale] to any minor or person intoxicated," and not prohibiting the carrying of firearms generally). These laws are not relevantly similar to § 922(g)(1)'s permanent disarmament.

The laws disarming "tramps" are no different. They too did not effectuate permanent disarmaments. Rather, they applied only to individuals who were actively engaging in certain activities. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1475 (2009) (distinguishing between restrictions that limit "how" or "when" one may carry, and restrictions that limit "who" may carry). For example, Ohio's law applied to men who were not "in the county in which he usually lives or has his home" and were "found going about begging and asking subsistence by charity." *State v. Hogan*, 63 Ohio St. 202, 208 (1900). "The point of prohibiting armed tramps from threatening harm to another's person or property was plainly to prevent violence." Greenlee, *Historical Justification* at 270 (citing *Hogan*, 63 Ohio St. at 215, 219). As the Ohio Supreme Court explained in upholding this law against constitutional challenge, the law

did not prohibit carrying firearms generally but only carrying firearms for the unlawful purpose of "terrorizing" the community. *See Hogan*, 63 Ohio St. at 216; *id.* at 219 ("A man may carry a gun for any lawful purpose, for business or amusement, but he cannot go about with that or any other dangerous weapon to terrify and alarm a peaceful people.").

Altogether, the majority's proffered laws simply effectuated temporary disarmaments. And a temporary disarmament is not a relevant analogue to the lifetime bar on possession that § 922(g)(1) imposes. *See Rahimi*, 602 U.S. at 699 (emphasizing "[s]ection 922(g)(8)'s restriction was temporary as applied to Rahimi"); *id.* at 713 (Gorsuch, J., concurring) (stressing the same point); *Kanter*, 919 F.3d at 468 n.18 (Barrett, J., concurring) (distinguishing between permanent and temporary disarmaments). Because the "how" of the historical temporary disarmaments do not match § 922(g)(1)'s much-broader permanent disarmament, these laws are not "relevantly similar" analogues. *Rahimi*, 602 U.S. at 692.

### 3. Absolute Discretion

The consequences of the principle the majority announces are profound. The majority puts it entirely within the hands of "the legislature [to] determine[] [who] represent[s] a 'special danger of misuse.'" In doing so, our court neuters any judicial oversight of the legislative determinations as to who can be permanently disarmed—effectively stripping them of their Second Amendment rights altogether.

By granting legislatures unreviewable discretion to disarm entire categories of individuals, the majority necessarily returns right back to a regime of deference to legislative interest-balancing rejected by the Supreme Court

in *Bruen*.  *See Range*, 124 F.4th at 228 (rejecting the approach the majority takes here "because such 'extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label'" (quoting *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting))); *Williams*, 113 F.4th at 660 (rejecting the majority's approach here because "complete deference to legislative line-drawing would allow legislatures to define away a fundamental right").  The Supreme Court has clearly instructed us to *stop* deferring to legislative interest-balancing in Second Amendment cases.  *See Bruen*, 597 U.S. at 19, 22, 26.  The Court has given us one standard for determining when an individual can be disarmed, consistent with the Second Amendment: "whether there is a tradition of disarming analogous groups in a similar manner and for similar reasons.  Deference to legislative labels is not part of that test."  *Perez-Garcia*, 115 F.4th at 1022 (VanDyke, J., dissental) (citations omitted).

It is problem enough that the majority steps back into a regime of interest-balancing.  But the majority goes even further.  Instead of just returning to the old interest-balancing regime—in which our court applied either strict or intermediate scrutiny, *see, e.g.*, *Young*, 992 F.3d at 783–84—the majority's decision here effectively now applies *rational basis* review to categorical firearm disarmaments.  One step forward in *Bruen*, three steps back in the Ninth Circuit.

As *Heller* explained, "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."  554 U.S. at 628 n.27.  That is why, for each of our constitutional rights—including those found

in the First through Fourteenth Amendments—courts do not simply defer to legislative fiat. *See id.* at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.").

The majority's rational basis test doesn't stop at disarming just felons either. Under the majority's extreme deference, the legislature can disarm anyone it deems to present a "special danger." States could, for example, disarm "aliens, or military veterans with PTSD." *Nat'l Rifle Ass'n, Inc. v. A.T.F.*, 714 F.3d 334, 345 (5th Cir. 2013) (Jones, J., dissental). And why stop at felons? Those with misdemeanor convictions could be disarmed too.[18] Perhaps even just those who have only ever been indicted. Those with a below-average IQ score could lose their right to bear arms.[19] Those who are unemployed, are less educated, or have a low income could be banned, since a legislature could rationally conclude that they were more likely as a group to

---

[18] *See Kanter*, 919 F.3d at 449 (discussing findings that "even handgun purchasers with only 1 prior misdemeanor conviction and no convictions for offenses involving firearms or violence were nearly 5 times as likely as those with no prior criminal history to be charged with new offenses involving firearms or violence" (quoting Garen J. Wintemute, et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 J. Am. Med. Ass'n 2083, 2083 (1998) (emphasis omitted))).

[19] *See, e.g.*, Richard J. Herrnstein et al., *Does IQ Significantly Contribute to Crime?*, *in Taking Sides: Clashing Views on Controversial Issues in Crime and Criminology* 34–42 (6th ed. 2001) (arguing that IQ is a significant cause of crime and indicating that criminal populations generally have an average IQ below the mean).

commit violent crimes.[20]  How about everyone under the age
of 25?  Of course, they could be disarmed too under the
majority's rationale.[21]  There are countless classes of people
for whom a legislature could muster up enough statistics to
show that they are more likely to commit certain crimes
using a firearm than the general public: men;[22] people who

---

[20] *See, e.g.*, Richard B. Freeman, *The Economics of Crime*, *in* 3
*Handbook of Labor Economics* 3532 (Ashenfelter & Card eds. 1999).

[21] *See, e.g.*, Richard B. Freeman, *Why Do So Many Young American Men
Commit Crimes and What Might We Do About It?*, J. Econ. Perspectives,
Winter 1996, at 29–30.

[22] *See United States v. Daniels*, 77 F.4th 337, 353 & n.39, (5th Cir. 2023)
(noting that in 2012, approximately 80% of offenders arrested for violent
crimes were men (citing Crime in the United States 2012, Fed. Bureau
Invest. (2012), https://ucr.fbi.gov/crime-in-the-u.s/2012/crime-in-the-
u.s.-
2012/tables/42tabledatadecoverviewpdf/table_42_arrests_by_sex_2012
.xls)).

play violent videogames;[23] transgender persons;[24] registered Democrats.[25]

The merits of the social science behind each of these suspect classifications may not be rock-solid. But under the majority's rational basis test, I see no reason why they would not pass constitutional muster. After all, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). "[T]he rational basis standard 'asks whether there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Montana Med. Ass'n v. Knudsen*, 119 F.4th 618, 630 (9th Cir. 2024) (quoting *Olson v. California*, 104 F.4th 66, 77 (9th Cir. 2024) (en banc)) (cleaned up). With no more than a rational basis requirement, legislatures have carte blanche authority to disarm any disfavored groups.

---

[23] *See, e.g.*, Craig Anderson et al., *Violent Video Game Effects on Aggression, Empathy, and Prosocial Behavior in Eastern and Western Countries: A Meta-Analytic Review*, 136 Psych. Bull. 151, 151–73 (2010) ("[W]e believe that debates can and should finally move beyond the simple question of whether violent video game play is a causal risk factor for aggressive behavior; the scientific literature has effectively and clearly shown the answer to be 'yes.'").

[24] *See, e.g.*, Diana Miconi et al., *Meaning in Life, Future Orientation and Support for Violent Radicalization Among Canadian College Students During the COVID-19 Pandemic*, Frontiers Psychiatry, Feb. 2022, at 7, 9 ("Transgender and gender-diverse youth emerge as the group at the highest risk of support for [violent radicalization].").

[25] *See* Marc Meredith & Michael Morse, *Do Voting Rights Notification Laws Increase Ex-Felon Turnout?*, 651 Annals Am. Acad. Pol. & Soc. Sci. 220, 229 (2014).

We would never treat any other fundamental
constitutional right this way.  This "approach once again
makes the Second Amendment a constitutional outlier."
*Perez-Garcia*, 115 F.4th at 1020 (VanDyke, J., dissental).  I
have already explained how we treat the First and Fourth
Amendments different from the Second.  *Id.* at 1020–21.
Under the First Amendment, legislatures cannot willy-nilly
preclude speech "on a categorical basis based on a
reasonable determination that [the speech] present[s] a
'special danger.'"  Rather, to "exempt[] a category of speech
from the normal prohibition on content-based restrictions"
the government must show "'persuasive evidence that a
novel restriction on content is part of a long (if heretofore
unrecognized) tradition of proscription.'"  *United States v.
Alvarez*, 567 U.S. 709, 722 (2012) (quoting *Brown v. Ent.
Merchants Ass'n*, 564 U. S. 786, 792 (2011)).  In the Sixth
Amendment context, the Supreme Court has also rejected
deference to state policymakers when identifying exceptions
to the confrontation right, emphasizing that "federal
constitutional rights are not typically defined—expanded or
contracted—by reference to [such] non-constitutional bodies
of law."  *Smith v. Arizona*, 602 U.S. 779, 794 (2024)*.*

Try to imagine any other constitutional right that the
members of this majority would treat the way it treats the
Second Amendment—explicitly providing our court's
imprimatur to "overbroad" laws and granting governments
authority to strip the rights even of "law-abiding people who
[are] not dangerous, violent, untrustworthy, or unstable."  I
can't think of one.  The Second Amendment is inarguably
the red-headed stepchild of the Constitution.

### III.   Response to Separate Concurrence

Judge Collins's concurrence offers a different route to
get to the majority's conclusion.   The concurrence first
accepts the majority's view that there is a historical tradition
that rests on the back of the racially and religiously
discriminatory laws that categorically disarmed certain
groups at the founding.   But unlike the majority, Judge
Collins is unwilling to leverage that tradition to authorize a
freewheeling power today to disarm *any* group a legislature
desires, since that historical principle would be too broad to
satisfy *Bruen*'s commands and would effectively eliminate
an express constitutional guarantee.    So to cabin the
principle, the concurrence concludes that a legislature's
categorical disarmament power must at least be tethered to
some group that was actually disfavored at the founding.
Thus the Second Amendment does not prevent legislatures
from categorically disarming those who were disarmed in
the past, such as Loyalists, Catholics, Native Americans,
Blacks, and slaves (although the concurrence quickly adds
that all of these groups—except modern anglophiles, I
suppose—would presumably be protected from singling out
today by other constitutional provisions).

It's an admirable attempt by Judge Collins to cabin the
majority's breathtakingly broad historical principle and to
gerrymander something to save § 922(g)(1) as applied to
nonviolent felons without inventing a sweeping exception to
the Second Amendment that so obviously swallows the rule.
The threshold problem with that approach, though, is the
stubborn fact that felons were never, as a group,
categorically disarmed at the founding.   The concurrence
needs some mechanism to extend the disarmament power to
all felons notwithstanding this historical obstacle, so it
concludes that the modern power to disarm extends not only

to those who were disarmed at the founding, but also to any group that could have been treated as bad as or worse than being disarmed. This works, the concurrence concludes, because legislatures at the founding could treat felons worse than just disarming them—they could impose the death penalty upon them. Therefore, "taken together," the two historical traditions of the state power to severely punish felons and the state power to categorically disarm historically disfavored groups are enough to sustain § 922(g)(1)'s constitutionality.

I offer a few points in response to Judge Collins's gloss on the majority's approach.

First, the different route taken by the concurrence still runs into many of the same flaws that I and other judges have already identified with the majority's approach. For starters, both the majority and concurrence depend on a false history. As I already explained, the colonies departed from the older common law tradition of generally imposing the death penalty for felonies, and that trend continued through the founding and into succeeding generations. So to get around this absence of historical support, the concurrence makes the same analytical move the majority does, contending that what matters is not that *real* history supports its position, but rather that history theoretically *could have* supported its position, since presumably Founding-era legislatures had the discretion to make basically any felony (not to mention many non-felonies) death eligible.

But that doesn't do the trick. *Bruen* requires a "well-established" historical tradition, not speculation about what historically could have happened in a Marvel-style multiverse. 597 U.S. at 46. Because history shows the lack of any "uniform severity of punishment that befell" felons

at the founding, "the permanent and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon." *Kanter*, 919 F.3d at 461 (Barrett, J., dissenting).

The concurrence's historical analysis tracks the majority's flaws in another way too. The concurrence presupposes that felonies at the founding were the equivalent of felonies today. But as described in response to the majority, many felonies today bear little resemblance to the felonies at the founding that were eligible for the death penalty. *See, e.g.*, *Garner*, 471 U.S. at 14. This is particularly problematic for the concurrence. If the whole point of the concurrence's novel approach is to arrive at the same conclusion as the majority but in a way that does not give carte blanche to legislatures to simply disarm whomever they want, then you would think that the types of "felons" disarmed today would need to be the same types of "felons" usually executed at the founding. Where the only similarity is the label "felon," then the constraining rationale for the concurrence's alternative approach falls apart.

From the laws that disarmed Catholics, Loyalists, slaves, Blacks, and Native Americans the concurrence also seems to draw the same principle as the majority: That these groups of persons were all deemed to present a "special danger of misuse." But like the majority the concurrence fails to acknowledge that each of these "[l]aws imposing class wide disarmament were enacted during times of war or civil strife where separate sovereigns competed for loyalty." *Range*, 124 F.4th at 245 (Matey, J., concurring). Thus the historical principle that flows from these laws is that groupwide disarmament is appropriate "if one was a member of a group that was expected to take up arms against the government." *Perez-Garcia*, 115 F.4th at 1031 (VanDyke, J., dissental). Neither the majority nor the concurrence make sense of that.

The concurrence also suffers from the flaw that it does not explain what historical punishments are severe enough to be equal to or "greater" than disarmament. The concurrence notes that "a historical tradition allowing the imposition of other, *more severe* penalties than disarmament on a given class of persons may provide a sufficient analogue to support allowing such persons to be disarmed," but never explains what penalties are, in fact, "more severe." Most would agree that death is worse than disarmament. As the concurrence acknowledges, "[i]nflicting death … is the most severe exercise of state power against an individual," thus making *any* other punishment a lesser restriction. But at what point does imprisonment—even if not for life— become "more severe" than permanent disarmament? Many would no doubt surrender their right to bear arms for life rather than spend even a short time in prison. And how large must a fine become before it is more severe than permanent disarmament? The majority treats disarmament as a "lesser restriction" than estate forfeiture. But why would forfeiture be a more severe punishment than disarmament when, in fact, an individual could recover all that was forfeited, but could not recover the constitutional right stripped by a permanent disarmament? *See Range*, 124 F.4th at 231 (describing estate forfeiture as a temporary punishment). Just like the majority, the concurrence offers no principled way for courts to ascertain what "legal burdens [are] equivalent to or more onerous than permanent disarmament." Nor could it. This is surely at least part of

the reason courts don't use this "greater includes the lesser" reasoning for other rights.[26]

It is also important to notice that while the concurrence makes an admirable effort to reach a narrower holding than the majority's, it is far from clear that it successfully achieves that goal. The concurrence would cabin the discretion afforded to legislatures in just one dimension while leaving a wide-open path to generally disarm in just slightly different ways. The concurrence contends that its approach    "confin[es]    any    legislative    categorical

---

[26] The concurrence is correct to note that I am not a fan of the "greater-includes-the-lesser" standard.    Unless such standards are rigorously applied, they fail to constrain judges.  And it is clear that in the Second Amendment context judges need constraining, as judges— like my colleagues in the majority here—can always find a reason to rule against the Second Amendment when given some flexibility.  Indeed, one of the reasons that *Bruen* rejected the interest balancing two-step approach was that it gave too much leeway to judges to balance away constitutional rights.    597 U.S. at 22–24.    The Justices have also repeatedly emphasized that courts must be careful to avoid using historical analogizing to eliminate constraints. *See id.* at 29 n.7 (noting that analogizing "is not an invitation to revise th[e] balance [struck by the founding generation] through means-end scrutiny"); *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) (noting that "a court must be careful not to read a principle at such a high level of generality that it waters down the right"); *id.* at 734 (Kavanaugh, J., concurring) (noting that a "history-based methodology supplies direction and imposes a neutral and democratically infused constraint on judicial decisionmaking"); *id.* at 712 (Gorsuch, J., concurring) (noting the problem of permitting judges "to extrapolate their own broad new principles from" text and history such that "no one can have any idea how they might rule").    The concurrence fails to head those warnings when applying the greater-includes-the-lesser standard here; not only applying that standard, but extending it beyond the context of temporary disarmament in which the *Rahimi* court applied it to the new context of permanent disarmaments. 602 U.S. at 699.

disarmament power" and "avoids endorsing the sort of
freewheeling legislative power to categorically disarm that
the Second Amendment sought to eliminate."   But the
concurrence's approach leaves legislatures essentially
unfettered discretion to categorically disarm for life anyone
who has committed some crime (and who hasn't?) by using
the eminently manipulable "felony" label.      As the
concurrence acknowledges, there are few limits on what
conduct a legislature could designate a felony. So at the end
of the day, the concurrence would still "give[] legislatures
unreviewable power to manipulate the Second Amendment
[just] by choosing a label." *Id.* at 228 (quoting *Folajtar*, 980
F.3d at 912 (Bibas, J., dissenting)).

And while at first blush the concurrence's serpentine
approach may seem to be a handy way to justify disarming
all felons—but only felons—on closer inspection it
unfortunately isn't as constrained as it first appears. If, as
the  concurrence  posits,  the  "legislative  categorical
disarmament power" can apply to any "historically based
classes of persons who could be subjected to equivalent or
greater disabilities," then it is not just felons who would be
affected.   While the concurrence would rely on "*other*
provisions of the Constitution" to cabin its approach, other
large groups besides felons still fall in the gap. Legislatures
at the founding punished—including with death or lengthy
imprisonment—those who engaged in conduct that the
founding generation deemed to be sexually immoral or
deviant, a tradition of disarmament that could presumably
extend to the massive part of society today who engage or

USA v. DUARTE                    125

have engaged in similar conduct.**27**    Legislatures at the
founding also allowed for the indefinite imprisonment of
delinquent debtors in debtor's prisons, a tradition that one
could expect to allow for disarming the bankrupt or insolvent
today.**28** The sexually immoral and debtors at the founding
certainly were "subjected to legal disabilities that were
equivalent to, or more severe than," disarmament.    If
legislatures today can disarm those who fall in even just
these two "historically based" categories, a large number of
Americans beyond just "felons" could be disarmed under the
concurrence's approach.**29** And I'm sure if we tried we could
think of more groups.

---

[27] *See, e.g.*, An Act Against, and For The Punishment of, Adultery, *in
Acts and Laws of the State of Connecticut in America, supra*, at 30–31;
Martin J. Siegel, *For Better or for Worse: Adultery, Crime & the
Constitution*, 30 J. Fam. L. 45, 48 (1992) (discussing the prevalence of
colonial laws prohibiting adultery and sex outside of wedlock);
*Lawrence v. Texas*, 539 U.S. 558, 597 (2003) (Scalia, J., dissenting)
(noting that there are "records of 20 sodomy prosecutions and 4
executions during the colonial period" (citing Jonathan Katz,
*Gay/Lesbian Almanac* 29, 58, 663 (1983))).

[28] *See* Bruce H. Mann, *Republic of Debtors: Bankruptcy in the Age of
American Independence* 81 (2002); *see also generally* Charles Dickens,
*Little Dorrit* (London, G.L. Wright 1857).

[29] *See, e.g.*, Bankruptcy Filing Statistics, United States Courts,
https://www.uscourts.gov/data-news/reports/statistical-
reports/bankruptcy-filings-statistics (last visited April 21, 2025);
Lindsay T. Labrecque & Mark A. Whisman, *Attitudes Toward and
Prevalence of Extramarital Sex and Descriptions of Extramarital
Partners in The 21st Century*, 31 J. Family Psych. 952, 952–57 (2017);
Lawrence B. Fine, *Trends in Premarital Sex in The United States,
1954-2003*, Pub. Health Rep., Jan.–Feb. 2007, at 76 (noting that
"[a]lmost all individuals of both sexes have intercourse before

Now you might think that judges and state legislatures
out here on the left coast would never, ever rely on historical
laws punishing sexual conduct and impoverishment to
justify modern disarmament. If so, you would be wrong.
Our court has repeatedly made sufficiently clear that when it
comes to justifying disarmament, *any* stick will do to beat a
dog—even the ugliest stick. One need look no further than
this very case, where the majority and the government (and
the concurrence) justify disarming non-violent felons by
relying on racially and religiously discriminatory laws.
Notwithstanding the majority's professed displeasure with
such discriminatory laws, this displeasure apparently takes a
back seat to their "demonstrated dislike of things that go
bang." *See Mai*, 974 F.3d at 1097 (VanDyke, J., dissental).
Similarly, while the State of Washington and a majority of
this court professed tears of sympathy for the plight of the
mentally ill and insisted that they didn't really believe that
once mentally ill, always so, *see Mai*, 952 F.3d at 1121, that
didn't stop them from justifying permanent disarmament
based on exactly that notion, *see Mai*, 974 F.3d at 1098
(VanDyke, J., dissental). Just as our court does with race
and religion here, and did with mental illness in *Mai*, when
presented with a choice between modern sexual mores and
views about the poor, or effectuating a broader disarmament,
the safe bet is that our court would pursue the latter. The
concurrence's approach, while an admirable attempt to limit
our court's discretion to broadly disarm groups other than all

marrying"); Jeffrey M. Jones, *LGBTQ+ Identification in U.S. Now at 7.6%*, GALLUP (Mar. 13, 2024), https://news.gallup.com/poll/611864/lgbtq-identification.aspx (noting that "7.6% of U.S. adults now identify[] as lesbian, gay, bisexual, transgender, queer or some other sexual orientation besides heterosexual").

felons, would still leave ample avenues to get to much of the same result as the "legislatures-can-ban-whomever-they-want" principle adopted by the majority today. I give the concurrence an "A" for effort, but ultimately the same failing grade as the majority for its slightly different but equally flawed approach.

## IV. Conclusion

It's worth reiterating at this point how unnecessary it was for the majority to reach the merits of Duarte's Second Amendment claim in this case. If forced to decide whether to apply the plain error or de novo standard of review, I would easily predict that a majority of this en banc panel would apply plain error. But in its zeal to reach and broadly deny Duarte's Second Amendment claim on the merits, the majority is happy to simply assume de novo review. That allows it to announce the broadest of holdings, giving legislatures effectively unconstrained authority to disarm entire swaths of our citizenry. Once again we demonstrate our court's deep-seated prejudice against a fundamental constitutional right, and I must respectfully dissent.